1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
MLADEN MILJAS,                :
                             :
       Plaintiff,            :
                             :
vs.                          :      Case No. 4:20-cv-320
                             :
GREG COHEN PROMOTIONS,       :   <u>EVIDENTIARY HEARING ON MOTION</u>
LLC and GREG COHEN,          :     <u>FOR PRELIMINARY INJUNCTION</u>
                             :
       Defendants.           :
- - - - - - - - - - - - - X

                             Courtroom 145, First Floor
                             U.S. Courthouse
                             123 East Walnut Street
                             Des Moines, Iowa
                             Friday, April 9, 2021
                             1:32 p.m.

BEFORE:  THE HONORABLE STEPHANIE M. ROSE

APPEARANCES:

For the Plaintiff:        MICHAEL A. DEE, ESQ.
                          THOMAS D. STORY, ESQ.
                          Brown Winick Law Firm
                          666 Grand Avenue, Suite 2000
                          Des Moines, Iowa  50309


For the Defendants:       DAVID A. SCHRADER, ESQ.
                          Paykin, Krieg & Addams LLP
                          10 Grand Central
                          155 East 44th Street, 6th Floor
                          New York, New York  10017

                          TIMOTHY N. LILLWITZ, ESQ.
                          Bradshaw, Fowler, Proctor & Fairgrave
                          801 Grand Avenue, Suite 3700
                          Des Moines, Iowa  50309

                 TONYA R. GERKE, CSR, RDR, CRR
                    United States Courthouse
              123 East Walnut Street, Room 197
                   Des Moines, Iowa 50309

1       P R O C E E D I N G S

2            THE COURT:  Thank you.  You can be seated.  We are

3    here in the matter of Mladen Miljas versus Greg Cohen

4    Productions and Greg Cohen.  It's Case Number 4:20-cv-320.

5    Joining us on behalf of the plaintiffs, we have Mr. Miljas as

6    well as his attorneys, Thomas Story and Mike Dee.  Joining us on

7    behalf of the defendants, we have Michael [sic] Cohen, as well

8    as his attorneys, Tim Lillwitz and David Schrader.  Also present

9    in the courtroom is Steven Heid, who I understand to be

10   Mr. Miljas's manager.

11           We are here for purposes of a preliminary injunction

12   evidentiary hearing regarding essentially the plaintiff's desire

13   to have a ruling that he is no longer part of the promotional

14   agreement that he signed with Greg Cohen Promotions, essentially

15   allowing him to operate as a free agent until this case is fully

16   resolved.

17           Before we get started with testimony, I had a handful

18   of questions just to help me track some of these documents, and

19   I wanted to address the plaintiff 's sur-reply in this case as

20   well.  When we last had our hearing, we adjourned to allow the

21   defendants to produce some documents that they had referenced in

22   an earlier filing.  In the plaintiff's sur-reply, which is found

23   at docket 28, they have raised concerns that the defendants did

24   not produce the documents that were supposed to be produced and

25   instead produced numerous documents that had not been part of

1   the scope of what my order had previously been.  I wanted to get

2   some clarity with respect to that matter.

3          On behalf of Mr. Cohen, who would be the most

4   responsive attorney for me to talk to on this topic?

5          MR. SCHRADER:  Your Honor, I think you have some of

6   the names wrong.  Greg Cohen is the client.  You have Michael

7   Cohen listed as an attorney, but there isn't an attorney who's

8   Cohen.  I'm David Schrader.  I'll introduce myself --

9          THE COURT:  Okay.

10         MR. SCHRADER:  -- and I'll be representing this side

11  of the case.

12         THE COURT:  Sorry for that.

13         MR. SCHRADER:  No problem.

14         THE COURT:  Good -- it should be Greg Cohen

15  throughout, so I apologize if I have been calling him Mike.

16  Mr. Schrader, I know you were on the phone during our last

17  telephone -- or during our last hearing because you were

18  traveling obviously here from the east coast.

19         Go ahead, Mr. Schrader.  You're the person I should be

20  speaking to with respect to the sur-reply that was filed?

21         MR. SCHRADER:  Sure, Your Honor.  At the telephonic

22  conference that we had, Your Honor flagged that there were

23  various discovery -- or differences in testimony between the two

24  sides and that Your Honor needed to resolve those.  You gave us

25  leave to put in additional documents that showed the backup for

1  the different fights that were offered and the various

2  contentions that Mr. Cohen had raised in his initial affidavit,

3  so what we basically did was we tracked chronologically all of

4  the fights.  We put in all of the documents that pertained to

5  those to show that they existed, because there was some dispute

6  as to whether these fights had been offered, whether they

7  existed, and the -- the plaintiffs had an opportunity to respond

8  to it, so I'm not really sure what the complaint would be.

9  We've now put before the Court all of the various documents that

10 we have that show the paperwork behind the different fights that

11 were offered.

12        THE COURT:  Okay.  So the documents that have been

13 provided to the Court at this point are all of the documentation

14 that Mr. Cohen has about the matters relevant to whether bouts

15 were scheduled or not.

16        MR. SCHRADER:  Yes, we believe so, Your Honor.

17        THE COURT:  Or offered or not.

18        MR. SCHRADER:  Yes.

19        THE COURT:  Okay.

20        MR. SCHRADER:  With one caveat, those are documents in

21 his possession.  There may be additional documents in possession

22 of other people that we don't have in our files, but he's

23 produced everything within his possession, custody, and control.

24        THE COURT:  And that includes obtaining documents from

25 people like Mr. Heid, Mr. Muhammad; correct?  Because I saw

1   forwards in 2021 from those individuals to Mr. Cohen.

2   MR. SCHRADER:  So they're not people that work for or

3   are affiliated with Greg -- I'll call it GCP, Greg Cohen

4   Promotions.  Mr. Heid is here to testify.  We don't have his

5   file.  Muhammad was a trainer, so whatever communications he had

6   with Mr. Cohen are in our files, but whatever communications

7   Mr. Muhammad had with the plaintiff, we don't have access to

8   those.

9   THE COURT:  Okay.  So Mr. Heid does not have with him

10  any documents beyond what has been produced to the Court that

11  supports his testimony?

12  MR. SCHRADER:  That is correct, Your Honor.  So I

13  think -- I think you have the full scope of what's available to

14  us at this time.

15  THE COURT:  Does not have or does not have with him

16  those documents?

17  MR. SCHRADER:  I think, Your Honor -- if you want,

18  I'll ask him, or you can ask him when he's on the witness stand,

19  either way.  Whatever the Court prefers.

20  THE COURT:  Okay.  I'll swing back to that as well

21  then.

22  Who is Michele Cohen?

23  MR. SCHRADER:  That's Mr. Greg Cohen's wife.

24  THE COURT:  Is she an attorney?

25  MR. SCHRADER:  No.

1          THE COURT:  Why is she signing documents as an

2  attorney in this case?

3          MR. SCHRADER:  She has a power of attorney.  She's not

4  an attorney.

5          THE COURT:  She signed it as an attorney, not power of

6  attorney.  She signed a document as the attorney.

7          MR. SCHRADER:  I don't know which document Your

8  Honor's referring to.

9          THE COURT:  Let me point you to it.  It's filed at

10  27-5.  It is your Exhibit 25.  It's page 43 of 43 at 27-5.  It

11  is the purported response from Greg Cohen to the allegation of

12  the breach, and it is signed by Michele Cohen, attorney in fact,

13  for Greg Cohen.

14          MR. SCHRADER:  Your Honor, Mr. Cohen understands that

15  to be the way that you sign with a power of attorney in New York

16  and New Jersey.  It's not intended that she's a lawyer.

17          THE COURT:  And why did this come with a cover sheet

18  from a law firm if she's not a lawyer?  Is the cover sheet not

19  supposed to be attached to this document?

20          MR. SCHRADER:  No.  The -- Baruch Gottesman was the

21  law firm that represented GCP, and they transmitted under a

22  transmittal cover a letter that's on GCP stationery that's

23  signed by Michele Cohen.  She signed it on GCP corporate

24  letterhead.

25          THE COURT:  Do we have any evidence that they actually

1  transmitted this other than this cover sheet which is blank as

2  far as a transmittal goes.

3          MR. SCHRADER:  I'm sure there is, but it's not

4  attached as an exhibit.  My client informs me that it was sent

5  in multiple fashions, certified, Fed Ex, and there are multiple

6  confirmations.

7          THE COURT:  But we don't have any of those.

8          MR. SCHRADER:  We don't have any of them, but if the

9  Court thought it was important for us to subsequently submit

10 them, we can do that.

11         THE COURT:  Well, that's what this round of exhibits

12 was to do.

13         MR. SCHRADER:  I understand, Your Honor.  I'm just --

14         THE COURT:  Okay.

15         MR. SCHRADER:  -- doing the best I can do with that

16 information.

17         THE COURT:  Okay.  On behalf of the plaintiff, can you

18 tell me what his e-mail was during the relevant periods of time

19 here?

20         MR. DEE:  Mladen_Miljas@outlook.com.

21         THE COURT:  Okay.  There are a number of documents

22 that are purportedly sent from Mr. Cohen to Mr. Miljas at other

23 e-mail addresses that are not that one.  These are some of the

24 same documents that Mr. Miljas or Miljas says he never received.

25 So that is a line of questioning I would like the parties to

1    address.  And in particular here, I'm looking at, for instance,

2    Exhibit 19, Exhibit 20, Exhibit 21, Exhibit 22.  Now, Exhibit 22

3    is the third e-mail address that is used by Greg Cohen

4    Promotions to provide and reach Mr. Miljas, and it's the first

5    time we see any kind of response from Mr. Miljas to Greg Cohen,

6    and that doesn't happen until June of 2020.  The other e-mails

7    that were sent -- so I'm looking here at Exhibit 21, for

8    instance, went to an e-mail address MladenMiljas, with no --

9    nothing between those names, @gmail.com, and then there was an

10   exchange earlier that went to -- there's a Gmail.  There's an

11   Outlook, and there's a third one.  Let me see if I can find the

12   third one.

13          MR. SCHRADER:  Your Honor, if I might.  Each of the

14   exhibits that you've referenced appear to be e-mails from Steven

15   Heid to Mladen Miljas, not from Greg Cohen Promotions.

16          THE COURT:  Not exactly.  Because, for instance, if

17   you look at Exhibit 19, Mr. Heid specifically tells Mr. Cohen

18   that the e-mail he just sent won't go through because that's not

19   his e-mail address, but yet you or your client continues to use

20   that bad e-mail address to purportedly send documents to

21   Mr. Miljas.  So there's a disconnect somewhere here.  I'm just

22   trying to figure out what it is.  And so that is something that

23   needs, in my view, to be explored between the parties because if

24   these weren't, in fact, sent to the right e-mail address, we may

25   have our answer as to why one person says they were sent and one

9

1  person says they were never received, and then we need to peel

2  back why an inaccurate address is being used.

3       Another question I wanted the parties to address is

4  that in the immigration information that is listed, the

5  immigration lawyer asks the parties to produce -- and this is

6  Exhibit 14, so we're at docket 24 -- I'm sorry -- 27-4, and

7  we're on page 38 of 41, and this is Frank Ronzio writing to Greg

8  Cohen.  He says that he wants, in number 3 here, a new

9  promotional contract between your Boxing Promotions and your

10  boxer, and I know a visa is later granted the following month

11  for Mr. Miljas.  Is there a new promotional contract somewhere

12  that I should be looking at?  And if so, where is that?

13       So I also don't have a signed version of the

14  promotional contract that was purportedly entered into between

15  these folks.  Is there a signed one that exists somewhere?

16       MR. DEE:  Your Honor, we only have -- and my client

17  only has the --

18       MR. STORY:  You have the --

19       MR. DEE:  Both the Exhibit A, Your Honor, document

20  7-1, on the final page -- the final page, page 12 of 12 has

21  Mr. Miljas's signature on it.

22       THE COURT:  Okay.

23       MR. DEE:  I don't know that we are in possession of

24  one with Mr. Cohen's signature.  I don't know, however, that

25  there's a dispute that --

1          THE COURT:  That there's a signed version somewhere?

2          MR. DEE:  -- there's a signed version somewhere.

3    Right?

4          THE COURT:  And there -- there isn't any allegation

5    here, I assume, that these documents exist somewhere else.  In

6    other words, I know there was this criminal investigation that

7    was done.  I know Mr. Cohen was convicted and sentenced for a

8    fraud case out of New Jersey, and his sentencing happened in

9    late 2019, and he went to prison in 2020.  I assume there's no

10   allegation here that documents relevant to this case were seized

11   in connection with that investigation or something; correct?

12         MR. SCHRADER:  That is correct, Your Honor.  The

13   criminal matter was completely unrelated to the boxing industry.

14         THE COURT:  Okay.  And Mr. Cohen is not now in

15   bankruptcy; correct?

16         MR. SCHRADER:  That is correct, Your Honor.

17         THE COURT:  Okay.  And has not been at any point

18   since -- since this contract was entered into?

19         MR. COHEN:  That's correct, Your Honor.

20         THE COURT:  All right.  With those concerns flagged

21   for the parties, we're ready to start taking some testimony.

22   Plaintiff bears the burden here of establishing the need for a

23   preliminary injunction.  You may call your witnesses.

24         MR. DEE:  Your Honor, I have one other matter to raise

25   before calling the first witness.

1          THE COURT:  Go ahead.

2          MR. DEE:  Mr. Heid, who I think Mr. Schrader just

3   identified, is not a party to this case is in the courtroom.  I

4   would ask for sequestration, that he wait outside until he is

5   called.

6          THE COURT:  Agreed.

7          Mr. Heid, if you'll step out until you're called and

8   not communicate with anyone about the substance of any testimony

9   that may be provided.  Thank you.

10          Go ahead, Mr. Dee.

11          MR. DEE:  We'd call Mladen Miljas, Your Honor.

12          THE COURT:  Mr. Miljas.

13          THE CLERK:  Please raise your right hand.

14           MLADEN MILJAS, PLAINTIFF'S WITNESS, SWORN

15          THE CLERK:  Thank you.  Please have a seat.

16          MR. SCHRADER:  Your Honor, just to speed things up, I

17   just wanted to clarify that any documents that are already

18   exhibits don't need to be moved into evidence in the hearing.

19   Is that --

20          THE COURT:  As long as both parties agree to that,

21   I'll assume that anything submitted by the parties has been

22   admitted, although foundations can be certainly discussed and

23   other things of that nature.

24          MR. DEE:  Agreed.  We were under the assumption too

25   that exhibits that both sides have filed were actually already

1   part of the record.

2           THE COURT:  I'll also say just in the hopes that it

3   will help the parties focus here, the only calendar year in my

4   view in which we have a full calendar year to examine whether

5   the four bouts that are required under the terms of the contract

6   were scheduled is 2019.  There does not appear to be any dispute

7   that there were three bouts in 2019 that Mr. Miljas fought and

8   that the fighting issue remains in this case then whether or not

9   a fourth opportunity was ever offered in 2019 after that third

10  bout, which was on August 9th of 2019 against Aaron Chavers --

11  or I don't know if that's how he pronounces his name, but

12  Mr. Chavers, and so for purposes of focusing here, I know there

13  was a lot of background between the parties in 2018.  A lot has

14  happened in 2020 and 2021, but I am mostly focused on whether

15  there was an offer for a fourth bout at some point after

16  August 9th of 2019, whether it was known to Mr. Miljas, whether

17  he refused the bout or bouts, and whether that refusal was

18  reasonable on his part given whatever the circumstances may be.

19  So if that helps focus testimony, that's where I'm focusing my

20  attention at this time.

21          Go ahead, Mr. Dee.

22          MR. DEE:  Yeah.  For clarification on that.  So the

23  Court is not interested in whether or not any fights took place,

24  whether four in 2018 or prorated for the second half of 2018

25  when the contract was signed in June?

1          THE COURT:  I think in my -- those all may be relevant

2   to the greater dispute at hand here, but for my purposes, what

3   I'm looking at is calendar year 2019, were there four bouts?

4          MR. DEE:  So, I mean, in other words -- I guess it's

5   really not disputed, there was really only one fight in 2018.

6          THE COURT:  That was my understanding as well.

7          MR. DEE:  And there were none in 2020.

8          THE COURT:  I understood that as well.  Correct.

9          MR. DEE:  Okay.

10          THE COURT:  And as far as I know, March 11th of 2020

11   is the first written communication Mr. Miljas makes to Greg

12   Cohen Promotions saying you're in breach; I want a cure or I'm

13   out, in summary fashion.

14          MR. DEE:  Uh-huh.

15          THE COURT:  Is that the earliest known date of a

16   written conferral of that breach?

17          MR. DEE:  To my knowledge.

18          THE COURT:  Okay.  So although it may be relevant at

19   later stages, right now I'm focused really on what happened

20   after August 9th of 2019 up to basically March 11th of 2020, if

21   that makes sense.

22          MR. DEE:  It does.  I mean, at the risk of -- I need

23   to ask another question just for the Court's --

24          THE COURT:  Go ahead.

25          MR. DEE:  Because, you know, one of our other claims

14

1  here is that the fights that did take place were not -- did not

2  comply with section 3 about being adequate to his experience,

3  ranking, stature, et cetera.

4          THE COURT:  And certainly you can focus on that.  I

5  think that's the weaker claim for me to resolve at this stage.

6  I think those are definitely issues that warrant attention from

7  a trier of fact in my view, but those are a more subjective

8  issue than whether there were these four bouts, and I don't know

9  that we have adequately briefed and given the time necessary to

10  address reasonableness nor that we really could without full

11  discovery and a lot of other issues that just don't dovetail

12  well with a preliminary injunction, if that makes sense to you.

13          MR. DEE:  It does, and I -- with the Court's

14  permission, I may still at least touch on them, but I -- I

15  understand where your focus is.

16          THE COURT:  Okay.  Go ahead.

17          MR. DEE:  All right.

18                    DIRECT EXAMINATION

19  BY MR. DEE:

20  Q.  All right.  Mr. Miljas, can you state your name for the

21  record and spell your last name?

22  A.  My name is Mladen Miljas, last name M-i-l-j-a-s.

23          MR. DEE:  And I -- Your Honor, I think with the

24  surroundings here with the Plexiglas, is he okay to take his

25  mask off?

1      THE COURT:  You are.  Thank you.  I should have

2  notified you of that.  Can you pronounce your last name for me

3  again?

4      THE WITNESS:  Miljas.

5      THE COURT:  Miljas.

6      THE WITNESS:  Yes.

7      THE COURT:  Okay.  I'll try and get that right.

8      Go ahead, Mr. Dee.

9      MR. DEE:  Thank you, Your Honor.

10 Q.  Mr. Miljas, how old are you?

11 A.  28 years old.

12 Q.  And where do you live?

13 A.  Toronto, Ontario, Canada.

14 Q.  And what's your profession?

15 A.  Professional boxing.

16 Q.  How long have you been boxing?

17 A.  I've been boxing for 10 years, professional for 5.

18 Q.  So roughly 2016 you turned pro?

19 A.  Correct.

20 Q.  What is your professional record?

21 A.  12 wins, 0 losses, 12 knockouts.

22 Q.  Okay.  And in the five years, did you obtain a title -- any

23 titles?

24 A.  Yes, the Canadian heavyweight title.

25 Q.  And when did you obtain that?

1   A.   December 1st, 2017.

2   Q.   And do you still have that title?

3   A.   No.

4   Q.   Why not?

5   A.   It was stripped off of me.

6   Q.   Why?

7   A.   Because I never defended the title at home, and when I

8   fought outside of the country, I fought low-level opposition.

9   Q.   So the Canadian Boxing Federation didn't recognize the

10   fights you had in 2018 and '19 as being high-enough quality to

11   defend your heavyweight title?

12   A.   That's correct.

13   Q.   And you were stripped of that title.  Do you recall the

14   date?

15   A.   I believe maybe June 2018.

16   Q.   How about --

17   A.   2019.

18           MR. DEE:  For the record, I don't think there's any

19   dispute about this.  July 5th of 2019, and, Your Honor, that

20   would -- for the record, that's listed in Exhibit O, which we

21   filed yesterday.

22           THE COURT:  Thank you.

23   Q.   Okay.  And that -- and there's a listing in BoxRec in

24   Exhibit O that indicates that you had zero title defenses;

25   correct?

1   A.   Correct.

2   Q.   But you had had three fights between -- during the time you

3   were the heavyweight champion; correct?

4   A.   Correct.

5   Q.   Why -- why -- do you know why it would show zero title

6   defenses when you actually had three fights between December of

7   '17 and July of '19?

8   A.   Yes.  As an example, there's a prior champion named George

9   Chuvalo, who is very well-known in Canadian boxing, and he also

10  fought outside of Canada and had zero title defenses, but he

11  fought Joe Frazier and George Foreman over here in the United

12  States.  Even though he lost those bouts, he maintained the

13  title because of the quality of those opponents.

14          THE COURT:  Can you spell George Chuvalo for me?

15          THE WITNESS:  Sure.  George, last name is

16  C-h-u-v-a-l-o.

17          THE COURT:  Thank you.

18  Q.   When you signed your contract with Greg Cohen Promotions

19  which I'm just going to shorthand GCP, what was your rank in

20  Canada?

21  A.   I was number 2 in Canada, number 39 in the world.

22  Q.   Okay.  And when you terminated your contract with Mr. Cohen

23  in the spring of 2020, what was your rank in Canada?

24  A.   Number 6 in Canada, number 105 in the world.

25  Q.   Each of the fights that you had while you were the

1    heavyweight champion were fights that Mr. Cohen arranged; is

2    that correct?

3    A.   Correct.

4    Q.   Of -- so you had the -- and I'll identify them here in a

5    moment, but the fight you had in September of '18 and then

6    January 2019 and March 2019 -- we'll start with that.  Those

7    three fights, did you want to fight those guys?

8    A.   No.

9    Q.   Why -- well, first, why not?

10   A.   Because they were close to 40 years of age.  They were much

11   smaller than me, and they've been knocked out all their previous

12   fights before facing me.  I didn't feel like they were the level

13   of opposition -- it felt kind of embarrassing to be put in the

14   ring with those people.

15   Q.   Why did you fight them?

16   A.   Because I needed to earn a living and make money.

17   Q.   And at this point -- okay.  At this point in time -- what

18   level of trust at this point in time did you have in Mr. Cohen

19   in trying to get you the proper fights for your career?

20   A.   As much as I could.  I thought it was in my best interests

21   to give him all my trust and always put my best foot forward

22   because I was always hoping for the best outcome.

23   Q.   All right.  Now, you're aware -- I mean, you've read all the

24   submissions for this motion that each side has filed; right?

25   A.   Correct.

MLADEN MILJAS - DIRECT

19

1   Q.  You're aware that one of the things that Mr. Cohen -- that

2   GCP is alleging is that the communications for fights is from

3   the promoter to the manager; correct?

4   A.  Yes.  That's what he's claiming.

5   Q.  And they actually -- and they've got affidavits from

6   Mr. Heid who says the same thing.  Do you recall that?

7   A.  Correct.

8   Q.  All right.  Now, initially when you hired Mr. Cohen, who was

9   your manager?

10  A.  My father.

11  Q.  And Mr. Heid became your manager what?  Roughly a year

12  later; right?  In 2019?

13  A.  Yes.

14  Q.  Okay.  So during that roughly one year when your father was

15  your manager, did Mr. Cohen make all the fight offers to your

16  father?

17  A.  No.

18  Q.  Who did he deal with directly?

19  A.  To me directly.

20  Q.  Was your father listed publicly as your manager?

21  A.  Yes.

22  Q.  Where?

23  A.  On BoxRec.

24  Q.  And what is -- first of all, B-o-x-R-e-c.  What is BoxRec?

25  A.  BoxRec is a universal recordkeeping of professional boxing.

1   Many fighters, managers, and promoters use it to communicate

2   with each other and arrange fights and other opportunities.

3   Q.   And actually Mr. Cohen's listed on BoxRec as a promoter;

4   right?

5   A.   Right.

6   Q.   Mr. Heid is listed as a manager?

7   A.   Currently he's listed as my manager, correct.

8   Q.   Now, during this time, was your father receiving offers from

9   others for you to fight?

10  A.   Yes.

11  Q.   And what did he do with those offers that he would receive?

12  A.   He would instruct those people to contact Greg Cohen

13  Promotions.  He would give all of his contact information.

14  Q.   So the -- the testimony that's been submitted with

15  affidavits from the defendants that all the communications for

16  fight offers always go from promoter to manager --

17          MR. SCHRADER:  Objection as to form.  Your Honor, I've

18  been really trying not to intervene, but that is so leading

19  as -- that it seems over the line.

20          THE COURT:  Sustained.  Can you rephrase?

21  Q.   Is the testimony that's been submitted by the defendants

22  that communications are always from the promoter to the fighter

23  [sic], and, therefore, the fighter wouldn't necessarily have

24  paperwork or see anything -- in your experience when your father

25  was your manager, was that the case?

1   A.   No.

2   Q.   It was only the case when Mr. Heid became your manager?

3   A.   Correct.

4   Q.   All right.  When Mr. Cohen did make fight offers to you

5   during that first year when your father was still your manager,

6   what information would he provide to you about the fight?

7   A.   He would give me the opponent, the date and the venue, but

8   he would --

9   Q.   And -- go ahead.  I'm sorry.

10  A.   -- but he would never provide the purse amount.

11  Q.   Okay.  So the first fight you had was in September of 2018

12  against Travis Fulton; correct?

13  A.   Correct.

14  Q.   What was his record?

15  A.   Roughly 20-something wins, over 40 losses.

16  Q.   All right.  How old was he roughly?

17  A.   42 years old.

18  Q.   And what was the result of the fight?

19  A.   First round knockout.

20  Q.   By you, of course?

21  A.   By me, yes.

22  Q.   Okay.  The next fight was about four months later, in

23  January -- on January 18th of 2019; correct?

24  A.   Correct.

25  Q.   And that was against Wayman Carter?

MLADEN MILJAS - DIRECT

22

1  A.  Correct.

2  Q.  What was his record?

3  A.  3 wins, 3 losses.

4  Q.  And do you know what his age was?

5  A.  Late 30s.

6  Q.  And what was the result of that fight?

7  A.  I won by first round knockout.

8  Q.  Okay.  And then the third fight was in -- March 2nd of 2019

9  against Matthew Greer; correct?

10  A.  Correct.

11  Q.  What was his record?

12  A.  Roughly 11 wins, 16 losses.

13  Q.  And do you know how old he was when you fought him?

14  A.  41.

15  Q.  And what was the result of that fight?

16  A.  I won by second round knockout.

17  Q.  Okay.  And then with -- shortly after that, in July of 2019,

18  what happened to your heavyweight title in Canada?

19  A.  It was stripped off of me.

20  Q.  Okay.  Now, during these approximately nine months from the

21  time you signed the contract with GCP in June of 2018 and you

22  had your third fight with Mr. Greer, what, if anything, were you

23  asking Mr. Cohen about the quality of your opponents?

24  A.  Well, even from the first fight, which I think is shown in

25  the exhibits, I said yes to all of the opponents that he offered

MLADEN MILJAS - DIRECT

23

1   me, but I also asked if there were others, better opponents.  So

2   throughout the time, I was always asking if there was better

3   options for opponents presented.

4   Q.   And how did he respond?

5   A.   He told me to be patient, that he was working on it.

6   Q.   Bottom line then, Mr. Miljas, what was the result of the

7   quality of the fights that Greg Cohen Promotions scheduled for

8   you in September of '18 and January and March of '19?

9   A.   In my opinion, they really damaged my reputation and also

10  lowered my ranking both worldwide and in Canada.

11  Q.   And what happened to your title in Canada?

12  A.   It was stripped off of me.

13  Q.   During the first year of the contract, from June '18 to June

14  '19, were there any times when Mr. Cohen said he had fights

15  scheduled for you that did not occur?

16  A.   Yes, numerous times.

17  Q.   Can you just give a general description of -- of those

18  events for the Court?

19  A.   So I would ask him when I would be fighting, and he would

20  usually give me three to four dates, and none of those dates

21  would come to fruition or happen.

22  Q.   Now, there were -- were there times when there were actual

23  specific fights, opponents, and dates that he proposed?

24  A.   Yes.

25  Q.   And that did not happen?

MLADEN MILJAS - DIRECT

24

1    A.   Yes.

2    Q.   And were there other times when it was -- when it was more

3    vague?

4    A.   Yes.

5    Q.   What -- describe the situation what I would call as being

6    more vague.

7    A.   So one example, prior to my first fight in September of

8    2018, I was offered to fight an opponent named Richard Carmack

9    in August, and I was told the week of the fight that the

10   opponent had pulled out due to injury, and I was assured by

11   Mr. Cohen that he would be suspended by the commission and

12   unable to fight again.  Through my own research, I found that

13   that same opponent fought a week later on another show.

14   Q.   Do you recall a fight offer you received for a guy named

15   Nathan Gorman?

16   A.   Yes.

17   Q.   Who is Nathan Gorman?

18   A.   Nathan Gorman at one time was the British and Commonwealth

19   champion.

20   Q.   What is the Commonwealth?  What is the British and

21   Commonwealth champion?

22   A.   So in regards to Canada, being Canadian champion, you're

23   only champion of one country.  Commonwealth champion is all the

24   Commonwealth countries, which consisted of over 30 countries, so

25   if you have a commonwealth belt, that usually gets you a top 10

MLADEN MILJAS - DIRECT

25

1  ranking in the world.  It's a higher belt -- much higher belt.

2        THE COURT:  I'm sorry.  Can you spell Gorman for me?

3        THE WITNESS:  G-o-r-m-a-n.

4        THE COURT:  Thank you.

5  Q.  And when approximately did this offer come in?

6  A.  Sometime in 2018.

7  Q.  Okay.  And did it come in through Mr. Cohen or in another

8  way?

9  A.  It came to my father, Mr. Miljas.

10  Q.  As your manager?

11  A.  As my manager, yes.

12  Q.  And what -- what did he say in response to this offer -- or

13  excuse me.  What did he do in response to this offer?

14  A.  My father informed them that Greg Cohen Promotions is my

15  manager and gave him all of my contact information to contact

16  him in regards to the fight.

17  Q.  So, to be clear, your understanding was that this was a --

18  this was a title fight for the Commonwealth belt.

19  A.  Yes, correct.

20  Q.  Okay.  And did that fight -- once the information was

21  relayed to Mr. Cohen, did the fight ever proceed?

22  A.  I never heard of it after that.

23  Q.  And then in April of 2019, you hired Mr. Heid as your

24  manager; correct?

25  A.  Correct.

1   Q.   How did you find Mr. Heid?

2   A.   Through Mr. Cohen's recommendation.

3   Q.   And why did you -- why did you hire him?  Why didn't you

4   keep using your dad?

5   A.   Well, at the time I was training at home, and my coach had

6   been incarcerated through some of his own personal problems, and

7   I had gone to two fights without a coach, and Mr. Cohen became

8   concerned of this and offered that a manager that he knew named

9   Steven Heid could move me to Las Vegas and get me

10  top-of-the-world training to better my career.

11  Q.   And so you proceeded to hire him as your manager; correct?

12  A.   Correct.

13  Q.   And signed a contract with him?

14  A.   Correct.

15  Q.   All right.  And then in April of '19, did you move?

16  A.   Yes.

17  Q.   Where had you been living?

18  A.   Toronto, Ontario, Canada.

19  Q.   And where did you move to?

20  A.   Las Vegas, Nevada, the United States.

21  Q.   Why did you move there?

22  A.   I moved there full time for my boxing career.

23  Q.   And were you then going to have a trainer there?

24  A.   Yes.

25  Q.   And that was going to be who?

MLADEN MILJAS - DIRECT

27

1  A.  Eddie Mustafa Muhammad.  Mr. Muhammad.

2          MR. DEE:  Mustafa is M-u-s-t-a-f-a.  Muhammad is

3  M-u-h-a-m-m, I believe, a-d.

4          THE COURT:  Thank you.

5  Q.  Now, paragraph 23 of Mr. Cohen's February 11th, '21,

6  declaration states that you were traveling back and forth

7  between Vegas and Canada and didn't move to Las Vegas full time

8  in July of 2019.  Is that a true statement in his affidavit?

9  A.  No.  That's incorrect.

10  Q.  He says one of the reasons -- he says that is one of the

11  reasons that he did not schedule a fight for you until August of

12  '19.  First of all, are you aware that he's testified to that

13  effect?

14  A.  I'm aware he's claiming that, yes.

15  Q.  And when you moved to Las Vegas in April of 2019, did you

16  stay?

17  A.  Yes.

18  Q.  Did you ever leave Las Vegas or the United States?

19  A.  No.

20  Q.  Until October?

21  A.  Until October 2019.

22  Q.  You did have a fight in Minnesota in August; correct?

23  A.  Yes, yes.

24  Q.  Did you leave Las Vegas at any other time between April and

25  October of 2019 other than that fight in Minnesota?

MLADEN MILJAS - DIRECT

28

1   A.   No.

2   Q.   And then you returned to Canada in October; correct?

3   A.   Correct.

4   Q.   Now, you've seen this too, and the record is replete with

5   all sorts of texts while you were in Las Vegas between yourself

6   and Mr. Cohen essentially saying how happy you are with the

7   situation and the training.  Are you aware of those?

8   A.   Yes.

9           MR. DEE:  For the record, Your Honor, Exhibits 2, 3,

10  4, and 6.

11  Q.   Now, in the early days that you moved there in April, was

12  Mr. Muhammad there full time available to train you?

13  A.   The first week he was absent in Japan for a press

14  conference, but when he arrived back, every single day I was in

15  the gym with him.

16  Q.   Okay.  And then at some point he went back to Japan for

17  another fighter's fight; correct?

18  A.   Correct.

19  Q.   And then when he got back from Japan, how was the -- how was

20  his work schedule with you and the training schedule?

21  A.   We resumed as normal.  Back to five days a week training

22  boxing, and every Saturday we'd run the mountains in Las Vegas.

23  Q.   And did that remain the same throughout the time you were

24  there until October?

25  A.   No.

1  Q.  When did it change?

2  A.  After my fight in August.

3  Q.  Okay.  And what happened then?

4  A.  Mr. Muhammad didn't make it to the gym so often, and we

5  stopped running the mountains -- well, I continued to on my own,

6  but he stopped taking me.

7  Q.  And when you say he wasn't there as often, what -- I mean,

8  give the Court an example of --

9  A.  He was there approximately three times a week.  On the way

10  to the gym, I would receive text messages that he was either

11  sick or he had appointments -- doctor's appointments.

12  Q.  And so this was really just in the final month that you were

13  in Las Vegas.

14  A.  Correct.

15  Q.  Okay.  So let's talk now about the August fight that you did

16  have.  This was against Aaron Chavers, C-h-a-v-e-r-s; correct?

17  A.  Correct.

18  Q.  And do you recall what his record was when you fought?

19  A.  8 wins, 8 losses.

20  Q.  Okay.  But what had been the results of the -- immediately

21  previous five fights before he fought you?

22  A.  His previous five fights he all lost.  Four of them were by

23  knockout.

24  Q.  And do you know his age at the time he fought you?

25  A.  38 years old.

MLADEN MILJAS - DIRECT

30

1  Q.  And what was the result of your fight?

2  A.  First round knockout.  I won.

3  Q.  All right.  You also understand from the papers that have

4  been submitted that the defendant is saying that the reason --

5  another reason besides his claim that you were back and forth to

6  Canada and Vegas -- another reason he claims that you did not

7  get a fight between March and August of 2019 is because you and

8  Mr. Heid and Mr. Muhammad had agreed that you wouldn't fight

9  again until August.  Are you aware that they're claiming that?

10  A.  I'm aware they're claiming that.

11  Q.  Is that true?

12  A.  No, that's incorrect.

13  Q.  What was really happening during those months while you were

14  in Las Vegas training?

15  A.  From April when I landed, I was calling Mr. Cohen all those

16  months asking when would a fight be arranged for me.

17  Q.  When you arrived in April, you were about a month out from

18  your last fight that you had in March.  Did you -- at least did

19  you consider yourself to have been in shape at that point in

20  time?

21  A.  Correct.  I'm always in shape, ready to fight.

22  Q.  All right.  Now, again -- I guess the Court's sort of put

23  the universe of documents here we talked about in order.  Have

24  you seen any documents anywhere -- a text, an e-mail, a letter,

25  anything from you to Mr. Cohen, Mr. Heid, anybody saying, I do

MLADEN MILJAS - DIRECT

31

1  not want to fight because I need to train more or I agree that I

2  shouldn't be fighting for three or four months?

3  A.  No.

4  Q.  All right.  Have you ever heard Mr. Cohen or Mr. Heid or

5  Mr. Muhammad say this to you, that you -- accuse you essentially

6  of not wanting to fight in mid 2019 prior to this motion for

7  injunction being filed?

8  A.  No.

9  Q.  All right.  Now, while all of this was going on, you're

10  living in Las Vegas.  What's your understanding of your

11  immigration status at the time?

12  A.  That I have six months to stay without a visa or I must

13  return home.  If I stay past the six-month mark, I may be denied

14  entry into the United States for three to five years.

15  Q.  And how do you know this?  I mean --

16  A.  Common knowledge amongst Canadians.

17  Q.  I mean, why?

18  A.  Because we would be considered illegal here.

19  Q.  If you didn't have --

20  A.  If we didn't have proper visa and paperwork.  May I give an

21  example of previous?  I've been offered previously to go to

22  China for sparring.  I was unable to go because I didn't have a

23  visa.  So anytime that we as Canadians go to other countries,

24  especially for a long period of time, a visa or some sort of

25  paperwork is needed.

MLADEN MILJAS - DIRECT

32

1   Q.  All right.  Now, you have a written contract with Mr. Heid

2   as your manager; correct?

3   A.  Correct.

4   Q.  And for the record, that's Exhibit M, as in Michael.  And

5   under that contract, what's your understanding of who was

6   responsible for getting you the visa when you were in Las Vegas?

7   A.  Mr. Heid.

8   Q.  All right.  And was he -- and that's in section 3.3, just

9   for the record.  And then there's also a provision in that

10  contract that he's responsible for paying for the visa and other

11  immigration documents for you as well; correct?

12  A.  Correct.

13          MR. DEE:  And just, again, Your Honor, for the record

14  3.4.

15          MR. SCHRADER:  And, Your Honor, this is basically

16  counsel giving testimony.  This is not questions and -- that's

17  really not appropriate.  That's legal argument which we can all

18  talk about, and it's also not a contract that involves GCP.

19          THE COURT:  I've read the contract.  I agree that

20  Mr. Heid was responsible for getting that visa.

21          MR. DEE:  All right.

22  Q.  Did he do this?

23  A.  No.

24  Q.  All right.  So then six months comes along in October of

25  2019.  Did you have your visa?

1  A.   No.

2  Q.   What did you have to do then?

3  A.   I had to drive back home to Canada.

4  Q.   Okay.  In the long run, was Mr. Heid the one who ever got

5  you a visa?

6  A.   No.

7  Q.   Who got you the visa eventually?

8  A.   It was Mr. Cohen.

9  Q.   Okay.  And after you got the -- when did you finally get a

10  work visa for the U.S.?

11  A.   I believe sometime of November 2019.

12  Q.   All right.  And then once you got that work visa, what did

13  you do?

14  A.   I returned back to Las Vegas.

15  Q.   Okay.  And did you continue training then with Mr. Muhammad?

16  A.   No.  In January -- I arrived back in Las Vegas January 2nd.

17  The first two weeks I was back in Las Vegas, Mr. Muhammad was

18  sick in the hospital.

19  Q.   After those two weeks then, did you start training with him?

20  A.   Those two weeks I was still training in the gym, just

21  without a coach, and I continued training once he was back, but

22  then when he was back, it was very minimal because he wasn't in

23  good health.

24  Q.   All right.  Okay.  So I want to return back to the fight

25  schedule now.  In August of -- you have the August '19 -- excuse

MLADEN MILJAS - DIRECT

34

1  me.  The August 2019 Chavers fight.  At some point after that

2  fight, did you have a conversation or provide anybody, Mr. Cohen

3  or Mr. Heid, with a list of opponents you thought would be

4  appropriate?

5  A.  Yes.  I provided Mr. Heid with a couple of opponents.

6  Q.  And did any of those opponents ever get proposed to you for

7  a fight?

8  A.  No.

9  Q.  All right.  Were you told -- now, again, in August, maybe

10  early September of 2019, were you told about a possible

11  September 2019 fight?

12  A.  Yes.

13  Q.  And that -- do you remember the details of when that fight

14  was supposed to be?

15  A.  Yes.  I believe around the time of September 17th in either

16  Virginia or West Virginia against Damion Reed.

17  Q.  Okay.  And Damion Reed, what was his record at the time?

18  A.  3 wins and 20 losses.

19  Q.  And was Mr. Reed a heavyweight?

20  A.  No.  He was under heavyweight much of his career.

21  Q.  Do you know what division he was in?

22  A.  Light heavyweight, which is 175 pounds.

23  Q.  Okay.  And how much do you weigh -- at the time how much did

24  you weigh?

25  A.  250 pounds.

MLADEN MILJAS - DIRECT

1      THE COURT:  Can you spell Damion Reed for us?

2      THE WITNESS:  D-a-m-i-o-n, last name R-e-e-d.

3      THE COURT:  Thank you.

4  Q.  Did you want to fight this guy?

5  A.  No.

6  Q.  Did you ultimately agree to fight him?

7  A.  Yes.

8  Q.  Why?

9  A.  Because I hadn't made much of a living since arriving in Las

10 Vegas.  It was very difficult for me.

11 Q.  Did the fight take place?

12 A.  No.

13 Q.  What -- can you tell the Court sort of your memory of the

14 details of how it got -- or how you were notified of the

15 cancellation?

16 A.  Yes.  I had a flight early in the morning to leave for the

17 fight, and my fiancee was getting ready to drive me to the

18 airport.  I received a text message from Mr. Cohen that the

19 fight is no longer happening because something happened with my

20 opponent.

21 Q.  Okay.

22 A.  I asked Mr. Cohen what exactly happened, and he couldn't

23 give me an explanation.

24 Q.  All right.  So after you returned to Canada, you received a

25 proposal for a fight on October 19th of 2019; correct?

1  A.  Correct.

2  Q.  And who would that opponent have been?

3  A.  Named Ruann Visser.

4  Q.  Why don't you spell that for the Court.

5  A.  R-u-a-n-n, last name V-i-s-s-e-r.

6  Q.  And that was going to be in Canada; correct?

7  A.  Correct.

8  Q.  Did you accept that fight?

9  A.  No.

10  Q.  Why not?

11  A.  Because it was offered when I was already back home in

12  Canada without a coach, without proper preparation, and without

13  sparring.

14  Q.  All right.  So let's dig into this for a little bit.  Mr. --

15  what was Mr. Visser's record at the time?

16  A.  17 wins, 1 loss, with roughly 15 knockouts.

17  Q.  And how tall was he?

18  A.  6 foot, 9.

19  Q.  So this would have been, by far, the most prestigious fight

20  for you; correct?

21  A.  Yes, my hardest opponent to date.

22  Q.  So -- now, when you're preparing for a fight like this

23  that's, you know, not against these other cupcakes but a real

24  fight, what is the kind of work that you do with a trainer other

25  than getting in shape to prepare for a fight like this?

MLADEN MILJAS - DIRECT

37

1  A.  Well, normally for a high-profile fight, a fighter would

2  have 8 to 12 weeks to prepare, not just 2 weeks, and also they

3  would have their coach there to study the opponent and also

4  imitate the opponent in training, you know, in exercises like

5  sparring and other training as well.

6  Q.  So, I mean, do you do things like study film?

7  A.  Yes.

8  Q.  Do you do that with your trainer?

9  A.  Yes.

10  Q.  And then do you work -- what, if anything, is done with the

11  trainer to come up with, you know, the strategy and the tactics

12  for the fight?

13  A.  For example, if I'm fighting somebody 6 foot, 9, I would

14  have people in the gym that are of similar height so that I'm

15  used to fighting somebody that size and stature.  I wouldn't be

16  sparring or preparing with people who are only 6 feet tall.  I

17  need special preparation.

18  Q.  After the September fight against Damion Reed was canceled,

19  what were you advised by Mr. Muhammad to do with respect to your

20  training?

21  A.  Mr. Muhammad told me to take the week off from the gym

22  because I had been training so hard for that fight.

23  Q.  Okay.  So by the time you got this offer to fight Ruann

24  Visser -- again, it was how much notice before the fight were

25  you given?

1  A.  Roughly three weeks, almost three weeks.

2  Q.  And -- and at this point were you still on your week off

3  that your trainer had told you to take or not?  Were you back?

4  A.  No.  I was back home in Canada.

5  Q.  All right.  So in that time period, you took the week off

6  after the September Damion Reed fight didn't occur.  Is it -- is

7  it true you took a week off at your trainer's advice?

8  A.  No.  I didn't listen to my trainer's advice.  I kept on

9  training, but my trainer never showed up to the gym.

10  Q.  All right.

11  A.  He took the week off.

12  Q.  He being who?

13  A.  Mr. Muhammad.

14  Q.  All right.  And then also in this time period, is it -- is

15  this the time period when you moved back to Canada?

16  A.  Yeah, shortly after.

17  Q.  Because of the visa issue?

18  A.  Yes.

19  Q.  All right.  Mr. Miljas, would it have been reasonable for

20  you to fight Ruann Visser on October 19th under these

21  circumstances?

22  A.  No.

23  Q.  All right.  Have you ever turned down any other fights that

24  Mr. Cohen ever presented to you in the entire time -- the two

25  years roughly that you were under contract with him?

MLADEN MILJAS - DIRECT

39

1  A.  No.

2  Q.  Did you tell him or Mr. Heid that you did not want to fight

3  again in 2019?

4  A.  No.

5  Q.  What, in fact, were you telling these people, people who

6  were your team; right?  Your promoter, your manager?

7  A.  Yeah.

8  Q.  What were you telling them?

9  A.  I was asking to fight constantly.

10        THE COURT:  Can you clarify for me how the offer of

11  the October 19, 2019, fight with Mr. Visser was conveyed to you?

12        THE WITNESS:  Yes.  It was conveyed to me verbally

13  over the phone.  Once again, no purse amount, financial amount

14  was offered to me for the fight nor was any amount for how many

15  rounds it would be either.

16        THE COURT:  And who conveyed that to you?

17        THE WITNESS:  All three called me on a group call:

18  Mr. Cohen, Mr. Muhammad -- Mr. Muhammad and Mr. Heid.

19        THE COURT:  Okay.  So you never received any kind of

20  written offer?

21        THE WITNESS:  No.

22        THE COURT:  Thank you.

23  Q.  In one of Mr. Cohen's affidavits -- his first one, in

24  paragraph 28, he says he offered you a fight with Ruann Visser

25  again in January of '20, and you declined.  Is this true?

1   A.   That's incorrect.

2   Q.   Okay.  Were you ever again told by Mr. Cohen of an

3   opportunity to fight Mr. Visser?

4   A.   I never heard the name Ruann Visser after that first time.

5   Q.   Although were you willing to fight the guy?

6   A.   Yes.

7   Q.   And what, if anything, did you say to your team about your

8   desire to do that?

9   A.   I told Mr. Cohen that I would fight Mr. Visser once I'm back

10  in Las Vegas with adequate training.

11          THE COURT:  And is Ruann Visser as it appears on the

12  documents submitted, R-u-a-n V-i-s-s-e-r?

13          MR. DEE:  I think it's R-u-a-n-n.

14          THE COURT:  Double Ns?

15          THE WITNESS:  Correct.

16          THE COURT:  Okay.  So it's spelled wrong on the

17  purported contract that's been provided at document 27-4.

18  Q.   Related to this purported January fight with Mr. Visser, are

19  you aware of any texts, e-mails, or anything in writing that

20  refers to a purported January fight with Mr. Visser -- January

21  2020 fight with Mr. Visser?

22  A.   No.

23  Q.   Are you aware of any texts, e-mails, or anything in writing

24  referring to a fight with anybody in January of 2020?

25  A.   No.

1   Q.  All right.  Is the first time you ever heard about a

2   purported second opportunity to fight Mr. Visser after this

3   injunction motion was filed?

4   A.  Correct.

5   Q.  And have you ever seen any documents to substantiate it?

6   A.  No.

7   Q.  In paragraph 30 of Mr. Cohen's supplemental declaration, he

8   says he started negotiations in January of '20 for you to fight

9   Manuel Charr, C-h-a-r-r.  Do you recall that?

10  A.  Correct, yes.

11  Q.  You recall seeing that?

12  A.  I do recall that, yes.

13  Q.  Did that fight get scheduled?

14  A.  No.

15  Q.  Did you refuse to fight Mr. Charr?

16  A.  No.  I agreed to fight Mr. Charr.

17  Q.  I mean -- and did you -- you agreed to fight him, but did

18  you also want to?  I mean --

19  A.  Yes.  It would have been for a proposed world heavyweight

20  title.

21  Q.  And -- and as part of your agreement to fight him, did you

22  ask Mr. Cohen, you know, to see anything or for anything related

23  to the fight?

24  A.  I asked both Mr. Cohen and Mr. Heid for correspondence --

25  correspondence with Mr. Charr's team.

MLADEN MILJAS - DIRECT

42

1  Q.  And how did -- at least how did Mr. Cohen respond when you

2  asked him -- made that request?

3  A.  They said it's none of my business to be involved in

4  something like that.

5  Q.  All right.  All right.  And then we know Mr. Cohen started

6  his prison sentence on February 4th of '20.  I think that's just

7  part of the record.  Did Mr. Cohen or Mr. Heid or anybody tell

8  you when he had started his prison sentence?

9  A.  No.

10 Q.  How did you learn that he had -- he had reported to prison?

11 A.  Online from boxing news websites.

12 Q.  Paragraph 32 of Mr. Cohen's supplemental declaration states

13 that he told all his fighters and managers before he started his

14 sentence who the contacts at GCP would be while he was

15 incarcerated.  Were you ever told anything?

16 A.  No.

17 Q.  Did you ever receive anything from GCP, whether or not it

18 was Mr. Cohen, about this?

19 A.  No.

20 Q.  Did Mr. Cohen ever provide a text or an e-mail or anything

21 to corroborate this to let you know anything about these

22 notifications?

23 A.  No.

24 Q.  So then, you know, as the Court noted, we get to March, and

25 you sent an e-mail notifying GCP that you intended to terminate

1  the contract; is that correct?

2  A.  Correct.

3  Q.  Why did you decide that you wanted to terminate the contract

4  with GCP?

5  A.  Because he never fulfilled the four fights in each calendar

6  year, and when he would get me fights, it was not to the quality

7  opposition that I felt met our contract.

8  Q.  I asked you this earlier, and I'll -- just to sort of link

9  it back together again.  At the time then that you terminated

10 your contract with GCP in 2020, remind the Court again what your

11 world boxing ranking had been -- had changed from and to.

12 A.  So at the time of signing with Mr. Cohen, I was number 2 in

13 Canada, number 39 in the world.  At the time of termination, I

14 was number 6 in Canada, number 105 in the world.

15 Q.  Despite having had four fights, all by first or second round

16 knockouts.

17 A.  Correct.

18       MR. DEE:  And, you know, just as a side note, Your

19 Honor, not a question, we've got a number of exhibits that we've

20 put in with articles and criticisms and all sorts of things like

21 that about what Mr. Miljas's fighters have been and all of that

22 which I'm not going to go through now.

23       MR. SCHRADER:  Your Honor --

24       THE COURT:  Hold on just a moment.  Go ahead,

25 Mr. Schrader.

1          MR. SCHRADER:  Your Honor, are we going into issues of

2     the sufficiency of the fights in this hearing, because that

3     opens up a whole Pandora's box, and we would object as hearsay

4     these outside articles that purport whether the fights are good

5     or bad.

6          THE COURT:  I'm not going to rely upon articles that

7     talk of whether they're good fights or bad fights at this stage.

8     Right now my focus really is on the number of bouts.  I think

9     that's where the -- the assistance helping me get through what

10    these documents are and aren't is most useful to me as far as

11    that testimony goes.  Otherwise, I can rely on the affidavits

12    that were submitted by both parties.

13         MR. DEE:  And just for -- and just for the record -- I

14    understand what you just said about that.  I would -- the

15    articles, I would suggest to the Court, are not hearsay.

16    They're not being offered for the truth of the matter.  They're

17    being offered to show what his reputation had become in the

18    boxing community, which the Court knows with professional

19    athletes and entertainers, whether or not it's true, the

20    reputation can be devastating, and it's also -- it's also an

21    exception under 803(21) as reputation evidence in the boxing

22    community.  Just -- I just wanted to be on the record with that.

23         MR. SCHRADER:  Your Honor, just for the record also,

24    we've submitted, I guess, what amounts to really expert

25    testimony from multiple people in the industry as to the

1  significance of the fights that were selected.  There's been no

2  evidence of the same type put in by the plaintiff, so whatever

3  they want to talk about reputation, there are three affidavits

4  that talk about the significance and that the -- the

5  appropriateness of the fights.

6      MR. DEE:  And for the record, not a single one of

7  those affidavits addresses the loss of the Canadian title, the

8  decline in his rankings, the criticisms that were being made all

9  over the boxing world about the cupcakes that he was fighting.

10  Just for the record, none of those even addressed those

11  circumstances.  They just skate right over them.

12      MR. SCHRADER:  And in similar fashion, plaintiff

13  skates over the WBA boxing --

14      MR. DEE:  Right.

15      MR. SCHRADER:  -- the commission ranking.

16      MR. DEE:  We'll cover that if they get into it on his

17  cross which -- which, by the way, was removed as soon as the

18  contract was terminated, not because of his record or a recent

19  fight but because he was no longer with Mr. Cohen.

20      MR. SCHRADER:  And that's not accurate.  He stopped

21  fighting, and that's why any rating was removed.

22      THE COURT:  Okay.  Let's focus on whether this October

23  fight was offered to Mr. Miljas as required under the terms of

24  his contract.  In other words, was the form correct?  Was it

25  offered?  And was his rejection of this particular fight on this

MLADEN MILJAS - DIRECT

46

1   particular time reasonable?  Let's focus on that at the moment.

2           Which one are you looking for?  I might have it.

3           MR. DEE:  No.  I have one.  I had one that I had

4   marked up, though.

5           THE COURT:  That I don't have.  And, Mr. Dee, while

6   you're doing a little bit of searching here, are you making an

7   allegation that when Mr. Cohen went to prison, he assigned this

8   contract improperly, or are you just noting that he went to

9   prison without staying in touch with somebody he was supposed to

10  be promoting?

11          MR. DEE:  The latter.

12          THE COURT:  Okay.

13  Q.  Let's -- we're going to take a look at Exhibit A, which is

14  the contract.  Paragraph 3.  So, Mladen, you see paragraph 3

15  there from your contract with GCP?

16  A.  Yes.

17  Q.  As a side note, I may have misspoke earlier.  Did you ever

18  get a copy of this contract that was signed by Mr. Cohen?

19  A.  No.

20  Q.  Have you ever seen one or been provided one?

21  A.  No.

22  Q.  All right.  The -- paragraph 3 is the one that talks about

23  the four minimum bouts; correct?

24  A.  Correct.

25  Q.  All right.  Which is more or less the second sentence

1  beginning with, Notwithstanding the foregoing --

2  A.  Yes, I see.

3  Q.  -- Promoter agrees to promote or arrange for the staging of

4  a minimum of four bouts in each calendar year of this agreement;

5  correct?

6  A.  Correct.

7  Q.  And you're -- and the reason -- one of the reasons you sent

8  the notice of termination was that that had not been met;

9  correct?

10  A.  Correct, but not just in one year; in all three years.

11  Q.  And the -- well, we'll focus on 2019 for right now, Mladen,

12  at the Court's request.  So then in paragraph 6 of the same

13  contract, it begins with a sentence, For the purposes of

14  Promoter's obligations under Section 3 of this Agreement --

15  A.  I see that.

16  Q.  -- Promoter shall be deemed to have complied with its

17  promotion obligations with respect to any BOUT if it shall have

18  made an offer to Boxer to promote a BOUT setting forth (i) the

19  name of a suitable opponent; and (ii) the gross purse to be paid

20  to Boxer.  Do you see that?

21  A.  Yes.

22  Q.  Okay.  First of all, in this fight that was supposed to be

23  in October of 2019, you were given the name of the fighter,

24  correct, by Mr. Cohen?

25  A.  Correct.

1  Q.  I mean, on a conference call.  So was he the one doing the

2  talking?

3  A.  Him and Mr. Heid mostly.

4  Q.  And we've already talked to the Court about why you think it

5  was not a suitable opponent; correct?

6  A.  Correct.

7  Q.  And -- excuse me.  That's not correct.  This was -- this --

8         THE COURT:  This was a timing issue.

9  A.  It was suitable opponent, not suitable circumstances for the

10  opponent.

11  Q.  And were you told in that call what the gross purse would be

12  paid to you?

13  A.  No.

14  Q.  And as a side note, were you presented any documents for

15  this?

16  A.  No.

17  Q.  And then the continuation of this sentence in paragraph 6

18  says, And Boxer exercising his reasonable discretion, accepts

19  the terms of Promoter's offer in writing.  Do you see that?

20  A.  I see that, yes.

21  Q.  And obviously you did not accept the terms of this offer in

22  writing or verbally; correct?

23  A.  Correct.

24  Q.  In any of the other fights that you did have, did you ever

25  accept in writing the offers for the fights?

1  A.  No.  It was never presented to me.

2  Q.  And were you ever given the gross purse in advance of what

3  they would be?

4  A.  Never.

5  Q.  In each of the four fights that took place, the one in --

6  the one in 2018 and the three in 2019, were you paid anything

7  more than the minimum purse set forth in section 7 of this

8  contract?

9  A.  No.

10  Q.  Meaning you were paid the minimum -- the contractual

11  minimum?

12  A.  Yes.

13  Q.  The -- then you sent the formal notice of termination of the

14  contract on May 21st of '20.  I believe that's undisputed;

15  correct?

16  A.  Correct.

17        THE COURT:  I think -- I thought it was March 11th.

18        MR. DEE:  That was an initial e-mail that said I'm

19  going to do this.

20        THE COURT:  Okay.

21        MR. DEE:  The formal notice was May 21st.

22        THE COURT:  Go ahead.

23        MR. DEE:  Which would have been then effective

24  June 20th, I think, 30 days.

25  Q.  Did you tell Mr. Heid around this time that you were

MLADEN MILJAS - DIRECT

50

1    terminating the contract with Mr. Cohen, with GCP?

2    A.   Yes.

3    Q.   And, of course, at this point in time Mr. Cohen himself was

4    still in prison; correct?

5    A.   Correct.

6    Q.   Now, at this point in time, were you planning to terminate

7    your management agreement with Mr. Heid?

8    A.   No.

9    Q.   Were you planning to -- what were your plans with respect to

10   continuing or not training with Mr. Muhammad?

11   A.   To keep in training -- to keep training with Mr. Muhammad.

12   Q.   And so when you told Mr. Heid that you had done this, what

13   did he do in response to your termination of the contract with

14   Mr. Cohen?

15   A.   He told me that my visa would be taken away and I would be

16   sent back home to Canada if I went through with terminating my

17   contract with Mr. Cohen.

18   Q.   And did he take any steps then when you -- obviously you

19   said, I'm terminating it anyway, or something.

20   A.   Uh-huh.

21   Q.   Did he take any steps then after you confirmed you were

22   terminating the contract?

23   A.   Yes.

24   Q.   What did he do?

25   A.   He stopped paying all of the financial duties that were owed

1  to me in my contract such as my monthly stipend and also my

2  rent.

3  Q.  Okay.  And at this point you still had your contract with

4  him.

5  A.  Correct.

6  Q.  All right.  Now, when he withdrew the monthly stipend then

7  and your rent payments in Vegas, what did you have to do?

8  A.  I had to go back home to Canada.

9  Q.  Okay.  I mean, did you want to move back to Canada?

10  A.  No.

11  Q.  What did you want to continue doing?

12  A.  I wanted to stay living and training in Vegas and progress

13  my boxing career and having suitable fights.

14  Q.  And then did you eventually take steps to terminate your

15  contract with Mr. Heid?

16  A.  Yes, correct, after returning home to Canada.

17          MR. DEE:  I have nothing further at the moment, Your

18  Honor.

19          THE COURT:  Okay.  Mr. Schrader?

20          MR. SCHRADER:  Thank you, Judge.

21                      CROSS-EXAMINATION

22  BY MR. SCHRADER:

23  Q.  Mr. Miljas, isn't it true that BoxRec is not a sanctioning

24  body?

25  A.  Correct.

MLADEN MILJAS — CROSS

52

1  Q.  And, in fact, if BoxRec ranks you, whatever their ranking

2  is, that's not an official ranking; correct?

3  A.  Correct.

4  Q.  Do you have a minimum purse that's defined in the exclusive

5  promotional agreement with GCP?

6  A.  Yes.

7  Q.  Did GCP ever not pay you at least the minimum purse?

8  A.  No.  That's correct.  He always did.

9  Q.  Is it accurate to say that you did fight the Travis Fulton

10  fight in September of 2018?

11  A.  Yes.

12  Q.  And that you did fight the Wayman Carter fight in

13  January 18th of 2019?

14  A.  Yes.

15  Q.  You testified that you didn't think that that was an

16  appropriate fight for you, but you fought it anyway?

17  A.  Yes.

18  Q.  Are you aware -- who's the e-mail address Jozo Miljas -- or

19  Jozo Miljas?

20  A.  That's my father.

21  Q.  Are you aware that on December 21st, 2018, he sent an e-mail

22  to Mr. Cohen --

23          MR. DEE:  I'm going to object.

24  Q.  I'm sorry.  December 21st.  I'll show it to you.  It says,

25  Good evening, sir; we're happy with your choice of opponent, and

MLADEN MILJAS — CROSS

53

1   we're looking forward to being there; thanks.  You're aware that

2   that was sent?

3         MR. DEE:  First of all, let me just interject an

4   objection.  This is hearsay, and I don't believe it's an

5   exhibit.  If it is, we need it identified.

6         THE COURT:  Can you identify it?

7         MR. SCHRADER:  Sure.  There's an e-mail from --

8         THE COURT:  No.  I mean the exhibit.

9         MR. SCHRADER:  It's not -- it's not marked.

10        THE COURT:  Okay.  Then how are you authenticating it

11  in any way at this point?

12        MR. SCHRADER:  I'm using it to challenge his

13  recollection.

14        THE COURT:  Was he copied on that e-mail purportedly?

15        MR. SCHRADER:  No.  It's sent from his father, who he

16  contends was his manager at the time.

17        THE COURT:  Okay.  Is Mr. -- is Jozo going to be

18  testifying?

19        MR. SCHRADER:  We're not calling him.  I don't know if

20  they're calling him.  But he can testify if he has knowledge of

21  what his father/manager responded to Mr. Cohen.

22        THE COURT:  Okay.  Then Mr. Cohen can talk about what

23  he purportedly --

24        MR. SCHRADER:  Well, I can ask -- sorry, Judge.  Can I

25  ask the witness whether he has knowledge of it?

1          THE COURT:  You can ask if he has knowledge of any

2   communications between his father and Mr. Cohen, sure.

3   Q.  Were you aware that your father thought that that was a good

4   opponent for you?

5   A.  I only had knowledge that my father and Mr. Cohen had e-mail

6   communications back and forth.  I have no knowledge what was

7   said in those communications.

8   Q.  So is it your contention that there's a lot of

9   communications between Mr. Cohen and your father that you were

10  not aware of?

11  A.  Not a lot.

12  Q.  How do you know how many there were?

13  A.  Because my father had a very hard time getting into contact

14  with Mr. Cohen.

15  Q.  If your father thought that a fight was a good fight for

16  you, would he have a conversation with you about it?

17  A.  No.

18  Q.  Do you agree that the Matthew Greer fight took place in

19  March of 2019?

20  A.  Yes.

21  Q.  And you retained Mr. Heid as a manager in April of 2019;

22  correct?

23  A.  Correct.

24  Q.  From -- from April of 2019 through August 2019, you do agree

25  that you trained with Eddie Mustafa Muhammad; correct?

1  A.  Correct.

2  Q.  And you trained in Vegas?

3  A.  Correct.

4  Q.  And do you have any documentation that says that you

5  requested fights to take place during that time period?

6  A.  Not in my possession.

7  Q.  Okay.  Are you aware that Eddie Mustafa Muhammad says that

8  he specifically directed along with Steven Heid that you were

9  not to have any fights until you finished training in August of

10  2019?

11  A.  My first time hearing that was at the start of this

12  litigation.

13  Q.  Okay.  Would -- would you -- you never had any discussions

14  with Mr. Muhammad about wanting to fight while you were in

15  training with him?

16  A.  Often, yes.

17  Q.  Okay.  And did you ever send anything in writing to him?

18  A.  No.

19  Q.  Okay.  Isn't it, in fact, true that he didn't think you were

20  ready for another fight until after you finished training with

21  him?

22  A.  That's not true.

23  Q.  Isn't that the reason why you signed on to train with him in

24  Vegas, because you needed to up your skills?

25  A.  Not up my skills, up my preparation.

1  Q.  Preparation?

2  A.  Yeah.

3  Q.  Were you training for any particular fight at the time that

4  you were working with Mr. Muhammad from April through August of

5  2019?

6  A.  For the August fight.

7  Q.  So when did you learn about the August fight?

8  A.  I can't remember exactly.  Roughly a month and a half to two

9  months prior.

10  Q.  So if you learned about it in, let's say, July or late June

11  of 2019 -- so from April to June, you were just preparing;

12  correct?

13  A.  Yes.

14  Q.  Without any particular fight?

15  A.  Well, I was preparing, asking for a fight to be arranged.

16  Q.  Okay.  And so your contention now is that as of the end of

17  June 2019, you knew that there was going to be a fight arranged

18  in August of 2019; correct?

19  A.  Correct.

20  Q.  And that was the Aaron Chavers -- Chavers fight; correct?

21  A.  Correct.

22  Q.  And that fight actually took place; correct?

23  A.  Correct.

24  Q.  Was there an incident that occurred with regard to your drug

25  testing at the end of that fight?

1   A.  Only that I heard from Mr. Cohen, nobody else.

2   Q.  Were you aware that you failed your post-fight drug test

3   after the Chavers fight?

4   A.  Only from Mr. Cohen, nobody else.

5   Q.  Nobody contacted you about it?

6   A.  No.  Nobody from any commission or boxing authority

7   contacted me.

8   Q.  Were you aware that Mr. Cohen was able to avoid you having a

9   suspension for failing that drug test?

10   A.  Only from his word.

11   Q.  Did you ever question it?

12   A.  Yes.

13   Q.  And who did you write to to question it?

14   A.  I didn't write.  This is a verbal conversation.

15   Q.  And who did you have conversations with to question it?

16   A.  Mr. Cohen and Mr. Heid.

17   Q.  And what did Mr. Heid tell you?

18         MR. DEE:  Objection.  Hearsay.

19         THE COURT:  Sustained.  There --

20         MR. SCHRADER:  Well, that's -- why is that hearsay,

21   Judge?

22         THE COURT:  Well, because it's an out-of-court

23   statement but --

24         MR. SCHRADER:  It's a statement made to the witness by

25   Mr. Heid.  We're not objecting to it.  I don't -- I'm not sure

1    what the problem is.

2           THE COURT:  It's an out-of-court statement being

3    offered for the truth of the matter asserted.

4           MR. SCHRADER:  Okay.

5    Q.  Did Mr. Heid confirm what Mr. Cohen told you?

6           MR. DEE:  Same objection.

7           THE COURT:  Sustained.  There actually is a written

8    communication from Mr. Miljas complaining about that test and

9    wondering why he could have possibly failed it, so there is an

10   exhibit that's been offered in writing about that issue, but go

11   ahead.

12          MR. SCHRADER:  And --

13   Q.  Didn't you, in fact, make some type of excuse that you were

14   taking some kind of CBD over-the-counter medication?

15   A.  No excuse, a possible reasoning.

16   Q.  Okay.  So you were aware, though, and you did acknowledge

17   that you failed that drug test; correct?

18   A.  I didn't acknowledge.  I still questioned it.

19   Q.  Okay.

20   A.  And proof of this question was Mr. Cohen and Mr. Heid asked

21   me after my fight -- when my fight ended that day, I returned to

22   the hotel.  I received a Facebook message from Mr. Cohen to

23   return to the venue to explain to the commission.  When I got

24   there, no commission was there, only Mr. Heid and Mr. Cohen, and

25   they gave me a speech trying to put me down about being a drug

1  user.

2  Q.  Did you ask to talk to the commission when you returned?

3  A.  No, because they said it wasn't an issue.

4  Q.  Okay.  And is that because Mr. Cohen was able to resolve the

5  issue with whoever had a problem with the drug test?

6  A.  I'm not sure there was an issue.

7  Q.  Okay.  Is there any particular reason why Mr. Cohen would

8  have told you that you failed the drug test at that point in

9  time, if you didn't fail one?

10  A.  I'm not sure.

11  Q.  Okay.  After the Chavers fight, didn't you, in fact, end up

12  getting a rating in the top 15 from the WBA?

13  A.  That's correct.

14  Q.  What is the WBA?

15  A.  World Boxing Association.

16  Q.  And is that one of the major sanctioning bodies in the

17  boxing industry?

18  A.  Yes.

19  Q.  There was a fight that you talked about with Damion Reed

20  that never took place in September of 2019; correct?

21  A.  Correct.

22  Q.  That fight was offered to you, and it was canceled; correct?

23  A.  Correct.

24  Q.  There was a fight that was proposed to you for Ruann Visser;

25  correct?

1   A.  Correct.

2   Q.  And that fight was to take place on, I think, October 19th

3   of 2019; correct?

4   A.  Correct.

5   Q.  And you said that you found out about it on a three-way

6   call -- or a call with a couple of people that notified you

7   about the fight; correct?

8   A.  Correct.

9   Q.  And who was on that call?

10  A.  Mr. Cohen, Mr. Heid, and Mr. Muhammad.

11  Q.  And isn't it, in fact, true that all three of them

12  recommended that you take the fight?

13  A.  They tried to pressure me into it and told me I'm not a man

14  if I don't accept.

15  Q.  And didn't Mr. Muhammad, your trainer, tell you that you

16  were properly prepared to take that fight?

17  A.  I don't recall.

18  Q.  Did Mr. Heid tell you that you were properly prepared to

19  take that fight?

20  A.  He wouldn't know.  He wasn't in Las Vegas with me training.

21  Q.  I'm not asking.  I'm asking --

22  A.  No.

23  Q.  -- whether he told you that.

24  A.  Not that I recall.

25  Q.  Did Mr. --

MLADEN MILJAS - CROSS

1   A.   Not that I recall.

2   Q.   Sure.  Did Mr. Heid, Mr. Muhammad, or Mr. Cohen tell you the

3   importance of why they were suggesting that you take that fight?

4   A.   Yes.

5   Q.   And they told you that this was a higher-caliber opponent

6   that would help your record if you beat him?

7   A.   Correct.

8   Q.   Now, you testified a short time ago that you had been

9   training straight from April to August of 2019; correct?

10  A.   Correct.

11  Q.   And -- so isn't it true that you, in fact, would have been

12  properly prepared to take this type of fight?

13  A.   Not at the time it was offered.

14  Q.   Okay.  And you said that you would have needed additional

15  time to train for this?

16  A.   Not only additional time, but I was in Canada without my

17  boxing coach.  He was still in Las Vegas.

18  Q.   Okay.  The fight was proposed to take place in Canada,

19  wasn't it?

20  A.   Yes.

21  Q.   Okay.  You had testified earlier on today that there were a

22  couple of periods of time where Mr. Muhammad was not available

23  and you were able to train without him; correct?

24  A.   Yes.

25  Q.   And wouldn't you have been able to continue to train even if

1  Mr. Muhammad wasn't in Canada?

2  A.  Those times where Mr. Muhammad was absent from the gym, I

3  didn't have any fight arranged.

4  Q.  Did you make any effort to try and see if you could arrange

5  to train in Canada for the Visser fight?

6  A.  Yes.

7  Q.  Well, when did you -- when did you tell all three --

8  Mr. Muhammad, Mr. Cohen, and Mr. Heid -- that you weren't going

9  to accept the fight?

10  A.  Immediately on the phone.

11  Q.  So you didn't try and arrange to train for that fight.  You

12  immediately rejected it; correct?

13  A.  I trained on my own, but for that fight in three weeks is

14  not enough time to prepare, as you stated, for such a

15  high-caliber opponent.

16  Q.  Now, there's testimony from other people that this same

17  opponent was offered to you at a later time for you to fight, I

18  guess, in the United States the second time around.  Are you

19  aware of that?

20  A.  The first time hearing of that was during this litigation.

21  Q.  And, in fact, wasn't the proposal as it's put forward in the

22  papers from the other witnesses in this case that there was

23  going to be a Showtime boxing event that you would be fighting

24  with Mr. Visser on to take place in January of 2020?

25  A.  I never saw those papers.  They were never presented to me.

1  Q.  I'm not asking whether you saw papers, sir.  Did anybody

2  ever tell you about that opportunity to fight on Showtime boxing

3  for that event?

4  A.  No.

5  Q.  Okay.  And that offer was made to you, at least according to

6  the other witnesses, in November of 2019; correct?  Did you read

7  what other people had said?

8  A.  I don't recall that specifically.

9  Q.  Okay.  If that offer had been conveyed to you in November of

10 2019, would you have had adequate time to train before

11 January 19th of 2020?

12 A.  No.

13 Q.  So even two months later --

14 A.  I didn't have a coach.

15 Q.  So --

16 A.  I didn't have a trainer.  I'm a professional athlete

17 fighting another high-caliber professional athlete.  I can't

18 just train myself walking into a ring to fight someone of that

19 caliber.

20 Q.  So is it your contention that Mr. Cohen was responsible to

21 provide you with that trainer?

22 A.  No.  He's responsible with giving me adequate time and

23 adequate notice to prepare for a fight.

24 Q.  But you're now telling me that two months was not adequate

25 time for you to prepare for a Visser fight?

MLADEN MILJAS - CROSS

64

1   A.   I also said adequate training, not just adequate time.

2   Q.   Adequate training.

3   A.   Yeah.

4   Q.   So how long would it have taken you to prepare for a Visser

5   fight?

6   A.   Six to eight weeks with a trainer.

7   Q.   Isn't that two months?

8   A.   Roughly two months.

9   Q.   Okay.  So I thought you just said two months wasn't going to

10  be adequate.  So did I misunderstand?

11  A.   Two months with a trainer.  Two months without a trainer,

12  no.

13  Q.   There came a period of time where you went back to Canada,

14  and I gather your testimony is that there was a problem with

15  your visa, and so -- in October of 2019; correct?

16  A.   Correct.

17  Q.   And according to your testimony, that's something that

18  Mr. Heid was supposed to handle, not Mr. -- not GCP.

19  A.   Correct.

20  Q.   Okay.  And did you take any steps prior to October of 2019

21  to try and resolve your visa problem?

22  A.   Yes, and so did my father.

23  Q.   And what did you do?

24  A.   Throughout the whole time I was in Las Vegas, I was asking

25  both Mr. Cohen and Mr. Heid the status of my visa.  They told me

MLADEN MILJAS — CROSS

65

1   to be patient; that they were working on it.  On my fight in

2   Minnesota with Mr. Chavers, Mr. Cohen and Mr. Heid came to my

3   fight, as did my father, because he's my cutman.  My father then

4   again asked them once again, Nearly a month is approaching that

5   my son can't stay in Las Vegas; what's the status of the visa;

6   if it's a money issue, my father is willing to pay for it.  They

7   assured him no, no, no, don't worry about it; all would be taken

8   care of.

9   Q.  In fact, why would you have that conversation with Mr. Cohen

10  if it was Mr. Heid's responsibility?

11  A.  Because Mr. Heid told me that Mr. Cohen would be the one

12  doing it and paying for it.

13  Q.  Did you ever write to Mr. Cohen asking him to take care of

14  that?

15  A.  No.  I had very minimal writing with Mr. Cohen.

16  Q.  Are you aware --

17          MR. SCHRADER:  Can you do me a favor and put up the

18  exclusive promotional agreement?

19          MR. STORY:  Oh, you're asking me.

20          MR. SCHRADER:  Yeah, if you guys could do that for me,

21  I'd appreciate it.  Thank you.  If you can go to paragraph 30.

22  Q.  Are you familiar with paragraph 30 of the promotional

23  agreement that was entered into with GCP?

24  A.  Give me a moment to read it, please.  One moment.

25  Q.  Sure.  Please do.

1   A.   Yes, I see that.

2   Q.   And notwithstanding that GCP was not responsible to handle

3   your visa, you had an obligation to be able to fight legally

4   within the United States; correct?

5   A.   Correct.

6   Q.   And you agreed to that in the GCP promotional agreement?

7   A.   Correct.

8   Q.   And, in fact, in the GCP promotional agreement, it

9   specifically says that if you're not able to fight in the United

10  States, then the time period in which you're not able to do that

11  is deemed a disability under the agreement; correct?

12  A.   So why was a fight offered to me during the disability?

13  Q.   I'm asking you what the agreement says, sir.  Does it say

14  that --

15          MR. DEE:  Well --

16  Q.   Where does it say what you're now saying?

17          MR. DEE:  I think we can all read what it says, Your

18  Honor.

19          THE WITNESS:  Yes.

20          MR. DEE:  We don't need the witness to confirm the

21  language in the agreement, so object to the question.

22  Q.   So was it your understanding that you had an obligation to

23  be legally able to fight within the United States?

24  A.   Yes.

25  Q.   And so your contention is that Mr. Heid didn't do that.  Did

1  Mr. Cohen actually step up and help you?

2  A.  Yes.

3  Q.  And in November of 2019, didn't Mr. Cohen help you retain an

4  attorney to try and process a visa?

5  A.  Yes.

6  Q.  And, in fact, he agreed to sponsor you for the visa;

7  correct?

8  A.  Correct.

9  Q.  And within approximately a month, you were able to obtain

10 that visa; correct?

11 A.  Correct.

12 Q.  And you had that by December of 2019; correct?

13 A.  Correct.

14 Q.  You returned to Las Vegas in or around January of 2020; is

15 that correct?

16 A.  January 2nd of 2020, yes.

17 Q.  Okay.  And when you returned to Las Vegas January 2nd of

18 2020, did you start to train again?

19 A.  Yes, but on my own because Mr. Muhammad was in the hospital.

20 Q.  Okay.  Were you able to train on your own without

21 Mr. Muhammad?

22 A.  Yes.

23 Q.  And were you training for any particular fight?

24 A.  No.

25 Q.  So there seems to be a dispute about whether a second Visser

1  fight was offered to you, and Mr. Heid says it occurred,

2  Mr. Muhammad says it occurred, and Mr. Cohen all say it

3  occurred.  Do you have any documentation in that time period

4  that relates to Visser at all?

5  A.  No.

6  Q.  Did you have any -- when you returned to Vegas, you

7  mentioned Mr. Muhammad was in the hospital?

8  A.  Yes.

9  Q.  And how long was he in the hospital for?

10  A.  Roughly two weeks.  Well, away from the gym for roughly two

11  weeks; in the hospital, I'm not exactly sure for how long.

12  Q.  Okay.  And when he came back to the gym, did you start

13  training again with him?

14  A.  Yes, but not the same as before.

15  Q.  And what do you mean by that?

16  A.  He would show up to the gym three out of five days a week at

17  most.

18  Q.  Is that because he was still sick?

19  A.  That's what he told me, yes.

20  Q.  Okay.  Did you look to potentially get a new trainer?

21  A.  No.

22  Q.  Did you find that his training was adequate or wasn't

23  adequate at that point?

24  A.  It was adequate only because I never had fights scheduled.

25  If I had had a fight scheduled, especially against a

1    higher-quality opponent, I might have looked elsewhere.

2    Q.  You -- do you agree that the boxing industry essentially

3    shut down starting in March of 2020 due to COVID?

4    A.  Yes.

5    Q.  And essentially there were no fights being scheduled from

6    March through at least June of 2020; correct?

7    A.  Correct.

8    Q.  Did you receive -- so there -- so you sent a -- an e-mail --

9    I guess the Court referenced it earlier -- on March 11th of

10   2020, complaining that you weren't having enough fights

11   scheduled; is that accurate?

12   A.  If I could see it, but possibly.

13   Q.  Okay.  Well, did you send -- since we have a short amount of

14   time, I don't want to pull out every document.  Did you send an

15   e-mail to Mr. Cohen complaining that you weren't getting

16   adequate fights?

17   A.  I can't recall.

18   Q.  Okay.  In the e-mail that you sent in March of 2020, if

19   Mr. Cohen had wanted to schedule a fight for you at that time

20   frame, would he have actually been able to do so?

21   A.  Possibly.

22   Q.  You just acknowledged that the fighting industry essentially

23   shut down from March to June of 2020; isn't that correct?

24   A.  Well, fights had shut down but not negotiations for future

25   fights.

MLADEN MILJAS — CROSS

70

1  Q.  And were fights actually being scheduled for specific dates?

2  A.  Yes.

3  Q.  Okay.  Did Mr. Cohen attempt to schedule fights for you?

4  A.  During which time?

5  Q.  Yep -- so let's start in January of 2020.  Did Mr. Cohen

6  tell you that he was attempting to negotiate a fight for a WBA

7  championship title with Manuel Charr?

8  A.  No.  I heard that from Mr. Heid.

9  Q.  Okay.  Mr. Heid told you that that was happening?

10  A.  Yes.

11  Q.  And that didn't take place; correct?

12  A.  Correct.

13  Q.  And, in fact, Manuel Charr declined to actually go forward

14  with the fight and hasn't fought since January of 2020; correct?

15  A.  He hasn't fought since January of 2020.

16  Q.  Okay.  Did Mr. Cohen offer you any fights to take place for

17  the April to June 2020 period for a Top Rank Boxing ESPN series?

18  A.  Could you clarify if he offered them to me directly or

19  through --

20  Q.  Well, are you aware that he offered them to Mr. Heid?

21  A.  He offered one to Mr. Heid.

22  Q.  Okay.  And do you know what fight that was?

23  A.  I believe July 9, 2020.

24  Q.  So the -- in April to June 2020, my understanding is -- and

25  you can correct me if this doesn't agree with what your

1   understanding is -- is that Mr. Cohen was actually attempting to

2   schedule these fights in February of 2020, and they got

3   side-railed -- they basically got put on hold because of COVID,

4   and then when COVID lifted and fights started to get

5   rescheduled, there was a date in July that was offered to you.

6   A.  Well, all throughout January I was asking Mr. Cohen to

7   arrange me a fight, and he never mentioned any opponent or any

8   potential date, so I'm not sure of that.

9   Q.  Well, didn't we just talk about that he offered Manuel

10  Charr, and he did that through Mr. Heid?

11  A.  Through Mr. Heid, not Mr. Cohen.

12  Q.  All right.  And so --

13  A.  And also to note, the only offer that was given was a

14  conversation from Mr. Heid.  When I asked for any correspondence

15  or proof of such a bout, none was provided to me, so I don't --

16  I didn't know how true that was.

17  Q.  Did you agree that you wanted to fight Mr. Charr?

18  A.  Yes.

19  Q.  Even though you didn't have a trainer that was working

20  properly?

21  A.  He was back at the gym at this time when they were offering

22  it to me.

23  Q.  Okay.  So you had just testified that the training that you

24  were getting at that point was only adequate because you didn't

25  have a specific opponent.

1  A.  Yes.

2  Q.  And if you had that opponent and it was a world championship

3  fight, would you have needed a different trainer or different

4  training?

5  A.  Most likely.

6  Q.  So would you have accepted that fight at that time if it had

7  gelled?

8  A.  If I saw a contract, yes.

9  Q.  Even though you weren't properly trained for it?

10  A.  I would get proper training for the fight.

11  Q.  When COVID lifted in -- so -- so we agree that COVID kind of

12  shut down boxing from March to June of 2020.  Was there -- you

13  know, you sent a termination notice to Mr. Cohen in -- on

14  May 21st of 2020 during the COVID shutdown; correct?

15  A.  Correct.

16  Q.  And your contention in that in part was that he wasn't

17  scheduling any fights at that time?

18  A.  Not just that time, from the beginning of our contract.

19  Q.  Do you agree that Top Rank started operating its boxing

20  series on ESPN again in or about June or July of 2020?

21  A.  After termination, yes.

22  Q.  Okay.  Did GCP -- well, after you sent the termination

23  notice; right?

24  A.  Yes.

25  Q.  So you were offered a fight for July 9th, 2020, that would

1  have been televised on ESPN, but you -- you didn't believe that

2  that fight was real; correct?

3  A.  Correct.

4  Q.  Okay.  And Mr. Cohen told you it was real; correct?

5  A.  Mr. Cohen was incarcerated.  I never spoke to him.

6  Q.  Okay.  Somebody from Mr. Cohen's office told you it was

7  real?

8  A.  I never spoke to anyone from Mr. Cohen's office ever.

9  Q.  Okay.  Did Mr. Heid tell you it was real?

10  A.  All communication from Mr. Heid.

11  Q.  Okay.  And did you also reach out to contact Top Rank in

12  connection with confirming whether that fight was real?

13  A.  So after nearly over -- I believe I was given an exhibit

14  from Mr. Heid, an e-mail.  He stated over 10 opponents withdrew.

15  I've been going through weeks and weeks of problems with him

16  giving me a proper opponent, giving me a concrete opponent that

17  I was questioning the legitimacy of the bout.  So, yes, I did

18  contact Top Rank myself.

19  Q.  Okay.  And didn't he confirm that there was a slot available

20  for you?

21  A.  He told me -- he never heard of me, he never heard of

22  Mr. Heid but that Greg Cohen Promotions had a slot, not me.

23  Q.  Okay.  And, in fact, did the -- didn't Mr. Heid send you

24  correspondence in June -- June 21st, 2020, which I think is in

25  Exhibit 26 in the record, telling you that Sergio Ramirez was

MLADEN MILJAS — CROSS

74

1  going to be the opponent?

2  A.   Yes.

3  Q.   And did you accept that fight?

4  A.   No, because Sergio Ramirez was 5 foot, 7.  I thought it was

5  embarrassing, me being 6 foot, 6, to fight someone like that on

6  TV with such a poor record.

7  Q.   What is the purpose of a manager?

8  A.   To make the boxer as much money as possible and progress his

9  career as much as possible.

10  Q.   And if the -- does the boxer often give you advice on

11  whether or not an opponent is a good opponent for you?

12  A.   You mean the manager?

13  Q.   The manager.  Sorry.  Thank you.

14  A.   Yes.

15  Q.   And did Mr. Heid believe that this was a good fight for you,

16  Sergio Ramirez?

17          MR. DEE:  Objection.  That's speculation.

18          THE COURT:  Agreed.

19          MR. SCHRADER:  I didn't -- Your Honor, did you --

20          THE COURT:  Sustained.

21  Q.   Did Mr. Heid make a recommendation on whether you should

22  accept the fight?

23          MR. DEE:  Objection.  Hearsay.

24          THE COURT:  Sustained.

25          MR. SCHRADER:  Your Honor, I'm not sure why that's an

1   objectionable question.

2        THE COURT:  Well, it calls for a hearsay response.

3        MR. SCHRADER:  The statement was made to this witness

4   on whether there was a recommendation made to him.

5        THE COURT:  Right.

6        MR. SCHRADER:  And I'm not really -- I'm not really

7   following why that's a problem question.

8        THE COURT:  Because it calls for an answer that is an

9   out-of-court statement.

10       MR. SCHRADER:  But it's not meant to prove the truth

11  of the statement made.  It's just whether he made a

12  recommendation.  It's not whether the recommendation was a

13  proper recommendation, whether it was --

14       THE COURT:  You're offering it for proof that Mr. Heid

15  made a certain recommendation to this person; correct?

16       MR. SCHRADER:  I'm asking whether he had -- whether he

17  had a communication with Mr. Heid.

18       THE COURT:  Correct.  That's an out-of-court

19  conversation, an exchange of statements.

20       MR. SCHRADER:  But it's not for the truth of the

21  statement made.

22       THE COURT:  So you're not going to allege that

23  Mr. Heid made a recommendation to the defendant?

24       MR. SCHRADER:  I'm asking whether Mr. Heid made a

25  recommendation.  Mr. Heid's going to testify so --

1          THE COURT:  Okay.  Then let's talk to --

2          MR. SCHRADER:  -- we're going to find that out but --

3          THE COURT:  It's hearsay.  I don't know how to explain

4     it beyond telling you it's hearsay.

5          MR. SCHRADER:  Okay.  Okay, Your Honor.  I understand

6     Your Honor's ruling.

7     Q.  On the same day that you received information about the --

8     Mr. Heid told you the information on who the opponent was;

9     correct?

10    A.  Correct.

11    Q.  And on that same day, did you send the termination --

12    another termination letter on June 21st, that same day?

13    A.  I don't recall.

14    Q.  Was an opportunity to fight with Simon Kean offered to you?

15    A.  Months after termination.

16    Q.  And that offer -- well, months after what you contend was a

17    proper termination; correct, sir?

18    A.  Yes, and only through e-mail conversations.

19    Q.  Okay.  And Mr. Kean was offered to you as a fight to take

20    place in Canada for September of 2021; correct?

21    A.  Correct.

22    Q.  And you rejected that, saying that you were a free agent?

23    A.  Correct.

24    Q.  Was there also an offer made to you to fight Filip -- I'm

25    going to probably --

1  A.  Hrgovic.

2  Q.  -- Hrgovic?

3  A.  Yes, once again, after termination.

4  Q.  And that offer was made to you on November 13th of 2020, and

5  that fight would have taken place on December 19th of 2020;

6  correct?

7  A.  Correct.

8          THE COURT:  Can you spell Hrgovic for us?

9          MR. SCHRADER:  It's H-r-g-o-v-i-c.

10          THE COURT:  Thank you.

11  Q.  And I was not going to try and figure that out.

12          Throughout your testimony today, you've complained

13  repeatedly that you wanted to get more and more difficult

14  opponents to fight; is that correct?

15  A.  Correct.

16  Q.  But on each of the different occasions when you were offered

17  more difficult opponents, you seem to find a reason to reject

18  each of those fights; isn't that correct?

19  A.  The three that were offered to me, one was without a

20  trainer, without a coach, and the two were after termination.

21  Q.  Is it Mr. -- is it GCP's obligation to provide you with a

22  trainer or a coach?

23  A.  No.

24  Q.  And that -- if anything, that would be the manager's

25  obligation; right?

MLADEN MILJAS — CROSS

78

1  A.   Yes.

2  Q.   So if -- if GCP offers you a fight but you don't have the

3  other things in place, that's not GCP's fault, is it?

4  A.   GCP should have better knowledge not to offer me a fight

5  during that time.

6  Q.   But your -- your complaint is that they weren't offering you

7  adequate fights.  Here they are offering you fights, but you're

8  coming up with other reasons not to accept those fights that are

9  outside of GCP's control; isn't that true?

10  A.   To me, it would have been illegal to accept those fights

11  after termination.  I would be going against whatever document I

12  gave him.

13  Q.   The -- do you believe that it's important -- that the WBA

14  ranking was actually important to your career?

15  A.   I don't believe so.

16  Q.   You don't think that a ranking as being one of the top 15

17  for the world ratings of the WBA is important to your career?

18  A.   Not under the circumstances it was given.  If I could

19  further explain.

20  Q.   Is it true, though, that you thought that being ranked on

21  BoxRec, a non-sanctioning body, was important to your career?

22  A.   Yes.

23  Q.   And so you're telling me that it's important to have a world

24  ranking from an entity that doesn't have any authority to issue

25  rankings, but it's not important to have a ranking from an

1  entity that does issue real ratings and is a sanctioning body?

2  A.   Under the circumstances I was given the ranking by the

3  sanctioning body, it didn't progress my career in any way.

4  Q.   Sir, weren't you just earlier testifying about how important

5  public perception is and that rankings are important for public

6  perception?

7  A.   My public perception was already ruined before that ranking.

8  Q.   Are you familiar with the concept that it's important to be

9  undefeated -- have an undefeated record early in the career of a

10 boxer?

11 A.   Yes.

12 Q.   Do you agree with that?

13 A.   I would agree.  It's definitely a help.

14 Q.   You had challenged whether or not different communications

15 were made from Mr. Cohen to your father as manager, and you said

16 that you didn't think those occurred; correct?

17 A.   Sorry.  Could you repeat the question?

18 Q.   Sure.  I thought your testimony earlier was that you believe

19 that Mr. Cohen -- well, let me go a different direction with

20 this.

21 A.   Sure.

22 Q.   Throughout the period of time where Mr. Heid was acting at

23 your manager, a lot of the communications about fights went to

24 Mr. Heid from GCP; is that correct?

25 A.   Correct.

1  Q.  And do you know whether Mr. Heid conveyed all of those

2  offering proposals to you?

3  A.  I'm not sure.

4          THE COURT:  We need to take a break.  It is 3:15, so

5  we're going to take a break until 3:30.

6          Until we return to conclude testimony with Mr. Miljas,

7  Mr. Miljas, you shouldn't talk to anybody else about your

8  testimony, and because we do have a sequestered witness, nobody

9  should speak with Mr. Heid, including the attorneys, during this

10 break until after his testimony has been given.

11          I do want to help the lawyers focus on something that

12 I think is important here.  The contract required that the

13 promoter make these offers to the boxer.  Whether they were made

14 to Mr. Heid or they were made to Mr. Muhammad or they were made

15 to his father, the contract says to the boxer.  That's what's

16 important right now.

17          MR. SCHRADER:  Your Honor, our position essentially is

18 that the manager acts as the agent for the boxer.

19          THE COURT:  I understand that's how you wish to read

20 the contract, but that's not what the contract says.

21          MR. SCHRADER:  Okay.  Well, Your Honor, that's -- that

22 is what is done in the industry, and we've put in affidavits

23 from multiple people to that effect.  I understand Your Honor is

24 trying to interpret the contract, and I guess Mr. Cohen will

25 also testify about that, and we will address that issue.

1          THE COURT:  Yeah.  And, I mean, that's -- and I'll

2     hear Mr. Miljas's attorneys on that issue too, but the contract

3     very specifically says that the offer is going to be made to the

4     boxer.  It doesn't say to the boxer's manager.  It doesn't say

5     to the boxer's -- you know, coach, to his trainer.  It says to

6     the boxer.

7          MR. SCHRADER:  We'll address that on Mr. Cohen's

8     testimony.

9          THE COURT:  Okay.

10          MR. SCHRADER:  Your Honor, just to -- one thing.  I

11     know we have a short amount of time left today.  I -- my

12     understanding is that we have to conclude by 4:30.

13          THE COURT:  No.  5:00 is when we'll end today.

14          MR. SCHRADER:  Okay.

15          THE COURT:  I just wanted to be clear that in my view

16     the people whose testimony is important are Mr. Miljas and

17     Mr. Cohen because in my view, that's what the contract requires

18     is the exchange of information between those two people or Greg

19     Cohen Promotions and Mr. Miljas.

20          MR. SCHRADER:  Okay.  So I guess we'll pick up in a

21     couple minutes.  Thank you.

22          THE COURT:  Let's take a 15-minute break.  We'll

23     return.

24          (Recess at 3:15 p.m. until 3:30 p.m.)

25          THE COURT:  Welcome back.  You can be seated, and,

1  Mr. Miljas, you can return to the witness stand and once you're

2  seated there, you can remove your mask.  We'll continue with

3  cross-examination by Mr. Schrader.

4  Q.  Mr. Miljas, just a couple things.  I'm going to try and

5  finish up quickly with you.  Famous last lawyer words.  You said

6  that your ranking went down at some point in time; correct?

7  A.  Correct.

8  Q.  When did it go down?  Do you recall?

9  A.  Gradually since the point I signed with Greg Cohen

10  Promotions.

11  Q.  No, I'm talking about your WBA ranking, sir.

12  A.  Yeah.  That was, I believe, June 2019 -- I'm sorry -- June

13  2020.

14  Q.  And what -- what do you believe occurred in June 2020 that

15  resulted in your ranking going down at that point in time during

16  the COVID crisis?

17  A.  Well, I was told when I obtained the ranking that it wasn't

18  off the merit of my fighting, that Greg Cohen was friends with

19  the president of WBA and he had pulled some strings, so in my

20  opinion it was after terminating him, he once again pulled

21  strings to have me removed.

22  Q.  Do you have any personal knowledge that that occurred?

23  A.  No.

24  Q.  In fact, isn't it possible that, if anything, your ranking

25  went down because you stopped having fights?  You weren't having

1  any bouts?

2  A.  Possibly.  I could also argue that nobody else in the

3  rankings were either because of the coronavirus pandemic, so I

4  don't know why I was --

5  Q.  Sir, I didn't ask you about other people.  I asked you about

6  you.

7  A.  Sorry.

8  Q.  If you can kind of restrict your answers.

9  A.  Sorry.

10  Q.  If your counsel wants to ask you other questions, he'll do

11  that.

12  A.  Sure.

13  Q.  You mentioned in your testimony that Mr. Heid told you that

14  if you terminated your contract with GCP that your visa would

15  likely become invalid; is that correct?

16  A.  Correct.

17  Q.  And is that the reason for that -- that was told to you by

18  Mr. Heid to your knowledge, that because GCP was your sponsor

19  for the visa?

20  A.  Correct.

21  Q.  And so if you were to terminate your relationship with GCP,

22  just as a matter of course, your visa would become invalid?

23  A.  Correct.

24  Q.  At this point in time, have you hired a new promoter?

25  A.  No.

MLADEN MILJAS - CROSS

84

1   Q.   Have you hired a new manager?

2   A.   No.

3   Q.   Have you hired an advisor?

4   A.   No.

5   Q.   Okay.  There was a question asked by the Court about certain

6   e-mail addresses.  What are the different e-mail addresses that

7   you've used over the last couple years?

8   A.   I only really have one e-mail address that I use, but I have

9   other e-mail addresses.  The main one that I use is the one that

10   was stated in the court, Mladen_Miljas@outlook.com.

11   Q.   Okay.  Do you know that you actually sent a reply back to

12   Steven Heid from your e-mail address, MladenMiljas@gmail.com?

13   A.   It's possible.

14   Q.   So isn't it accurate that you did sometimes use that e-mail

15   address?

16   A.   Never with Greg Cohen.

17   Q.   Okay.  But you used it with Steven Heid; correct?

18   A.   Possibly.

19   Q.   And why would you use it with Steven Heid and not Greg

20   Cohen?

21   A.   Because in Greg Cohen's contract, as a point of contact it

22   specifically says which e-mail I'm supposed to use to receive

23   and to give statements to him.

24   Q.   So are you being hypertechnical that you may have actually

25   received e-mails from Greg Cohen, but you just didn't think they

1  were valid?

2  A.   No.

3  Q.   So did you monitor that e-mail account -- that Gmail

4  account?

5  A.   No, not --

6  Q.   You didn't monitor it at all?

7  A.   Not often.

8  Q.   Well, how did you know when Mr. Heid sent you e-mails to

9  that account?

10         MR. DEE:  Well, objection.  He just said it was not

11  often, not never.

12  A.   Not never, not often.  It wasn't my main e-mail address.

13  Q.   That's fine, but how did you know when Mr. Heid sent you

14  e-mails to that account?

15  A.   Just luckily at the time that I checked, I saw one from

16  Mr. Heid that popped up and caught my attention.

17  Q.   And just coincidentally?

18  A.   Correct.

19  Q.   Okay.  Were there other e-mail addresses that you had that

20  you just didn't check very often?

21  A.   No.

22  Q.   You had no other e-mail addresses?

23  A.   No.

24         MR. SCHRADER:  I don't have any other questions for

25  the witness at this time.

1    THE COURT:  Redirect?

2    MR. DEE:  Yes.  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4  BY MR. DEE:

5  Q.  Mladen or Mr. Miljas, let me just pick up with the last set

6  of questions that Mr. Schrader asked you.

7         If I could -- if we could have Exhibit A, which is the

8  GCP contract, up on the screen, please.  And go to, yeah,

9  paragraph 29.

10        This is the provision that identifies how written

11  notices are going to be made to each party, and, Mladen, do you

12  see there -- what's the e-mail address in the contract with Greg

13  Cohen Promotions that he is supposed to use to provide you

14  notice of anything?

15  A.  Mladen_Miljas@outlook.com.

16  Q.  Okay.  And now if we could take a look at Exhibit M, as in

17  Michael, and this is -- well, do you recognize this?

18  A.  Can I see more of it, please?  Yes.

19  Q.  What is it?

20  A.  That looks like my promotional advisor manager agreement

21  with Mr. Heid.

22  Q.  Correct.  Let's go to section 13.2.  So Exhibit M that was

23  filed with the Court --

24    MR. DEE:  Your Honor, if I could address you.

25    THE COURT:  Yeah.

1          MR. DEE:  Exhibit M filed with the Court, we obviously

2    redacted -- I don't know why we didn't do it with Exhibit A, but

3    we redacted the contact information here in 13.2.  I have the

4    unredacted copy of this page, and I am prepared to make -- and

5    we can show it to Mr. Schrader -- make a statement to the Court

6    that the e-mail address for Mladen in this contract is also the

7    Mladen_Miljas@outlook.com, and, David, if you want to see it, we

8    can show it to you.

9          MR. SCHRADER:  Your Honor, I don't have a copy of the

10   unredacted document nor have I had an opportunity to see it.  I

11   mean, if it says what it says about the e-mail address, that's

12   fine.  I'm not going to --

13         MR. DEE:  David --

14         MR. SCHRADER:  I'm looking on the screen.

15         THE COURT:  Okay.  And the record can reflect that the

16   unredacted version has now been shown in court and does reflect

17   under the Boxer an e-mail as stated, the outlook.com address

18   essentially.

19         MR. DEE:  Thank you.

20   Q.  And so, Mladen, did you -- this fight that was supposed to

21   take place against Ruann Visser in October of 2019, did you

22   receive a written offer from Greg Cohen Promotions for that

23   fight?

24   A.  No.

25   Q.  Did you receive an e-mail from Greg Cohen Promotions for

1  that fight containing all of the information that an offer is

2  supposed to contain in this contract?

3  A.  No.

4  Q.  At this e-mail address, outlook.com?

5  A.  Not at all.

6  Q.  Or at any e-mail address?

7  A.  Not at all.

8  Q.  Did you receive anything in the mail?  A letter?  Anything

9  at the address that's provided?

10  A.  No.

11  Q.  Okay.  I want to go back to this issue about -- about the

12  training versus preparation issue for the fight that would have

13  been against Mr. Visser.  Mr. Schrader asked you a lot of

14  questions.  You've been training since April.  You've been

15  training here; you've been training there.  Do you make a

16  distinction in your mind between training as in like physical

17  fitness versus actual preparation for an opponent?

18  A.  Yes.

19  Q.  What is that -- what is that distinction?

20  A.  There's a big distinction.  It's my job as a professional,

21  whether I have a trainer or no trainer, to always be in the best

22  shape that I can.  When I have a fight coming up, that's where a

23  trainer and another professional is needed to properly help me

24  prepare.  That has nothing to do with being in shape.

25  Q.  And -- and, again, that -- does that have to do with --

1   A.   Strategies, tactics, yes.

2   Q.   You know, is that like -- in a boxing match, Mr. Miljas, is

3   there -- is there a mindset of offense and a mindset of defense

4   in a particular fight?

5   A.   Yes.

6   Q.   Can you explain to the Court what that is, what that means?

7   A.   Yes.  So, for example, if I'm playing a certain opponent

8   that has a certain offensive skill set, I have to make sure my

9   defensive skill set matches that and matches those threats that

10  he possesses, just as if he's good at certain things

11  defensively, offensively I have to be able to exploit those --

12  Q.   And --

13  A.   -- which is done through the help of a trained professional

14  that has a lot more experience other than myself.

15  Q.   And is that -- is that part -- what does that have to do

16  with your decision not to take the Visser fight in October of

17  '19?

18  A.   Everything to do with that.

19  Q.   So fighting a guy who is 6 foot, 9 and whose record was 17

20  and 1 at the time, give the Court a description of the type of

21  preparation, the type of strategy, the offense-defense that you

22  would have relied on a trainer to help you with and then to spar

23  with someone of that size using those tactics.

24  A.   For example, in my 10 years' experience of boxing, I have

25  yet to fight somebody that big or that tall, so I have no

1   experience fighting somebody of that size.  So if I had a coach

2   that would prepare me for that, we would bring in sparring

3   partners close to his height so that I could adjust my

4   techniques that would be effective on them.

5   Q.  And what do you mean by techniques?  Are you talking about

6   how aggressive you are, whether you go on defense, whether

7   you're in the middle of the ring, whether you're on the ropes?

8   That's the kind of -- that's the kind of generality I'm asking

9   for you to describe.

10  A.  For example, usually a bigger person is much more

11  aggressive.  How would I be able to be aggressive towards him?

12  How would I impose my will on him, the fact that he's bigger,

13  just like my opponents have the same strategy against me.

14  Q.  And then do you also take time to view what you perceive --

15  you and your trainer perceive to be your opponents' certainly

16  strengths, but weaknesses, whether you might be able to get

17  after him?

18  A.  Yes, and then we would drill those weaknesses in the gym.

19  Q.  All right.  So all the questions you got about training -- I

20  mean, in your mind, training, is that -- that's really kind of

21  physical fitness; is that correct?

22  A.  Yes.

23  Q.  And the reason for the refusal to fight Visser, as you've

24  been saying, is really the inability to prepare properly with a

25  trainer?

1  A.  Correct.

2  Q.  For the reasons you just described?

3  A.  Correct.

4  Q.  You know, we've gone back and forth on this visa issue and

5  whose responsibility it was, and we lawyers can all read the

6  documents and the agreements and decide who -- most importantly,

7  Judge Rose -- who was responsible for what, but isn't the point

8  of all of this that but for the failure to get the visa within 6

9  months, you would not have been back in Canada when this fight

10  was offered to you?

11  A.  Yes, correct.

12  Q.  I don't know -- I mean, at one point Mr. Schrader was asking

13  you about -- some questions about the WBA, and you answered a

14  question, and you said, I could further explain if you'd like,

15  and, you know, he exercised his prerogative to move on to

16  another question.  Is there further explanation that you want to

17  give to your answer that you have not been allowed to yet?

18          MR. SCHRADER:  Objection as to form.  I'm not sure

19  what specifically that is referring to.  Maybe he can identify

20  what the topic was.

21          MR. DEE:  The WBA rankings.

22          MR. SCHRADER:  What about it?

23          MR. DEE:  That's -- Your Honor?

24          THE COURT:  Mr. Miljas, what was your thought with

25  respect to the WBA ranking?

1            THE WITNESS:  So after the fight with Aaron Chavers,

2   on a phone conversation with Mr. Cohen, he told me that he would

3   get me a top 15 ranking in the world with the WBA.  He told me

4   that he was friends with the president and that he would pull

5   some strings to get me ranked.  A few weeks went by, and I

6   didn't see my name in the rankings.  He told me the president

7   was at a wedding; he was unable to get into contact with him.

8   Then a few weeks later he showed me and saw -- I saw my name in

9   the ranking system.

10            MR. DEE:  Nothing further, Your Honor.

11            THE COURT:  Any recross?

12            MR. SCHRADER:  Very, very quick issue.

13                         RECROSS-EXAMINATION

14   BY MR. SCHRADER:

15   Q.  Mr. Miljas, you just saw both the Heid advisory agreement,

16   and you looked at the promotional agreement with -- with GCP;

17   correct?  And specifically you looked at what has an address for

18   certain notices; correct?

19   A.  Correct.

20   Q.  And it shows an address in Ontario for you; correct?

21   A.  Correct.

22   Q.  And it also shows an e-mail address?

23   A.  Correct.

24   Q.  From the period of April 2019 forward, were you living at

25   that address in Ontario?

1   A.   No.  My parents were.  My family was.

2   Q.   Did you ever update your contact information in the

3   contract?

4   A.   No.

5   Q.   Did you ever update other contact information in the

6   contract aside from your address?  Did you ever update e-mail

7   addresses?

8   A.   I thought they all were still valid up to that date.  My

9   mother is the one that usually handles my administrative things,

10  and the fact that my father was my manager -- anything that

11  would come there relating to my boxing I had no problem going to

12  that address.

13  Q.   So, sir, you -- you're arguing -- or your attorney is

14  arguing that every communication had to go to you directly.

15  A.   Yeah.

16  Q.   But now you're saying it was fine if it went to your father

17  at your home -- your old home address in Canada.

18          MR. DEE:  Objection.  Argumentive and misstates the

19  testimony.

20          THE COURT:  Agreed.

21  Q.   Were you okay that communications that were supposed to be

22  directed to you, according to your counsel, were sent to your

23  father?

24  A.   Well, one reason --

25          MR. DEE:  Same objection.  It misstates his answer.

1          THE COURT:  I agree.  This is -- unless you're going

2    to allege that Greg Cohen Promotions actually did send written

3    notice not through e-mail but to this Sugarbush address in

4    Ontario, and since there's no evidence of that anywhere in the

5    record and you've already advised that this is all of the

6    written documents that exist, I'm not sure what the relevance of

7    this particular line of questioning is.

8          MR. SCHRADER:  Your Honor, if I might respond a couple

9    things.  One, the relevance is to show that he didn't update his

10   contact information and that he was okay if it went to the old

11   contact location.  You know, there -- there's a hypertechnical

12   argument being made here that there wasn't this, quote, written

13   notice, and at the end of testimony today, I'd like to address

14   that with the Court briefly as to whether that is actually

15   required under the contract but --

16         THE COURT:  I don't read it as requiring written

17   notice.  There have been questions about whether he received

18   written notice.

19         MR. SCHRADER:  Okay.

20         THE COURT:  I have two lines of inquiry.  Did he

21   receive notice from Greg Cohen Promotions of a match that

22   identified an opponent and the purse after August 9th of 2019

23   and before December 31st of 2019?  Secondary, if there becomes a

24   dispute between Mr. Cohen and Mr. Miljas about whether that

25   happened, is there any written documentation that supports

1   either person's version of events?  That's why I'm looking for

2   written documents, if that makes sense.

3           MR. SCHRADER:  Thank you, Judge.  I don't have further

4   questions for this witness.  I think it's starting to get late.

5   I think we need to move on to the other two witnesses.

6           THE COURT:  Okay.  Any further re-redirect?

7           MR. DEE:  Just one -- just to be clear, Your Honor,

8   and if I've already asked this, you'll be the one who tells me

9   I'm sure, but I don't recall.

10                     RE-REDIRECT EXAMINATION

11  BY MR. DEE:

12  Q.  Mr. Miljas, you did not receive the amount of the proposed

13  gross purse for the Visser fight in October 2019 from Greg Cohen

14  Promotions?

15  A.  Correct.

16          MR. DEE:  That's all I have, Your Honor.

17          MR. SCHRADER:  I have a follow-up question.

18          THE COURT:  Go ahead.

19          MR. SCHRADER:  Thank you, Judge.

20                    RE-RECROSS-EXAMINATION

21  BY MR. SCHRADER:

22  Q.  Let's assume for argument's sake that you didn't receive a

23  specific amount.  Doesn't the contract provide a minimum amount

24  of a purse?

25  A.  Yes.

1   Q.  And isn't that the default amount, if nothing is agreed

2   differently?

3            MR. DEE:  No.  Objection.  That's -- that's your call,

4   Your Honor.  We're not -- this witness --

5            THE COURT:  Agreed.

6            MR. SCHRADER:  But, Your Honor, what the witness's

7   understanding was is relevant.

8            MR. DEE:  No.  The witness's understanding -- I mean,

9   I don't know if I'm talking against myself.  The witness's

10  understanding doesn't change the language of the contract and

11  its legal interpretation.

12           THE COURT:  I agree.

13           MR. SCHRADER:  Your Honor, the --

14           THE COURT:  So the argument you're making is if -- if

15  in silence he should have assumed $1,000?  That's the argument

16  you're making?

17           MR. SCHRADER:  Well, we're going to argue that it was

18  conveyed, but what I'm arguing is that if it wasn't conveyed,

19  wasn't there a provision in the contract that dealt with that,

20  that would have essentially filled that gap?

21           MR. DEE:  But the provision in the contract is what

22  the minimum should be when they make the offer.

23           THE COURT:  Agreed.

24           MR. SCHRADER:  Well, that's -- we don't agree with how

25  you interpret that, but that's --

GREG COHEN - DIRECT

97

1          THE COURT:  That's my job, and I'll take care of it.

2          MR. SCHRADER:  Okay.

3          THE COURT:  Let's let our witness step down.

4          MR. SCHRADER:  Thank you, Judge.

5          THE COURT:  I assume Mr. Cohen is the next witness.

6          THE WITNESS:  Thank you.

7          MR. DEE:  Yeah.  We -- I'm not calling another

8  witness, Your Honor.

9          THE COURT:  I assume -- okay.  I'm sorry.  Are you

10 calling Mr. Cohen --

11         MR. SCHRADER:  I'm sorry.  I didn't know you were

12 ready.

13         THE COURT:  Yeah.

14         MR. SCHRADER:  I call Mr. Cohen to testify.

15         THE CLERK:  Please raise your right hand.

16            GREG COHEN, DEFENDANTS' WITNESS, SWORN

17         THE CLERK:  Thank you.  Please have a seat.

18                     DIRECT EXAMINATION

19 BY MR. SCHRADER:

20 Q.  Mr. Cohen, can you tell me what GCP is?  I'm using the

21 abbreviation but . . .

22 A.  It's a boxing promotion company.

23 Q.  And what's your position at GCP?

24 A.  I am the CEO of GCP.

25 Q.  And were you the CEO of GCP throughout the relevant time

1    frame of 2018 through 2020?

2    A.   Yes.

3    Q.   You saw a document that was identified as the Exclusive

4    Boxing Promotional Agreement.  Is that the agreement between

5    yourself and the plaintiff?

6    A.   Yes.

7    Q.   And was that signed by all parties?

8    A.   Yes.

9    Q.   You don't dispute that that's the agreement that's in

10   effect; correct?

11   A.   No, I don't dispute that.

12   Q.   Okay.  What is the job of a promoter in the boxing world?

13   A.   A promoter's job is to stage the events and as it relates to

14   his fighters that are under contract to provide fights for that

15   fighter and certain minimum purses for that fighter, and they

16   have contracts with fighters that vary in terms of how long they

17   last, you know, but multiyear agreements.

18   Q.   And what does a manager do in the boxing world?

19   A.   A manager is -- is the -- has a fiduciary responsibility to

20   the fighter.  A manager negotiates on behalf of the fighter with

21   the promoter.  The manager tends to the day-to-day needs of the

22   fighter, equipment, training, helps them out, you know, in a

23   variety of ways and also has financial responsibilities to the

24   fighter that differ on a case-by-case basis.  But if I could

25   just make a quick analogy.  You know, if you look at other

1   sports, the promoter is more like the team owner, and a manager

2   would be like an agent, you know, that's specifically on behalf

3   of that athlete.

4   Q.   Does the manager have a role in helping assist the boxer in

5   the process of setting up fights or evaluating fights?

6   A.   The manager is the point of contact for the boxer.

7   Industrywide, the protocol is the manager and the promoter

8   speak.  The manager conveys whatever was discussed to the

9   fighter.  They speak amongst each other, come back to the

10  promoter, and that's really how, you know, the communication is

11  involved.

12  Q.   At the time that you entered into the boxing promotional

13  agreement, did you understand whether Miljas had or didn't have

14  a manager?

15  A.   It was my belief he did not have a manager at that time.

16  Q.   And what did you understand his father's role was, if

17  anything, in connection with assisting Miljas?

18  A.   I knew that he was his father, so he was a concerned father,

19  and I knew that he participated as a cornerman when Mladen

20  fought.

21  Q.   Did your understanding of whether there was a manager impact

22  on the way in which the promotional agreement was drafted?

23  A.   Yes.

24  Q.   And in what manner?

25  A.   Well, when a fighter has a manager, the manager is a party

GREG COHEN - DIRECT

1  to the agreement, and the agreement is written differently

2  because the manager -- again, the protocol is when there's a

3  manager involved, all offers and information is disseminated

4  promoter to manager, manager to fighter, and, you know, the

5  reverse.

6  Q.  Is there any reflection in the promotional agreement of

7  whether there's a manager involved that was included at the time

8  that the agreement was drafted and signed?

9  A.  No.

10  Q.  When -- when did Mr. Heid become the manager for the

11  plaintiff?

12  A.  Sometime in March or April, I believe, of 2019.

13  Q.  And when Mr. Heid came on board to assist Mr. Miljas, did it

14  change the way that you interacted with the fighter?

15  A.  Yes, it did.

16  Q.  And in what way?

17  A.  Mr. Heid became Mladen's point person, and he was the one

18  who was contacting me, contacting me often, and, again, that's

19  how the information was disseminated, through Mr. Heid.  Very

20  seldom at that point did Mladen and I interact directly, or when

21  we did interact, it was often on a three-way phone call, or

22  sometimes we did speak on the phone or text one another.  More

23  just generally, how are you doing; how's training; what's going

24  on, things like that.  But when it came to the business of

25  setting up fights and things of that nature, that was all

1  conveyed through Mr. Heid.

2  Q.   So prior to Mr. Heid coming on board as a manager, how did

3  you communicate with the fighter about upcoming fight offers?

4  A.   Again, we -- we would talk on the phone, and then what would

5  happen is at some point there would be a bout agreement issued

6  to the fighter, to Mladen, that on the bout agreement it would

7  say who he was fighting, the date, the purse, the location, all

8  necessary information, and that bout agreement every time he

9  fought had to be filed with the state commission that was

10 overseeing the bout and the event.

11 Q.   After Mr. Heid came on board, how did you communicate fight

12 offers to the fighter?

13 A.   Again, it was done verbally.  We would get on the phone, but

14 it was done through Mr. Heid, and if Mladen wanted to fight, we

15 would discuss it more, and if he didn't, then, you know --

16 ultimately he's the decision maker whether he's going to fight

17 or not.

18 Q.   Okay.  Is there anything in the contract that puts any type

19 of burden on the fighter with regard to whether he should or

20 shouldn't accept the fight?

21 A.   The dates of these bouts, the opponents, they are -- there's

22 a schedule that the promoter has, and in the contract it calls

23 that the promoter sets forth when these fights are occurring,

24 who they're going to be against, what the -- what the financial

25 remuneration is going to be, and it's -- you know, I lost my

1  train of thought.  Could you ask the question again?  I'm sorry.

2  Q.  Sure.  Is it possible to have the question read back?

3        THE COURT:  Yes.

4        (The requested portion of the record was read by the

5  court reporter.)

6  A.  It says -- I believe it says that his acceptance of

7  opponents should not be unreasonably withheld.

8  Q.  With regard to the different fights that were offered to

9  Mr. Miljas, did you believe that each of the fights that were

10 offered to him were appropriate for him?

11 A.  I did.

12 Q.  Did you believe that the Travis Fulton fight was

13 appropriate?

14 A.  Yes.

15 Q.  The Wayman Carter fight?

16 A.  Yes.

17 Q.  The Matthew Greer fight?

18 A.  Yes.

19 Q.  The Aaron Chavers fight?

20 A.  Yes.

21 Q.  There -- so I think it's undisputed that there was a

22 proposal for the Ruann Visser fight and that -- is that -- do

23 you agree that that -- there was a proposal made for the fighter

24 to fight Ruann Visser?

25 A.  Yes -- yes, there was, and it was first brought to my

1  attention in actually August of 2019 by the promoter in Canada

2  who was putting on that event contacted me, and he actually --

3  he knows Mladen because they, I guess, were often together in

4  the same location in Las Vegas in the gym, and one of Mladen --

5  or a fighter that's from a nearby town that Mladen -- near where

6  Mladen's from in Canada, a gentleman by the name of Cody

7  Crowley, also trained in the gym in Vegas, and he was headlining

8  a show in Canada.  They came to me and said, listen, Mladen is

9  from the area; would you guys be interested in being on that

10 card, so it was first addressed in August of 2019.

11          THE COURT:  Can you spell Cody Crowley?

12          THE WITNESS:  C-o-d-y, and I think it's C-r-o-w --

13 C-r-o-w-l-e-y, I believe.

14          THE COURT:  Thank you.

15 Q.  And how did the proposal to have that fight evolve from this

16 conversation in August?

17 A.  Again, I had -- you know, a -- the promoter -- or the

18 promoter for the event in Canada was somebody I've known a

19 while, you know, many years, over 10, and they just thought --

20 we were talking, and we thought it would be, you know, a good

21 opportunity for Mladen to fight near his hometown in Canada.

22 Q.  You heard Mladen testify about a conversation in which this

23 fight was communicated to him.  Can you tell me what you recall

24 about the fight being communicated to the plaintiff?

25 A.  Well, so Mladen was scheduled to fight on, I believe,

1  September 14th, 2019, near Washington, D.C.  I think it was in

2  Virginia.  And that fight was canceled a couple days before the

3  fight.  I want to say -- call it the 12th of September.  I heard

4  both from -- or all three.  I heard from Steven Heid, I heard

5  from Mladen, I heard from Eddie Mustafa Muhammad and then later

6  from Mladen's father that Mladen was very disappointed that that

7  fight fell through, and they were putting a lot of emphasis that

8  I needed to deliver a fight as soon as possible.  You know,

9  Mladen fought in August.  Then he was supposed to fight back to

10 back in September.  He's ready.

11         And so I then -- I was dealing with the people in

12 Canada.  I believe it was about 10 days later I got -- and it

13 could be 2 weeks.  I don't know the exact time frame, but in a

14 relatively short period of time, we got the firm offer to fight

15 Ruann Visser, and that's when we got on the phone with Mladen --

16 and this was in September.  This was, I want to say, sometime --

17 call it between the 20th and the 30th of September.  And Eddie,

18 Steven, myself expressed that we thought this was a great

19 opportunity for Mladen.  Not only would he be fighting in front

20 of his hometown; he said he wanted to step up his competition.

21         On paper Visser looked better than the opposition he

22 had been fighting.  He had a better record and more experience.

23 We thought the risk-reward -- we did not believe that Visser

24 would pose a big problem for Mladen.  We thought Mladen would

25 win the fight.  And also the fight was going to be on UFC Fight

1  Pass, so Mladen would actually have an opportunity to be seen by

2  fans all around the world on the UFC Fight Pass streaming

3  system.

4  Q.  Can you explain what that is?

5  A.  It's -- it's the -- the UFC, the Ultimate Fighting

6  Championship.  They have a subscription-based platform that

7  receives hundreds of thousands, if not sometimes a million plus

8  viewers.  It gets, you know, far more viewership than most of

9  the boxing -- traditional boxing mediums, and this would have

10 been really an opportunity for Mladen to be seen on a worldwide

11 basis, and it was following him just becoming world-rated,

12 again, by the WBA, which is the world's oldest sanctioning body.

13 I mean, that's the title Muhammad Ali had, and this was an

14 opportunity for Mladen to really raise his profile, you know, by

15 being seen on that platform.

16 Q.  There was a period of time where it's agreed that Eddie

17 Mustafa Muhammad was training Mladen between April of 2019 and

18 August of 2019.  Did you have communications with Mladen, with

19 Muhammad, and/or with Steven Heid about scheduling any fights

20 for Mladen during the period of time while he was training with

21 Muhammad?

22 A.  Yes is the answer.

23 Q.  And can you tell me about those conversations or

24 communications?

25 A.  So I spoke with all three of them individually a number of

GREG COHEN - DIRECT

1   times, and the message was conveyed that Mladen had made a

2   decision that he was going to relocate from Canada to Las Vegas.

3   That was going to be his new home would be Las Vegas for

4   purposes of training with Eddie, and I think -- not I think.  I

5   mean, he was very excited at that point.  He had visited, gone

6   for I think a week or two, a few weeks to see if they gelled.

7   They did.  He had just, you know, started a new relationship

8   with Steven Heid as well.  Eddie Mustafa had a prior obligation

9   to a world champion fighter of his who was fighting in mid July

10  in Japan, and Eddie was actually out of the country for over a

11  month leading up to that fight, so I was directed to have --

12  schedule a fight for Mladen upon Eddie returning from Japan,

13  which I think the fight that we ended up having was roughly a

14  month after Eddie returned from Japan.

15  Q.  And that's the August 9th Aaron Chavers fight?

16  A.  Yes.

17          THE COURT:  Directed by whom?

18          THE WITNESS:  By my discussions with Eddie, Steven,

19  and Mladen regarding the scheduling of Eddie.

20  Q.  At the point in time when you began your promotional

21  relationship with Mr. Miljas, how would you characterize his

22  existing record and status in the boxing world?

23  A.  He was -- he was 8 and 0 with 8 knockouts, so he had a

24  nice-looking record, but at this stage in your career when

25  you're 8 and 0 -- and Mladen didn't have an extensive amateur

1   career.  He was really, you know, learning on the job as a

2   professional fighter.  Everybody knew he was big and strong and

3   can punch, and he looked like a promising prospect, but he was

4   not considered anything other than a promising prospect on a

5   regional level at the time he signed with me.

6   Q.  And what was the rationale behind the fights that you

7   selected for him?

8   A.  So -- the rationale was, look, he -- he was in the building

9   stage of his -- of his career, and it was very important for him

10  to get experience and have more fights, build his record.  There

11  was a mystique to him.  Preserving that knockout ratio for

12  fighters, especially a heavyweight to have a 100 percent

13  knockout ratio, I mean, it's -- it's a big selling tool, big

14  marketing tool, and we had a plan, and we were carrying the plan

15  out.

16  Q.  As a result of the four fights that Mr. Miljas did, the

17  Travis Fulton, Wayman Carter, Matthew Greer, and Aaron Chavers,

18  was there -- were you able to get a rating for the fighter with

19  the WBA?

20  A.  After -- after the Chavers fight, Mladen was world-rated in

21  the top 15 by the WBA.

22  Q.  And what is the significance of that?

23  A.  If you're in the top 15 in the world ratings of the 4 major

24  sanctioning bodies, which are the WBA, WBC, IBF and WBO, you're

25  eligible to fight for the world title, and just to illustrate

1    what that means, when you're at the stage where Mladen was prior

2    to this, you're fighting smaller fights against -- undercards

3    typically, not televised, fighting for your contractual minimums

4    to build to the point where, okay, now we can step up.  Now we

5    can -- now there's going to be a little bit more risk because

6    you're fighting higher-level opposition.

7            The only reason to fight higher-level opposition is if

8    there's higher financial remuneration.  And, again, that was the

9    template that was set and we were following, and it led to

10   negotiations with Manuel Charr's promoter, and Manuel Charr's

11   team for Mladen was -- we were considered to fight Charr for the

12   WBA regular heavyweight championship, and just to put things

13   into perspective, Mladen was fighting for single digit thousands

14   of dollars, and this would have been, you know, 250 to possibly

15   even closer to a half a million dollars.  So, you know, you're

16   talking about a meteoric rise, and if he would have won that

17   fight which -- look, to his credit, he was all for it when we

18   discussed it.  He wanted this opportunity, and if he would -- if

19   it would have happened and he would have won, well, now you're

20   talking about 7, 8, and possibly even 9-figure fights for

21   Mladen, and that's how quick the jump is made.

22   Q.  What impact would -- if Mladen had won the Visser fight if

23   he had participated, what impact would that have had in your

24   opinion?

25   A.  It would have -- it would have been the most credible win of

1  his career.  It would have -- the perception amongst the boxing

2  community would -- okay.  This guy is not just, you know, a

3  devastating puncher and an undefeated heavyweight with a -- you

4  know, an impressive record, but, hey, he just knocked out, you

5  know, another, let's call it -- Visser would be more of a fringe

6  prospect.  He had a couple of losses but not a bad fighter, and

7  it would have had a very positive effect on Mladen's perception

8  and on his rating.

9  Q.  Did you think that Mladen's rejection of the Visser fight

10  was reasonable or unreasonable?

11  A.  I felt it was unreasonable.

12  Q.  And why did you feel that?

13  A.  He was scheduled to fight September 14th, then -- and was --

14  again, wanted to fight as close to that date as possible.  He

15  was in shape.  He was in Las Vegas, and he was ready to go, and

16  then when the -- when I was told that Mladen -- the offer was

17  made, and then I was told after the offer had been made and he

18  rejected it on the phone -- he discussed he felt that, you know,

19  he wasn't comfortable with what Steven, myself, and Eddie had

20  said, and he did not want the fight.  Then he informed us that

21  he was going back to Canada, and I informed him and I believe

22  Steven and Eddie did too -- I was not on the phone with them at

23  the time but that, hey, okay, you're going back to Canada;

24  you're in shape; you can train in Canada; your -- your trainer

25  can go to Canada; if you want the fight, it can happen, and he

GREG COHEN - DIRECT

1   didn't want the fight.

2   Q.  In fact, wasn't that fight supposed to take place in Canada?

3   A.  The fight was taking place in Canada literally, I think, you

4   know, very close -- 15 minutes from his hometown where he lived.

5   Q.  So whether or not he had a visa issue, he could have

6   participated in that fight?

7   A.  Correct.

8   Q.  Okay.  You got involved in assisting Mladen to get a visa,

9   and can you explain why that came about?

10  A.  Well, when Mladen went back to Canada, he made it clear that

11  he was not going to fight until he had a visa, so I made an

12  executive decision because Mladen was an important prospect for

13  GCP, and, you know, we needed him to fight and he needed to

14  fight, and so we took the steps to ensure that -- we sponsored

15  him and filed his paperwork and got him his visa so he would

16  resume fighting.

17  Q.  Did there come about a follow-up offer for another Visser

18  fight?

19  A.  Yes.

20  Q.  And can you tell us about that?

21  A.  So -- you know, there's a series for prospects in boxing

22  called the ShoBox series on the Showtime network, and I've done

23  dozens of these events over the years, and they -- they were

24  giving me a slot for one of my fighters on a ShoBox event in

25  January of -- I guess at that point it would have been 2020, and

1   I wanted Mladen to fight, and they liked the Visser fight.  We

2   proposed it to Mladen, and he was not comfortable to take the

3   fight at that point.

4   Q.  Do you have a recollection of how that fight -- that second

5   Visser fight offer was communicated?

6   A.  It was communicated through Steven Heid, and I -- I believe

7   there's written correspondence between Steven and Mladen as well

8   as verbal, but, again, it was conveyed back to me that --

9          MR. DEE:  Objection.  Hearsay, what was related back

10  to him if it wasn't from Mladen.

11         THE WITNESS:  Well, it was --

12         THE COURT:  Sustained unless the answer you're going

13  to give comes from Mladen.

14  A.  I was told by Mladen that he was not looking to fight,

15  period, until he had his visa, and he knew the timing of when

16  he'd have his visa, and until then he was not fighting.

17  Q.  And how long did that period where he wasn't fighting until

18  he got his visa -- how long did that last?

19  A.  I believe he left for Canada the 1st or 2nd of October and

20  that he came back to the United States, I think, the 2nd of

21  January.  And when he came back in January, he said he was

22  training with Eddie and --

23         MR. DEE:  Again -- I'm sorry for interrupting,

24  Mr. Cohen.

25         Your Honor, the witness is taking off on all these

1 things that Mr. Miljas allegedly said, but I would really like

2 foundation laid as to who -- as to whether or not he's getting

3 information about what Mladen said directly from Mladen or

4 through Heid or Mr. Muhammad, because it's all getting bunched

5 together here.  His last answer about Mladen supposedly told him

6 he didn't want to fight until he got a visa, that was back in

7 September or October, when we were just now talking about the

8 second Visser fight in December or January, so I would just

9 interpose that objection, that the questions and the answers be

10 a lot more explicit about who is saying what to whom.

11        THE COURT:  Okay.

12        MR. DEE:  So I object to his last answer as lacking

13 foundation until we find out who he's talking about.

14        MR. SCHRADER:  I don't even recall what the question

15 and answer was at this point.  I didn't find anything improper

16 with the answers that we received.  I think counsel can ask a

17 follow-up question if he wants to clarify.

18        MR. DEE:  Not if it's about hearsay.

19        THE COURT:  Okay.  Just to be clear, Mr. Cohen, if

20 you're testifying about anything that Mladen said, it should be

21 something that was said to you directly.  Otherwise, you should

22 not be testifying about it.

23        THE WITNESS:  Understood.

24 Q.  So you saw the exclusive promotional agreement earlier, and

25 there's a provision in it in paragraph 30 where the fighter says

1  that he's going to be legally able to fight in the United

2  States.  Is that something that you normally put in your

3  agreements?

4  A.  That's in the agreement when a fighter is not from the

5  United States.

6  Q.  And what -- what happens if the fighter -- under your

7  agreement, what happens if the fighter is not properly able to

8  fight in the United States for a period of time?

9  A.  For that amount of time, the contract is suspended until the

10  fighter is permitted to fight in the United States.

11  Q.  If -- if the fighter was not able to fight in the United

12  States for that period of time, would that have suspended your

13  obligations to provide additional fights -- whether you did or

14  didn't do it, but would it have suspended your obligation to the

15  period of time when the fighter was not able to be in the United

16  States to fight?

17          MR. DEE:  Objection.  Calls for a legal conclusion.

18          THE COURT:  I agree.

19          MR. SCHRADER:  It's his interpretation of his own

20  contract.

21          MR. DEE:  Then I'd also object on relevance grounds.

22          THE COURT:  Okay.  First of all, that's not what the

23  contract says.  It doesn't say it suspends anything.  It says it

24  extends the contract.  The contract is for a term of -- what was

25  it?  30 months or 36 months or something along that.  So it

1   doesn't say anything about suspending the parties' obligations.

2   It says it will extend the terms of the contract.

3          MR. SCHRADER:  That's actually not correct, Your

4   Honor.  It says that it makes -- it constitutes a disability,

5   and if you actually cross-reference to the section that talks

6   about disability, there's a whole provision as to what that

7   means, and I -- we can have that as a legal argument at some

8   other time.  I --

9          THE COURT:  Okay.

10          MR. SCHRADER:  I didn't intend to have this witness go

11   into a legal analysis but just touch on what happens if the --

12   if the fighter --

13   Q.  So, Mr. Cohen, let me ask it this way.  What happens if the

14   fighter is not able to fight in the United States for a period

15   of time?

16   A.  The contract would be extended by that period of time.

17   Q.  And what obligations do you have that are different or the

18   same during the time that the fighter can't come in and fight in

19   the United States?

20   A.  During the time -- if he's not able to fight, I'm not able

21   to provide him, you know, fight offers or fights.

22   Q.  Notwithstanding whether Mr. Miljas was or wasn't able to

23   fight in the United States, in fact, wasn't it accurate that the

24   first Visser fight offer was to take place -- would have taken

25   place in Canada?

1  A.  That's correct.

2          THE COURT:  Can you help me find, counsel, where it

3  says in the contract that the fights have to occur in the United

4  States?

5          MR. SCHRADER:  Can we do that at the end of the day?

6          THE COURT:  Sure.

7          MR. SCHRADER:  I don't think it actually says that in

8  that language.

9          THE COURT:  Right.  That's what I understood as well,

10  but go ahead.

11          MR. SCHRADER:  Okay.  Yeah.  I mean -- Your Honor, I

12  might make a suggestion.  There are a couple of contractual

13  issues in terms of how or what the contract says on certain

14  issues.  Perhaps at the end of the day the Court would just

15  allow the parties to put in very brief letters or little mini

16  briefs just addressing those limited issues for the Court.

17          THE COURT:  That's fine.  I -- just by way of warning,

18  you're down to your last 12 minutes with this witness, so if you

19  have any final things you want to wrap up with him, you need to

20  do so fairly quickly at this point.

21          MR. SCHRADER:  I will do that, Your Honor.

22  Q.  There were -- there was an opportunity that was offered

23  to -- for certain fights with Top Rank Boxing in February of

24  2020.  Can you quickly tell us about those?

25  A.  Well, I conveyed to Mladen and his team -- Mladen directly,

1    Steven directly, Eddie directly verbally that I had -- because

2    of two of my other fighters, Robert Brant and Jarrell Miller,

3    who I had a co-promotion deal with Top Rank Boxing, I had a

4    contractual relationship with Top Rank to supply slots for other

5    fighters of mine on cards that Miller and Brant perform on, that

6    they're participating on.  So for -- there was supposed to be a

7    card -- there was supposed to be two cards between April and

8    June of 2020, one for Miller, one for Brant, and Mladen was

9    going to get a slot on those undercards.  When COVID happened,

10   those events did not come to pass, but as soon as the -- boxing

11   came back a little bit and Top Rank resumed their ESPN events,

12   the first slot that I had on July 9th was offered to Mladen for

13   him to appear on the Top Rank ESPN slot of GCP's.

14   Q.   And did he accept or reject that?

15   A.   He rejected it.

16   Q.   Did you make further offers to Mr. Miljas for other fights?

17   A.   Yes.

18   Q.   And can you -- was one of them for Simon Kean?

19   A.   I believe in September he was offered the Simon Kean bout

20   that he rejected, and then in, I want to say, November was

21   offered the Filip Hrgovic fight for the end of the year which he

22   rejected.

23   Q.   Since we're running out of time, I want to jump to a

24   slightly different topic.  To the extent that the exclusive

25   promotional provisions were not honored in the agreement, what

1    is potential damage exposure that you're going to face from lost

2    income from your promotional relationship?

3    A.   I don't understand the question.

4    Q.   Sure.   If the Court were to rule that it was granting a

5    preliminary injunction and that the fighter didn't have to honor

6    the exclusive promotional agreement at this time -- obviously it

7    would get resolved somewhere down the road -- what is the

8    potential monetary injury that you would face from not having

9    those promotional rights?

10   A.   It could be in the millions.

11   Q.   And how do you evaluate that?

12   A.   Well, again, a fighter -- a heavyweight fighter -- an

13   undefeated heavyweight very quickly goes from -- with one

14   significant victory in his career goes from making contractual

15   minimums to making hundreds of thousands and then millions of

16   dollars.   Mladen is at the point in his career where he's one

17   fight away from that happening, and, you know, the -- we were

18   not looking to rush him, meaning like when we selected -- or we

19   were looking to make the Charr fight, it was an appropriate

20   fight.   I'm not saying that every fight's an appropriate fight

21   for somebody in Mladen's career, and there's an art to knowing

22   what the -- it's playing chess, not checkers.   It's selecting

23   the proper opponent that's marketable, that you can -- that TV

24   is willing to pay, and if somebody else signed Mladen today or

25   somebody else -- if GCP was not able -- was not his exclusive

1    promoter, they might say, you know what?  Let's throw the kid

2    in; let's use him for one of our other guys, and he could -- he

3    could be a B side instead of an A side, which, you know, an

4    opponent, and if he loses once, I mean, it's almost -- I can't

5    say his career is over, because it's not, but it's years to get

6    back to, you know -- to the level where he was.

7              MR. SCHRADER:  I thank you for your testimony.

8              THE COURT:  Cross-examination?

9              MR. DEE:  Thank you, Your Honor.

10             MR. SCHRADER:  Your Honor, before you start, we have

11   one last witness who's out in the hall who I think will be a bit

12   shorter but probably will take about 20 minutes on our side, so

13   just --

14             THE COURT:  Is this Mr. Heid?

15             MR. SCHRADER:  Yes, it is, Your Honor.

16             THE COURT:  What's your thought?

17             MR. SCHRADER:  I'm not sure what time it is.  My cell

18   phone battery has died.

19             THE COURT:  It's 4:30, so, Mr. Dee, I assume you have

20   more than 10 minutes of cross-examination of this witness;

21   correct?

22             MR. SCHRADER:  I can -- I can expedite Mr. Heid if we

23   have to.  I can probably finish him in 10 minutes, but it will

24   be very abbreviated.

25             MR. DEE:  Well, but then we need cross.

1           MR. SCHRADER:  I understand that.

2           THE COURT:  What is Mr. Heid going to be testifying

3    about?  Just in general terms.

4           MR. SCHRADER:  Sure.  He's going to testify what the

5    role of the manager is, his specific communications with regard

6    to the different fight offers, whether or not some of the fight

7    offers that are contested actually occurred, and I think that's

8    the most important stuff, and the other stuff I can kind of

9    leave out.  But those are things where he's either going to

10   corroborate or not corroborate either side's testimony so far.

11          THE COURT:  Okay.  I need to hear the

12   cross-examination of this witness before we can go down that

13   road.  So, Mr. Dee, go ahead.

14          MR. DEE:  Thank you, Your Honor.

15                       CROSS-EXAMINATION

16   BY MR. DEE:

17   Q.  So, Mr. Cohen, my name's Mike Dee.  I'm Mladen's attorney.

18   We've never met before, have we?

19   A.  No.

20   Q.  No.  You haven't had your deposition taken or any discovery

21   done in this case; correct?

22   A.  Yes, sir.

23   Q.  Understanding that, I think -- and I know the judge will

24   correct me if I'm wrong -- that one of the purposes of this

25   today is to determine credibility of the witnesses.  When we get

GREG COHEN - CROSS

120

1  a one says "X" and one says "not X" situation, I feel incumbent

2  to point out that you were convicted of wire fraud by the -- by

3  the federal government in 2019; correct?

4  A.  Correct.

5  Q.  All right.  And the allegation -- well, and then -- and you

6  pled guilty; correct?

7  A.  Correct.

8  Q.  And served six months -- just under six months, five and a

9  half --

10  A.  Correct.

11  Q.  -- in federal prison?  And your service time was

12  February 4th to late July?

13  A.  Correct.

14  Q.  Okay.  And you pled guilty to stealing $200,000 from someone

15  who you promised to put into a private placement stock purchase

16  essentially; correct?

17  A.  That is incorrect.

18  Q.  No.  What's incorrect?  The amount or the representation you

19  made?

20  A.  No.  I did not -- I pled guilty to one count of wire fraud.

21  Q.  Correct.

22  A.  I did not steal anybody's money.  He was paid back with a

23  large interest rate.

24  Q.  He was -- he was paid back.  You had a plea agreement --

25  A.  Yep.

GREG COHEN - CROSS

121

1   Q.  -- that you pled to; correct?  And the amount was $200,000;

2   correct?  That the Government alleged that you took by wire

3   fraud; correct?

4   A.  I -- again, I pled to one count of wire fraud for a $200,000

5   transaction.

6   Q.  Yeah.  That's what I was getting was the 200.  So -- and I

7   understand you did pay it back, but you -- but you did pay it

8   back as part of -- you know, as part of your sentencing;

9   correct?

10  A.  No.  I paid it back.  It was not part of my sentencing.

11  Q.  Well, you appeared -- the person who sentenced you was Judge

12  Lorna Schofield?

13  A.  It was paid back well before my sentencing.

14  Q.  It was.  And do you recall that during your sentencing that

15  this issue came up, Mr. Cohen, about the timing of your

16  repayment?  Do you recall?

17  A.  I don't recall.

18  Q.  Do you recall Judge Schofield saying during your sentencing

19  that the repayment was a product of negotiations with the victim

20  and was repaid only after you were arrested, and the judge was

21  concerned that, quote, some element of this was to create the

22  best picture possible before your sentencing; so although there

23  is a good side to what you've done, I think it is colored

24  somewhat by the need to paint the best picture possible; don't

25  misunderstand; that is a natural thing for you and your lawyers

1   to want to do, but the facts are the facts in terms of the

2   timing and what happened.  Do you recall that --

3          MR. SCHRADER:  Your Honor --

4   Q.  Do you recall the judge making that statement to you during

5   your sentencing?

6          THE COURT:  There's an objection.

7          MR. SCHRADER:  Your Honor, for purposes of time,

8   Mr. Cohen acknowledges this.  Maybe he could just put a

9   transcript in rather than reading the transcript.

10          MR. DEE:  Well, if I --

11          THE COURT:  And that wasn't -- that wasn't the

12   objection I expected.

13          MR. SCHRADER:  I mean, it just -- we're running out of

14   time today so . . .

15          THE COURT:  I understand.  As you'll recall from my

16   communication with the parties, I gave you each a certain amount

17   of time to allocate.  You've run out of time.  You've used all

18   the time I allocated to you other than 7 minutes is what you

19   have left.  That's the problem.  You chose to do a lengthy

20   cross-examination of Mr. Mladen -- or Mladen.  You chose to do a

21   lengthy direct examination of Mr. Cohen, and so you've run out

22   of time.  If Mr. Dee wants to use his remaining, you know, 20

23   minutes this way, he can do that.

24          I was going to sustain a hearsay objection, but you

25   didn't make that particular objection.

1          MR. SCHRADER:  He pled guilty to the crime.  It is

2  what it is so --

3          THE COURT:  I don't disagree with that.  Again, if you

4  make a hearsay objection, I will sustain it.

5          MR. SCHRADER:  Okay.  Objection.  Hearsay.

6          THE COURT:  Sustained.  Go ahead, Mr. Dee.

7  Q.  And, Mr. Cohen, Mladen is not the first one of your fighters

8  to have sued you for a breach of contract and other issues, is

9  he?

10 A.  I've been in the business over 30 years.  I've had a handful

11 of lawsuits.

12 Q.  So is the answer to my question yes, Mr. Miljas is not --

13 A.  Mr. Miljas is not the only fighter I've had a lawsuit with.

14 Q.  Okay.  And you have had lawsuits filed against you -- do you

15 remember Austin Trout?

16 A.  Sure.  He was a world champion of GCP's.

17 Q.  Yeah.  Former super welterweight; correct?

18 A.  Uh-huh.

19 Q.  Yes?  Is that a yes for the court reporter?

20         THE COURT:  I'm sorry.  Welterweight?

21         MR. SCHRADER:  It's a weight class, yes.

22         THE COURT:  Okay.  Showing my ignorance there.  Go

23 ahead.

24 Q.  Is it true that the allegation was that you forged the

25 signature on the contract?  Not that you did, but that was the

GREG COHEN - CROSS

124

1  allegation?

2  A.  I actually sued him, and then he counter-sued me, but -- I

3  don't recall what his allegations are.  All I recall is that he

4  settled, and he paid me a lot of money.

5  Q.  Well, you've opened that door.  You didn't pay him anything?

6  A.  No.  He owed me money.  I didn't owe him anything.

7  Q.  Uh-huh.  Sam Clarkson?

8  A.  Yeah.

9  Q.  He sued you because he claimed you owed him money you never

10  paid him for a 2017 fight; correct?

11  A.  He alleged that.

12  Q.  Right.  And you settled with him?

13  A.  He was paid every dollar that he was owed.

14  Q.  You settled with him?

15  A.  No.  He was paid every dollar that he was owed.

16  Q.  Did you settle that lawsuit with him?  Yes or no, Mr. Cohen?

17  A.  That lawsuit settled, yes.

18  Q.  Yeah.  And who is Sarah Fina, F-i-n-a?

19  A.  She worked for GCP.

20  Q.  Yeah.  And isn't it true she posted on Twitter the actual

21  general release from that lawsuit?

22          MR. SCHRADER:  Objection.

23  A.  I have no idea.

24  Q.  And dated --

25          THE COURT:  Hold on.  There's an objection.

1                MR. SCHRADER:  So we're --

2                THE COURT:  What's the objection?

3                MR. SCHRADER:  So, Your Honor, this is all kind of

4    hearsay stuff.

5                THE COURT:  I agree.  Sustained.

6                MR. DEE:  Well, I'm asking -- this is somebody -- with

7    all due respect, this is, as he just said, a statement from a

8    GCP employee, so from my position it's a statement of the party

9    opponent.

10               MR. SCHRADER:  Your Honor, this is exactly the same

11   thing that I was precluded of doing earlier.  These are hearsay

12   statements.

13               MR. DEE:  Well, it's not hearsay if it's a party

14   opponent.

15               MR. SCHRADER:  Somebody who is not acting in their

16   capacity as a party is not a party statement.

17               THE COURT:  There's some legal nuances here that are

18   different, but at any rate, I think we're far afield of what

19   matters.

20               Here is what I want to know.  What was conveyed to

21   Mr. Miljas during that three-way telephone call?  That's what I

22   want to know.  Somebody ask him that, please.

23               MR. DEE:  You're getting ahead of where I am in my

24   outline, Your Honor.

25               THE COURT:  You can go back if you want.  I just -- by

1    the time we hit 5:00, if somebody could please ask that

2    question, which is the only one I asked you guys to ask

3    basically, that would be great.

4    Q.  All right.  So let's talk about this call, Mr. Cohen.  You

5    testified it was a week or two -- I think you said --

6    A.  Between the 20th and the 30th of September.

7    Q.  Yes.  Thank you.  Between the 20 -- I was going to say 20 to

8    30 days, but the 20th and 30th of September.  But when you had

9    that call, Mladen was in Canada already; correct?

10   A.  No.  I believe he was in -- that call was in -- that call

11   was in September.  I was told he wasn't in Canada until --

12   Q.  I'm sorry for interrupting.  Who -- before you finish the

13   answer, who told you what you are about to say?

14   A.  Mladen, Eddie, and Steven --

15   Q.  Okay.

16   A.  -- all told me.

17   Q.  Okay.  We don't care -- Eddie and Heid, with all due

18   respect --

19   A.  I'm just answering your questions.

20   Q.  So Mladen told you during that call that he was still in

21   Vegas?  That call that took place between the 20th and the 30th

22   of September about the Visser fight in October?

23   A.  They were in Vegas.

24   Q.  Who is they?

25   A.  I was told that they were in Vegas.

GREG COHEN - CROSS

127

1   Q.  Who told you that they were -- that Mladen was in Vegas?

2   A.  The four of us were on the telephone:  Mladen, Steven,

3   Eddie, and myself.  It was discussed that Mladen was in Vegas,

4   and then after he rejected the fight, a few days later I was

5   told by, again -- and this was not on a three-way that --

6   Q.  I'm sorry for interrupting you.  You were told by whom?

7   A.  I was told by Eddie --

8   Q.  Okay.

9   A.  -- that Mladen left --

10           MR. DEE:  Objection.  Hearsay.

11           THE COURT:  Sustained.

12  Q.  Do you understand you're not supposed to be testifying about

13  what Eddie and Heid told you, sir?

14           MR. SCHRADER:  Excuse me.

15           MR. DEE:  I mean, that will speed things up.

16           MR. SCHRADER:  You can make your objections.  Please

17  don't instruct the witness.  The judge can do that.

18           THE COURT:  I already did but -- okay.  A call happens

19  in September, sometime between the 20th and 30th of September.

20  The four of you are on the phone.  What was said?

21  Q.  So you -- Mladen's testimony that the call took place in

22  early October, you disagree?

23  A.  It happened in September.

24  Q.  All right.  So your -- all right.  So did you -- you told

25  them about -- well, you told them it was Visser; correct?  Who

1   the opponent would be?

2   A.   Correct.

3   Q.   The date?

4   A.   Correct.

5   Q.   The location?

6   A.   Correct.

7   Q.   And you say you told him what the gross purse would be?

8   A.   It was an eight-round fight -- his other fights had been

9   six-round fights -- and that he'd be getting his contractual

10  minimum for an eight-rounder.

11  Q.   You told him that?

12  A.   Correct.

13  Q.   You specifically remember that?

14  A.   I said, You're fighting for your contractual minimum.

15  That's a standard thing to have in a conversation with a fighter

16  when you're going over the purse.  That was said.

17  Q.   And Mladen in that call then said no.

18  A.   Mladen rejected the fight and -- yes.  That's all that I was

19  privy to with a direct conversation with Mladen about his

20  rejection.

21  Q.   So you never had a conversation with Mladen about why he

22  didn't want to take that fight?

23  A.   I had several conversations after the fact with Mladen.

24  Q.   After the fact of --

25  A.   After that conversation and after he rejected that fight.

1  Q.  With Mladen?

2  A.  Mladen and I, when he moved back to Canada --

3  Q.  Yeah.

4  A.  -- because we were dealing with his visa, so we were in --

5  he and I were having a number of one-on-one conversations on the

6  telephone after he went back to Canada.

7  Q.  All right.  About this fight with Visser in October?

8  A.  Just about a number of things that including -- including

9  that.

10  Q.  My question for you, sir, is can you testify to the judge

11  today in court that Mladen told you personally the reasons why

12  he was uncomfortable taking that fight?

13  A.  On the phone with my own ears, Mladen said he -- he was

14  rejecting the fight.  He did not want the fight.  He said that

15  his head was not in the right place, and he was rejecting the

16  fight.

17  Q.  Did he say why his head was not in the right place?

18  A.  I don't recall on that conversation.

19  Q.  Mladen -- you heard his testimony; you were in here -- said

20  part of that is because he was already back in Canada and didn't

21  have someone training with him.  Is your testimony that that's

22  not the reason that his head wasn't in the right place?

23  A.  My testimony is that at the time we had that conversation, I

24  was told on the phone by Mladen and Eddie that they were in

25  Vegas, that there was enough time -- Eddie kept saying and

1  Mladen too --

2  Q.  I'm --

3  A.  I'm explaining what Mladen said.  This was the conversation,

4  that he was in Las Vegas and that there was ample time for him

5  to train for the fight, and Mladen said, No, my head is not into

6  it; I'm -- I'm rejecting the fight.  I'm paraphrasing.  That's

7  not a quote.

8  Q.  So Mladen -- your testimony is that Mladen when this offer

9  was made was still in Las Vegas; correct?

10  A.  I'm testifying that that's what I was told.

11  Q.  By Mladen?

12  A.  Was he there?

13  Q.  Your testimony is that Mladen was still in Las Vegas;

14  correct?

15  A.  That I was told that Mladen was in Las Vegas by Mladen and

16  Eddie.

17  Q.  And that he didn't want the fight because he said his head,

18  as you described it -- I don't want to mistake how you said it.

19  His head wasn't in it essentially?

20  A.  Essentially.

21  Q.  But at that point in time as you understood things, he was

22  still in Vegas, still had his trainer every day, still had his

23  manager -- did that answer that he gave you make sense to you?

24  A.  I -- what answer?

25  Q.  That his head wouldn't be in it?

1   A.   He -- I don't know how he feels.  That's -- that's -- you

2   know, listen.  I have a fighter who was supposed to fight

3   September 14th, implored me through himself, his manager, his

4   trainer, and even an e-mail from his father to get him a fight

5   as soon as possible.  I get him a fight very quickly thereafter,

6   and I -- and then the fight happens to be in Canada.  He's

7   making a decision thereafter that he's going to Canada.  I was

8   very surprised that he did not want the fight and especially

9   fighting in front of his hometown.

10  Q.   You're saying he was making a decision thereafter to go to

11  Canada.  Are you saying he had a choice whether or not he could

12  have stayed in the U.S. without a visa?

13  A.   I'm -- again --

14  Q.   Your terminology.

15  A.   No -- well, that's not what I said.  What I'm saying is he

16  made the choice that he did not -- the fight was happening in

17  Canada.  The fight offer was always in Canada.  The fight was

18  known about in August of 2019 but didn't become official until

19  sometime after the 20th of September of 2019.  Okay.  It was

20  rejected.

21  Q.   One of the last things you said in your direct from

22  Mr. Schrader was -- he was asking you questions about the losses

23  and the money towards the end of the -- you know, what could be

24  made, what might not be made, and one of the things you said

25  was, you know, if someone loses -- if someone in Mladen's stage

1  of his career loses once -- I tried to write this as fast as I

2  could, and I have it in quotes -- it could be years to get back

3  to where he was before.

4  A.  Correct.

5  Q.  So isn't that all the more reason why if he wasn't properly

6  prepared for the Visser fight, he shouldn't take it?

7  A.  Again, that's his decision.  If he doesn't want to take a

8  fight, that's up to him.  My obligation is to make the offer.

9  My obligation it to arrange the bout, give him a bona fide offer

10  with a bona fide opponent for a bona fide dollar amount.  If he

11  is not comfortable, that's -- that's his decision that he can

12  make.  The fighter doesn't set the schedule with TV and when

13  fight cards are happening.

14  Q.  One of the things you also testified about during your

15  direct examination was at least your understanding that Mladen

16  didn't want to fight from April to roughly August of 2019;

17  correct?

18  A.  Mladen and his team.

19  Q.  Mladen and his team.  You know, Mr. Cohen, your attorney and

20  I have shared all sorts of documents so far in the case, and

21  we've got all these exhibits that we've submitted to the Court,

22  and -- and I've never seen anything in writing, a text, an

23  e-mail, anything from anybody, even Mr. Muhammad and Mr. Heid,

24  that reflects something as major as a fighter saying, I don't

25  want to fight the next four or five months.  Would you agree

1  that you're not -- you couldn't find anything and there's

2  nothing in writing?

3  A.   What I can tell you is that --

4  Q.   With all due respect because we're running out of time, if

5  you could just answer my question.  Are you aware -- have you

6  submitted everything?  Do you have anything in writing that

7  would corroborate your testimony that Mladen chose -- and his

8  team chose not to fight for four or five months in 2019?

9  A.   I don't think I have anything in writing, but I have plenty

10 of conversations, and I checked up on Mladen in writing via text

11 when Eddie was out of the country, and we had -- and he was

12 doing things on his own.  You know, there was communication in

13 writing between us, and Mladen kept telling me how pleased he

14 was with the way his training was going, and Eddie told him what

15 to do when he's not here, and when he gets back, he's ready to

16 go.

17 Q.   Exactly.  I agree.  There's all sorts of stuff about how he

18 was enjoying his training and getting ready to fight.  I agree

19 with you.

20 A.   And the moment Eddie got back, within -- within four weeks

21 of Eddie being back -- I mean, the fight was already scheduled

22 in, I think, June for August.  Mladen was in the ring.

23 Q.   Getting back to my question about whether there's anything

24 to corroborate -- anything in writing to corroborate what you're

25 now saying --

1          If we could pull up Exhibit 20.  If we go -- let's

2     see.  Scroll down a little further.  Right there.  So

3     Exhibit 20, Mr. Cohen, is an e-mail -- let's see that -- yeah,

4     is an e-mail that Mr. Heid forwarded to Mladen from you on

5     May 31st of 2020, and this is your response to Mladen's -- at

6     this point his notice of termination of the contract, and one of

7     the things you say in here is in the second sentence starting on

8     the right side of the first line, In fact, even when Mladen

9     moved back to Canada, his choice, GCP arranged for a bout in his

10    hometown on October 19th, 2019, which Mladen rejected.  Do you

11    see that?  Do you see that sentence?

12    A.   I see the sentence.

13    Q.   That's what I meant.  I just wanted to make sure you're

14    tracking with me, that we're at the same place.

15    A.   Yes.

16    Q.   And then, you know, you talked a little bit when he moved

17    back to Canada, he decided that he would not return to the USA

18    until he received his visa, that kind of thing.  I mean, you're

19    essentially giving him reasons in this e-mail, as I interpret it

20    anyway, as to why you did meet your contractual obligation of

21    getting four fights a year.  Would you agree that was the

22    purpose?

23    A.   I don't know if that was the purpose.

24    Q.   Well, you're responding why you don't think you've breached

25    the contract.  Would you agree?  You said at the very last

1  sentence that the GCP is in good standing.

2  A.  Again, I don't know the context.  I don't know what this is

3  in response to.

4  Q.  All right.  Well, my point is here you are sending an e-mail

5  response from -- I guess you were still in prison on May 31st.

6  Is that -- were you still incarcerated at that point?

7  A.  I was.

8  Q.  So you're sending an e-mail response to Mladen as to why you

9  haven't breached the contract, and nowhere in here do you say,

10 And don't forget, you refused to fight for four or five months

11 in 2019.  Wouldn't this have been an appropriate place to say

12 that?

13 A.  Again, I don't know the context, and, again, I -- I

14 didn't -- this is not from -- when I was in prison, I don't have

15 access to my e-mail, so this was something that I forwarded to

16 my office, and they must have transcribed it and sent it to him.

17 I did not send this directly.

18 Q.  Okay.  But this is your message.  This is your

19 communication.  Regardless of how many people it went through --

20 A.  I believe it was in response to something that was sent to

21 me, but I don't -- I don't see the -- I don't have the context.

22 Q.  Okay.  Let me ask it really simply this way, Mr. Cohen.  At

23 the end of it it says, Sincerely, Greg Cohen.  Are you claiming

24 that was not an e-mail that originated with you?

25 A.  No.  I'm claiming that it is an e-mail that originated with

1  me.  What I'm saying is I was answering something, and I don't

2  know the exact context.  Every -- every -- you're talking about

3  something -- this e-mail was written May 31st, 2020.

4  Q.  Uh-huh.

5  A.  You're talking about something in September of 2019 and

6  saying why didn't you reference it in this e-mail?  Again, this

7  was not -- I don't know why.  I didn't reference a lot of things

8  that happened in that, you know, whatever it is, 10-month or

9  9-month period.  You know, I don't know.

10 Q.  Let's look at Exhibit 25.  Go down to the letter.  This is a

11 long exhibit, but the last few pages of it -- keep going -- are

12 the letter from Michele Cohen, who I think you said earlier is

13 your wife?

14 A.  She is.

15 Q.  Yeah.  Okay.  So here's a letter dated -- get the date up

16 there -- June 19th of 2020, and it's sent from your wife as your

17 attorney in fact, you know, your power of attorney, I suppose;

18 correct?

19 A.  Correct.

20 Q.  Did you have anything to do with the preparation of this

21 letter?

22 A.  I communicated as best I could under my circumstances, and,

23 again, GCP is a company.  I am the CEO of GCP, but there are

24 people at GCP, and this was in response to Mladen sending GCP a

25 notice of breach, and Baruch Gottesman, who is an attorney that

1    GCP uses from time to time, crafted this response based on

2    information members of GCP gave him.

3    Q.  Well, let's scroll down to the second page, and being a good

4    lawyer, he has letters and numbers, so in section B(i),

5    there's -- right there, yeah, compliance with the contract.  I

6    respectfully reject and return your Notice to Cure because we

7    are in full compliance with our obligations pursuant to the

8    Agreement.  Here's why.  And then the first bullet point points

9    out, again, the fight that Mladen turned down with Visser in

10   October, and then there's an argument about how you define

11   calendar year.  But, again, here's another example -- you're

12   responding to someone who says you've breached the agreement,

13   and even in this opportunity you do not say anything about

14   Mladen refusing to fight for four or five months in 2019;

15   correct?

16   A.  I don't have to say it.  Mladen said it himself.  He moved

17   back to Canada --

18   Q.  In fact, Mr. Cohen, there is nothing in the record prior to

19   the filing of this motion for an injunction anywhere that you or

20   your team or your company or anybody alleged that Mladen refused

21   to fight for four or five -- these four or five months in 2019;

22   correct?

23   A.  There's nothing in writing for that?

24   Q.  Right, until after this lawsuit and this injunction motion

25   was filed; correct?

1   A.   I don't see anything in writing.  It was certainly said.

2   Q.   Now, one of the other things you said when we were talking

3   about the October fight was you -- he had just -- you know, he

4   was already prepared to fight Damion Reed in September in

5   Virginia a month earlier; correct?

6   A.   And he had just fought in August a few weeks before that.

7   Q.   Right.  Now, Damion Reed isn't anywhere near the caliber of

8   Ruann Visser you have to admit.

9   A.   Agree.  No.

10  Q.   Yeah.  I mean, Damion Reed, as I remember -- as I understand

11  it had a record of 3 and 20, and he was a light heavyweight;

12  correct?

13  A.   No.  For you to categorize that he was a light heavyweight,

14  that would be a violation of a boxing commission.  It is not

15  allowed to have a light heavyweight fight a heavyweight.  That's

16  against the law.  So for that to be categorized is just

17  improper.

18  Q.   Okay.  So your testimony --

19  A.   My testimony is that he's a licensed heavyweight, and the

20  fact that he at one point was a light heavyweight -- Evander

21  Holyfield was a light heavyweight.  He became heavyweight

22  champion of the world.  Michael Spinks was a light heavyweight.

23  He became heavyweight champion of the world.  It happens often.

24  Roy Jones Junior was a middleweight.  He became heavyweight

25  champion of the world.  James Toney was a middleweight, 160

GREG COHEN - CROSS

1  pounds, became heavyweight champion of the world.  It is not

2  uncommon for fighters as they get older to move up in weight

3  classes, and this is an opponent.  You know, he was not a great

4  fighter, but he was a licensed heavyweight fighter by the state

5  commission.

6  Q.  You would never take the position that the preparation for a

7  fight with Damion Reed is the equivalent of the preparation

8  needed to fight Ruann Visser, would you?

9  A.  I would take the position and use Mladen's own words that he

10 said today.  He's always in the gym.  He's always ready.  He's

11 always training.  And this was not physical fitness training.

12 He was in the gym with his trainer preparing for fights, and to

13 have several weeks' notice -- call it -- probably four weeks'

14 notice to fight Ruann Visser after just fighting a month before

15 that is more than ample notice.

16 Q.  Right.  Well, you said the phone call was between the 20th

17 and the 30th of September.  If the phone call --

18 A.  Well, three weeks --

19 Q.  Can I -- let me finish.

20 A.  Call it three weeks.

21 Q.  Yeah.  Possibly --

22 A.  Three --

23 Q.  -- less than three weeks' notice.

24         THE REPORTER:  I can only take one person at a time.

25         MR. DEE:  Yeah, I know.

1    Q.  Let me finish my question, Mr. Cohen.

2    A.  I'm sorry.

3    Q.  You know, it is quite possible that you gave him less -- by

4    your own testimony less than three weeks to prepare for the

5    Ruann Visser fight, if he was told on the 29th or 30th.  Simple

6    math; correct?

7    A.  It could be -- it's possible.  Not probable but possible.

8    Again, this -- this was --

9    Q.  I'm sorry.  There's no question --

10   A.  This was contemplated -- this was contemplated in all of

11   this.

12              MR. DEE:  There's no question pending, Your Honor.

13              THE COURT:  Stop.  Wait for a question.

14   Q.  One last series of questions, I think -- lawyers' famous

15   last words -- about this role of a manager.  One of the things

16   you said that I really agree with, Mr. Cohen, is that a manager

17   has a fiduciary obligation to a fighter; correct?

18   A.  Correct.

19   Q.  Yeah.  And you testified that, you know, you didn't know

20   that Mladen's father, Joe, was his manager in the year --

21   roughly year before Mr. Heid was hired as his manager; correct?

22   A.  Correct.  He was not acting as a manager.

23   Q.  Did you know that he was listed on BoxRec as his manager?

24   A.  I did not know that, and BoxRec, again -- BoxRec is not

25   official.

1   Q.  But it's used a lot.

2   A.  It's a website.  It's not official like --

3   Q.  It's actually the official recordkeeping site of the --

4   A.  The recordkeeping --

5   Q.  -- Association of Boxing Commissioners, isn't it?

6          THE COURT:  Stop.  One at a time.

7   A.  BoxRec is for verifying fights that have taken place and the

8   results of fights, not who is somebody's manager or promoter.

9   Q.  Well, regardless of what the practice may be in -- what you

10  claim the practice is in the industry, doesn't your contract in

11  the first sentence of paragraph 6 require you to make an offer

12  to the boxer to promote a bout?

13  A.  Yes.

14         MR. DEE:  Okay.  All right.  That's all I have, Your

15  Honor.

16         THE COURT:  Okay.  You've got a few minutes left,

17  Mr. Schrader, if you want to do any redirect.

18         MR. SCHRADER:  Could you just pull that page back up?

19  I'd just ask one more question on that page.  Thanks.

20                      REDIRECT EXAMINATION

21  BY MR. SCHRADER:

22  Q.  Mr. Cohen, does the contract require you to make the offer

23  in writing?

24         MR. DEE:  Objection.  Calls for a legal conclusion.

25         MR. SCHRADER:  He just asked him questions about the

STEVEN HEID - DIRECT

142

1  same paragraph.

2          THE COURT:  Go ahead and answer.

3  A.  It does not say that I have to make -- a promoter has to

4  make the offer in writing.

5          MR. SCHRADER:  No questions.

6          THE COURT:  Okay.  Mr. Cohen, you are excused.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  So presumably you would offer

9  Mr. Heid to testify about this particular phone call that took

10  place sometime between -- well, I guess the earliest it could

11  have been was September 20th, and the latest it could have been

12  was the date of the fight, October 19th, somewhere in that range

13  of time; is that right?

14          MR. SCHRADER:  Yes, Your Honor.

15          THE COURT:  You can bring him in here and ask those --

16  those -- limited to that.

17          MR. SCHRADER:  I will do so.  Thank you, Judge.

18          THE CLERK:  Please stand and raise your right hand.

19          STEVEN HEID, DEFENDANTS' WITNESS, SWORN

20          THE CLERK:  Thank you.  Please have a seat.

21          THE COURT:  Mr. Schrader.

22                    DIRECT EXAMINATION

23  BY MR. SCHRADER:

24  Q.  Mr. Heid, were you the manager -- or was your company the

25  manager of the plaintiff in this case, Mladen Miljas?

   Case 4:20-cv-00320-SMR-SBJ   Document 34   Filed 04/12/21   Page 143 of 155

1   A.   Yes.

2   Q.   Were you a party to a telephone -- let me ask you a

3   different way.  Were you involved in any communications in which

4   the Visser fight -- the original Visser fight that was to take

5   place in Canada was told to Mladen?

6   A.   I was -- I knew about the Visser fight from Greg's son, who

7   is also an employee of the company.  He had mentioned it to me,

8   and it was discussed not once but twice.

9   Q.   And what do you recall about different conversations

10   relating to the fight?

11   A.   Mladen didn't want to fight Visser.  His father actually

12   even called me to tell me that Mladen should take the fight and

13   he doesn't understand what his son's doing.  Visser is a guy who

14   has a good record, but he lost to a guy that had 5 wins, 8

15   losses; 2 wins, 3 losses.  He had a fancy record, but he wasn't

16   really a good fighter, and it was an international televised

17   event where Mladen, who was at the time, I believe, ranked

18   number 15 had a great opportunity to move up into the rankings,

19   and he was right there, and unfortunately he did not take the

20   fight.  If you want me to elaborate and continue, I certainly

21   will.

22   Q.   There was a -- do you have a recollection of a phone

23   conversation that involved you, Mr. Cohen, Mr. Muhammad, and

24   Mladen in which the fight offer was discussed with him or

25   conveyed?

144

1   A.   I do believe, yes.

2   Q.   Okay.  Can you tell us what you recall about that?

3   A.   Mladen wasn't really interested in the fight.  He brought up

4   this whole thing about his visa, and he was afraid to go back to

5   Canada because he was concerned he wouldn't get back into the

6   U.S., so Mladen didn't really want to hear it.  He was avoiding

7   it at every cost, and it actually led to friction between him

8   and I, so the conversation wasn't very long.  The dollars and

9   cents weren't really discussed.  It was discussed that the fight

10  would take place, I believe, in October in Canada, in Ontario,

11  basically in Mladen's backyard, and then also the fight was

12  offered again to him on a ShoBox date in, I believe, January.

13  Q.   Do you have any recollection as to whether or not there was

14  any discussion of the amount of the purse, a minimum or greater

15  amount?

16  A.   It might have been discussed.  I don't remember.  I think it

17  might have been -- I don't want to say the wrong information,

18  but it was -- it was a decent payday for Mladen.  By far, his

19  highest payday.

20  Q.   Do you have any other recollection of that phone -- can you

21  tell me -- do you have a recollection of when that conversation

22  occurred?

23  A.   It occurred right before Mladen went back to Canada, which I

24  believe was after the September fight that was supposed to

25  happen that fell through.  I believe it was the end of September

1  or the beginning of October.

2  Q.  Okay.  Do you recall whether -- where Mladen was at the time

3  that that phone conversation took place?

4  A.  The first conversation I had with him he was still in Las

5  Vegas, and he made it very clear that he didn't want to fight

6  Visser, but he used his visa as an excuse.

7  Q.  Do you have any other recollection of that conversation?

8  A.  As far as -- Eddie thought it was the perfect opponent for

9  him.

10        MR. DEE:  Objection.

11  A.  He was the trainer.  He was on the phone call.

12        MR. DEE:  I'm sorry, Mr. Heid.  Excuse me.

13        THE COURT:  Stop.

14        MR. HEID:  Heid.

15        MR. DEE:  That's what I said.  Objection.  Hearsay.

16        THE COURT:  Sustained.

17  Q.  Did you believe that this was an appropriate fight for

18  Mladen?

19  A.  It was the perfect fight for Mladen, yes.

20  Q.  Why did you think that?

21  A.  First of all, he was ranked number 15 in the world because

22  of Greg Cohen Promotions.  It was an internationally televised

23  fight.  It was the highest payday he was going to receive, and

24  it was the perfect opponent.  The guy had a fancy record, but as

25  you can see from his fights if you looked him up, he lost to a

1   bunch of mediocre lower-level guys.

2   Q.   Did you have any subsequent conversations with Mladen about

3   fighting Visser?

4   A.   I spoke to Mladen a few times about it.  First, it started

5   off, as I said, about his visa, that he didn't want to go back

6   to Canada because I believe the fight was in Ontario or

7   somewhere in his backyard.  And then in the middle of the night

8   he picked up and he left, and he went back to -- to Canada on

9   his own which none of us understood.  I found out three days

10  later from the trainer.  But Mladen said he'll fight him at a

11  later date, that he wasn't -- he didn't want him for this fight

12  but at a later date, which was also presented to him in -- for a

13  January fight on, I believe, ShoBox.

14  Q.   Were you -- were you a party to any communications with

15  Mladen about a subsequent date on ShoBox for a Visser fight?

16  A.   It was just mentioned that it was going to be in January.

17  Mladen and I at that point -- things went really bad when Mladen

18  and I -- after a fight that he had in Minnesota where he failed

19  a drug test, and it just -- it was bad after that.

20  Q.   Did your relationship with him -- did he allege that your

21  relationship was terminated with him at some point in time?

22  A.   He did, yes.

23  Q.   Do you recall approximately when?

24  A.   I believe he terminated me -- let's see.  He turned down a

25  fight again in July of 2020.  It was right after that.  Maybe

1   August or September.  I'd have to look at my records.

2   Q.  Did Mladen institute a lawsuit against you in Florida

3   relating to --

4             THE COURT:  Okay.  This is --

5             MR. SCHRADER:  Okay.  I was just trying to close the

6   thing but --

7             THE COURT:  No.  I understand.  We're just out of

8   time.

9             MR. SCHRADER:  Okay.  No problem.

10            THE COURT:  Mr. Dee?

11                          CROSS-EXAMINATION

12  BY MR. DEE:

13  Q.  Just a couple of things, Mr. Heid.  By the way, my name's

14  Mike Dee.  I represent Mladen.  You said a second ago he just up

15  and left Las Vegas in the middle of the night for reasons no one

16  knew; right?

17  A.  That's not how I said it.  I said he left because he was

18  concerned about his visa which is what he claimed -- first he

19  told me that he was concerned that if he went back to Canada

20  that he would be stuck there, but he was permitted to go back

21  and forth with whatever papers he had.  I suggested to him, Why

22  don't you go back to Canada, take this fight, if that's your

23  concern; work on your visa, and come back after the fight.  In

24  the middle of the night, I found out two days later from his

25  trainer, Eddie Mustafa Muhammad, who is a world champion and

 1  probably the best trainer in the world, that Mladen had picked

 2  up and left.

 3  Q.  And, Mr. Heid, who was responsible for getting Mladen a visa

 4  and the immigration papers he needed?

 5  A.  Greg Cohen Promotions took care of it.  I was --

 6  Q.  No, no.  Excuse me for interrupting.  I know who took care

 7  of it.  Who was responsible for doing it, though?

 8  A.  I had it listed on my contract with Mladen, but Greg Cohen

 9  Promotions, it was discussed with Mladen -- see, this whole

10  thing comes about because --

11          MR. DEE:  Your Honor?

12          THE COURT:  Yep.

13          MR. SCHRADER:  Your Honor, the whole thing is beyond

14  the scope of direct anyway.

15          THE COURT:  Sort of.

16          MR. SCHRADER:  And I kind of just -- I kind of didn't

17  jump in but --

18          THE COURT:  Stop.  All I want to hear about is the

19  phone call.  I am aware there are all kinds of issues between

20  all of these people.  I'm well aware that it impacts, you know,

21  the credibility determinations and the motives and all of those

22  kinds of things.  All I want to hear about is this particular

23  witness's recollection about this telephone call that happened

24  between the four people about the Visser call sometime between

25  September and October of 2019.

1          MR. DEE:  I have no questions about that phone call.

2    We can live with this witness's testimony.

3          THE COURT:  Excellent.  Okay.  Then for now you are

4    excused, Mr. Heid.

5          I want to talk with the parties about sort of what --

6    what this means and what this doesn't mean.

7          For one, I understand absolutely there are a lot of

8    very strong feelings about what's going on.  There are a lot of

9    irritations with each other and with the issues at hand.  All of

10   these are things in my mind that will be fleshed out in later

11   litigation.

12         The issue that's facing me right now is the more

13   limited question presented by this preliminary injunction, and

14   that's what I am focusing on today, because clearly there are

15   high stakes here for Mr. Miljas and Mr. Cohen with respect to

16   whether this contract stays in place while litigation advances

17   given that clearly the parties can't work together, and so

18   that's what I need to make a decision on.

19         Mr. Schrader, you had asked to brief some of the

20   issues I've raised in writing.  I think that's a smart idea.  I

21   will tell you that, you know, in my review of the contract, I

22   certainly read it as -- in a plain reading requiring that the

23   boxer be advised by Greg Cohen Promotions about these bouts and

24   that he be told the name of the opponent and the gross purse to

25   be paid to the boxer.  That -- I interpret that to mean that

1   even if the custom in the industry is when there's a manager you

2   talk to the manager, that's not what your contract says.  And so

3   that may well be an issue for later litigation for a jury to

4   consider, but I don't see it as one that I need to resolve right

5   now under a plain reading of the contract.

6          There is this issue of whether or not Mr. Miljas could

7   fight within the United States and what that meant if he became

8   disabled and, if disabled, what it triggered within the

9   contract.  I assume the parties then are talking about a

10   reference to paragraph 20, which talks about in the event a

11   boxer becomes permanently or partially disabled, the promoter

12   can extend the contract or terminate the agreement and then says

13   at the promoter's sole discretion, the agreement can be

14   suspended during the period of the boxer's temporary retirement,

15   if any, but shall become fully operative if and when boxer

16   resumes boxer's professional boxing career, and so this isn't a

17   great fit for our facts.  I am interested in how the parties

18   read that language and whether it -- the contract in any way

19   required that these fights happen within the United States.  I

20   know one was offered in Canada.  I think there was one that's

21   been discussed in -- was it Bosnia or Croatia?  I don't

22   remember.  But there's some other foreign country one that's

23   referenced in the parties' briefing, and so the question is

24   whether even if Mr. Miljas could not fight within the United

25   States from October to December of 2019 whether that meant that

1 he was disabled under the terms of the contract and what that

2 triggered.

3       We've got, of course, then the credibility call that

4 I'll ultimately have to make about what was said during this

5 phone call, and then we've got issues with the written

6 documents.  The foundation on many of the written documents that

7 have been submitted are -- are just missing.  I -- they're

8 almost useless in the sense that I can't tell who they went to.

9 I can't tell when they went.  There's very little corroboration

10 of things.  They're excerpts of text messages that have no

11 context.  It would be very helpful to me if there were ever

12 phone records that corroborated who even has these phone numbers

13 and that these calls that everybody says happened actually

14 happened, but that's something maybe the parties can address.

15       If, Mr. Schrader, you want to make an argument that

16 they don't have to tell him what the purse is because he should

17 assume the minimum is triggered under the contract, you can make

18 that pitch as well, and I'll -- of course, Mr. Miljas through

19 his counsel can argue whatever they think that means.

20       How much time would you like to do this additional

21 briefing and respond to each other's additional briefing?

22       Mr. Dee?

23       MR. DEE:  How much time -- I mean -- I mean, we -- we

24 are in a hurry.  I mean, I would say -- let's say -- well, I

25 mean, I -- 10 days.  A week from Monday.

1          MR. SCHRADER:  Your Honor, I guess that depends on

2     whether Your Honor wants us to integrate facts from the

3     transcript or just strictly limit it to legal issues.  Because

4     if we need to get the transcript, I assume that that will

5     take -- even if we expedite it, it will still take a couple of

6     days.

7          THE COURT:  I have no idea what --

8          MR. SCHRADER:  Our intent is not to rebrief everything

9     that's already been briefed but just to focus on the specific

10    contractual issues and the things that Your Honor just talked

11    about on the record.  Maybe what would be helpful is just if the

12    parties can order on an expedited basis the last couple of

13    minutes of transcript so that the issues are defined and then

14    give us two weeks to brief those issues.

15          THE COURT:  Okay.  Let's go off the record for a

16    minute so I can just talk with the court reporter.

17          (Off the record.)

18          THE COURT:  The court reporter has advised that she's

19    currently finishing up a 600-page other transcript that's also

20    been expedited, but she can fit this one in and would be willing

21    to work over the weekend to get those things accomplished, so if

22    an expedited is ordered, she can get that turned around in a

23    matter of days, if necessary, either the whole thing or just the

24    tail end.

25          Now, I don't need a relitigation of what I heard.  I

1   heard what I heard.  I saw the testimony and heard the testimony

2   given, so I don't want the parties to spend time on that because

3   we don't need 25 more pages.

4           I do think there's some urgency to getting this

5   resolved, frankly, for everybody, and so I think the 10-day

6   suggestion is appropriate here.  I'll ask that briefs be filed

7   by the parties by Monday -- a week from Monday.  That will give

8   you probably about a week with the transcript, a little bit

9   less, but you shouldn't really need the transcript for purposes

10  of what you're briefing in any event.

11          MR. SCHRADER:  Your Honor, can you just extend that a

12  couple extra days because -- you know, I still have to travel

13  back home and -- so I can't really get started on it until

14  probably Tuesday of next week.

15          THE COURT:  As long as you don't need to cross-respond

16  to each other, that's great.

17          MR. SCHRADER:  I'm fine --

18          THE COURT:  Are you going to need to cross-respond to

19  each other?

20          MR. SCHRADER:  Mike, how do you want to handle that?

21          THE COURT:  Or we shorten that window up.  I mean, I

22  want to get an answer to both parties.

23          MR. SCHRADER:  Let me give a suggestion.  Why don't we

24  do 10 days, and then the parties have 7 days to give a response.

25          THE COURT:  Can you live with that?

1          MR. DEE:  Fine.

2          THE COURT:  10 days and then 7 days to respond, and

3    then I'll get an order out as quickly as I can.

4          Anything else to talk about today?

5          MR. DEE:  Not from the plaintiff, Your Honor.

6          MR. SCHRADER:  Not from this end, Judge.

7          THE COURT:  Travel safe, those of you who are.

8          There was a whole series of names, Mr. Dee, that you

9    rattled off towards the end of your cross-examination of

10   Mr. Cohen.  If you could just make sure our court reporter has

11   those spellings, that would be helpful.  She can probably spend

12   all the time Googling the names of all the heavyweight

13   champions, but it would be helpful --

14         MR. DEE:  No, I got it.

15         THE COURT:  -- to her getting this expedited to have

16   those.

17         Okay.  Everybody take care, and we are adjourned.

18         (Proceedings concluded at 5:20 p.m.)

19              C E R T I F I C A T E
          I, Tonya R. Gerke, a Certified Shorthand Reporter of
20   the State of Iowa and Federal Official Realtime Court Reporter
     in and for the U.S. District Court for the Southern District of
21   Iowa, do hereby certify, pursuant to Title 28 U.S.C. Section
     753, that the foregoing is a true and correct transcript of the
22   stenographically reported proceedings held in the above-entitled
     matter and that the transcript page format is in conformance
23   with the regulations of the Judicial Conference of the U.S.
          Dated at Des Moines, Iowa, April 10, 2021.
24                    /s/ Tonya R. Gerke
                      Tonya R. Gerke  CSR, RDR, CRR
25                    Federal Official Court Reporter

1                          INDEX

2       **MLADEN MILJAS,** PLAINTIFF'S WITNESS           11

3    DIRECT EXAMINATION BY MR. DEE                   14

4    CROSS-EXAMINATION BY MR. SCHRADER               51

5    REDIRECT EXAMINATION BY MR. DEE                 86

6    RECROSS-EXAMINATION BY MR. SCHRADER             92

7    RE-REDIRECT EXAMINATION BY MR. DEE              95

8    RE-RECROSS-EXAMINATION BY MR. SCHRADER          95

9       **GREG COHEN,** DEFENDANTS' WITNESS             97

10   DIRECT EXAMINATION BY MR. SCHRADER              97

11   CROSS-EXAMINATION BY MR. DEE                   119

12   REDIRECT EXAMINATION BY MR. SCHRADER           141

13      **STEVEN HEID,** DEFENDANTS' WITNESS           142

14   DIRECT EXAMINATION BY MR. SCHRADER             142

15   CROSS-EXAMINATION BY MR. DEE                   147

16

17

18

19

20

21

22

23

24

25