IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MLADEN MILJAS, | ) | Case No. 4:20-cv-00320-SMR-CFB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER ON DEFENDANTS' MOTION |
| | ) | TO DISMISS AND PLAINTIFF'S |
| GREG COHEN PROMOTIONS, LLC, and | ) | MOTION FOR PRELIMINARY |
| GREG COHEN, | ) | INJUNCTION |
| | ) | |
| Defendants. | ) | |

Before the Court is a Motion to Dismiss by Defendants Greg Cohen Promotions, LLC

("GCP") and Greg Cohen, the CEO of GCP, [ECF No. 8]; and a Motion for a Preliminary

Injunction by Plaintiff Mladen Miljas. [ECF No. 11]. For the reasons set forth in this Order,

Defendants' Motion to Dismiss is GRANTED in part, and DENIED in part. Plaintiff's Motion for

a Preliminary Injunction is GRANTED.

## I.    FACTUAL BACKGROUND[1]

Plaintiff is a professional boxer from Canada who competes in the heavyweight division.

[ECF No. 7 ¶ 1]. Plaintiff won the Canadian heavyweight championship in 2017 and was recently

ranked as high as 41st in the world and 2nd in Canada. *Id.* He has won all 12 of his bouts, winning

each of them by knockout. *Id.*

In June 2018, Plaintiff entered into an "Exclusive Boxing Promotional Agreement"

("Agreement") with GCP. *Id.* ¶ 22. The Agreement provides GCP with "the sole and exclusive

---

[1] The facts in this Section are drawn from Plaintiff's Complaint. [ECF No. 7]. When
evaluating a motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations
in the Complaint, but it need not accept the legal conclusions. *See Brown v. Medtronic, Inc.*,
628 F.3d 451, 459 (8th Cir. 2010).

worldwide right to secure all professional boxing bouts . . . and promote such bouts during the term." [ECF No. 7-1 ¶ 1].[2]  Section 3 of the Agreement obligates GCP to schedule a minimum of four bouts within each calendar year.  *Id.* ¶ 3.  GCP must "use reasonable efforts to promote or arrange . . . a reasonable number of bouts, commensurate with [Plaintiff's] level of ability, ranking, stature in the boxing industry and marketability."  *Id.*  In turn, the Agreement specifies, "[Plaintiff's] approval of opponents shall not be unreasonably withheld."  *Id.* ¶ 5.

Prior to signing the Agreement, Plaintiff had "self-represented" himself throughout his career, scheduling and promoting his own bouts with the help of his family.  [ECF No. 7 ¶ 17].  Plaintiff's first bout under the Agreement was held on September 8, 2018.  *Id.* ¶ 24.  No other bouts were scheduled for Plaintiff for the remaining months of 2018.  *Id.* ¶ 30.  Plaintiff participated in three bouts in 2019: January 18, March 2, and August 9.  *Id.* ¶¶ 33, 37.  In total, between September 2018 and August 2019, GCP scheduled four bouts for Plaintiff.  *Id.* ¶¶ 24–42.  Plaintiff alleges these bouts were against boxers far below his skill level, who were much older and smaller than him.  *Id.*  GCP scheduled two other bouts, but according to Plaintiff, they were cancelled with dubious explanations or no explanation at all.  *Id.* ¶¶ 23, 42.

After the August 9, 2019 bout, Plaintiff, who was living in Las Vegas, alleges he needed to return to his native Canada in September 2019 due to concerns regarding his immigration status.  *Id.* ¶ 49.  Plaintiff alleges the concern about his immigration status was a result of Defendants' failure to submit paperwork necessary for him to obtain a visa.  *Id.* ¶ 48.  It was around this time

---

[2] Generally, the Court does not consider matters outside the pleadings in deciding a motion to dismiss under Rule 12.  But "documents 'necessarily embraced by the complaint' are not matters outside the pleading."  *Enervations, Inc. v Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (citations omitted).  And documents incorporated by reference, items necessarily "integral to the claim," and matters "subject to judicial notice" or of public record may properly be considered in evaluating whether a complaint states a claim for which relief may be granted.  5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed.).

that Greg Cohen was charged and convicted of unrelated fraud charges in the United States District Court for the Southern District of New York. *Id.* ¶ 51. Cohen was sentenced to six months in federal prison for the conviction. *See* J., *United States v. Gregory Cohen*, Case No. 19CR397 (S.D. N.Y. Nov. 20, 2019), ECF No. 23.

Plaintiff returned to Las Vegas in January 2020. [ECF No. 7 ¶ 52]. After he returned to Las Vegas, Plaintiff alleges Steven Heid[3] provided him with "multiple contracts for fights that lacked key information and appeared to be fraudulent." [ECF No. 7 ¶ 52–53]. Plaintiff alleges Heid furnished these contracts while Cohen was incarcerated and did so at the direction of Cohen. *Id.* Despite asking for details about the bouts, Plaintiff alleges he was not provided any further information and was told later that his opponents had pulled out of the bouts. *Id.* No other bouts were scheduled by GCP on behalf of Plaintiff. *Id.* ¶ 54. Plaintiff alleges he was stripped of the Canadian Heavyweight Championship due to inactivity and his world ranking dropped from 41st in the world to 101st. *Id.* ¶ 55.

Plaintiff sent a breach of contract notice ("Breach Notice") to GCP on May 21, 2020, citing GCP's failure to perform its obligations under the Agreement, which triggered a 30-day period for GCP to cure its breach. *Id.* ¶ 67–68. Plaintiff's justification for the Breach Notice was GCP's failure to schedule the minimum number of bouts and its failure to find suitable opponents, both of which were required by Section 3 of the Agreement. [ECF Nos. 7 ¶ 68; 7-1 ¶ 17].[4] GCP

---

[3] The Complaint describes Heid as "Cohen's long-time business partner." [ECF No. 7 ¶ 52]. Evidence submitted in support of the Motion for Preliminary Injunction revealed Heid is also Plaintiff's manager. [ECF No. 28-2]. This fact is not relevant to the Motion to Dismiss but will be discussed during the Court's analysis of the Motion for Preliminary Injunction.

[4] The opponents named in the Complaint are Travis Fulton age 43, ranked 644th in the world. [ECF No. 7 ¶ 25]; Wayman Carter age 42, ranked 596th in the world, *id.* ¶ 34; Matthew Greer age 43, ranked 637th in the world, *id.* ¶ 35; Aaron Chavers age 39, ranked 534th in the world, *id.* ¶ 38.

responded to the Breach Notice with a letter from GCP's counsel outlining why the company was not in breach of the Agreement. [ECF No. 7 ¶¶ 70–71]. GCP claimed it was in compliance with the Agreement but at the same time asserted its performance was excused due to the coronavirus pandemic.[5] *Id.* ¶ 71. On June 21, 2020, two days after receiving GCP's response, Plaintiff sent a Notice of Termination ("Termination Notice") based on GCP's alleged failure to satisfy its obligations under Section 3. *Id.* ¶ 73. GCP provided no response to the Termination Notice. *Id.* ¶ 74.

## II. PROCEDURAL HISTORY

On October 15, 2020, Plaintiff filed suit against GCP and Greg Cohen alleging claims for breach of contract, tortious interference with existing and prospective contracts, defamation, fraudulent inducement, fraud, and violation of the ALI Act. [ECF No. 7]. Plaintiff also seeks a declaratory judgment declaring that the Agreement has been validly terminated. *Id.* The Complaint was originally filed in a redacted form, [ECF No. 1], but an unredacted Complaint was subsequently filed on December 9, 2020. [ECF No. 7]. Defendants filed this pre-answer Motion to Dismiss on December 10, 2020, seeking to dismiss all claims against Cohen individually and the claims against GCP for tortious interference, defamation, fraud, and fraudulent inducement. [ECF No. 8].

Plaintiff filed Motion for Preliminary Injunction on December 22, 2020, [ECF No. 11], requesting the Court to enjoin Defendants from contacting Plaintiff without the presence of his counsel; contacting third parties about Plaintiff's contractual status with GCP; or making defamatory statements about Plaintiff. [ECF No. 11]. The Court heard oral argument on the

---

[5] Neither party has yet presented evidence that the pandemic impacted their ability to perform under the Agreement.

Motion for Preliminary Injunction on February 16, 2021. [ECF No. 26]. At oral argument, the Court requested the parties submit supplemental documents supporting their position on the preliminary injunction. After the parties submitted the additional documents, an evidentiary hearing was held where the Court heard live testimony from Plaintiff, Greg Cohen, and Steven Heid. [ECF No. 33]. At the conclusion of the evidentiary hearing, the Court requested a supplemental round of briefing on contractual issues, to which the parties provided in timely fashion. *See* [ECF Nos. 35; 36; 37; 38].

## III.  DISCUSSION

### A.  *Personal Jurisdiction Over Cohen*

This case, involving a Canadian boxer and a New Jersey boxing promoter, is before the Court because the Agreement contains a forum-selection clause designating Iowa as the chosen forum for any disputes arising out of the parties' contractual relationship. [ECF No. 7-1 ¶ 25]. The Agreement also selects Iowa law to govern any such dispute. *Id.* ¶ 24.

Federal courts apply the long-arm statute of the forum state to determine the existence of personal jurisdiction over the parties. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). The exercise of personal jurisdiction over a defendant also must not violate due process protections. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.,* 89 F.3d 519, 522 (8th Cir. 1996). A plaintiff bears the burden to "make a prima facie showing of personal jurisdiction," and this showing "must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citation omitted).

The parties agree Iowa's long-arm statute permits personal jurisdiction to the fullest extent allowed by the Due Process Clause of the Fourteenth Amendment. *Hammond v. Fla. Asset Fin.*

*Corp.*, 695 N.W.2d 1, 5 (Iowa 2005) (citation omitted). Defendants move to dismiss all claims against Cohen in his individual capacity due to a lack of personal jurisdiction. Neither general nor specific jurisdiction exists over Cohen, Defendants argue, because he is a New Jersey resident with no specific ties to Iowa. Defendants maintain that Cohen cannot be bound by the forum-selection clause because he is not a party to the Agreement, of which only Plaintiff and GCP are signatories.

Plaintiff insists the Court does have personal jurisdiction over Cohen, pursuant to the closely related party doctrine. The closely related party doctrine allows for the exercise of personal jurisdiction over parties who are closely related to disputes arising out of contracts with a binding forum-selection clause. *Marano Enter. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001). Plaintiff argues Cohen is "closely related" to GCP and the contract dispute, so it was foreseeable that he could be and should be bound by the Agreement's forum-selection clause.

In *Marano*, the United States Court of Appeals for the Eighth Circuit held that the plaintiff in that case—an individual who was a shareholder, officer, and director of a company—could be bound by a forum-selection clause that was binding on the company. *Id.* at 757. The *Marano* Court found it was "without question" the plaintiff was "'closely related' to the disputes arising out of the agreements and properly bound by the forum-selection provisions." *Id.* Courts applying the closely related party doctrine after *Marano* have found similar relationships to be sufficient to exercise personal jurisdiction. *See CruiseCompete, LLC v. Smolinski & Assocs., Inc.*, 859 F. Supp. 2d 999, 1012 (S.D. Iowa 2012) (finding "[i]t should have been entirely foreseeable to [the individual defendant] that he was sufficiently related to [the company defendant's] relationship with Plaintiff that he would be bound by the forum selection clause."); *Ross v. Extreme Techs., Inc.*, No. 09-0787-CV-W-SOW, 2009 WL 10671679, at *4 (W.D. Mo. Dec. 21, 2009) (holding an

individual was bound by a forum-selection clause because they were the president of the signatory company and "negotiated and executed the agreements" on the company's behalf).

One court in this district found:

> Several cases suggest that when a control person agrees to a forum, it is foreseeable that the entities controlled by that person which are involved in the deal will also be bound to that forum. The rationale for binding such entities rests on the public policy that forum selection clauses promote stable and dependable trade relations, and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause. Cases applying this approach focus on whether the same people were involved in all of the agreements, even if they were acting on behalf of different entities.

*All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 990 (S.D. Iowa 2012) (internal citations and quotations omitted). The closely related party doctrine can be applied to non-signatory plaintiffs and defendants alike. *See Medtronic, Inc. v. Endologix, Inc.*, 530 F. Supp. 2d 1054, 1057 (D. Minn. 2008) (finding no reason why "a third party sued as a defendant . . . cannot reasonably foresee that it might be bound by a forum-selection clause agreed to by one or more of its co-defendants.").

Defendants contend the exercise of personal jurisdiction on this basis is inappropriate here because the corporate shield doctrine limits the individual exposure of shareholders, officers, or other persons "mere[ly] associate[ed]" with a corporation. *See State ex rel. Miller v. Grodzinsky*, 571 N.W.2d 1, 3 (Iowa 1997) (noting the doctrine "is a due process limitation on the exercise of personal jurisdiction"). Defendants claim this doctrine applies to Cohen because he is only "associated" with GCP—an insufficient basis to support an exercise of personal jurisdiction over him. The corporate shield doctrine does not apply here. Cohen is much more than "merely associated" with GCP. He is the company's namesake and CEO and signed the Agreement on

behalf of GCP. *See* [ECF No. 7-1 at 12]. Nearly every allegation in the Complaint relates to actions allegedly taken by Cohen. Cohen's relationship to GCP and the contract dispute is sufficiently close to bind him pursuant the same forum-selection clause as the company under the closely related party doctrine.

Defendants' next argument is that personal jurisdiction is improper because the Court must assess Cohen's contacts individually under *Calder v. Jones*, 465 U.S. 783 (1984). According to Defendants, because neither Cohen nor the Agreement have any nexus to Iowa, jurisdiction over him is improper. However, *Calder* did not involve a forum-selection clause, like here, so the Court does not need to assess whether Cohen "directed" his activities at a forum resident or whether his activities had a specific nexus to Iowa. *See Calder*, 465 U.S. at 789 ("[The defendants'] intentional, and allegedly tortious, actions were expressly aimed at [the forum state]."). The forum-selection clause is controlling. *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir. 2001) ("Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause.") (quoting *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001)). Because the Court finds that Cohen is a closely related party to the Agreement and the alleged wrongdoing, he is bound by the forum-selection clause.

If the Court were to accept Defendants' argument, Plaintiff would need to maintain separate lawsuits across the country against GCP and Cohen, regardless of how closely related Cohen is to the alleged wrongdoing. The parties are entitled to agree to a forum for litigation, as they did, and it was foreseeable that Cohen would possibly have to answer a lawsuit brought in this forum concerning the Agreement. Defendants' Motion to Dismiss claims against Greg Cohen is DENIED.

*B. Defendants' Motion to Dismiss*

Defendants next ask the Court to dismiss Plaintiff's claims for tortious interference, defamation, fraudulent inducement, and fraud. They argue that Plaintiff fails to state a claim as to each. *See* Fed. R. Civ. P. 12(b)(6) (a complaint is subject to dismissal when it "fail[s] to state a claim upon which relief can be granted"). Defendants also argue the claims for tortious interference, fraudulent inducement, and fraud do not satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b) and must be dismissed on that basis.

When evaluating the sufficiency of the pleadings, courts must accept as true all factual allegations and view them in the light most favorable to the plaintiff. *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). Conclusory allegations or mere legal conclusions do not suffice. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999). The Court will address each claim in turn.

1. Tortious Interference with Existing and Prospective Contracts

a. Failure to state a claim

Count III alleges tortious interference with an existing contract and prospective business relationships. To state a claim for tortious interference with an existing contract, a plaintiff must plead: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 151 (Iowa 2013) (quoting *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008)). The elements of tortious interference with prospective business relationships are essentially the same: (1) a prospective contractual or business relationship; (2) the defendant knew of the prospective

relationship; (3) the defendant intentionally and improperly interfered with the relationship; (4) the defendant's interference caused the relationship to fail to materialize; and (5) damages. *Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001).

Plaintiff's basis for tortious interference set forth in the Complaint is that Defendants interfered with his existing and prospective contracts with other actors in the boxing industry because Cohen contacted and threatened them with litigation by "falsely representing the validity" of the Agreement. [ECF No. 7 ¶¶ 93, 95].

Defendants move to dismiss the interference claim, arguing that any interference by Cohen was to enforce GCP's valid business interests and was, thus, not improper. *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 (Iowa 1994) (finding a party does not improperly interfere with another's contract by exercising its legal rights to protect its own financial interests.). Plaintiff responds that Defendants' assertion that they were protecting their financial interests is contradicted by the allegations in the Complaint that the Agreement was terminated.

The Complaint alleges that Plaintiff validly terminated the Agreement by sending GCP the Breach Notice, waiting the requisite 30-day cure period, then sending the Termination Notice on June 21, 2020. [ECF No. 7 ¶¶ 65–74]. The basis for the termination articulated in the Breach Notice is GCP's failure to comply with Section 3's requirements for the number of bouts and the quality of opponents. The allegations set forth in the Complaint are sufficient to support Plaintiff's position that the Agreement was validly terminated, at least for the purposes of a motion to dismiss.

Plaintiff has also pleaded sufficient facts to support the other elements of tortious interference—existing or prospective contracts; knowledge of such contracts by Defendants; causation stemming from interference; and damages. [ECF No. 7 ¶¶ 77, 80]. The Complaint thus alleges sufficient facts to state a claim.

### b. Failure to allege particularity

Defendants next argue that Count III does not satisfy Federal Rule of Civil Procedure 9(b), which requires certain claims to be pleaded with special particularity. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard means "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 590 (8th Cir. 2018) (citation omitted).

Although Rule 9(b) identifies allegations of fraud and mistake as requiring special pleading, Defendants insist that particularity is also required for Plaintiff's tortious interference claim as well. In support of their contention, Defendants direct the Court to case law requiring special pleading when claims are "intertwined" with fraud allegations. *See Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp., Inc.*, No. 3:06-CV-0575-P, 2007 WL 2729935, at *14 (N.D. Tex. Sept. 18, 2007) ("[C]ompliance with Rule 9(b) is required only when the non-fraud claims are 'so intertwined' with the fraud averments that it is not possible to describe a simple redaction to separate the two." (citation omitted)). According to Defendants, this extends to any claim based on fraudulent conduct even if fraud is not a required element. *See Monsanto Co. v. E.I. DuPont de Nemours and Co.*, No. 4:09CV00686 ERW, 2012 WL 3765059, *3 (E.D. Mo. Aug. 30, 2012); *SL Montevideo Tech. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003). The case law cited by Defendants is distinguishable and unpersuasive. *Monsanto* involved an action under the Lanham Act and the case acknowledged there was a split among courts whether Rule 9(b)'s heightened pleading standard even applied. *Monsanto*, 2012 WL 3765059 at *3 n.1. *SL Montevideo* makes no mention of Rule 9(b).

The Court finds Plaintiff's tortious interference claim only needs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, Plaintiff is not required to plead Count III with special particularity pursuant to Rule 9(b). Because Count III is sufficiently pleaded to satisfy this standard the standard of Rule 8(a), Defendants' Motion to Dismiss Count III is DENIED.

### 2. Defamation

Plaintiff alleges in Count IV that Defendants defamed him when they published false statements that were damaging to his reputation, good name, and business. [ECF No. 7 ¶ 98]. The statements at issue pertain to whether Plaintiff is still under contract with GCP and subject to the Agreement's exclusivity clause. *Id.*

Defendants ask the Court to dismiss this claim arguing Plaintiff does not identify any allegedly defamatory statement. Furthermore, Defendants claim Plaintiff must satisfy the standard of "actual malice," identified in *New York Times v. Sullivan*, 376 U.S. 254 (1964), because Plaintiff qualifies as a "public figure." *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154–55 (1967) (holding a college football coach was a public figure for libel purposes); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1280 (3d Cir. 1979) ("Professional athletes, at least as to their playing careers, generally assume a position of public prominence. Their contractual disputes . . . command the attention of sports fans."); *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (including "athletes" in the category of public figures who are "involved in issues in which the public has a justified and important interest"); *Cepeda v. Cowles Mag. & Broad., Inc.*, 392 F.2d 417, 419–20 (9th Cir. 1968) (considering a professional baseball player as a public figure). Plaintiff does not provide a basis for why he should not be considered a public figure and the Complaint supports the contention that he is a public figure for libel purposes. *See* [ECF

No. 7 ¶ 19] (alleging that Plaintiff was "second ranked heavyweight boxer in Canada, and forty-first in the world").

A defamatory falsehood is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) (quoting *Sullivan*, 376 U.S. at 279–80). "Actual malice 'may be alleged generally,' but 'to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred.'" *Id.* at 958 (citing Fed. R. Civ. P. 9(b) (first quote); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (second quote)). Therefore, a complaint "must allege 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence'" that a statement was published knowing it was false or reckless disregard for whether it was false. *Id.* (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Before deciding if Plaintiff has properly pleaded actual malice, the Court will consider whether the allegations otherwise satisfy the elements of defamation.

A claim for defamation under Iowa law consists of "the twin torts of libel and slander. Libel involves written statements, while slander involves oral statements." *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citations omitted). "To establish a prima facie case in any defamatory action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Accent Media, Inc. v. Young*, No. 12-CV-07-LRR, 2013 WL 12140468, at *9 (N.D. Iowa Sept. 11, 2013) (quoting *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996)).

The Complaint sets forth enough facts to satisfy elements (1) and (3). Plaintiff alleges that Defendants have contacted other promoters and promotional companies asserting that Plaintiff is

still under contract with GCP and threatened them with legal action. [ECF No. 7 ¶ 80]. Taken as true at the motion to dismiss stage, this satisfies the publication requirement. The statements obviously "of and concern" Plaintiff.

However, the Court must still determine if the statements cited by Plaintiff are capable of a defamatory meaning. *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 830 (Iowa 2007) (finding it is the Court's duty to initially determine whether the alleged statements are capable of a defamatory meaning) (citing Restatement (Second) of Torts § 614, at 311 (Am. Law Inst. 1965)). "The gist of defamation is the publication of written or oral statements which tend to injure a person's reputation and good name." *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996) (citation omitted).

The Iowa Supreme Court has explained that defamation protects the impairment and injury to a person's reputation, not merely their financial or property interests:

> [t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation or slander is based upon a violation of this right. The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation. Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in his reputation and good name. A cause of action for defamation is based on the transmission of derogatory statements, not any physical or emotional distress to plaintiff which may result. Defamation law protects interests of personality, not of property.

*Kiesau*, 686 N.W.2d at 174–75 (citation omitted).

Plaintiff pleaded that Cohen's allegedly inaccurate statements regarding the validity of the Agreement were damaging to Plaintiff's "reputation, good name, and business." [ECF No. 7 ¶ 98]. Plaintiff alleges that Cohen did this to damage his reputation in the industry. *Id.* ¶¶ 99–101. The

Complaint does not identify any specific statements Cohen made to third parties; it only provides allegations based upon Cohen's communications to Plaintiff threatening to make statements to third parties. Accepting the allegation that these statements were published, Plaintiff does not allege how such statements were damaging to his *reputation*. The Complaint offers the conclusion the statements "were in fact damaging" to Plaintiff's reputation but does not provide further factual allegations. This is "an unadorned, the-defendant-unlawfully-harmed-me accusation" which the Supreme Court has held is insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It may be true that the alleged statements have interfered with Plaintiff's business opportunities, but claims for that type of harm are appropriately embodied in other claims which Plaintiff has also pleaded, such as Count III for tortious interference. Plaintiff has not pleaded sufficient facts to support a claim for defamation. Defendants' Motion to Dismiss Count IV is GRANTED.

### 3. Fraud Claims

The Complaint contains two separate claims of fraud. Count V alleges Defendants fraudulently induced Plaintiff to sign the Agreement by making material misrepresentations during contract negotiations. [ECF No. 7 ¶ 105–07]. Plaintiff alleges in Count VI that Defendants committed fraud by making material misrepresentations during the term of the Agreement concerning the status of bouts GCP claimed it had scheduled. *Id.* ¶ 113. The effect of these misrepresentations, according to Plaintiff, was to delay his decision to terminate the Agreement because he was unaware that GCP was not performing its obligations. *Id.* ¶ 119.

Defendants seek dismissal of the claims on two grounds. First, they argue the Complaint fails to state a cause of action for either claim. Second, they argue neither claim satisfies the particularity requirement of Rule 9(b).

The elements for fraud and fraudulent inducement are the same: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) injury and damage. *See Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012); *Whalen v. Connelly*, 545 N.W.2d 284, 294 (Iowa 1996) (citation omitted). Both claims are subject to the special pleading requirements of Rule 9(b). As previously discussed, Rule 9(b) requires special particularity in pleadings to put defendants on notice to matters such "as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir. 1982). The Court will address each fraud claim in turn.

a. Fraudulent Inducement

Plaintiff alleges he was induced to enter into the Agreement with GCP because Defendants "made material misrepresentations of their ability and resources, as well as expected or guaranteed results." [ECF No. 7 ¶ 105]. Plaintiff says he relied on these misrepresentations when he signed the Agreement and would not have signed absent the misrepresentations. *Id.* ¶ 109.

However, the allegations in the Complaint fail to allege sufficient particularity to satisfy Rule 9(b). *See Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 421 (8th Cir. 2020) ("The complaint must plead the "who, what, where, when, and how" of the alleged fraud." (citation omitted)). Here, Plaintiff has only pleaded the "who" (GCP and Cohen); the "what" (misrepresentations regarding their ability and resource to schedule appropriate bouts); the "where" and "when" (prior to entering into the Agreement and after Plaintiff won the Canadian

heavyweight championship).  [ECF No. 7 ¶¶ 7, 20, 21, 56, 105].  Plaintiff acknowledges the "how" is not explicitly pleaded in the Complaint but offers that "the reasonable inference given the context of the parties' relationship . . . is that these representations occurred by phone or email." [ECF No. 13 at 17] (Plaintiff's Resistance to Motion to Dismiss).  Given that the Court is limited to considering the pleadings and those materials "embraced" by the pleadings at the motion to dismiss stage, the Court cannot consider Plaintiff's further explanation provided in his Resistance. As such, the Court must grant the Motion to Dismiss as to Count V for failing to satisfy the particularity requirements of Rule 9(b).  However, in his Resistance, Plaintiff requests leave to amend his Complaint to cure the deficiency if necessary.

A plaintiff is entitled to amend the pleadings once as a matter of course within twenty-one days after the pleadings have been served or twenty-one days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.  Fed. R. Civ. P. 15(a)(1).  Amendments to pleadings outside this timeframe, such as here, may be made "only with the opposing party's written consent or the court's leave," which is to be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

The Eighth Circuit has instructed district courts to "liberally" grant leave to amend prior to dismissal.  *In re Supervalu, Inc.*, 925 F.3d 955, 961 (8th Cir. 2019).  Unless there exists good reason not to amend, courts are to grant a motion to amend:

> Given the courts' liberal viewpoint towards leave to amend, it should normally be granted absent good reason for a denial. The classic "good reasons" for rejecting an amendment are: undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of amendment.

*Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000) (citation omitted).  The Court does not discern any of these "good reasons" for rejecting leave to amend present here.

Defendants' Motion to Dismiss is GRANTED. Considering the Plaintiff's statement in his Resistance that the "how" element was likely by phone, the Court finds that an amendment to the Complaint is not futile. *See Hammer v. City of Osage Beach*, 318 F.3d 832, 844 (8th Cir. 2003) (holding leave to amend should be denied if proposed amendment is futile). Therefore, Plaintiff's request for leave to amend his Complaint is GRANTED.

### b. Fraud

Plaintiff's other fraud claim relates to Defendants' alleged conduct during the period after Plaintiff signed the Agreement. Plaintiff alleges that Defendants made material misrepresentations concerning the status of bouts they had scheduled, on which he relied to his detriment. [ECF No. 7 ¶¶ 113, 119]. Due to this detrimental reliance, Plaintiff says he did not terminate the Agreement as early as he would have, if he had been accurately apprised of the lack of bouts scheduled by Defendants. *Id.* ¶ 119.

Defendants argue the Complaint does not support Plaintiff's fraud claims because they are simply repackaged breach of contract claims. They argue the allegations do not give rise to an independent fraud claim because Plaintiff does not allege Defendants violated a duty separate from the contract itself. The Iowa Supreme Court has recognized that not every breach of contract gives rise to a tort:

> Only where a duty recognized by the law of torts exists between the plaintiff and defendant distinct from a duty imposed by the contract will a tort action lie for conduct in breach of the contract. As Prosser stated:
>
>> [I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not.

*Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 397 (Iowa 1990) (quoting W. Prosser, *Handbook of the Law of Torts* § 33, at 205 (1st ed. 1941)).

18

Plaintiff does not allege any duty Defendants have to accurately represent scheduled bouts outside the context of the Agreement. Any detrimental reliance by Plaintiff based on the alleged misrepresentations by Defendants may inform damages arising out of a breach of contract claim, but Plaintiff does not demonstrate why they give rise to a distinct tort action. This is distinguishable from a fraudulent inducement claim which consists of fraud *prior* to any contractual obligations by either party. In this claim, Plaintiff essentially alleges Defendants did not perform under the Agreement, and then lied to him by telling him they were performing. If this did cause a delay in Plaintiff's decision to terminate the Agreement, he could possibly collect additional damages as a result if the breach of contract claim is ultimately successful. Defendants' Motion to Dismiss Count VI is GRANTED.

### C. Plaintiff's Motion for Preliminary Injunction

Plaintiff has filed a Motion for Preliminary Injunction asking the Court enjoin Defendants from: "abusing, harassing, intimidating, molesting, interfering with, or menacing" Plaintiff; "contacting third parties at all with the intent to persuade them to terminate or cancel any existing business relationships or contracts with" Plaintiff or "dissuad[ing] them from entering into such business relationships or contracts"; or "making false or defamatory statements" about Plaintiff which includes "any claim that [Plaintiff] remains subject to the [Agreement], is restricted from engaging in other business relationships . . . or owes any duties to [GCP] in connection" with the Agreement. [ECF No. 11-1 at 1].

### 1. Preliminary Injunction Standard

Injunctive relief is an "awesome power vested in the district court," and issuance of an injunction is not done lightly. *Iowa Right to Life Comm., Inc. v. Smithson*, 750 F. Supp. 2d 1020, 1028 (S.D. Iowa 2010). "A preliminary injunction is an extraordinary remedy never

awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008)). The Court considers four factors when analyzing if a preliminary injunction is warranted: (1) Plaintiff's likelihood of success on the merits of his claim; (2) the threat of irreparable harm or injury to Plaintiff without preliminary relief; (3) the balance of equities, weighing the harm suffered by Plaintiff versus the harm to other parties because of an injunction; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Consideration of the "*Dataphase* factors" is not a "rigid formula." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). Although, "[n]o single factor in itself is dispositive," *Dataphase*, 640 F.2d at 113, the "likelihood of success on the merits is most significant," *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)). Plaintiff bears the burden of showing the balance of these factors weigh in favor of issuing the injunction. *Dataphase*, 640 F.2d at 113.

### 2. Preliminary Injunction Analysis

#### a. Probability of success on the merits

The Court first turns to Plaintiff's probability of success on the merits of his breach of contract claim. This factor examines whether Plaintiff has a "fair chance" of success on his underlying claim. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). A "fair chance" means "something less than fifty percent" probability. *Rounds*, 530 F.3d at 730.[6] Plaintiff's underlying breach of contract claim turns on whether he

---

[6] Defendants insist that the standard for probability of success on the merits is much higher than the "fair chance" standard because Plaintiff seeks a "mandatory" injunction, which they contend requires "a clear showing that the moving party is entitled to the relief requested, or where

validly terminated the Agreement because of a prior material breach by GCP. If the Agreement was validly terminated, then Plaintiff can properly request the Court from enjoining Defendants from engaging in the conduct described. If not, then a preliminary injunction is improper as Defendants are entitled to enforce their exclusivity rights under the Agreement.

Plaintiff cites two reasons why the Agreement was validly terminated. The first reason is GCP's failure to schedule bouts with "suitable" opponents who were commensurate with Plaintiff's ranking, stature in the boxing industry, and marketability, as required by the Agreement. [ECF No. 7-1 ¶ 3]. Plaintiff maintains that the four bouts arranged by GCP were unsuitable because the opponents were far shorter, much older, and less skilled than him.

Plaintiff's other justification for termination was GCP's failure to arrange four bouts over the course of a calendar year, the minimum required by the Agreement. GCP only scheduled four bouts in total and only three in 2019, the only full calendar year prior to Plaintiff's termination.

Defendants respond that the bouts arranged by GCP featured opponents that were suitable because Plaintiff is at a stage of his career where an undefeated record is an important asset which can facilitate his rise up the boxing ranks. They further claim that the insufficient number of bouts was Plaintiff's fault for several reasons: his request to pause scheduling fights to allow him time

---

extreme or very serious damage will result from a denial of preliminary relief." [ECF No. 18 at 13]. Preliminary injunctions come in two different varieties: prohibitory and mandatory. A prohibitory injunction "restrains" a party from taking specified actions whereas a mandatory injunction "orders a responsible party to 'take action.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). The type of injunction Plaintiff seeks is prohibitory, not mandatory. Plaintiff requests the Court enjoin Defendants from contacting him outside the presence of counsel, contacting third parties to dissuade them from doing business with Plaintiff, or making false or defamatory statements about Plaintiff. *See* [ECF No. 11]. Plaintiff does not request the Court order Defendants to engage *in* specific conduct, he requests the Court enjoin Defendants *from* engaging in specific conduct. Therefore, Plaintiff's burden for showing a success on the merits is a "fair chance." *Rounds*, 530 F.3d at 732.

to train; his ineligibility to fight in the United States due to an issue with Plaintiff's visa; and his unreasonable withholding of approval of opponents. The Court will assess each argument.

### i. Suitability of opponents

Plaintiff claims that all four of his bouts were against opponents not suitable to his "level of ability, ranking, stature in the boxing industry and marketability," as also required by Section 3. [ECF No. 7-1¶ 3]. The Court has already noted the relevant characteristics of the opponents but, essentially, they were significantly older and shorter than Plaintiff.[7]

Defendants respond that the arranging of fights with opponents of such apparent disparity is, in fact, "suitable" to Plaintiff's career. Defendants' explanation for scheduling easy opponents early in Plaintiff's career is to build up his record. This is especially important for heavyweight boxers, according to Defendants. Cohen testified that, because Plaintiff was undefeated with all his victories by knockout, "[t]here was a mystique to him." [ECF No. 34 at 107]. And preserving a "knockout ratio . . . especially a heavyweight to have a 100 percent knockout ratio . . . it's a big selling tool, big marketing tool."[8] *Id.* Defendants also point to the fact that Plaintiff entered the top 15 of the WBA rankings, a prestigious sanctioning body, after the fights arranged by GCP. Cohen explains in an affidavit that "[t]o get a fighter ranked, the sanction body . . . must become aware of the fighter and his accomplishments . . . [i]t is also customary in the industry for a highly

---

[7] The earlier discussion of the suitability of opponents was during an analysis of the Motion to Dismiss. Although that standard requires the Court to accept all of Plaintiff's factual allegations as true, there has been no dispute by Defendants regarding the relevant characteristics of those boxers.

[8] This marketing strategy—to craft the image of an intimidating heavyweight boxer with an undefeated record—is endorsed by Defendants' expert Richard Glaser. Glaser submitted an affidavit stressing that "at this early stage of a boxer's career, it is extremely important to try to maintain an undefeated record. In fact, most promotional companies will release a fighter from their exclusive promotional agreement once they lose a single fight. This further illustrates the importance of maintaining an undefeated record." [ECF No. 30-1 at 3] (Glaser Decl.).

touted prospect to intentionally face lower level opponents . . . [t]his protects the boxer from the risk of a loss to a high-level opponent without receiving a large purse for taking that risk." [ECF No. 18 ¶¶ 15–16]. Plaintiff responds to this argument by repeating Cohen's statement that WBA rankings are "inherently political," and that Plaintiff no longer holds the ranking anymore due to his inactivity.

Plaintiff attained a fairly high ranking the WBA rankings after four bouts against opponents he insists were unsuitable. It is true Plaintiff is no longer ranked but that appears to be due to inactivity rather than quality of opponents because he entered the rankings *after* his four bouts under GCP. Cohen's explanation, corroborated by his expert, that risking an undefeated record for a small purse is a reasonable marketing strategy. The Court holds that, on this record, Plaintiff has not carried his burden to prove a likelihood of success that the suitability of opponents violated Section 3 of the Agreement.

## ii. Sufficient number of bouts

Plaintiff's second reason that the termination of the Agreement was valid is because GCP breached its obligation to arrange a minimum of four bouts over a calendar year. GCP staged a total of four bouts for Plaintiff between the signing of the Agreement in June 2018 and his putative termination in June 2020. The Agreement expressly requires "the staging of a minimum of four (4) bouts in each calendar year." [ECF No. 7-1 ¶ 3]. Although the time period in question is approximately two years in total, the Agreement explicitly defines the relevant time period as a "calendar year" for the minimum bout requirement. In that case, 2019 is the only full calendar year in which the Court will evaluate GCP's performance. It is undisputed that Plaintiff did not participate in four bouts during 2019. Defendants claim that Plaintiff was responsible for this failure, so there is no breach.

First, Defendants claim that Plaintiff requested GCP not schedule any fights between April and August of 2019 to allow him time to train with his new trainer Eddie Mustafa Muhammad. [ECF No. 27-3 ¶ 11] (Cohen Decl.). Cohen says this was a "joint decision" agreed to by Plaintiff, Muhammad, and Heid. *Id.* He says he "was expressly requested not to schedule any fights prior to August 2019." *Id.* Defendants submitted declarations from Muhammad and Heid, both echoing this claim. [ECF Nos. 27-1 ¶ 4] (Muhammad Decl.); 27-2 ¶ 4 (Heid Decl.)]. Defendants have not submitted any contemporaneous documents supporting their claim that Plaintiff requested a pause. Defendants argue that because Plaintiff requested a pause for approximately four months, they did not breach Section 3 of the Agreement.

In his own declaration, Plaintiff emphatically denies that he requested any pause in fights. [ECF No. 28-1 ¶ 3] (Miljas Decl.). He testified similarly at the evidentiary hearing. [ECF No. 34]. Plaintiff says he made it "very clear" he wanted to "stay busy and was always positive and eager" when responding to "possible fights." [ECF No. 28-1 ¶ 3].

The Court recognizes Defendants' position that the pause in fights was allegedly requested by Plaintiff. Without deciding whether Plaintiff did in fact request a pause for training, there is no language in the Agreement to find that any such request would affect GCP's minimum bout obligation under Section 3. Defendants encounter two problems with their requested interpretation to the contrary.

First, the Agreement already contemplates a contingency that does void GCP's minimum bout obligation. If Plaintiff is named the "mandatory challenger" for a world title, GCP "will not be considered in breach of the Agreement," if GCP fails to arrange four bouts. [ECF No. 7-1 ¶ 3]. Because the Agreement contemplates a scenario when the minimum bout requirement is voided, the Court is hesitant to imply additional contingencies. *Peak v. Adams*, 799 N.W.2d 535, 548

(Iowa 2011) (holding that a contract expressly releasing one individual for liability implies that a different individual is not released by the contract); *cf. Alta Vista Props., LLC v. Mauer Vision Cty., PC.*, 855 N.W.2d 722, 727 (Iowa 2014) ("Courts imply contractual terms where the obligation 'arise[s] from the language used or [is] indispensable to give effect to the intent of the parties.'").

Second, the Agreement provides "[Plaintiff's] approval of opponents shall not be unreasonably withheld" and "[Plaintiff] will not act unreasonably in exercising his discretion in rejecting bouts offered by [GCP] and to the extent that [Plaintiff] has acted unreasonably in rejecting a bout, such bout shall be counted towards the total number of required bouts for purposes of Section 3 of this Agreement." [ECF No. 7-1 ¶ 5, 6]. Defendants have not pointed to any evidence that Plaintiff "unreasonably withheld" his approval of any opponents nor "acted unreasonably in rejecting a bout" during the period from April to August 2019. Furthermore, it is not clear how a requested pause by Plaintiff, if he did request such a pause, would figure into the minimum bout requirement if such a term were implied. In the event Plaintiff unreasonably withheld approval or unreasonably rejected a bout, the Agreement specifies that "such bout shall be counted" towards GCP's Section 3 obligation. [ECF No. 7-1 ¶ 6]. However, if Plaintiff requested a four-month pause to train, does that count as one fight? Or two fights? Does it nullify the minimum bout requirement entirely? The Agreement does not address this situation. GCP was surely aware of its obligation under Section 3, but there is nothing in the record indicating the company had any objection to Plaintiff's hiatus.

Defendants' second justification for failure to comply with the minimum bout requirement is Plaintiff's immigration situation. Section 30 of the Agreement requires Plaintiff to "be legally permitted to fight in the United States of America." [ECF No. 7-1 ¶ 30]. Failure to maintain legal

authorization to fight in the United States "shall be deemed a disability and this Agreement shall be extended until [Plaintiff's] eligibility is re-established." *Id.* The parties disagree if it was late September or early October 2019, but Plaintiff returned to Canada around that time because he had not obtained a visa to allow him to remain in the United States. Plaintiff's managerial contract with Heid required Heid to acquire any necessary immigration documents, including work visas, for Plaintiff. [ECF No. 28-2 at 3]. Plaintiff asserts that Heid "pawned off" this contractual obligation to GCP, who did help obtain the visa. [ECF Nos. 34 at 33; 35 at 6]. Thus, Plaintiff contends that GCP caused his "disability" and cannot benefit from it. [ECF No. 35 at 6]. Although GCP did assist Plaintiff in eventually obtaining his visa, there is no indication in the record that Heid assigned or legally delegated this obligation to GCP. The Court cannot impute to GCP what was contractually Heid's responsibility. However, the immigration issue is not sufficient to excuse GCP's non-performance, for similar reasons as Plaintiff's training pause.

The Agreement does not provide that ineligibility to fight in the United States voids GCP's obligation under Section 3. But it *does* address a situation where Plaintiff is ineligible to fight. Section 30 requires Plaintiff to be eligible to fight in the United States. If he is not legally permitted to fight in the United States, "the period of his ineligibility shall be deemed a disability and this Agreement shall be extended until his eligibility is re-established." [ECF No. 7-1 at 9]. Section 20 specifies remedies available to GCP in the event of a "disability" of Plaintiff. GCP may either extend the "Term" of the Agreement or terminate it. [ECF No. 7-1 at 7]. Plaintiff argues because the Agreement provides for a remedy under the specific situation here—his ineligibility to fight in the United States—the Court should not imply an additional one. Defendants contend GCP should be relieved of obligations to schedule fights due to the ineligibility.

The Court agrees with Plaintiff. The Agreement contemplates a situation where Plaintiff is not eligible to fight in the United States. It further provides two remedies in the event Plaintiff is ineligible to fight. But does not address Section 3's minimum bout requirement. The Court does not find that it is appropriate here to imply additional recourse when the Agreement already expressly provides for such.

Finally, Defendants claim Plaintiff's rejection of a fourth fight in 2019 was unreasonable. The proposed fight was scheduled to take place on October 19, 2019 against Ruann Visser. ("Visser Fight"). At the evidentiary hearing on the Motion for Preliminary Injunction, Plaintiff, Cohen, and Heid all testified as to the circumstances surrounding the offer of the Visser Fight. Plaintiff testified that the offer occurred on a four-way phone call with Cohen, Muhammad, and Heid, approximately three weeks before the fight was scheduled to take place. [ECF No. 34 at 39]. Plaintiff testified that he was not advised of a fight purse or told how many rounds the fight would be on during call. *Id.* at 38. Both Cohen and Heid testified that Plaintiff was advised of the payout for the fight during the call. Defendants have submitted a draft contract for the Visser Fight, [ECF No. 27-4], which includes the scheduled length of the bout and a purse of $4,000 for Plaintiff. Defendants argue that if this information was available to Cohen at the time of the phone call, then he likely would have conveyed it to Plaintiff. The Court finds this explanation credible.[9]

Regarding whether the rejection of the Visser Fight was unreasonable, the Court disagrees with Defendants. The parties disagree when the four-way phone call occurred but Cohen testified

---

[9] Defendants' proposition finds only modest support in Heid's testimony that a purse amount "might have been discussed. I don't remember . . . it was a decent payday for Mladen. By far, his highest payday." [ECF No. 34 at 144]. The $4,000 purse is the contractual minimum for an 8-round bout. [ECF No. 7-1 ¶ 7]. Cohen testified that Plaintiff's previous fights had all been scheduled for six rounds, so Heid's claim that the purse for Plaintiff was the highest yet is plausible.

that it was "between the 20th and the 30th of September [2019]."[10]   [ECF No. 34 at 126]. Defendants rely on the draft contract for the Visser Fight to establish details of their four-way discussion with Cohen "offering" the bout to Plaintiff.  Cohen received the draft contract shortly after 10 PM on September 27, 2020.  [ECF No. 27-4 at 24].  Assuming, as the Court must in order to find necessary terms were discussed with Plaintiff to trigger the Visser Fight's status as an offered bout, this timeline would have allowed Plaintiff, at most, 22 days to train for the Visser Fight.  When asked about the Visser Fight, Plaintiff testified to his concern about fighting a higher caliber opponent on short notice:

> Q.  Did you accept [the Visser Fight]?
>
> A.  No.
>
> Q.  Why not?
>
> A.  Because it was offered when I was already back home in Canada without a coach, without proper preparation, and without sparring.
>
> . . . .
>
> Q.  So this would have been, by far, the most prestigious fight for you; correct?
>
> A.  Yes, my hardest opponent to date.
>
> Q.  So—now, when you're preparing for a fight like this that's, you know, not against these other cupcakes but a real fight, what is the kind of work that you do with a trainer other than getting in shape to prepare for a fight like this?
>
> A.  Well, normally for a high-profile fight, a fighter would have 8 to 12 weeks to prepare, not just 2 weeks, and also they would have their coach there to study the opponent and also imitate the opponent in training, you know, in exercises like sparring and other training as well.

---

[10] Plaintiff testified he was given "roughly three weeks, almost three weeks" notice for the Visser Fight.  [ECF No. 34 at 37–38].

Q.  So, I mean, do you do things like study film?

A.  Yes.

Q.  And then do you work—what, if anything, is done with the trainer to come up with, you know, the strategy and the tactics for the fight?

A.  For example, if I'm fighting somebody 6 foot 9, I would have people in the gym that are of similar height so that I'm used to fighting somebody that size and stature.  I wouldn't be sparring or preparing with people who are only 6 feet tall.  I need special preparation.

[ECF No. 34 at 36–37].

Plaintiff's hesitancy about his unpreparedness to fight a higher caliber opponent is reified by the implications of losing the fight and his undefeated record, as described by Heid: "if he loses once . . . I can't say his career is over, because it's not, but it's years to get back to . . . the level where he was."[11]  [ECF No. 34 at 118].

Defendants refute these concerns about Plaintiff's readiness by pointing to his statement at the hearing that he is "always in shape ready to fight."  *Id.* at 30.  They also assert that any lack of training should not be attributed to GCP because they have no legal obligation to provide trainers or coaches.  Therefore, Defendants say Plaintiff's rejection of the Visser Fight was unreasonable and GCP satisfied its obligation by offering a fourth fight.

The Court concludes, on this record, that Plaintiff has demonstrated a "fair chance" of prevailing.  The parties energetically dispute whether Plaintiff's rejection of the Visser Fight was

---

[11] The Court will again note that Defendants' own expert attested that "most promotional companies will release a fighter from their exclusive promotional agreement once they lose a single fight."  [ECF No. 30-1 ¶ 6].  To be clear, there does not appear to be a provision in the Agreement which would allow GCP to release Plaintiff if he lost, but this emphasizes the importance of maintaining an undefeated record—the justification used by Defendants to defend against Plaintiff's claim that the boxers from his first four GCP-arranged bouts were unsuitable opponents.

reasonable.  But on a motion for preliminary injunction, it is the Court's duty simply to determine whether Plaintiff has a "fair chance" of success.  *See Rounds*, 530 F.3d at 731.  The Court finds Plaintiff does.

Plaintiff is not required to show "a greater than fifty per cent likelihood" of prevailing on the merits.  *Dataphase*, 640 F.2d at 113.  Rather, "where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation."  *Id.*; *see also Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003) (holding a plaintiff "is not required to prove a mathematical (greater than fifty percent) probability of success on the merits.").  It is undisputed that the Visser Fight was to be a significant "step up" in competition for Plaintiff.  Defendants assert that Plaintiff's claim that he was not prepared to fight in October is not genuine because he had been prepared for a fight in September 2019, which was ultimately cancelled.  But Cohen agreed that the opponent for that September fight, Damion Reed, was nowhere "near the caliber of Ruann Visser."  [ECF No. 34 at 138].  Also, the previous four opponents Plaintiff faced under GCP's promotion were all shorter than him.  Ruann Visser is taller than Plaintiff, six feet nine inches tall, which Plaintiff testified would require him to train to become accustomed to fighting an opponent taller than him.  [ECF No. 34 at 37].  These factors all inform the Court's determination that Plaintiff has a "fair chance" of succeeding on the merits—that the Agreement was validly terminated due to GCP's failure to satisfy its obligations to offer a minimum of four bouts within a calendar year.

### b.  Irreparable harm

To prevail on a motion for a preliminary injunction, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction, for '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987) (citation omitted).

Plaintiff argues, in absence of a preliminary injunction, he would suffer irreparable harm because he is at a prime age in his career, 27 years old, and Defendants' actions are preventing him from advancing it. [ECF No. 11-1]. Plaintiff has included an email correspondence from Cohen to support his contention that Defendants are interrupting his career which states, in part: "GCP will enforce their promotional rights and notify every promoter, commission and sanctioning organization of our rights which include but are not limited to injunctive relief amongst various other remedies." [ECF No. 7-5 at 1]. Plaintiff further submits that Defendants have followed through on this threat by contacting a UK promotional company and threatening litigation. There is no evidence in the record of any contact between Defendants and other promotional companies, but Defendants do not deny Plaintiff's allegations and instead argue that they are entitled to do so to protect their contractual rights.

Plaintiff argues that he is at the most important time for his career, with the average age of top 50 boxers being 31.3.[12] Plaintiff has submitted evidence that he has suffered harm due to his inactivity—he has been stripped of his Canadian heavyweight title and dropped sixty spots in the world rankings.

---

[12] *See* BoxRec, *Boxing Ratings*, https://web.archive.org/web/20201013164106/https://boxrec.com/en/ratings (last visited April 26, 2021).

Defendants respond that Plaintiff does not face a risk of irreparable harm because he can be made whole by money damages—a prerequisite for a finding of irreparable harm. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (holding a preliminary injunction is inappropriate when a plaintiff has "an adequate remedy at law" and "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." (citations omitted)). Defendants claim that any loss to Plaintiff would be monetary only in nature. They point to Plaintiff's progression with GCP "from an unranked boxer to a top 15 world ranking with the WBA." [ECF No. 18 at 17].

Defendants confuse the issue. The inquiry into irreparable harm on a preliminary injunction is not retrospective, but prospective. *Dataphase*, 640 F.2d at 114 (noting a movant must show "the *threat* of irreparable harm"). Defendants also point out that the Agreement provides for an injunction against Plaintiff, but contains no similar provision for Plaintiff. Plaintiff's right to seek injunctive relief in a federal court is not conditioned on the contractual agreement by the party against whom he seeks the relief. A preliminary injunction is "never awarded" as a matter of right, *Winter*, 555 U.S. at 24, but as an "equitable remedy" within the sound discretion of the issuing court, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982). Plaintiff has done so here, and he has demonstrated that he would suffer irreparable harm absent an injunction against Defendants.

### c.  Balance of equities

The third factor for the Court to consider is the "balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Dataphase*, 640 F.2d at 114). "At base, the question is whether the balance of equities so favors

the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

Plaintiff argues there is no harm to Defendants by granting a preliminary injunction. Plaintiff's position is that the balance of equities favors him because the Agreement has been validly terminated, so Defendants have no claim to engage in the conduct he seeks to enjoin. He argues that any assertion by Defendants for a continuing contractual relationship between the parties is "without merit." [ECF No. 11-1 at 14].

Defendants resist Plaintiff's assertion, claiming that if the Court issued a preliminary injunction it would "essentially void the exclusivity" of the Agreement. Defendants' position is the Agreement is valid and still in effect and they would be prejudiced if GCP were not allowed to contact third parties to assert their exclusivity under the Agreement. In Defendants' view, this prejudice would extend to third parties who would not receive notice that they may be potentially interfering with GCP's contractual rights.

Defendants offer that a compromise could be reached where GCP could notify third parties of their asserted contractual right, and Plaintiff could have his legal counsel offer the third party his legal position on the continuing validity of the Agreement. Plaintiff calls Defendants position "absurd" and calls the threat of litigation a "powerful weapon." [ECF No. 24 at 4].

The Court agrees with Plaintiff. The balance of equities—the harm to GCP and third parties versus the interruption of Plaintiff's boxing career during his prime years—clearly weigh in favor of Plaintiff. As part of the "balancing" of the equities, the Court finds that the harm to Plaintiff—an extended pause of his career during the pendency of this litigation—is greater than any harm to the contractual exclusivity for GCP. Plaintiff works as a professional athlete and has a limited timeframe to pursue his vocation. Defendants run a boxing promotional company as a

business venture. The Court acknowledges the evidence in the record that GCP has invested significant money in Plaintiff to advance his career—in hopes of being there to harvest a very large payday as a return for their investment in Plaintiff while he was not a revenue-generating athlete. However, the Court holds that the balance of equities favors Plaintiff.

### d. Public interest

The final consideration under the *Dataphase* factors is the public interest. Plaintiff offers that the public has a strong interest in allowing him to practice his trade and prevent any restraint of him from doing so. He analogizes this restraint to an invalid non-compete agreement. Restrictive covenants are permissible under a valid contract, but here Plaintiff has shown a fair chance that the contract has been terminated and, if true, Defendants have no claim to prevent Plaintiff from "exercising the skill and general knowledge he has acquired or increased through experience." *Baker v. Starkey*, 144 N.W.2d 889, 897 (1966).

Defendants assert that there is a public interest in enforcing valid contracts, which they argue is present here. They also claim that the requested injunction will implicate their communication interests which "runs counter to our legal system." [ECF No. 18 at 19].

The Court finds that the public interest weighs in favor of Plaintiff exercising his ability to ply his boxing trade, given the "fair chance" Plaintiff has demonstrated that the Agreement was validly terminated.

### 3. Security

Rule 65 of the Federal Rules of Civil Procedure requires the moving party to post bond to obtain preliminary injunctive relief: "The court may issue a preliminary injunction . . . order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis

added).  After succeeding on demonstrating the balance of factors weighs in favor of a preliminary injunction, Plaintiff asks the Court to waive the bond requirement.  Defendants resist that request asking the Court to impose a bond of "no less than $500,000.  [ECF No. 18 at 20].

"Courts in this circuit have almost always required a bond before issuing a preliminary injunction . . . ." *Richland/Wilkin*, 826 F.3d at 1043 (citing *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1278 (N.D. Iowa 1995)).  There are cases where informal exceptions have been recognized despite the language of Rule 65(c), such as "where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown."  *Richland/Wilkin*, 826 F.3d at 1043 (citing *Fantasysrus 2, LLC v. City of East Grand Forks*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012); *Bukaka, Inc. v. Benton Cty.*, 852 F. Supp. 807, 813 (D. Minn. 1993)).  However, Rule 65(c) is clear and unambiguous: preliminary injunctive relief is available "only if" security is posted.  "[B]ecause a preliminary injunction proceeding is both expedited, resulting in only provisional findings of fact, and interlocutory, there is a higher chance that the district court will err in granting the preliminary injunction."  *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 979 (N.D. Iowa 2006) (citations omitted).  The Court finds a bond is appropriate under the mandatory language of Rule 65(c).

Nonetheless, the bond must be in an amount "the [C]ourt considers proper."  Plaintiff requested that the Court waive the bond requirement but submitted that if the Court does impose a security requirement it should be in the range of $10,000-$25,000.  Defendants, as previously noted, request a bond in excess of $500,000.  Cohen testified that the potential monetary injury to GCP "could be in the millions," if Plaintiff were allowed to fight for a different promotional company.  [ECF No. 34 at 117].

Both figures submitted by the parties are speculative and without any supporting evidence. Therefore, after considering the potential loss to GCP, the Court finds $35,000 to be a reasonable amount for security. Plaintiff shall post bond in the amount of $35,000 within 14 days of the date of this Order.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss, [ECF No. 8], is GRANTED in part, and DENIED in part. Plaintiff's Motion for a Preliminary Injunction, [ECF No. 11], is GRANTED. Counts IV and VI of the Complaint are DISMISSED. Plaintiff's request for leave to amend Count V is GRANTED.

Defendants are hereby ENJOINED from: (a) abusing, harassing, intimidating, molesting, interfering with, or menacing Mladen Miljas, or otherwise having any contact whatsoever with Mladen Miljas without the presence of his attorney; (b) contacting any third parties with the intent to persuade them to terminate or cancel any existing business relationships or contracts with Mladen Miljas or to dissuade them from entering into such business relationships or contracts; (c) making false statements about Mladen Miljas including making any claim that Mladen Miljas remains subject to the Exclusive Boxing Promotional Agreement, is restricted from engaging in other business relationships, or owes any duties to Greg Cohen Promotions in connection with the Exclusive Promotional Boxing Agreement.

IT IS SO ORDERED.

Dated this 30th day of April, 2021.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT