IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - -X
MLADEN MILJAS,                    :
                                 :
        Plaintiff,               :
                                 :
vs.                              :    Case No. 4:20-cv-00320
                                 :
GREG COHEN PROMOTIONS, LLC,       :
and GREG COHEN,                  :    <u>TRIAL TRANSCRIPT</u>
                                 :
        Defendants.              :        Volume III
- - - - - - - - - - - - - - -X

                        Courtroom, First Floor
                        U.S. Courthouse
                        123 East Walnut Street
                        Des Moines, Iowa
                        Wednesday, February 8, 2023
                        8:17 a.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Chief Judge,
         and a Jury.


APPEARANCES:

For the Plaintiff:      MICHAEL A. DEE, ESQ.
                        CASSANDRA M. ALESCH, ESQ.
                        Brown Winick Graves
                         Gross and Baskerville, P.L.C.
                        666 Grand Avenue, Suite 2000
                        Des Moines, Iowa  50309

For the Defendants:     TIMOTHY N. LILLWITZ, ESQ.
                        Bradshaw Fowler Proctor & Fairgrave, P.C.
                        801 Grand Avenue, Suite 3700
                        Des Moines, Iowa  50309


            KELLI M. MULCAHY, CSR, RDR, CRR
                United States Courthouse
            123 East Walnut Street, Room 115
                Des Moines, Iowa 50309

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendants: | | | | |
| Greg Cohen (Resumed) | 502 | 534 (Dee) | 592 | 596 (Dee) |
| For the Plaintiff in Rebuttal: | | | | |
| Mladen Miljas | 598 (Dee) | 600 | | |

E X H I B I T S

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| B - Fight poster | 509 | 509 |
| M - Email dated 9/27/2019 with attachment | 593 | |

1          P R O C E E D I N G S

2          (In open court, in the presence of the jury.)

3          THE COURT:  Good morning.  We are outside the presence

4    of the jury in the matter of Mladen Miljas vs. Greg Cohen

5    Promotions, LLC, and Greg Cohen.  We're here to talk about final

6    jury instructions and the verdict form.

7          I gave the parties an updated verdict form this morning

8    when I got in.  Earlier today I realized there were some

9    typographical errors in the verdict form, so I corrected those

10   and printed new copies for the parties.

11         Let's talk final just --

12         MR. LILLWITZ:  Hold on a second, Judge.  I didn't get

13   that.

14         MS. ALESCH:  Yeah.  There were three copies.

15         MR. LILLWITZ:  Oh, I apologize.  I didn't see them.

16         THE COURT:  So the final jury instructions I found a

17   handful of kind of ticky-tack typographical errors as well that

18   I'll correct this morning, but let's talk kind of substantively.

19         On behalf of the plaintiff, are there any objections or

20   suggested edits to the jury instructions?

21         MS. ALESCH:  Yes, Your Honor.  Just a few notes.

22         In Final Instruction No. 9, Plaintiffs had proposed some

23   explanation of the breach of contract, and that was removed in

24   the final instruction.  And when we prepared the proposed

25   instructions, we had included an explanation in Instruction No.

1  25, which is Defendants' failure to mitigate damages claim, and

2  so to the extent the explanation is removed in Final Instruction

3  No. 9, we would just ask that Instruction 25 also remove the

4  explanation of the failure to mitigate damages specifics.

5        THE COURT:  Okay.  All right.  Or leave them both in?

6  Is that the thought?

7        MS. ALESCH:  Yes.  Correct.

8        THE COURT:  Okay.  I'll go back.  Let me pull up what

9  you had.

10       MR. LILLWITZ:  Casey, which instructions you just

11  mentioned?  It was 25 and what?

12       MS. ALESCH:  And 9.

13       MR. LILLWITZ:  Thank you.

14       THE COURT:  I agree that should be added back in,

15  particularly in connection with the conversation we had

16  yesterday about what the specific allegations of the breach were

17  and the restriction on Mr. Lillwitz to just focus on those

18  particular claims, so I'll add that back in.

19     Mr. Lillwitz, any thoughts on that?

20       MR. LILLWITZ:  Yes.  I had similar comments, Your

21  Honor, so I would agree with that.

22       THE COURT:  I will add those two paragraphs as they

23  were provided in the proposed joint instructions back in.

24     Okay.  Next, Ms. Alesch?

25       MS. ALESCH:  Yes.  One other comment on Instruction No.

1   25.   In the second paragraph, it says, "Greg Cohen Promotions,

2   LLC claims Mladen Miljas failed to mitigate his damages by," and

3   the very first portion after that is "rejecting multiple fights

4   that Greg Cohen Promotions claims to have offered to Mladen

5   prior to expiration of the contract."

6        To the extent that refers to any fights offered after the

7   termination -- after Mladen's termination but in 2020, I just

8   want to clarify that.

9            THE COURT:  Do you want to say "that would have

10  occurred prior to expiration of the contract"?

11           MS. ALESCH:  No.  If we -- if we could specifically

12  refer to the Ruann Visser fight, because I think that's the only

13  one that would be relevant.

14           MR. LILLWITZ:  Well -- oh, sorry.

15           THE COURT:  Go ahead, Mr. Lillwitz.

16           MR. LILLWITZ:  Thank you, Your Honor.

17       I guess from a mitigation standpoint, I thought the Visser

18  fight was a breach issue.  Obviously, there is some mitigation

19  there, but the mitigation more stems from the idea that after

20  Visser even, there were further opportunities to fight, and then

21  after he terminated the contract, he, of course, had three years

22  to arrange fights on his -- you know, on his own.

23       But so I --

24           THE COURT:  Can you tell me which fights were offered

25  to him?

1          MR. LILLWITZ:  Well, and that's why I don't want to run

2     afoul of your motion in limine ruling.  I don't want to use the

3     word "offer."

4          So today there will be evidence on Exhibit 6 of the Simon

5     Kean -- you know, again, we talked about this yesterday -- where

6     Mr. Cohen uses the word "offer" in the email, but if you want to

7     call it an "opportunity" to not confuse the jury, I'm fine with

8     that.

9          I'm trying to think what else was in evidence.  There

10    was -- I think there is some further -- well, the Visser fight

11    might be accurate, because I think there was some further

12    discussion of other dates that he could have fought Visser on in

13    the text messages.  So I guess I would agree with that one as

14    well.  Those are the two in my mind.

15          THE COURT:  Ms. Alesch?

16          MS. ALESCH:  Any mention of fights offered prior to

17    June of 2020 would be improper based on the motion in limine

18    ruling.  And I don't know that we've heard any evidence, I mean,

19    aside from what he'll put on today, about fights that were

20    offered after Ruann Visser but before Mladen terminated the

21    contract.

22          Oh, anything after June of '20.  Sorry.

23          THE COURT:  Right.  When was the Simon Kean fight

24    offered?  I thought that wasn't offered until August of --

25          MR. LILLWITZ:  September of 2020.

1          THE COURT:  Okay.  So that falls within --

2          MR. LILLWITZ:  That's the email -- right.

3          THE COURT:  That falls within fighting only once since

4    expiration of the contract then, right?

5          MR. LILLWITZ:  Correct.

6          THE COURT:  So is the only mitigation, then, basically

7    only having one fight since the agreement expired?

8          MR. LILLWITZ:  Yeah.  I view it as -- correct.

9          THE COURT:  Okay.

10          MR. LILLWITZ:  The mitigation -- essentially, when he

11    terminates the contract --

12          THE COURT:  Okay.

13          MR. LILLWITZ:  -- the mitigation goes forward from

14    there.  Before that, it's a breach of contract issue is my --

15          THE COURT:  Okay.  So how about if we change that

16    second paragraph to say, "Greg Cohen Promotions, LLC, claims

17    Mladen Miljas failed to mitigate his damages by fighting only

18    once, on October 15th, 2022, since the promotional agreement

19    expired"?

20          MR. LILLWITZ:  That's sufficient for Defendants.

21          THE COURT:  Will that work?

22          MS. ALESCH:  Yes.

23          THE COURT:  Okay.  We'll make that change.

24      What else, Ms. Alesch?

25          MS. ALESCH:  I only had one other note, Your Honor,

1  regarding Final Instruction No. 21, and it's minor.  I don't

2  think that it's necessary to reference the manager in this

3  instruction --

4          MR. LILLWITZ:  I agree.

5          MS. ALESCH:  -- given the conflict of interest

6  provision is no longer applicable.

7          THE COURT:  Okay.  I'll pull that paragraph out.

8      Okay.  Mr. Lillwitz, what do you have -- and I should say

9  any objections to the verdict form?

10          MS. ALESCH:  No.

11          THE COURT:  Okay.  Mr. Lillwitz, what do you have?

12          MR. LILLWITZ:  Thank you, Your Honor.

13      I'll start with the jury instructions, as Ms. Alesch did.

14  And this goes to what we talked about in the sidebar yesterday

15  about the breach of contract issue.

16      On the second paragraph of Instruction No. 7 about

17  impeachment of witness by prior conviction --

18          THE COURT:  Okay.

19          MR. LILLWITZ:  -- it states, "You may also use that

20  evidence to help you decide whether Defendant Cohen

21  Promotions...was able to perform its obligations under the

22  promotional agreement."

23      His incarceration didn't start until 2020, so if the breach

24  issue is number of fights in 2019 and/or suitability of fights,

25  I'm not so sure how his incarceration is a breach issue, if that

1   makes sense.

2          THE COURT:  Well, I think there was testimony that he

3   was distracted by the fact that he was facing criminal charges,

4   getting ready to be sentenced, being sentenced in 2019, and that

5   that led him to be less attentive to the promotional agreement.

6       We could say, "You may also use this evidence to help you

7   decide whether Defendant Cohen Promotions, LLC was able to

8   perform its obligations under the promotional agreement,"

9   period.

10          MR. LILLWITZ:  That would be -- make more sense.  Sure.

11          THE COURT:  Does that work for you?

12          MS. ALESCH:  Yes.

13          THE COURT:  Okay.  What else?

14          MR. LILLWITZ:  I think Ms. Alesch covered many of mine

15   in the actual jury instructions.  I'm just flipping through to

16   make sure I'm not missing anything.

17       Yes.  In terms of other what I would call, perhaps,

18   non-substantive changes, in the final verdict form --

19          THE COURT:  Okay.

20          MR. LILLWITZ:  -- in Question No. 2 on page 1, and then

21   I think it's also in -- I'm trying to see if there was another

22   one.  Yeah.  It's just in Question No. 2 on page one.  There's

23   the word "Final."

24          THE COURT:  I meant to strike that and forgot.

25          MR. LILLWITZ:  Okay.

1           THE COURT:  Thank you for catching that.  Actually,

2  it's in Question 2 on Verdict Form 2 as well.

3           MR. LILLWITZ:  That's where I was looking as well.

4  Yes, there's two of them.

5           THE COURT:  And I had caught it by the time I got to

6  the third, but I forgot to double back, so I will remove that

7  word as well.

8           MR. LILLWITZ:  All right.  And just generally, and this

9  will dovetail with Defendants' Rule 50 motions, I don't think

10  there's been any evidence in trial, and I don't think there will

11  be any, as to why Greg Cohen individually needs to be on the

12  verdict form for any claim submitted against him.  All of his

13  actions have been taken as CEO of Greg Cohen Promotions, LLC,

14  whether that was before or after Mladen terminated the contract.

15           MS. ALESCH:  Our position is that any actions that he

16  took were outside the scope of his position as CEO and it would

17  be a factual determination for the jury.

18           THE COURT:  Okay.  Are you asking, Mr. Lillwitz, for a

19  special verdict on whether it was Greg Cohen or Greg Cohen, LLC,

20  or both?

21           MR. LILLWITZ:  Yes.  If you're going to leave Greg

22  Cohen on the verdict form, I would separate -- and, frankly, I'm

23  not sure how Your Honor would prefer to do it, if you would

24  separate the questions on the tortious interference.  Obviously,

25  the contract claim is only Cohen Promotions, but the tortious

1  interference and Ali Act claims, separate the two of them so the

2  jury can decide yes or no on Greg Cohen Promotions, LLC and Greg

3  Cohen.  In other words, make Question --

4        THE COURT:  Essentially two full sets of questions, one

5  for Cohen and one for --

6        MR. LILLWITZ:  Correct.  Correct.

7        THE COURT:  What's your thought there?

8        MS. ALESCH:  I think we're okay with that so long as

9  there's some sort of instruction that the jury isn't -- like

10  let's say they want a total verdict of $500,000, that they're

11  not splitting 250 to Mr. Cohen individually, 250 against the

12  company individually, that each claim is treated separately

13  against each named defendant.

14        THE COURT:  How would you suggest that we do that?

15        MS. ALESCH:  Yeah.  We were discussing this last night.

16        MR. DEE:  Remember, we had the -- remember the double

17  recovery issue we had in the ContiTech case last year?

18        THE COURT:  Yeah.  The Court will take care of any -- I

19  mean, the problem here is this isn't a case where the claims are

20  duplicative, it's the parties, and so that kind of instruction

21  doesn't work.

22        MR. DEE:  Right.

23        MS. ALESCH:  Right.  So, yeah, when we responded to a

24  jury question in ContiTech, I believe you answered, "Each claim

25  is entitled to be treated separately.  You should render a

1  verdict on each claim as if it is the only claim before you."

2  We could maybe modify to that each claim and each party would be

3  entitled to separate treatment.

4          THE COURT:  What's your thought there, Mr. Lillwitz?

5          MR. LILLWITZ:  Yeah.  Obviously, it sounds like you

6  guys have some experience in thinking through this from a

7  previous trial.

8      My thought is if they're awarding -- if they're awarding

9  damages against Mr. Cohen personally and the theory would be

10  that's outside the scope, then those damages couldn't be -- they

11  wouldn't be the responsibility of the LLC, right?

12      I mean, if he's acting as an individual, he's not binding

13  the LLC, so you can't have a jury verdict where they're

14  somehow -- and maybe I'm off base and this isn't what you're

15  saying, but you can't have a jury verdict where that would

16  occur.

17      Sorry.  Yeah.  I'm just thinking through it.  You'd have

18  to -- did Your Honor have any other -- that's my only -- my

19  thought is it would be, you know, if he's acting outside the

20  scope, Cohen is not legally able to bind the LLC for damages.

21          THE COURT:  Right.  But --

22          MR. LILLWITZ:  So if they -- if they put the same

23  damage award -- well, I guess, I mean, doesn't it solve the

24  problem if you have two whole separate --

25          THE COURT:  I think it does.

1        MR. LILLWITZ:  Because they'd have to list what the

2   damages were specifically against -- I think you'd have to

3   submit a duplicative damages instruction, but other than that, I

4   think that would -- if you had -- and I apologize for stumbling

5   through this, Your Honor.

6        THE COURT:  That's all right.

7        MR. LILLWITZ:  If you had two sets of instructions and

8   then a duplicative damages instruction, that should cure any

9   concern where they would just put, you know, $100,000 and then

10  they would both be, you know --

11       THE COURT:  I think the problem is I don't know how I

12  would decide what's duplicative.

13       MR. DEE:  Right.

14       MS. ALESCH:  Exactly.

15       THE COURT:  So I don't think we can give them an

16  instruction that says I'll take care of it, but I don't think I

17  will be able to if they find --

18       MR. DEE:  They might find that they're both liable --

19       THE COURT:  They might.

20       MR. DEE:  -- and have their own or they might -- you

21  know, and then what do they do?  Do they allot the full amount

22  of what they think the damages are to each party or do they

23  split it?

24       THE COURT:  That's sort of up to --

25       MR. DEE:  But we will never know.

1          THE COURT:  Well, that's the problem.

2          MR. DEE:  Right.

3          THE COURT:  And that's the solution.  What's the

4    downside of doing that?  The ability to recover, is that the

5    concern here?

6          MS. ALESCH:  Of doing what?  Of splitting up the

7    parties?

8          THE COURT:  Yes.  What's wrong with doing that?  If the

9    jury finds Greg Cohen, LLC is 50 percent responsible and Greg

10   Cohen individually is 50 percent responsible, isn't that a

11   verdict they could render?

12         MR. DEE:  Yes.  But how would we know that's what they

13   did?

14         MR. LILLWITZ:  You could --

15         MR. DEE:  In other words, how would --

16         MR. LILLWITZ:  Oh, sorry.  Go ahead, Mike.

17         MR. DEE:  I was going to say how we would know that

18   they didn't decide that the verdict should be 100,000 and we're

19   allocating 50,000 to each versus determining we think the total

20   verdict is 50,000 and they're each liable for the full amount?

21      I mean, maybe it doesn't make a difference, but in that

22   case, then, they've decided that the damages are 50 grand, and

23   we are entering judgment for 100 grand, which I realize I'm sort

24   of speaking against myself at the moment, but I think the way

25   the -- I think the way the verdict form is this morning that you

1    passed out is appropriate.

2            MR. LILLWITZ:  Would there be a way to instruct the

3    jury to assign a percentage of the total damages they find?  I

4    mean, again, it's not --

5            MR. DEE:  No.

6            MR. LILLWITZ:  I understand that --

7            THE COURT:  I don't know how we would do.

8            MR. DEE:  No.  There's no comparative fault.

9            THE COURT:  I think we either completely split it

10   out --

11           MR. LILLWITZ:  I understand there's no comparative

12   fault, but I'm not suggesting the plaintiff -- what I'm

13   suggesting is there's only one actor here, and it's Mr. Cohen,

14   so there's only going to be one universe of damages.  Somehow

15   instructing them that they have to decide what portion of those

16   damages, you know, was he responsible for personally and what

17   portion was he responsible for -- or was the LLC responsible for

18   because, yeah, they have to be -- I mean, they have to be

19   distinguished as a matter -- I mean legally.

20       And, Mike, to your point, I suppose we could leave the

21   current verdict form if we added something like that.  You know,

22   if we added -- let me look through it.

23           MS. ALESCH:  Because the way it is right now, I mean,

24   is joint and several liability.

25           MR. LILLWITZ:  Right.  And it can't be.  I mean, you

1  know, if he's acting outside the scope of his duties as an

2  officer for the LLC, it can't be joint and several liability

3  as a matter of law.  I mean, those two are two separate

4  entities.

5      So if you leave it currently, which, again, I'm -- maybe

6  that's the best way to do it, add some sort of question that

7  says of the amount of damages you find, what percentage were on

8  account of Mr. Cohen acting as CEO of Greg Cohen Promotions and

9  what percentage were as him acting individually.

10     Does that make sense or am I just talking to the ceiling?

11 Because I kind of feel like it.

12         THE COURT:  Yeah.  I'm thinking through.

13         MR. DEE:  I think one of the problems is that we're

14 assuming that there's a finite amount of liability that adds up

15 to 100 percent.  I mean, the jury could find that they are

16 equally responsible.  That doesn't necessarily mean each is

17 responsible for 50 percent of the damages.  In that situation,

18 they would each be responsible for 100 percent of the damages,

19 and that, I think, is the problem with what Tim is suggesting.

20     I mean, they could absolutely --

21         MR. LILLWITZ:  No.

22         MR. DEE:  Yeah.  Sure.  They could absolutely find that

23 they are each --

24         MR. LILLWITZ:  Well, no.  Because you're either acting

25 within the scope of your authority of the LLC or you're not.  So

1    if there's damages --

2            MR. DEE:  Well --

3            MR. LILLWITZ:  -- attributable to Mr. Cohen, it can't

4    be attributed to the LLC and vice versa.  It's not a comparative

5    fault issue, Mike, it's a scope of -- it's a scope of authority

6    issue.

7            MR. DEE:  Well, or the jury could find that there

8    simply is no distinction --

9            MR. LILLWITZ:  Based on what evidence?

10           MR. DEE:  -- in his conduct.

11       Well, whatever.  But we're just talking about what -- yeah.

12   That's what -- I mean, we had that -- we had that last year.

13   The jury found the individual, Mr. McLaughlin, liable, but then

14   they gave them zero damages and allocated it all to the company,

15   which --

16           MR. LILLWITZ:  Oh, okay.

17           MS. ALESCH:  So it was against both parties.

18           MR. LILLWITZ:  Yeah.

19           MR. DEE:  So they found both parties liable for fraud.

20   We had a fraud claim in that case.

21           MR. LILLWITZ:  Okay.

22           MR. DEE:  And then it was an issue of damages.  And so,

23   in other words, I mean, yeah, so I --

24           MR. LILLWITZ:  Yeah.

25           THE COURT:  We've reached the end of our ideas?  Is

1   that where we're at?

2         MR. LILLWITZ:  Yeah.  I guess Defendants' position is

3   ultimately going to be however we instruct the jury, if the

4   basis for having Mr. Cohen on the verdict form as an individual

5   is that he was acting outside the scope of his duties as the

6   CEO, those damages can't bind the LLC.  So I'm not sure how we

7   instruct the jury on that, other than just, I mean --

8         THE COURT:  We could add a final special interrogatory

9   to Verdict Forms Two and Three that said, "Do you find Greg

10  Cohen was acting within the scope of his duties as CEO for the

11  LLC?"  And they're either going to say yes or they're going to

12  say no.  If they say no, then Greg Cohen is individually liable.

13  If they say yes, then Cohen LLC is.

14        MR. LILLWITZ:  Yeah.  That works.

15        MR. DEE:  Well, we'd need one for each claim because

16  the Ali Act claims are --

17        THE COURT:  Correct.  Verdict Forms Two and Three you'd

18  have to add the same one.

19        MR. DEE:  Yeah.  On each one.

20        THE COURT:  Is that workable?  Do you want me to draft

21  something?

22        MR. LILLWITZ:  Yeah.  That works for Defendants.  That

23  theory works for Defendants, Your Honor.

24        THE COURT:  Does that work for you, Mr. Dee and

25  Ms. Alesch?

1          MR. DEE:  I'm still having trouble with the idea that

2   in that case the jury can't -- if they wanted to, they can't say

3   some of the time it was as CEO and some of the time it was, you

4   know, beyond the scope of being the CEO, and that's what I'm

5   struggling with.

6          THE COURT:  And I haven't looked at this.  Is there a

7   private right of action that Mr. Miljas would have against Greg

8   Cohen individually for a violation of the Muhammad Ali Act?  Is

9   there an individual right of action against Mr. Cohen on the

10  tortious interference?  I assume there is on that one at least.

11         MR. DEE:  Oh, there is on that one for sure, on the

12  tortious interference.

13         MR. LILLWITZ:  Yeah, tortious interference there would

14  be.

15         MR. DEE:  Oh, you mean as we pled it?

16         THE COURT:  Yes.

17         MR. DEE:  Yes.  We pled it as both on the Ali Act.

18         THE COURT:  All right.  What's your thought on the

19  special interrogatory question about whether Mr. Cohen's acting

20  within the scope?

21         MR. DEE:  Does that mean, then, we need an instruction

22  on how they make that determination?

23         THE COURT:  Probably.  And since that issue didn't come

24  up at any point prior to this, you didn't -- you know, we didn't

25  have any evidence about that.

1           MR. DEE:  No.  I know.  I mean, the -- I know.  But, I

2    mean, if we're going to add that interrogatory, I mean, there's

3    probably instructions, but there certainly is law out there on

4    what a party does, what the law considers the factors to

5    consider in determining whether somebody was acting within or

6    outside of the scope of their employment.

7           MR. LILLWITZ:  It's probably a Restatement section or

8    something, right, an agency?

9           MS. ALESCH:  We had an agency instruction in ContiTech.

10          MR. DEE:  We did?

11          MS. ALESCH:  Yes.

12          MR. LILLWITZ:  Did you do one in that other case?

13          MS. ALESCH:  We had an agency instruction in ContiTech.

14   I'm just trying to pull it up.

15          MR. LILLWITZ:  I mean, I've given it before.  I don't

16   have off the top of my head which case it is, but I've seen them

17   before.

18          MR. DEE:  Yeah.  Your Honor, let's see if we can pull

19   the one up we used last year.

20          THE COURT:  That's what I'm looking for as well.

21          MR. DEE:  So are we.

22          THE COURT:  Looks like it's Instruction No. 10.

23      Yeah.  It's basically the instruction we gave them in

24   preliminary jury instructions that a corporation acts only

25   through its agents or employees.

1          MS. ALESCH:  So that covers liability against the

2     corporation but not outside the scope.

3          THE COURT:  Correct.  We didn't talk about that.

4          MR. LILLWITZ:  I'm searching through firm memos to see

5     if there's one out there.

6          THE COURT:  Yeah.  We just did two completely separate

7     verdict forms in ContiTech.  We did one against McLaughlin

8     Freight and we did one against Dan McLaughlin.

9          MR. DEE:  Right.  The verdict forms, right.

10          MS. ALESCH:  I think that's fine so long as we are

11     clear in the jury instructions what we will do with the numbers

12     that they provide us.  So long as it's clear that if they want

13     $500,000 to each party, then all damages are considered

14     separately against each defendant, whereas -- instead of saying

15     we will take care of double recovery.

16          MR. DEE:  Yeah.  Double recovery is easy to do with

17     multiple -- well, not so much this case, but with multiple

18     claims based on the same conduct like we had last year.

19          THE COURT:  Why would we assume it was a double

20     recovery?  That's what I'm struggling with.  I mean, if we ask

21     them entirely separate questions, they provide whatever their

22     numbers are --

23          MR. DEE:  Right.

24          THE COURT:  -- those are separate numbers, in my view.

25          MR. DEE:  Separate judgments against separate parties.

1        THE COURT:  Correct.

2        MR. LILLWITZ:  Is there a way, then, to just somehow

3   insert the word "only," you know, when you separate the two so

4   that it's clear?  Because if you said -- I think there would

5   still be an issue if you said what are the damages caused by

6   Greg Cohen and then separately, on a different verdict form,

7   what are the damages caused by Greg Cohen Promotions.  If you

8   inserted the word "only" in there, I think it would be less

9   likely that we'd be confused as to whether they were doubling --

10  doubling the two.

11       MR. DEE:  Wouldn't that then direct them to either

12  enter a verdict against one or the other if it's "only"?

13       MR. LILLWITZ:  No.  We're just talking about damages.

14  I'm talking about only the damages question.

15       MR. DEE:  Okay.  I missed, then, where you would put

16  the "only."

17       MR. LILLWITZ:  So it would be -- let's see.

18       MS. ALESCH:  Could we just put Greg Cohen -- so

19  "tortious interference claim against Greg Cohen individually"?

20       MR. LILLWITZ:  Individually, yeah.  So I'm looking

21  at -- on the tortious interference, I'm looking at

22  Instruction -- No. 2, Casey.

23       MS. ALESCH:  Yep.  I'm there.

24       MR. LILLWITZ:  "What amount of damages should Mladen

25  Miljas be awarded for interference caused only by Greg Cohen

1  Promotions" or "caused only by Greg Cohen" if they're on

2  separate ones?

3       You know, if you have the two different, you separate them

4  out, you could say, "What amount of damages should Mladen Miljas

5  be awarded for tortious interference caused by Greg Cohen

6  Promotions?" and on a separate verdict form, "What amount of

7  damages" -- or "Greg Cohen Promotions only" -- sorry.  "What

8  amount of damages should Mladen Miljas be awarded for his

9  tortious interference" -- sorry -- "for tortious interference

10 caused by Greg Cohen only?"

11      MS. ALESCH:  I don't like adding the word "caused" in

12 there because they're already saying that damages were caused up

13 in question No. 1, so then in question No. 2 --

14      MR. LILLWITZ:  Right.  But that's not prejudicial

15 because they either said yes or no in question No. 1, so --

16      MR. DEE:  I think a separate verdict form probably.

17      THE COURT:  I'm going to do a separate verdict form.

18 I'll use the word "individually" with respect to Greg Cohen.

19 I'll draft something, and we'll recirculate it, but we need to

20 get started.

21      MR. LILLWITZ:  Okay.

22      THE COURT:  So we'll continue to work through those

23 issues.

24      And, Mr. Cohen, you can return to the witness stand.

25      (In open court, in the presence of the jury.)

1       THE COURT:  Good morning.  Welcome back.  You can be

2  seated.

3       I apologize for the delay.  We were working through some

4  legal issues on the jury instructions because we anticipate you

5  will get this case later today, and it's just taking us a little

6  longer than we expected.  I apologize for that.

7       Mr. Cohen, you remain under oath.

8         GREG COHEN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

9       THE COURT:  Mr. Lillwitz, you may continue with your

10  direct examination.

11       MR. LILLWITZ:  Thank you, Your Honor.

12                 DIRECT EXAMINATION (resumed)

13  BY MR. LILLWITZ:

14  Q.  Mr. Cohen, when we left off yesterday, I believe we were

15  concluding our discussion on the Wayman Carter fight from

16  January of 2019.  Do you recall that?

17  A.  Yes.

18  Q.  How much did Cohen Promotions pay Mladen for the Wayman

19  Carter fight?

20  A.  I believe $2,000 was his purse.  That's what we paid.

21  Q.  How much did Cohen Promotions receive for the Wayman Carter

22  fight?

23  A.  There were zero revenues for that fight.  We received zero

24  dollars in revenue.

25  Q.  No compensation at all?

1  A.  No.  You know, all of the fights -- this fight that you're

2  asking about was what's considered a paid-for bout, meaning I'm

3  a promoter, my fighter's fighting on another promoter's event,

4  they're allowing me to have the slot on their event, but it's my

5  responsibility to pay all costs and expenses for that particular

6  bout, and there are zero revenues that come back against that.

7  Q.  So is it your testimony that for the four bouts that Mladen

8  fought that we've discussed here this week, Cohen Promotions

9  received no revenues or compensations at all?

10  A.  Correct.  Not a penny.  Correct.

11  Q.  All right.  Moving on with the timeline, because I think

12  we've heard a lot about it this week, Mladen's next fight was

13  Matthew Greer on March 2nd, 2019.  Do you recall that?

14  A.  I do.

15  Q.  Prior to March 2nd, 2019, did Mladen ever express any

16  concern to you about the suitability of Matthew Greer?

17  A.  No.  He agreed to fight him.

18  Q.  And when you and Mladen discuss an upcoming fight, how does

19  that take place?  Is it phone calls, text messages?  How does

20  that work?

21  A.  It's a combination of phone calls and text messages.

22  Q.  Is that at all unusual for Mladen as a fighter or is that

23  how you handle it with all your fighters?

24  A.  That's how -- it's pretty standard.

25  Q.  Mr. Cohen, what made Matthew Greer an appropriate opponent

1  for Mladen to fight on March 2nd, 2019?

2  A.   In my opinion, Matthew Greer was a really good opponent for

3  Mladen because he had so much experience.  And when you look

4  at -- you know, when you look at an opponent's record, it's not

5  a matter of necessarily wins and losses, because you could have

6  an opponent that's 10-0 and you can have an opponent that's, you

7  know, 3-10, but that 3-10 fighter fought -- fought killers in

8  every one of his fights, that's why he has a bad record, and a

9  guy 10-0 could fight, you know, terrible fighters and is able to

10 manufacture a pretty record.

11      When you look at Greer's record, I think he had over 60

12 fights.  Two fights before he fought Mladen, he fought Lucas

13 Browne, who I believe the fight before Lucas Browne faced Greer,

14 he won the WBA heavyweight championship of the world.  He later

15 had that title stripped, and in his comeback fight, he fought

16 Greer.  But one or two fights before Greer fought Mladen, he was

17 fighting a heavyweight champion, Lucas Browne.  Prior to that,

18 Matthew Greer fought multiple heavyweight champions:  Deontay

19 Wilder, Shannon Briggs, Andy Ruiz.  And there's more.  I can't

20 remember everybody.

21      But the point is I thought it would be great experience for

22 Mladen to have a win on his resume, which I believed Mladen

23 would beat him.  I wasn't worried about whether Mladen was going

24 to, you know, win the fight.  Clearly, I felt he would win the

25 fight relatively -- I don't want to say easy, but he was

1   expected to win.  He's the A side, the other guy is an opponent.

2        But, you know, because of the quality of Greer's

3   opposition, as a promoter, for my marketing purposes, I could

4   say, hey, listen, Mladen Miljas, he knocked this guy out in the

5   first or second round.  He went X amount of rounds with these

6   other world champions.  I think Mladen, you know, is going to be

7   like these other world champions.

8   Q.  So the Greer fight happens, and then can you turn to Exhibit

9   20 -- 22, Exhibit 22, please, Mr. Cohen.

10       Are you there?

11  A.  Yes, I am.  I'm sorry.

12  Q.  And are you looking off the screen, just so I know for

13  future --

14  A.  I'm looking on the screen.

15  Q.  Okay.  Thank you.

16       And I don't want to go through the whole text messages,

17  because we've already covered it with other witnesses, but these

18  are text messages between you and Mladen after the Greer fight;

19  is that right?

20  A.  No.  I'm looking at February, and I believe the fight was in

21  March.

22  Q.  Oh, I'm sorry.  Yes.  If you scroll down -- that's the first

23  page.  The second text message --

24  A.  I see the text message.  I believe it's the night of -- just

25  right after his fight.

1  Q.  Did Mladen ever express any disappointment to you after the

2  Greer fight about his opponent?

3  A.  No, he did not.

4  Q.  Can you turn to Exhibit F, please.  It's one of Defendants'

5  exhibits.  I'll reduce the size there.

6      Now, I asked Mladen in his examination about this picture

7  you see on Exhibit F.  Do you see that picture?

8  A.  I do.

9  Q.  He couldn't remember why you would have been sending it to

10 him.  Do you have a recollection of why you would have sent this

11 picture to Mladen in June of 2019?

12 A.  Yeah.  We had, you know, finally met in person, and in the

13 picture, it's myself, Mladen, and Cory Rapacz, who is a

14 co-promoter I work with frequently.  And he actually was a

15 co-promoter or lead promoter of all four of the events that

16 Mladen participated on.

17 Q.  And --

18 A.  And I just thought --

19 Q.  Let me make a little bit more foundation just so we know

20 what we're talking about.  When was the picture taken; do you

21 recall?

22 A.  I was -- I was in Las Vegas in June of 2019, and Mladen came

23 to -- he and at the time his girlfriend or fiancee came to the

24 hotel to meet me, and Cory, and, you know, we were in the

25 lounge, and we got to know each other a little bit in person.

1   Q.   So where is this picture taken that we see?

2   A.   This is at the MGM Grand in Las Vegas, Nevada.

3   Q.   And you spent some time with Mladen there?

4   A.   I did.

5   Q.   How long?

6   A.   I think probably two hours we were in the lounge.

7   Q.   During that two hours, did Mladen ever express to you any

8   disappointment about the suitability of his opponents to that

9   date?

10  A.   No, he did not.

11  Q.   Had Mladen, do you know -- well, strike that.

12       Let's move to Exhibit G.  And if you see on Exhibit G,

13  Mr. Cohen -- and, again, I discussed this with Mladen in terms

14  of the text messages, but what's the picture we see there?  What

15  is that?

16  A.   So this is a -- I guess an electronic fight poster for an

17  upcoming event.  And the event was not taking place until

18  September, but it was, you know, planned in June.  And, you

19  know, this was to just have a little promotion, a little teaser,

20  that, hey, you know, there's an upcoming event where, you know,

21  Mladen Miljas is going to be featured, and the purpose of it was

22  for marketing.

23  Q.   Does GCP do this for all of its fighters?

24  A.   Frequently, yes.

25  Q.   Let's look at Exhibit B.

1        MR. LILLWITZ:  Kyle, this one's not in yet.

2   BY MR. LILLWITZ:

3   Q.  Mr. Cohen, do you have Exhibit B?  It's probably in the book

4   there in front of you, the defendants' exhibit.

5   A.  Yes.

6        MR. LILLWITZ:  And actually, Kyle, I'm going to have

7   him look at Exhibit G that we just looked at, so I'll put that

8   back up on the screen.  Hold on a sec.  I want him to compare

9   the two.

10       Could you publish Exhibit G.

11  BY MR. LILLWITZ:

12  Q.  So, Mr. Cohen, with Exhibit G still in your mind that we

13  just looked at, what do you see in Exhibit B?  What is that?

14  A.  So it's very similar.  It's an electronic fight poster of

15  Mladen for this event that is -- you know, I guess it's on the

16  screen.  Except this time it shows him and his opponent, Damion

17  Reed.

18  Q.  And before you keep going, so we can publish it, was Exhibit

19  B the work of Cohen Promotions?

20  A.  It was -- the lead promoter of the event was CyNation

21  Sports, and they went back and forth with GCP.

22  Q.  In terms of what, the contents?

23  A.  They create -- they created it.  They asked for our opinion

24  on, you know, graphics and certain things and which photo.  I

25  supplied them.  You know, it's a different photo of Mladen than

1  the first one.  I supplied them with the photo of Mladen.

2  Q.  Did Cohen Promotions then publish to the general public what

3  we see in Exhibit B?

4  A.  Yes.

5         MR. LILLWITZ:  Your Honor, at this time Defendants

6  would move to admit Exhibit B.

7         MR. DEE:  No objection.

8         THE COURT:  Exhibit B is admitted.

9                  (Defendants' Exhibit B was

10                  offered and received in evidence.)

11        MR. LILLWITZ:  Let me get that up, Kyle.

12     Go ahead.

13  BY MR. LILLWITZ:

14  Q.  So, again, we see it's just a -- essentially a later version

15  of what we see in Exhibit G?

16  A.  That's correct.  I believe the first one, there was not --

17  even though the date was set aside for Mladen, the slot on that

18  show was set aside for Mladen, the first one, the opponent was

19  not selected yet.  The second one was after the opponent was

20  selected.

21  Q.  In that process for selecting the opponent for the poster we

22  see in Exhibit B, would that have been any different than your

23  previous interactions with Mladen?

24  A.  No.

25  Q.  Let's look at Exhibit H very quickly.  And, again, this is a

1   text message that I went through with Mladen, between you and

2   him, in early July of 2019.  And what are you doing in that top

3   text message, Mr. Cohen?

4   A.   I'm reaching out to Mladen to see how he's doing.  You know,

5   he had moved to Las Vegas, and his trainer, Eddie Mustafa

6   Muhammed, was out of the country with another fighter for

7   several weeks, and I was just making sure that, you know, he's

8   okay.

9   Q.   And at the bottom, you see he responds with "everything is

10  great"?  Excuse me.  Do you see that?

11  A.   I did.

12  Q.   Did Mladen ever express to you during that time period that

13  he was unhappy with either his opponents or his situations?

14  A.   No.  He was very excited, you know, during that time period.

15  He was really happy about being in Las Vegas and, you know, was

16  happy that Eddie was his head trainer.  And I believe at the

17  time he also -- it was right after he brought on his manager as

18  well, so he was -- it was a good time for Mladen at that point.

19  Q.   So we've seen a number of exhibits and text messages between

20  this April of 2019 and July of 2019 time period.  Why was Mladen

21  not fighting during that time period?

22  A.   He had -- I'm not sure exactly when he made his deal with

23  his manager, but it was in that time period.  He then moved to

24  Las Vegas to train with Eddie Mustafa Muhammed as his new

25  trainer.  They had never worked together.  This was them

1  starting a relationship.

2       And, you know, he and Eddie were beginning to mesh, and

3  then Eddie had other obligations and had to be out of the

4  country for world title fights with other fighters, and it was

5  the thought between his manager, myself, Mladen, and Eddie that

6  when Eddie comes back, we will schedule a fight and to put a

7  fight on the schedule, you know, so that he could come back,

8  have a few weeks of training together, so they could be ready

9  for his first fight under his new manager and new trainer.

10 Q.  Do you recall as you sit here, Mr. Cohen, when was Mladen's

11 next fight?

12 A.  August of 2019.

13 Q.  And that's the Aaron Chavers fight; is that correct?

14 A.  That's correct.

15 Q.  And was Eddie back in the country at that point in time?

16 A.  He was.  For a couple weeks.

17 Q.  Prior to the Chavers fight on August 9th of 2019, did Mladen

18 ever complain to you about the suitability of Aaron Chavers?

19 A.  He did not.

20 Q.  Similar to the questions I've asked before this morning,

21 what made Aaron Chavers a suitable opponent, if you can recall?

22 A.  So Aaron Chavers was -- he was an experienced fighter.  He

23 had a .500 record.  I believe it was 8-8-1.  He had a draw

24 over -- at the time he was a 10-0 prospect.  His name is James

25 McKenzie Morrison, actually the son of Tommy Morrison, who is a

1  former heavyweight champion.  And he had fought a lot of

2  experienced fighters.

3       He fought, I believe, Jonathan Guidry twice, once before

4  Mladen -- he fought Mladen, once after.  Jonathan Guidry last

5  year -- or in, I want to say, January of 2022 fought for the WBA

6  heavyweight championship of the world.

7       The point is, he's fighting other prospects, and I felt

8  that he was an appropriate opponent for somebody at Mladen's

9  stage of his career.

10 Q.  Do you recall how much Mladen was paid for the Chavers fight

11 in August of 2019?

12 A.  $2,000.

13 Q.  And similar to your answers this morning, did Cohen

14 Promotions receive any compensation for that fight at all?

15 A.  No, they did not.

16 Q.  So we've heard testimony this week, Mr. Cohen, about -- and

17 you saw the posters -- the next fight which was scheduled,

18 anyway, the Damion Reed fight.  What happened with the Damion

19 Reed fight, as you can recall?

20 A.  I received a call from the promoter, the lead promoter of

21 the event, a few days before the fight, telling me, "I'm sorry.

22 The opponent's out."  I mean, it was literally when Mladen and

23 his team were -- it was the day or day before they were supposed

24 to travel to come to, you know, to -- I guess it was Virginia

25 for the fight.  And there was just not enough time to get a

1    replacement opponent.

2    Q.  Did Cohen Promotions pay for the airfare to Virginia for

3    Mladen and his -- well, and his parties, I guess?

4    A.  Yes.  Yes.

5    Q.  So the Reed fight -- well, first of all, since the Reed

6    fight was so close to being held, had you had discussions with

7    Mladen about Reed as an opponent?

8    A.  Yes.  I mean, we were advertising the fight.  There were

9    fight posters made, and we went through the same process we

10   always go through.

11   Q.  After the Reed fight fell through, what did you do next?

12   A.  Well, Mladen -- the Reed fight, I believe, was scheduled for

13   September 14th.  He had just fought Chavers the month before

14   that, in August.  So, you know, the idea was to just keep Mladen

15   busy.

16        When the Reed fight fell out, it was very disappointing,

17   and I received a lot of phone calls, some texts and emails but a

18   lot of calls, from his manager, his trainer, his father, and

19   even Mladen that, "Hey, you've got to get me a fight," or,

20   "We've got to get Mladen a fight as soon as possible, you know.

21   He's in great shape.  He just fought in August.  He was supposed

22   to fight, you know, a month later, and, you know, we don't want

23   to waste him being in this kind of condition.  Get us a fight as

24   soon as possible."

25   Q.  Let's look at Exhibit N, please.  And, again, we have

1   discussed this email chain with other witnesses this week,

2   Mr. Cohen, but what do we see here in Exhibit N?

3       And take your time to look through it, if you need to.

4   A.  You're saying from the September 27th correspondence?

5   Q.  Well, yeah.  Generally, what is it?  Are they emails between

6   you and who?

7   A.  Mr. Miljas, Mladen's father.

8   Q.  And look specifically at the email on Friday, September 27th

9   at 6:29 p.m.  What does Mr. Miljas express to you there?

10  A.  Consistent with the phone conversations that had been going

11  on, you know, over that two-week period, he's saying that he

12  wants to know the status of when Mladen's fighting next.  And,

13  you know, he was sure I could appreciate how difficult it is

14  that he trained, he was prepared to fight, and then the fight

15  didn't happen.

16      And, you know, it was -- I took it as he was asking when's

17  he going to fight next and, you know, please, you know, put our

18  concerns at ease, we want to fight.

19  Q.  Did you feel any pressure to get -- about that time in late

20  September of 2019, did you feel any pressure to get Mladen a

21  fight as soon as possible?

22  A.  Well, I felt, you know, an obligation and -- I mean, not any

23  negative pressure, but just, you know, for -- pressure for me to

24  perform my duties.  You know, everybody was -- when I say

25  "everybody," myself included, the team was not happy with his

1   fight being canceled, and we had so many things scheduled, it

2   looks like we were going to really hit our stride, and, you

3   know, I felt like, yeah, I had to -- I had to deliver.

4   Q.  The jury's already heard some testimony about the next

5   opportunity to fight, and that's the Ruann Visser fight on

6   October 19th of 2019.  How did that fight come about?  Explain

7   that to the jury.

8   A.  So I actually was contacted in August, early August, by the

9   promoter of the event, Ibn Cason.  We had heard about a fighter,

10  Cody Crowley, earlier, who is a prospect or contender from right

11  around where Mladen's hometown is in Canada, and they contacted

12  me in August saying, "Hey, there might be an opportunity for

13  Mladen to fight on our show October 19th.  Would you be

14  interested?"

15       And we had a number of conversations when the fight was --

16  Q.  And I want to interrupt you.  Just don't say anything that

17  they might have told you on those conversations.  I'm more

18  interested in what you would have told Mr. Cason about the fight

19  on October 19th.

20  A.  So at first, I said, you know, I -- I have no issue with the

21  date, the date would most likely work for us.  We had other

22  things scheduled, but the date would most likely work, and, you

23  know, it's a matter of who they want Mladen to fight.

24  Q.  Did you ever have the opportunity to discuss the Visser

25  fight directly with Mladen?

1  A.  Yes.

2  Q.  And set that scene for the jury.

3  A.  So around the time -- I think it was a couple days after

4  this email from Mladen's father, Mladen left Las Vegas

5  unexpectedly.  Nobody -- he didn't inform me or his manager or

6  his trainer.  He went back to Canada.  Myself, his manager,

7  trainer, and Mladen got on a telephone call, on a conference

8  call -- because before he left, there was discussion of the

9  Visser fight for October 19th in Canada, and we -- the four of

10  us were on a call to discuss, you know, what needed to be done

11  to secure this fight.

12      We discussed a number of things.  Mladen, which he said all

13  along while he was on the stand here, and then he also said it,

14  you know, he had no problem fighting Ruann Visser.  You know,

15  Mladen felt he was a good opponent and somebody that he would,

16  you know, probably beat.  But he was concerned that he was back

17  in Canada and didn't have his trainer with him.

18  Q.  And let me stop you there for a second.  So on that phone

19  call, obviously, the phone call was about Ruann Visser and the

20  Ruann Visser fight, correct?

21  A.  Correct.

22  Q.  Okay.  Was the amount of money Mladen would receive from

23  that fight discussed at all on that call?

24  A.  It was.

25  Q.  How so?

1  A.  I had received a bout agreement from the promoter of the

2  event earlier, prior to that call, and it was going to be a

3  $4,000 fight on the card in Canada.

4  Q.  How about Mladen's concerns that he was already back in

5  Canada, like you mentioned?  Were there any offers made on that

6  call to, you know, ease those concerns?

7  A.  Yes.  His manager, myself offered to pay the expenses of his

8  trainer, and his trainer was willing to go to Canada to be there

9  with him for the next couple of weeks so he can train and be

10 with his trainer for that -- so his trainer could be with the

11 fighter to get him ready for the fight.

12 Q.  And, I'm sorry, I didn't mean to cut you off.  Before we

13 move farther, when you say "his trainer," so the jury knows, who

14 are you referring to?

15 A.  Eddie Mustafa Muhammad, Mladen's trainer, his head trainer.

16 Q.  Did Mladen fight Visser on October 19, 2019, Mr. Cohen?

17 A.  He did not.

18 Q.  Why not?

19 A.  He said he wasn't in the right headspace and just didn't

20 like the date and was not -- he was not ready at that time for

21 that fight.

22 Q.  Did you find Mladen's refusal to fight on October 19th

23 reasonable?

24 A.  I did not.

25 Q.  Did you ever express that to Mladen?

1   A.   I did.

2   Q.   Mladen discussed with us on the stand the physical

3   characteristics of Visser and said he was an extremely tall

4   individual, I think he said 6-9.  Do you recall that testimony?

5   A.   I do.

6   Q.   Is there a height class within the heavyweight division,

7   Mr. Cohen?

8   A.   No, there's not.

9   Q.   Why not?

10  A.   Boxing is made up of weight classes.  If you're 200 pounds

11  plus, you're a heavyweight.  And heavyweights come in all shapes

12  and sizes.  Mike Tyson was 5-10, one of the most vicious

13  heavyweights in the history of the sport.  Nikolai Valuev was a

14  heavyweight champion, and he was seven-foot-two.  It's not a

15  height class, it's a weight class.

16  Q.   After the Visser fight, Mr. Cohen, we move later, obviously,

17  into 2019, and I want to skip ahead to some more topics.

18       So did you ever have a call with Mladen about your prison

19  sentence?

20  A.   I did.

21  Q.   And do you know when that was?

22  A.   It was in November of 2019, right after I was sentenced.

23  Q.   And I'm going to pull up -- actually, strike that.  I don't

24  need to pull it up.

25            MR. LILLWITZ:  Sorry, Kyle.

1  BY MR. LILLWITZ:

2  Q.  I can't remember if you just said.  Do you remember the

3  exact date of your prison sentencing?

4  A.  It was -- I was sentenced, I believe, the last week of

5  November of 2019, right before Thanksgiving.

6  Q.  Why had you not discussed with Mladen earlier that potential

7  sentencing and those charges?

8  A.  So until my sentence occurred, until my sentencing hearing

9  occurred, my case was under seal by the federal government, and

10  I was prohibited from speaking to anybody about it.

11  Q.  Did you tell any of your fighters prior to your sentencing

12  hearing about your criminal charges?

13  A.  The -- a couple of my fighters wrote letters of support to

14  the court on my behalf, but I didn't give them details.

15  Q.  Understood.  So we're at the end, now, on this timeline, the

16  end of 2019, beginning of 2020.  What are you working on or what

17  is Cohen Promotions working on on behalf of Mladen?

18  A.  So in the beginning of 2020, I was contacted by Mahmoud

19  Charr, who was at the time the WBA heavyweight champion of the

20  world.  His promoter contacted me that they were interested in

21  making a fight with Mladen for the spring of 2020, and --

22  Q.  Did you -- oh, sorry.  Did you discuss that potential

23  opportunity with Mladen?

24  A.  I did.  And I discussed it with his manager and his trainer

25  as well.

1   Q.  Would those have been phone calls; do you recall?

2   A.  There were definitely phone calls.  I'm sure with some of

3   them there could be written correspondence as well.

4   Q.  What was said by Mladen about the Manuel Charr fight?  Was

5   he excited?

6   A.  He was very excited.  He felt he was -- you know, it was a

7   great opportunity for him, and he felt he was going to be

8   heavyweight champion of the world or at least WBA heavyweight

9   champion of the world if that fight occurred.

10  Q.  What happened to the Charr fight?

11  A.  There was -- I mean, they sent contracts back and forth to

12  my lawyer.  It was a lot of negotiations.  Ultimately, the Charr

13  promoters did not go forward with an event, and Charr actually

14  became -- he was inactive and he never fought again as

15  heavyweight champion.  He was stripped of his title.

16  Q.  When you were having these discussions about the Charr

17  fight, had you reported to prison yet?

18  A.  No.

19  Q.  Do you recall what date you did report to prison?

20  A.  It was, unfortunately, my wife's birthday, February 4th,

21  2020.

22          MR. LILLWITZ:  Can we pull up Exhibit 3, please?

23      I lost my connection.  I apologize, Your Honor.  My

24  connection of my laptop just went down.  Do you mind if I

25  approach?

COHEN - DIRECT                                521

1          THE COURT:  Not at all.  Go ahead.

2          MR. LILLWITZ:  Thank you.

3   BY MR. LILLWITZ:

4   Q.  Can you look at Plaintiff's Exhibit 3.

5   A.  Plaintiff's?

6   Q.  Yes, Plaintiff's.

7          MR. LILLWITZ:  And, actually, Casey, do you have

8   Exhibit 3?  Could you put that up on yours?

9          MS. ALESCH:  Sure.  I've got to get logged in.

10         MR. LILLWITZ:  I'm sorry.  Don't worry about it.  I

11  didn't realize you weren't logged in.

12  BY MR. LILLWITZ:

13  Q.  Actually, I think I gave you the wrong -- yep.  There it is.

14         MR. LILLWITZ:  And I apologize to the jury, but we'll

15  have to show them at another time.  I think they've already seen

16  it.

17  BY MR. LILLWITZ:

18  Q.  What do we see on the second page -- excuse me.  What do we

19  see in Exhibit 3, Mr. Cohen?

20  A.  A notice from Mladen of -- Breach of Contract Notice on May

21  21st, 2020.

22  Q.  And where were you on May 21st, 2020?

23  A.  I was in prison.

24  Q.  So how were you made aware of this Breach of Contract

25  Notice; do you recall?

1   A.   I've got an email on the prison system from my son.

2   Q.   And let's look at -- I think it's 14 here.

3        Let's look at Exhibit 14.  What do we see in Exhibit 14?

4   A.   At the top?

5   Q.   Well, just generally speaking, what do we see?

6   A.   Let's see.

7   Q.   Is it an email?

8   A.   We see an email, yes.

9   Q.   Okay.  And at the bottom there you reference it's an email

10  from whom?

11  A.   At the bottom, the original email on the chain is from

12  Mladen, I guess, to me.

13  Q.   And what does he say in that email?

14  A.   He says, "Hey Greg I am reaching out to you in regards to my

15  fights.  I have not been satisfied with the amounts of fights I

16  have been having in both years of our contract.  I have not

17  received the...number of fights I was supposed to in

18  each...year.  I understand your current circumstances and have

19  still been patient waiting for you to schedule me a fight date.

20  I am going to go forward with removing myself from the contract

21  and getting fights elsewhere if this is not resolved

22  immediately.  I cannot keep my career and life on stall.

23        "All the best, Mladen."

24  Q.   And what's the date of that email?

25  A.   March 11th, 2020.

1  Q.  When was the last time you'd heard from Mladen prior to

2  March 11th of 2020?

3  A.  I don't -- I don't remember the exact date, but it was

4  probably the end of January or -- would be my guess.

5  Q.  Did that email catch you off guard, Mr. Cohen?

6  A.  I was surprised by it.  You know, it was -- yeah, I was

7  surprised by it, because we had -- just were in negotiations for

8  the Charr fight that had fallen through, you know, and, yeah, I

9  was surprised.

10  Q.  Well, in the interim, between the Charr fight and this, you

11  had, again, reported for your prison sentence.  And just so the

12  jury puts a timeline on it, when did you ultimately get out of

13  prison?

14  A.  I came home 5 1/2 months later, on July 16th, 2020.

15  Q.  While you were in prison, did Cohen Promotions continue

16  actively promoting its fighters?

17  A.  Yes, they did.

18  Q.  How did they do so?

19  A.  There was a staff other than myself, and we had a number of

20  fighters.  Even though I went to prison on February 4th, we had

21  fights on Showtime February 28th.  A fighter, Keith Hunter, was

22  the main event on Showtime ShoBox series.  GCP's fighter Joey

23  Dawejko that was a heavyweight --

24  Q.  And before you keep going, can you spell Dawejko for the

25  court reporter?

1   A.  Oh, I'm sorry.  D-a-w-e-j-k-o.  He fought March 12th, 2020,

2   on a nationally televised fight on Fox Network.  And another one

3   of our fighters, a female fighter, Melissa Hernandez, was

4   scheduled to fight Mikaela Mayer on ESPN at Madison Square

5   Garden on March 17th.

6   Q.  And what happened before March 17th?

7   A.  So the pandemic hit, and shortly before, right before March

8   17th, all events, all sporting events, in New York were

9   canceled.  The March 17th Hernandez fight was canceled.  And

10  from -- literally from that point, March of 2020, you know, it

11  just -- there were no fights going on, you know, for several

12  months.

13  Q.  We saw in other exhibits, Mr. Cohen, that Mr. Miljas

14  ultimately terminated your contract on June 21st of 2020.  Do

15  you recall those exhibits?

16  A.  I do.

17  Q.  Were there any -- to your knowledge, were there any boxing

18  fights that took place anywhere in North America between the

19  beginning of the pandemic and June 21st of 2020?

20  A.  There were not.

21  Q.  Before I get to a wrap-up here, Mr. Cohen, there was some

22  testimony yesterday from Plaintiff's expert, Mr. Shaffer, and he

23  explained to us that to calculate Mladen's alleged damages in

24  this case, he used nine other fighters as sort of a, you know,

25  support or baseline to do so.

1      Do you recall that testimony?

2  A.  I do.

3  Q.  And he gave us some names, and I think one of the names was

4  a fighter of yours, Bogdan Dinu.  Do you remember that?

5  A.  Bogdan Dinu.

6  Q.  Bogdan?

7  A.  B-o-g-d-a-n D-i-n-u.

8  Q.  Are you familiar with Bogdan Dinu?

9  A.  Sure.  Sure.

10  Q.  Can you compare Bogdan Dinu to Mladen Miljas for us?

11  A.  Bogdan Dinu was, I believe, either a five- or seven-time

12  Romanian national champion as an amateur, fought international

13  amateur competitions.  And Bogdan Dinu had -- has over 20

14  fights.  A large portion of them are ten-round fights.  He

15  fought for -- he fought for an interim world title.  He fought

16  on ESPN.  He fought on DAZN.  He fought on British Telecom, BT.

17  Q.  And how long have you represented Bogdan Dinu -- I'm sorry.

18  How long has Cohen Promotions represented Bogdan Dinu?

19  A.  So GCP started, I want to say, right end of '17, beginning

20  of 2018.

21  Q.  And does GCP still represent Bogdan Dinu?

22  A.  His contract's expired, and he's told me he's retired.  You

23  know, but the term of his agreement is no longer -- you know,

24  he's no longer signed to us, but we have a nice relationship.

25  Q.  Two other names that Mr. Shaffer mentioned were Daniel

1  Dubois, I think it's D-u-b-o-i-s, and Joe Joyce.  Do you recall

2  those names being mentioned?

3  A.  I do.  I do.

4  Q.  Can you compare those two fighters to Mr. Miljas?

5          MR. DEE:  I'm going to object.  There's no foundation

6  for this.  They're not his fighters.

7          MR. LILLWITZ:  I can lay some foundation.

8          MR. DEE:  It's hearsay.

9          THE WITNESS:  Actually, Daniel Dubois --

10          THE COURT:  Hold on.

11          MR. LILLWITZ:  Hold on, Mr. Cohen.

12          THE WITNESS:  I'm sorry.

13          THE COURT:  You can lay your foundation.

14      Mr. Cohen, you may not rely upon anything you've read or

15  heard about these boxers, so it needs to be your personal

16  experience.

17      If you can lay that foundation, go ahead.

18  BY MR. LILLWITZ:

19  Q.  Mr. Cohen, are you familiar with the fighters Daniel Dubois

20  and Joe Joyce?

21  A.  I am.

22  Q.  How are you familiar with them?

23  A.  Daniel Dubois fought Bogdan Dinu.

24          MR. DEE:  I'm sorry.  That's not responsive.

25          THE COURT:  This needs to be based on his personal

1  experience.

2  BY MR. LILLWITZ:

3  Q.  Were you at the Bogdan Dinu-Daniel Dubois fight?

4  A.  I did not attend the fight.

5  Q.  Have you watched the fight?

6  A.  I did.

7  Q.  In preparing to promote the Bogdan Dinu-Daniel Dubois fight,

8  did you look into Daniel Dubois' resume as a fighter?

9  A.  I -- I have.  And --

10        MR. DEE:  Wait.  Wait.  I'm sorry.  That's responsive.

11        MR. LILLWITZ:  Okay.

12        THE COURT:  Yeah.  If you looked into it by reading

13  things, that's hearsay.

14        MR. LILLWITZ:  We'll move on.

15  BY MR. LILLWITZ:

16  Q.  What was Mladen Miljas's record when he signed with Cohen

17  Promotions?

18  A.  8-0 with eight knockouts.

19  Q.  What was his record when he terminated Cohen Promotions in

20  June of 2021?

21  A.  12-0 with 12 knockouts.

22  Q.  When he signed with Cohen Promotions, what was Mladen

23  Miljas' WBA rank?

24  A.  Can you repeat that?

25  Q.  His ranking for the WBA.  Excuse me.

1  A.   When?

2  Q.   When he signed with Cohen Promotions, what was his ranking

3  in the WBA?

4  A.   He was not ranked.

5  Q.   What was his WBA rank in August of '19 after Mr. Miljas beat

6  Aaron Chavers?

7  A.   He was in the top 15.  I'm not sure if it was 12, 13, or 14,

8  but he was in the top 15 of the world.

9  Q.   How long did Mr. Miljas retain that WBA ranking in the top

10 15?

11 A.   Over a year.

12 Q.   Did Cohen Promotions lose money on the Mladen Miljas boxing

13 promotion agreement?

14 A.   Yes.

15 Q.   How so?

16 A.   Well, every expense that we had during the time we worked

17 together, there was never one dollar in revenue that came back.

18 So every -- every fight, you know, whether it was purses,

19 whether it was travel, whether it was legal, whether it was

20 medical, you know, that was -- that was our investment.  You

21 know, and there was never one dollar in revenue that came back.

22 Q.   In your experience as a promoter for GCP, Mr. Cohen, under

23 contracts similar to the one Mr. Miljas signed, what would have

24 had to happen for Cohen Promotions to make money?

25 A.   Mladen would have had to go to the next level and be

1  successful as a fighter and become an attraction that television

2  would be willing to pay a television rights fee for him to

3  appear on their network.  It's the --

4  Q.  Did Cohen Promotions have any incentive to see Mladen

5  Miljas' career fail?

6  A.  No.

7  Q.  Did you believe Cohen Promotions still had a valid

8  promotional agreement with Mladen Miljas even after he attempted

9  to terminate it in June of 2020?

10 A.  Yes.  100 percent.

11      MR. LILLWITZ:  Your Honor, can I just have 30 seconds

12 to try and reconnect my computer?

13      THE COURT:  Yes.

14      MR. LILLWITZ:  Thank you.

15      THE COURT:  There should be an attorney network you can

16 log on to.

17      MR. LILLWITZ:  That's what I think I was just doing.

18 Okay.  It will take me just one second.

19 BY MR. LILLWITZ:

20 Q.  Mr. Cohen, we're going to be pulling up Exhibit 6, so if you

21 want to start familiarizing yourself with that, as soon as my

22 computer is done loading here --

23      MR. LILLWITZ:  All right, Kyle.  We're up.

24 BY MR. LILLWITZ:

25 Q.  And we're going to start -- because it's an email chain,

1   we're going to start with the bottom of the email chain, okay?

2   A.   Okay.

3   Q.   What do we see at the very bottom of Exhibit 6?

4   A.   An email from me to Mladen and his manager and other -- his

5   father and his, I guess, attorney copied on it.

6   Q.   What are you seeing -- what are you saying to Mladen in the

7   email dated Tuesday, September 15th, at 8:22 p.m.?

8   A.   I'm telling him about a fight with Simon Kean in Montreal

9   for $17,500 with Eye of the Tiger, who is the promoter of record

10  of that event, and stated that it was one of, if not the first,

11  post-COVID boxing event in the country of Canada.

12  Q.   Did you have communications with Eye of the Tiger Promotions

13  about this opportunity?

14  A.   I did.  I did.

15  Q.   Why were you still communicating with Mr. Miljas about

16  fights even though he'd terminated the agreement in June of

17  2020?

18  A.   We had a -- our promotional agreement was a three-year

19  agreement, and after two years, Mladen sent that termination.

20  My position, the company's position, was there were no breaches

21  and I believe he's still under contract to GCP, and our job as

22  his promoter is procure him fights.

23  Q.   Mr. Mladen -- excuse me -- Mladen responds to your email on

24  September 15th just above that.  Do you see that?

25  A.   I do.

1  Q.  And what does Mr. Mladen tell you?

2  A.  It tells me that I've been terminated; that I received a

3  breach letter but never responded nor remedied; I received the

4  termination letter saying I don't have a valid agreement, that I

5  broke it multiple times through our agreement, you were

6  incarcerated; you haven't spoken to me in months; and you

7  misspelled Simon Kean's name.

8      And he said he's a free agent, he has no ties to me, I have

9  nothing to do with his career.  And he said, "You are more than

10 welcome to take legal action where I will be suing for loss of

11 wages as well as damages for my career as a result of dealing

12 with you."

13 Q.  Had Mr. Miljas ever threatened legal action against you

14 prior to September 15th, 2020, to your recollection?

15 A.  No.

16 Q.  And then the top, last email in Exhibit 6, is your response

17 to Mr. Miljas' email to you, and I believe you talked with

18 Mr. -- or, excuse me, I believe Mr. Dee talked to Mladen about

19 this, but, essentially, what did you say in your response?

20 A.  Oh, I was responding point by point to Mladen's email.  And

21 I said that he's currently under a valid exclusive promotional

22 agreement with GCP.  He said -- and then I said, attached you'll

23 find a copy of the response to your claim of breach, GCP's

24 counsel dated June 19th, 2020.  The letter was emailed to your

25 manager on June 19th.  He confirmed receipt in writing on June

1   19th.  The letter was sent to your Las Vegas address on June

2   19th.  "Tracking receipt of the package being delivered is

3   attached, and it was also sent to your Canadian address.  That

4   tracking receipt is attached as well."

5   Q.  And before you keep reading every part of it, what I want to

6   focus on is the bottom of the email, Mr. Cohen.  Starting with,

7   "GCP will enforce," do you see that?

8   A.  Yes.

9   Q.  What do you tell him there?  Why don't you go ahead and read

10  it for the jury.

11  A.  "GCP will enforce their promotional rights and notify every

12  promoter, commission, and sanctioning organization of our

13  rights, which include, but are not limited to, injunctive

14  relief, amongst various other remedies."

15  Q.  And you can stop there.  Did you think that was proper to

16  inform others of your rights, of your perceived rights, in

17  Mladen's contract?

18  A.  I did.  Mladen was a fighter under contract to GCP.  There

19  was still -- you know, there was a three-year term that we

20  signed.  We did not agree with his claims of breach or

21  termination.  And I was pointing out to him, because in the

22  contract, there's language that says the promoter can seek

23  injunctive relief, and I was making it clear that he was aware

24  of this.

25  Q.  These email exchanges in September of 2020, was this before

1    any lawsuit was filed, Mr. Cohen?

2    A.   Yes.  It was more than, I guess, two months before any

3    lawsuit was filed.

4    Q.   Can you go ahead and turn to Exhibit 12, please.

5         And I'm just refreshing your recollection and sort of

6    referencing it for the jury because Mr. Dee has already talked

7    about it.  What do we see in Exhibit 12, generally speaking?

8    A.   It's a text message between me and Sal Jobe.

9    Q.   And who is Sal Jobe?

10   A.   I don't really know him, other than he's somehow a boxing

11   advisor or agent who was apparently speaking to Mladen.

12   Q.   And if we look at the very top, when does your conversation

13   with Mr. Jobe via text start?

14   A.   On September 22nd, 2020.

15   Q.   And is that prior to any lawsuit being filed in this case?

16   A.   It is.

17   Q.   Did you also have phone calls with Mr. Jobe around this

18   time?

19   A.   I did.  I did.

20   Q.   Without telling us what Mr. Jobe said to you, what did you

21   tell Mr. Jobe in those phone calls?

22   A.   I told Mr. Jobe that Mladen was -- had a promotional

23   contract with Greg Cohen Promotions and we're his exclusive

24   promoter and he also had a management contract with Steven Heid.

25   Q.   Did you explain to Mr. Jobe how much longer that exclusive

1  promotion agreement would last?

2  A.  I told him we had a three-year contract and it was signed in

3  June of '18 and there's potential extensions based on certain

4  performance criteria.

5  Q.  You've heard testimony, Mr. Cohen, in this case that there

6  was an injunction entered by this Court on April 30th of 2021.

7  Do you recall that testimony?

8  A.  I do.

9  Q.  After that injunction was entered, did you contact any third

10  parties with the intent to persuade them to terminate or cancel

11  any existing or prospective business relationships with Mladen

12  Miljas?

13  A.  I have not.

14         MR. LILLWITZ:  I have no further questions, Your Honor.

15         THE COURT:  Cross-examination, Mr. Dee.

16         MR. DEE:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18  BY MR. DEE:

19  Q.  Good morning, Mr. Cohen.

20  A.  Good morning.

21  Q.  First question:  You've been pronouncing Mladen's name as

22  Miljas with a hard j, and Mladen tells me that's kind of how

23  you've always pronounced it.  Are you aware that the proper

24  pronunciation is a y, Miljas?

25  A.  I was never corrected, so thank you.

1   Q.  Okay.  Let's talk about GCP.  Obviously, it's a boxing

2   promotional company, correct?

3   A.  Correct.

4   Q.  All right.  And does it still exist?

5   A.  It still exists.

6   Q.  It, however, is inactive in the state of New Jersey for

7   failing to file its annual fees, correct?

8           MR. LILLWITZ:  Objection; hearsay.

9           MR. DEE:  I'm asking whether or not he knows.

10  A.  I'm not aware of that.

11  BY MR. DEE:

12  Q.  You're not aware of that?  Who is responsible for paying

13  your fees to the secretary of state in New Jersey, Mr. Cohen?

14  A.  Again, I'm not aware of that.

15  Q.  You don't know who the person is who is responsible for

16  filing your company documents with the government?

17          MR. LILLWITZ:  Objection; argumentative.

18          THE COURT:  Overruled.

19  A.  Again, I'm not aware of us being in violation.

20  BY MR. DEE:

21  Q.  The question is:  Do you know who is responsible for filing

22  those papers, sir?

23  A.  I would assume me.

24  Q.  Okay.  Are you aware of whether or not you've been suspended

25  by the Department of Labor in the state of New Jersey -- not

1  you, Greg Cohen Promotions?

2  A.  I am not.

3          MR. LILLWITZ:  Objection; hearsay.

4          THE COURT:  Overruled.

5  A.  I am not.

6  BY MR. DEE:

7  Q.  You're not?  You're not suspended?

8  A.  I'm not aware of any suspension, no.

9  Q.  All right.  Can you sit here under oath and categorically

10 deny that you are not -- under suspension by the Department of

11 Labor?

12 A.  I can say that I --

13         MR. LILLWITZ:  Objection to the "you," use of the word

14 "you."

15         MR. DEE:  Correct.  Yes.  I'll rephrase.  Thank you.  I

16 didn't mean that.

17 BY MR. DEE:

18 Q.  Can you sit here under oath and categorically state that

19 Greg Cohen Promotions is not under suspension with the

20 Department of Labor in New Jersey?

21 A.  I am not aware of any suspension.

22 Q.  Okay.  Mr. Cohen, that's not the question I asked.  Can you

23 state categorically that you are -- you are not aware of any

24 suspension?

25 A.  That's correct.

1   Q.   Okay.  Can you categorically state that you are not under

2   suspension?

3          MR. LILLWITZ:  Objection.

4   BY MR. DEE:

5   Q.   With certainty?

6          MR. LILLWITZ:  Objection to the use of the word "you."

7   BY MR. DEE:

8   Q.   Again, Greg Cohen Promotions.  Pardon me.  It's a bad habit

9   I have.

10  A.   Again, I am not aware of any suspension.  I can't confirm or

11  deny anything other than that.

12  Q.   All right.  You're the CEO.  Do you go by CEO or is it

13  president of the company?

14  A.   CEO, but we really don't use titles.

15  Q.   Okay.  And you had some testimony early on that -- you know,

16  you're a shareholder of the company, correct?

17  A.   Correct.

18  Q.   And you have two others.  Mr. Kudman and Mr. Richman are

19  also shareholders; is that right?

20  A.   That's correct.

21  Q.   And I believe between the two of them, you've previously

22  testified they own approximately 12 percent of GCP?

23  A.   I believe that's accurate.

24  Q.   And you own the other 88 percent?

25  A.   Yes.

1  Q.  All right.  So, obviously, you're the majority shareholder,

2  right?

3  A.  Correct.

4  Q.  All right.  And you're responsible for running GCP on a

5  daily basis, right?

6  A.  Correct.

7  Q.  And your other shareholders have nothing to do with the

8  daily operations?

9  A.  Correct.

10 Q.  Right.  And at least as of last year -- in 2021, you don't

11 have any employees, correct?

12 A.  Correct.

13 Q.  All right.  Is Cohen Promotions the only entity under which

14 you are currently operating as a promoter?

15 A.  I do not have any other promotional licenses or operations.

16 I do consult for some companies.

17 Q.  What is Bulldog Promotions?

18 A.  I don't know what Bulldog Promotions is.

19 Q.  If I represented to you that you're the registered agent for

20 Bulldog Promotions and the address is your home address in New

21 Jersey, would that help you refresh your memory?

22 A.  Again, I have no recollection of that.

23 Q.  Is Jarrel Miller, J-a-r-r-e-l, one of your fighters?

24 A.  Jarrel Miller is co-promoted by Salita Promotions and Greg

25 Cohen Promotions.

1  Q.  Okay.  Are you personally listed as his promoter as opposed

2  to Greg Cohen Promotions?

3  A.  I don't know.

4  Q.  It's possible you are?

5  A.  If you're talking about on BoxRec, BoxRec puts my name but

6  as Greg Cohen Promotions' representative.

7  Q.  But it doesn't say that on BoxRec.  It's you listed

8  individually as the promoter, correct?

9  A.  Again, it's -- the only connection to Greg Cohen in BoxRec

10  is as Greg Cohen Promotions, under me being the CEO of Greg

11  Cohen Promotions.  There's no connection between me personally.

12  That's how they choose to list it.

13  Q.  And you said Jarrel Miller -- he's a heavyweight; is that

14  right?

15  A.  He is.

16  Q.  Is he?  And you said he's -- and I may have missed it.  You

17  said he's co-promoted by whom?

18  A.  Salita Promotions and Greg Cohen Promotions.

19  Q.  All right.  Do you know if Salita Promotions is listed

20  anywhere on like BoxRec or elsewhere as his promoter?

21  A.  I'm not aware.

22  Q.  All right.  But you don't know anything about what Bulldog

23  Promotions is?

24  A.  I don't.  I don't know anything about Bulldog Promotions.

25  Q.  And you don't know why you would be listed as a registered

1  agent, if, in fact, that's the case for this company?

2  A.  Again, I have no recollection of that.

3  Q.  All right.  One of the things you said during your testimony

4  yesterday -- you were being asked some questions about Mr. Heid,

5  who -- Steven Heid, who was -- for a while he was Mladen's

6  manager, correct?

7  A.  Correct.

8  Q.  And I think you were asked -- I don't have the direct quote,

9  but whether or not Mr. Heid had a direct or an indirect interest

10  in GCP.  Do you recall?  And your answer was no, he doesn't.

11  Does that sound right?

12  A.  Correct.

13  Q.  Okay.  But at one point in time, Mr. Heid was an investor or

14  a lender in GCP, correct?

15  A.  I don't recall that.

16  Q.  You don't recall whether or not Mr. Heid was ever an

17  investor or a lender to GCP?

18  A.  I do not recall that.

19  Q.  And eventually paid it back?  You don't recall that?

20  A.  I don't.

21  Q.  Okay.  All right.  So, Mr. Cohen, do you recall having your

22  deposition taken in another lawsuit that was filed by Clifford

23  Mass, M-a-s-s, against you in the Southern District of New York?

24         MR. LILLWITZ:  Objection; hearsay.

25         MR. DEE:  I'm asking --

1          THE COURT:  At this point, it's not.

2       You can answer the question.  Do you recall testifying in

3   that matter?

4          THE WITNESS:  I recall being deposed.

5   BY MR. DEE:

6   Q.  Yeah.  About a year ago, in January of 2021 [sic].  Does

7   that sound right?

8   A.  It does, yes.

9   Q.  Okay.  And I have a copy of that transcript I was provided.

10  So let me ask you if, beginning -- which I provided to

11  Mr. Lillwitz a couple weeks ago.

12      Beginning at the bottom of page 75 of your transcript,

13  we're talking -- it's talking about GCP, and you're asked:  "Who

14  were the investors?"

15      And you say, "I'm sure there's names I don't remember."

16  And then you say Alan Cohen, who is your father, correct?  Is

17  that a correct answer?

18  A.  Alan Cohen's my father, yes.

19  Q.  Well, and was he an investor?  You're being asked who the

20  investors are in GCP.

21          MR. LILLWITZ:  Objection; hearsay.  He's reading from

22  an out-of-court deposition transcript.

23          THE COURT:  Mr. Dee, you can rephrase by asking the

24  questions that were asked in the deposition.  If the answers are

25  different, than you can impeach him.

1           MR. DEE:  Fair enough.  Thank you, Your Honor.

2   BY MR. DEE:

3   Q.  You say -- so who were the investors, and you say, "I'm not

4   sure.  There's names I don't remember" -- I'm sorry.  "I'm sure

5   there's names I don't remember.  Alan Cohen, my father."

6        And then the questioner says, "Who is Alan Cohen?"

7        And you say, "My father."

8        Okay.  And then you say, "Michelle Cohen, my wife; Greg

9   Cohen, me; Barry Honig" -- H-o-n-i-g -- "Stuart Kudman," who I

10  think you just mentioned.

11       And that says, "With Mr. Kudman, is that in addition to his

12  ownership interest?

13       And you say, "Yes."  And then you say, "Steve Heid, Paul

14  Keefe, Ira Greenspan, and then some other investment companies."

15          THE COURT:  Can you spell Paul Keefe and Ira Greenspan.

16          MR. DEE:  Sure.  Well, Paul, regular spelling, Keefe,

17  K-e-e-f-e.  Ira is I-r-a, and Greenspan is G-r-e-e-n-s-p-a-n.

18  BY MR. DEE:

19  Q.  Now, when you gave that testimony, was that truthful

20  testimony at the time, Mr. Cohen, that Steve Heid was an

21  investor at one point in your company?

22          MR. LILLWITZ:  Can counsel lay the foundation of when

23  that testimony was given?  I don't think we've heard that.

24          MR. DEE:  Absolutely.  January 14th of 2021.

25          THE COURT:  He did say that earlier on.

1          MR. DEE:  Yeah.

2          MR. LILLWITZ:  Thank you.

3   A.  Again, Mr. Heid's not an investor in my company.

4   BY MR. DEE:

5   Q.  And I believe my question was:  At some point in time was

6   he?

7   A.  He was not an investor in my company.

8   Q.  All right.  Was he a lender to your company?

9   A.  I don't recall him lending me money to the company.

10  Q.  So let me -- just for the jury's purposes, Mr. Cohen, you've

11  been through this exercise.  A deposition is a setting, a

12  situation where you're placed under oath and asked questions by

13  the counsel for the opposing party, correct?

14  A.  Correct.

15  Q.  Correct.  And before you take the deposition, you raise your

16  right hand and you take the same oath to tell the truth that you

17  took in this courtroom, correct?

18  A.  Correct.

19  Q.  All right.  And in that deposition, at least the transcript

20  reads you stated that Steven Heid, at least at some point, was

21  an investor in GCP.  Was that truthful testimony?

22  A.  Again, I don't recall saying that, and I don't -- Mr. Heid

23  was not an investor in my company.

24  Q.  All right.  Did you at some point after this deposition

25  contact opposing counsel and correct your sworn testimony in

1  that deposition?

2  A.  I never read the deposition.

3  Q.  Okay.  Later on in your examination yesterday afternoon,

4  Mr. Lillwitz was walking you through some of the provisions of

5  the promotional contract, Exhibit 2.  Just, I mean, do you

6  remember talking about the contract and various --

7  A.  I do, yes.

8  Q.  -- paragraphs?

9      Yeah.  And at one point he was asking you to explain how we

10 ended up -- how you and Mladen ended up in Iowa on this case --

11 A.  Correct.

12 Q.  -- and you talked about that.

13     And one of the things you said is, "I've never been in a

14 courtroom over a promotional agreement."  Do you remember that?

15 A.  I do.

16 Q.  Okay.  And then but you have had litigation with some of

17 your -- probably former fighters now regarding GCP's or your

18 representation of those fighters involving those contracts,

19 correct?

20 A.  I've been in the business over 30 years and have had

21 hundreds and hundreds of fighters under contract, and,

22 unfortunately, sometimes there's disputes.

23 Q.  And some of which, those disputes, were lawsuits, correct?

24 A.  This is the only lawsuit that has gone to trial.

25 Q.  All right.  Is it the only lawsuit for which you've ever had

1  hearings and court appearances?

2  A.  I've never made a court appearance for another lawsuit with

3  a fighter.

4  Q.  You had a fighter named Malik, M-a-l-i-k, Hawkins who sued

5  you in June of 2018; is that right?

6  A.  Malik Hawkins was my fighter, and we sued each other, yes.

7  Q.  Yeah.  So he sued you first, correct, and then you filed

8  counterclaims, correct?

9  A.  Correct.

10 Q.  Which is what happened in this lawsuit here; your fighter

11 sued you first and you filed counterclaims?

12 A.  Correct.

13 Q.  Right.  And that case settled without a trial, correct?

14 A.  Correct.

15 Q.  All right.  And one of the results of that is he's no longer

16 one of your fighters, correct?

17 A.  Correct.

18 Q.  All right.  Samuel Clarkson was a light heavyweight who was

19 a client of GCP's; is that right?

20 A.  He was not a client of GCP's.  He fought on a GCP event.

21 Q.  Okay.  And he sued you or GCP because he claimed you owed

22 him money for a fight in 2017; is that correct?

23 A.  Correct.

24 Q.  Okay.  And I think the allegation was he -- you wrote him a

25 check, told him to hold the check for a while before he deposits

1  it, but he didn't wait long enough to deposit it, and the check

2  bounced.  Does that sound familiar?

3          MR. LILLWITZ:  Objection; hearsay.

4          MR. DEE:  I'm asking if that's correct.

5          THE WITNESS:  No.

6          THE COURT:  Is that correct?

7          THE WITNESS:  That's not correct.  He was paid in full

8  with certified funds the night of his fight, his entire purse.

9  BY MR. DEE:

10 Q.  Mr. Cohen, let me refer you back to this deposition you gave

11 a year ago in the lawsuit in New York.  At the bottom of page

12 161, beginning on line 21, the lawyer says to you:  "Was there a

13 check that was given to Clarkson that bounced?  Was that the

14 basis of this claim?

15     "Answer:  There was a check that was given to Clarkson that

16 he was told not to deposit, and he deposited it.

17     "Question:  So Clarkson cashed a check before he was

18 supposed to?

19     "Answer:  That's correct."

20     Was that truthful testimony, Mr. Cohen?

21          MR. LILLWITZ:  Objection to foundation in terms of

22 whether we're talking about the same check that he asked the

23 previous question about.

24          THE COURT:  Mr. Cohen, if you want to see that

25 deposition to make sure that context is accurate, you're welcome

1  to do so; otherwise, if you know the answer, you can answer.

2  A.  It had -- it was not for his purse.  He was paid in full the

3  night of the fight for his purse.

4  BY MR. DEE:

5  Q.  Okay.  So if I misidentified the purpose of the check, then

6  that's on me.  But you were sued by Mr. Clarkson on the grounds

7  that you just -- that I just read that you testified to in that

8  suit, that he deposited a check before he was supposed to,

9  correct?

10  A.  I guess.  I mean, I don't know, but -- I don't remember if

11  that's --

12  Q.  All right.

13  A.  I don't remember exactly.

14  Q.  But you're not questioning your testimony under oath in this

15  deposition, are you, that you gave?

16  A.  No, I'm not.

17  Q.  Who is Tony Luis, L-u-i-s?

18  A.  He is a former fighter of Greg Cohen Promotions.

19  Q.  Okay.  And he was a -- is it a super lightweight?  Does that

20  sound right?

21  A.  When he was with GCP, he was a lightweight, and now I think

22  he, you know, might be a super lightweight.  I'm not sure.

23  Q.  And was he from Canada; do you recall?

24  A.  He was from Canada, yes.

25  Q.  Okay.  Without filing a lawsuit, he made a claim against you

1   at some point for some money and claimed that you breached your

2   promotional agreement with him.  Do you recall that?

3   A.  I recall him making a lot of false claims, yes.

4   Q.  Uh-huh.  And you disagreed, of course, with the claim he

5   made, I imagine, correct?

6   A.  For sure.

7   Q.  The lawyers got involved, the matter got settled, and he's

8   no longer one of your fighters; is that right?

9   A.  His contract ran out, and that's why he's no longer a

10  fighter, and we didn't re-sign.

11  Q.  But there were discussions and claims and negotiations back

12  and forth between the respective parties' lawyers; is that

13  correct?

14          MR. LILLWITZ:  Objection; hearsay.

15          THE COURT:  Sustained.

16          MR. LILLWITZ:  Greg, you don't have to answer.

17          MR. DEE:  Well, I'm not asking what they said.

18  BY MR. DEE:

19  Q.  There were negotiations back and forth between the lawyers?

20  A.  I do not remember --

21          MR. LILLWITZ:  The Court just sustained the objection.

22  A.  -- any lawyers being involved.

23          MR. LILLWITZ:  Excuse me.  Excuse me.

24          THE COURT:  Stop.  I sustained that objection.

25      Ask your next question, Mr. Dee.

1          MR. DEE:  Okay.  Yes.  Thanks, Your Honor.

2    BY MR. DEE:

3    Q.  One of the things you testified to yesterday was that you

4    had a fight in Sloan, Iowa, at one point.  Do you recall that?

5    A.  I recall the testimony, yes.

6    Q.  And probably fight's not the right word, was it?

7    A.  Fight card, an event.

8    Q.  Was it your event or was it just you had a fighter or

9    fighters there?

10   A.  No, no.  It was my -- it was my event.  I believe we had two

11   in Sloan, Iowa.

12   Q.  Okay.  Do you know who Mark Fratto is, F-r-a-t-t-o, if I

13   pronounced that right?

14   A.  I know who he is, yes.

15   Q.  Linacra, L-i-n-a-c-r-a, Media, does that sound familiar?

16   A.  That's Mr. Fratto's company.

17   Q.  Yeah.  Thank you.  Yeah.  He sued you for $16,000 claiming

18   that you owed him money from one of the fights at the WinnaVegas

19   Casino in Sloan, Iowa, correct?

20   A.  I don't recall if he sued me.  I recall that we had a

21   dispute and he was eventually paid in full.

22   Q.  Do you recall whether or not the lawsuit was filed in New

23   York state court?

24   A.  I don't.  I don't recall.

25   Q.  And do you recall that there was a judgment after which you

1  paid him?

2  A.  I recall he had me sign a confession of judgment and I paid

3  him.  You know, I paid him willingly.

4  Q.  All right.  You paid him willingly after signing a

5  confession of judgment, after the dispute was raised, right?  I

6  mean, "willingly" is a --

7           MR. LILLWITZ:  Objection; argumentative.

8  A.  He didn't have to collect on the judgment.

9           MR. LILLWITZ:  Objection.

10          THE COURT:  Stop.

11          MR. DEE:  I'll withdraw the question.

12          THE COURT:  Go ahead with your next question, Mr. Dee.

13          MR. DEE:  Okay.

14          THE WITNESS:  I'd like to add something about --

15          MR. LILLWITZ:  Greg, you don't have to answer.  There's

16 no question pending.

17          THE WITNESS:  Okay.

18 BY MR. DEE:

19 Q.  Mr. Cohen, let me ask you at least a couple of questions,

20 maybe more, about the contract itself.  And we'll pull it up on

21 the screen.  If you want a hard copy, it's Exhibit 2 in one of

22 the notebooks in front of you.  Your choice, whichever way you

23 want to look at it.

24      So it's at page 3, paragraph 5.  Mr. Lillwitz asked you

25 some questions about this paragraph 5 yesterday, and my notes

1    indicate, you know, that you talked about that essentially your

2    job as the promoter under this contract is to pick the dates and

3    the locations and then the fighter can accept or reject the

4    opponent, essentially.  Is that an accurate summary of your

5    understanding of paragraph 5?

6    A.  It's close.

7    Q.  Okay.  So I wanted to follow up on that and get some

8    clarification.  Is it your testimony under this paragraph 5, for

9    the record -- so it's really the second sentence, "Such bouts

10   shall be on such dates and at such sites as determined in the

11   sole and absolute discretion of Promoter and against such

12   opponents as mutually agreed upon by Boxer and Promoter."

13       Do you see that?  Do you see the sentence where I am,

14   Mr. Cohen?

15   A.  I do.

16   Q.  Okay.  Is it your testimony that the boxer under this has

17   absolutely no say in the date of the fight that you would

18   present to him?

19   A.  The boxer can accept or reject the fight.  The events that

20   the promoter has are established by the promoter, and that's

21   not -- the boxer does not determine when we put on our boxing

22   events or where we put on our boxing events.

23   Q.  Understood.  Understood.  That's clearly the promoter's job,

24   I would agree.  But in a situation -- the question I'm getting

25   at is more along the lines of a couple of questions that were

1   asked, I think, to Mr. Shaffer yesterday by your counsel.

2       So is it your contention that the bouts -- that the

3   language that -- pardon me.

4       Is it your contention that the fighter, when presented an

5   opponent by you on a particular date, can only reject the

6   fighter without regard to the date, if that makes sense?

7   A.  No, no.  They can -- fighter can reject the fight for any

8   number of reasons.  That's their prerogative.  But the staging

9   of the bouts, the dates of the bouts, the locations of the bouts

10  are in the promoter's discretion.

11  Q.  Understood.  So if you present a fight to one of your boxers

12  and it says we're going to fight John Smith on this date, and

13  the fighter says, "I'm not going to be ready to fight on that

14  date.  I like the fighter," your contention is -- assuming it's

15  reasonable under the contract, your understanding is the fighter

16  can do it based on the date of the fight as well, correct?

17  A.  Fighter has the right to accept or reject a fight for

18  whatever reason he sees fit, he or she.

19  Q.  Let me ask you, Mr. Cohen, about your testimony that the

20  four fights that Mladen had for you, the one in '18 and the

21  three in 2019, you didn't get paid for at all.  Was that your

22  testimony?

23  A.  Correct.

24  Q.  You received no -- you received no payment whatsoever,

25  correct?

1   A.  That's correct.

2   Q.  Did you receive other consideration of any kind?

3           MR. LILLWITZ:  Objection; it misstates the testimony.

4   It was Greg Cohen Promotions, not --

5           MR. DEE:  You're right.  I swear, I'm not doing that

6   intentionally.

7           MR. LILLWITZ:  No.  I understand.

8   BY MR. DEE:

9   Q.  But the -- now I forgot where I was.  Sorry.

10      Was there any other kind of consideration that you

11  received, such as, you know, did you get advertising out of the

12  fights or, you know, that Cohen Promotions is the -- Greg Cohen

13  Promotions has fighters or that maybe one of your -- that Mladen

14  is a Greg Cohen Promotions fighter, that kind of thing?

15  A.  Yeah.  I guess PR, you know.  When a GCP fighter is fighting

16  on an event, we publicize it.  But there is no monetary

17  compensation for any of the fights that Mladen participated in

18  to GCP.

19  Q.  I mean, that's not a very good business model, is it,

20  Mr. Cohen?

21  A.  It's a very difficult business model, boxing promotion.

22  Most, the overwhelming majority, of fighters that are under

23  contract to promoters, promoters do not make -- they're not

24  profitable.

25  Q.  Each of these four fights that Mladen fought was an event or

1  a show, a program -- I'm not sure what the right word is -- that

2  another promoter had organized and set up; is that fair?

3      In other words, they were not GCP events that you arranged?

4  A.  There -- there were co-promotions, a couple of them.  GCP, I

5  think, had other fighters in addition to Mladen on some of them.

6  I can't recall all of them.  And, you know, I believe the two

7  fights in Hinckley, Minnesota, GCP was listed as co-promoter of

8  the events.

9  Q.  You were listed as a co-promoter, but it was not an event

10 that you, as the CEO or president of Greg Cohen Promotions,

11 was -- that you were running, organizing, arranging, doing all

12 the logistics for; fair?

13 A.  Not all, but we certainly were involved.

14 Q.  Okay.  And we went through -- we heard Mladen's testimony,

15 and we looked -- and, you know, your lawyer showed you the

16 picture on the one text of you and Mladen and the other guy, you

17 know, standing there with your fists in front of you from June

18 of 2019.  You didn't attend any of the first three fights that

19 Mladen fought, correct?

20 A.  Correct.

21 Q.  Chavers was the first one?

22 A.  Chavers was not the first one.

23 Q.  No, no.  I meant Chavers was the first one you attended?

24 A.  Correct.  Yes.  Yes.

25 Q.  Which was in August of '19?

1   A.   August of '19 was the first Mladen fight I attended.

2   Q.   So was it your testimony that the first three fights that

3   you did not attend were programs that you were putting on, that

4   GCP was putting on --

5   A.   No.

6   Q.   -- even though you didn't attend?

7   A.   No, I am not contending that.

8   Q.   All right.  That's all I wanted to get clear.

9        All right.  So then let's stick with -- let's go back,

10  then, to Exhibit 2, and just -- we'll scroll down and start

11  looking at paragraph 7, which is a nice long paragraph that goes

12  on to the next page, which we lawyers always love.

13       All right.  So the first sentence of paragraph 7,

14  Mr. Cohen, for the record, "For all bouts staged or arranged by

15  Promoter under this agreement, Promoter and Boxer shall

16  negotiate each purse in good faith, within the applicable

17  prevailing standards of the industry for each type of bout."

18       Do you see where I am?

19  A.   I do.

20  Q.   Okay.  And in your testimony yesterday with Mr. Lillwitz --

21           MR. DEE:  Let's go to the next page.

22  BY MR. DEE:

23  Q.   At the very end of paragraph 7, you were asked questions

24  about the last sentence, the "Promoter further."

25       "Promoter further agrees to make no deductions from any

1    purse monies to be paid to Boxer without the prior written

2    consent of Boxer."

3         But I wanted to ask you -- so that's what I wanted to

4    cover, but I wanted to get that in context.

5              MR. DEE:  And I apologize to the jury for jumping

6    around because you don't have a hard copy in front of you.

7    BY MR. DEE:

8    Q.  But if we can now go back to that first sentence of

9    paragraph 7, so this paragraph applies for all bouts staged or

10   arranged by the promoter under this agreement.  I think you were

11   just saying at least two of the bouts that Mladen fought were

12   not staged or arranged by you, by Greg Cohen Promotions,

13   correct?

14   A.  No, that's not true.

15   Q.  No?  I thought you just said that there were two --

16   A.  The --

17   Q.  Excuse me.  I thought -- and maybe I misunderstood you.  I

18   thought you said that there were two bouts of the four Mladen

19   fought that maybe were co-promoted?

20   A.  No, no, no.  What I meant was the event, not the bout.  All

21   of Mladen's bouts were arranged, organized, and paid for by Greg

22   Cohen Promotions.

23   Q.  All right.  And so the obligation that you have here to

24   negotiate each purse in good faith with the boxer, as I

25   understand your testimony, there really wasn't any negotiation,

1  it was you just telling Mladen you're going to get the

2  contractual minimum of $2,000 for each fight; is that correct?

3  A.  The contract says with the -- it says, "Boxer shall

4  negotiate each purse in good faith within the applicable

5  prevailing standards of the industry for each type of bout."  So

6  under -- the four bouts that Mladen fought for Greg Cohen

7  Promotions are what are classified as paid-for bouts, and in a

8  paid-for bout and there's 100 percent of the expense paid by GCP

9  and there's zero revenue coming back, the industry standard is

10  you fight for your contractual minimum.

11  Q.  Okay.

12  A.  And that was explained.

13  Q.  What was explained?

14  A.  That he'd be fighting for his contractual minimum for these

15  type of bouts.

16  Q.  Yeah.  You used the word "explained."  You simply told him

17  what he was going to get paid for each of these bouts, right?

18  There were no negotiations; fair?

19  A.  I wouldn't call it a negotiation.  There were discussions

20  and explanations.  This was the level he was at currently when

21  he -- or not "currently," where he was when he fought for GCP.

22  Q.  Let me ask you this question:  You obviously have been in

23  here the whole time.  You've heard Mladen's testimony on Monday

24  and a little bit yesterday morning.  Do you disagree with his

25  testimony that either -- he was never told the purse and there

1  certainly were no negotiations?  Do you disagree with that

2  testimony?

3  A.  I do.

4  Q.  So it's your word against his; fair?

5  A.  No, it's not.

6  Q.  No, it's not?

7  A.  No.

8  Q.  All right.

9  A.  No.

10 Q.  There's no other witnesses that are here that were privy to

11 those communications, would you agree, who are testifying?

12 A.  There is a procedure -- and I don't want to say something

13 that I'm not allowed to say, I don't want to be admonished, but,

14 you know, regarding state bout agreements.  And, again, Mladen

15 knew what --

16 Q.  Well --

17 A.  -- he was being paid every fight before he fought.

18 Q.  Right.  That's your testimony; fair?

19 A.  That's my testimony, yes.

20 Q.  And it is not consistent with Mladen's testimony.  That's

21 really just the point I was trying to make.  Would you agree?

22 A.  Yeah, I'd agree that we -- his testimony is different than

23 mine, yes.

24         THE COURT:  Is this a good place to take a break,

25 Mr. Dee?

1          MR. DEE:  Sure.

2          THE COURT:  All right.  Ladies and gentlemen, it's

3   10:20.  If you'll be back in the jury room at 10:40, we'll get

4   started again at that time.

5       (In open court, out of the presence of the jury.)

6          THE COURT:  Okay.  Let's be seated.

7       Anything we need to talk about before the parties take

8   their break?

9          MR. DEE:  Not from the plaintiff, Your Honor.

10         MR. LILLWITZ:  Nothing from Defendants, Your Honor.

11         THE COURT:  All right.  I'll print those updated

12  versions of the final jury instructions and the verdict forms

13  for you.  And then it would certainly appear that we're going to

14  have a lunch hour before any kind of closing, so we'll have some

15  more time to talk, which is probably good here.

16      Enjoy your break.  I'll see everybody in 20 minutes.

17         MR. LILLWITZ:  Thank you.

18      (Recess at 10:23 a.m. until 10:40 a.m.)

19         THE COURT:  Okay.  A couple things that we'll want to

20  talk about over the lunch hour as well.  Exhibit AA was

21  partially agreed to as an admissible exhibit.  The parties had

22  said certain pages were not agreed to.  So we need to resolve

23  whether -- or which of those pages are being offered at some

24  point.

25         MS. ALESCH:  Judge, I believe -- and correct me if I'm

1   wrong, Tim -- at the pretrial conference we were discussing

2   pages 4 through 8, and Tim had maybe said that those would be

3   the only pages offered in the exhibit at all.

4           MR. LILLWITZ:  I completely agree with Casey.  And I

5   don't -- again, this goes back to my other Z exhibit that was

6   weird, but, yeah, that should not be -- it should start with --

7   it should be exactly the same as your Exhibit -- which is the

8   one you have?  You've got the same thing.  It's the cover page

9   from --

10          MS. ALESCH:  Oh, yes.

11          MR. LILLWITZ:  Right?

12          MS. ALESCH:  Yes.  Exhibit 4.

13          MR. LILLWITZ:  4.  So it should literally mirror 4, so

14  technically it probably doesn't need --

15          THE COURT:  Okay.  I have 11 pages in my AA.

16          MR. LILLWITZ:  And that's a mistake.  It should not be

17  the first --

18          THE COURT:  It should be the exact same four pages as

19  Exhibit 4 --

20          MS. ALESCH:  4.

21          THE COURT:  -- five pages?

22          MR. LILLWITZ:  Five pages, correct.

23          THE COURT:  All right.  And then we need a copy of No.

24  28, which is the video, for the jury.

25          MS. ALESCH:  We put that on a flash drive and brought

1  that last week.

2        THE COURT:  Okay.  Is it the flash drive that was in my

3  binder?

4        MS. ALESCH:  Yes.  So that actually has all of our

5  exhibits on it, Your Honor.

6        THE LAW CLERK:  I've got it.

7        THE COURT:  You've got it?

8     All right.  Okay.  Can you put just 28 on a -- we have to

9  have something we can hand the jury --

10        MS. ALESCH:  Oh, okay.

11        THE COURT:  -- that they can play on a computer.  So we

12  need just that on something.

13        MS. ALESCH:  Yes.

14        THE COURT:  Okay.  Also, I would just note -- and,

15  Mr. Cohen, you can return to the witness stand -- but there is a

16  Bulldog Boxing Promotions that certainly seems to be affiliated

17  with you.  Your three children, or at least Alex Cohen, Sophia

18  Cohen, and Brooke Cohen are all followers of that promotional

19  company.

20        THE WITNESS:  Yes.

21        THE COURT:  So I don't know if maybe that's something

22  you want to revisit in your testimony, but I have a little bit

23  of a concern about your testimony on that issue.

24     All right.  Let's get our jury.

25     (In open court, in the presence of the jury.)

1        THE COURT:  All right.  You can be seated.

2        Mr. Cohen, you remain under oath.

3        Mr. Dee, you may continue with your cross-examination.

4        MR. DEE:  Thank you, Your Honor.

5   BY MR. DEE:

6   Q.  Mr. Cohen, in response to a line of questioning this morning

7   with Mr. Lillwitz talking about the four opponents that Mladen

8   did fight, I have here in my notes that you described the four

9   of them as experienced.  Do you recall that?

10  A.  I recall saying that for some of them.

11  Q.  Okay.  Because that's what I was going to get at.  They

12  weren't necessarily all experienced.  For example, Wayman

13  Carter, do you remember what Carter's record was?

14  A.  I believe he had seven fights at the time he and Mladen

15  fought.  He was 3-3-1, I believe.

16  Q.  I think that's right.  I think that's right.  And what I was

17  going to ask you -- because, I mean, and you agree with the ages

18  that have been discussed of these four guys, right?

19  A.  I don't dispute that.

20  Q.  Three in the forties and one was 38-ish?

21  A.  I don't remember, but I don't dispute that.

22  Q.  Yeah.  Okay.  And so not trying to be a smart aleck, but I

23  was going to ask you if, when you used the term "experienced,"

24  that was code for "old," these four guys.

25  A.  No, no.  Look, Travis Fulton had over 60 fights.  Matthew

1  Greer had over 60 fights.  Aaron Chavers had 17 fights.  I mean,

2  all of them significantly more experienced than Mladen was at

3  the time.  And Aaron Chavers had seven fights -- I mean, not

4  Aaron Chavers --

5  Q.  Carter?

6  A.  Carter had seven fights when I believe Mladen had nine.

7  Q.  Right.  Right.

8  A.  So four were more experienced than Mladen.

9  Q.  They were all significantly older than Mladen too, agreed?

10 A.  Oh, yeah.  Yeah.  They were older than Mladen.

11 Q.  All right.  Let's talk about the Ruann Visser situation.

12 We've heard the testimony from a couple -- Mladen and a couple

13 of the guys yesterday that, you know, Ruann Visser is just this

14 gigantic human being, right?  You agree he's 6-9, 6-9 1/2, 270,

15 280, something like that?

16 A.  He's a big man, yes.

17 Q.  Yeah.  And his nickname was The Giant King, I believe.  Do

18 you know whether or not that's right?

19 A.  I don't know, but I don't dispute that.

20 Q.  And you've previously referred to Mr. Visser as, your term

21 was, a step-up fight for Mladen; would you agree?

22 A.  It was a step up in competition compared to other opponents

23 Mladen had faced.

24 Q.  Okay.  And I think you previously stated in an affidavit, a

25 declaration, that you secured the fight for him on September

1   29th of '19?

2   A.   I mean, if I -- if you have that affidavit, I'm sure it's

3   accurate.

4   Q.   Okay.  And, now, there's been testimony -- you know, you

5   talked about the conference call that you had with Mladen, and

6   Mladen talked about it too, but I wanted to ask you, in your --

7   maybe I should get you a copy of this.

8           MS. ALESCH:  He's going to give you one.

9           MR. LILLWITZ:  Thanks, Mike.

10  BY MR. DEE:

11  Q.   Mr. Cohen, I've handed you and your lawyer a document that

12  was filed in this case almost two years ago, and it's a

13  supplemental declaration of Greg Cohen.  Do you see that?

14  A.   I do.

15  Q.   Okay.  And for the jury's purposes, it's a statement from

16  you, and on the first page, it's, "I, Greg Cohen, declare under

17  penalty of perjury, pursuant to" this particular statute, as

18  follows, right?

19  A.   That's what it says, yes.

20  Q.   Okay.  And when you filled this out, you did it with the

21  understanding that this was the equivalent of sworn testimony,

22  correct?

23  A.   Correct.

24  Q.   Take a look at -- it begins on page 6, starting at paragraph

25  22.  There's a heading there, heading H, "The October 2019" --

1   excuse me -- "The October 19, 2019, Visser Fight - Refused by

2   Miljas."

3        Are you there?

4   A.   I'm sorry.  I'm looking at 22?

5   Q.   Page 6, paragraph 22.

6   A.   Uh-huh.

7   Q.   Are you there?

8   A.   I'm there.  Yes.  I'm sorry.

9   Q.   I want to make sure.  I also want to make sure I gave you

10  the right document.

11       So this is three or four paragraphs on the events

12  surrounding Mr. Visser, and it says there in the second sentence

13  of paragraph 22:  "On September 29th, 2019, I was able to

14  officially secure the opponent for the October 19th fight."  And

15  then the next sentence, "The opponent was to be Ruann Visser,"

16  which I know you just agreed to.

17       And then if you look down, here's the part I wanted to ask

18  you about, Mr. Cohen.  And if you want to -- you know what, why

19  don't I give you a chance to read, there's three or four

20  paragraphs, first.  That probably would be more fair.

21  A.   Okay.

22  Q.   Okay.  So in paragraph 22 -- gosh darn it.  I'm sorry.  In

23  paragraph 24, "On October 2, 2019, after not being able to get

24  ahold of Miljas via telephone, I reached out to his trainer,

25  Muhammed (via telephone)."  Do you see that?

1  A.  I do.

2  Q.  And then you go on to say that Muhammed was the one who told

3  you that Miljas was not going to take the October 19th fight,

4  and then later that day Muhammed informed you via text of some

5  other information.

6       Do you see that?

7  A.  I see that, yeah.

8  Q.  My question to you is you filed this declaration two years

9  ago saying that you never spoke to Miljas by phone about the

10  Ruann Visser fight, and today you've testified -- and, frankly,

11  Mladen has testified -- that you were on a conference call

12  talking all about this.  Can you --

13       MR. LILLWITZ:  Objection; misstates the testimony in

14  the declaration.  It didn't say he never talked to Mladen about

15  the Visser fight.

16       MR. DEE:  Okay.  Well, maybe that's what this dialogue

17  should be about.

18       THE COURT:  Go ahead, Mr. Dee, if you want to clarify

19  your question.

20  BY MR. DEE:

21  Q.  Well, "On October 2, 2019, after not being able to get ahold

22  of Miljas by phone, I reached out to his trainer, Muhammed (via

23  telephone).  Muhammed told me that Miljas was not going to take

24  the October 19th fight."

25       This morning I understood your testimony to be that Mladen

1  told you this directly on a phone call that you had with him.

2  Can you explain which of these two sworn testimonies is correct?

3  A.  They're both correct.  There were two different occurrences.

4  Q.  Okay.  You would agree with me that this sworn declaration

5  that you submitted two years ago, which is -- it's fairly

6  detailed, four paragraphs, of the events and the discussions,

7  does not anywhere talk about you having had a conference call or

8  a direct communication with Mladen of any kind regarding the

9  Visser fight, correct?

10 A.  It doesn't say it here, but it doesn't say that it didn't

11 happen either.

12 Q.  Now, regarding the Visser fight, one of the things you said,

13 it would have been yesterday afternoon.  You were generally

14 talking about the process of these events and how they get set

15 up and, you know, finding fighters and bouts and all that.  And

16 at one point you said, you know, these things can take months,

17 sometimes, to negotiate, which I have no reason to doubt.

18     Do you remember saying that?

19 A.  That was with respect to -- it wasn't with respect to

20 Mladen's bouts.  That was with respect to other fighters.

21 Q.  Right.  Just generally speaking.

22 A.  Yes.

23 Q.  Correct.  Yeah, yeah.  Now, in this case, you know, the

24 jury's heard we've had a lawsuit going on here for a little over

25 two years.  There have been no documents that have been provided

1   in this lawsuit by you involving any written communications,

2   agreements, or any kind that would substantiate that a fight

3   with Ruann Visser was actually going to be a possibility or

4   happen, correct?

5   A.   I don't know if that's correct.

6   Q.   Okay.  There are no exhibits that certainly you have marked

7   in this case that indicate -- that have anything in writing that

8   would corroborate that, in fact, there was actually going to be

9   a real -- that there actually was a real offer to fight Ruann

10  Visser, correct?

11  A.   Again, I'm not -- I don't know if that's correct.

12  Q.   All right.  So you know, and I know the members of the

13  jury -- the rest of us in the room are very familiar, but the

14  members of the jury probably don't understand in these lawsuits

15  that -- and I know you know this as well -- there are hundreds

16  and hundreds of pages of documents that the parties exchange in

17  the course of what's called discovery.

18       You're generally familiar with that process, right?

19  A.   Yes.

20  Q.   And, in fact, in this case, you and your lawyers did produce

21  hundreds of pages of documents to us, and I think we did the

22  same.  But in my review, I never saw anything in writing

23  whatsoever related to the Ruann Visser fight, and so I guess

24  what I'm asking you is do you agree with that, that there's

25  never been anything in writing produced?

1    A.  I believe there were exhibits produced and even addressed by

2    other witnesses over the last couple of days.

3    Q.  All right.  With respect to the Visser fight, I think you

4    said you first were contacted in August by someone for this

5    particular fight.  Now, at that time, I think they did not yet

6    know it would be Visser, but that you said in August this -- the

7    event that was going to take place on October 19th of 2019, you

8    began having discussions about.  Did I understand that

9    correctly?

10   A.  That in August the promoter of the October 19th event

11   contacted me about Mladen potentially having a slot on their

12   event.  It was not determined when he first contacted me who the

13   opponent would be.

14   Q.  Understood.  Understood.  And my question that I'm leading

15   up to is we don't have any documents, texts, emails, letters, we

16   have nothing in this record that would corroborate what you're

17   saying these events were, do we?

18   A.  I am pretty certain you have communications between me and

19   Ibn Cason, who was the promoter.  And I'm pretty sure you have a

20   bout agreement that he presented to me.  And there is a lot of

21   written text communication regarding the Visser fight between

22   Mladen, myself, Steven Heid, and Eddie Mustafa Muhammed.  And

23   there's certainly a number of telephone conversations and --

24   also involving Mladen, Mladen's father, myself, Steven Heid.  So

25   there was a lot of discussion and a lot of communication in

1  writing and telephonically.

2          THE COURT:  Can you spell Ibn Cason's name?

3          THE WITNESS:  I-b-n is the first name.  Cason,

4  C-a-s-o-n.

5          THE COURT:  Thank you.

6  BY MR. DEE:

7  Q.  All right.  Another question is, then, when you did -- when

8  you did try to schedule Mladen to fight Mr. Visser, did you at

9  that time know that Mr. Visser had tested positive for the

10  anabolic steroid stanozolol, s-t-a-n-o-z-o-l-o-l, after a

11  February -- excuse me -- after a 2018 fight?  Did you know that

12  at the time?

13  A.  I -- I did not know that at the time.

14  Q.  Okay.  Are you aware of the fact in your business that

15  stanozolol is a banned substance in boxing?

16  A.  I'm aware that there's hundreds of banned substances, and I

17  have particular -- I'm not familiar with that, but, you know,

18  yes, there's hundreds of banned substances, and that's one of

19  them.

20  Q.  Yeah.  Fair enough.

21      And were you aware at the time you were talking to Mladen

22  about possibly having this fight that at the time that positive

23  drug test of Visser's was on appeal, which is why at the time he

24  wasn't suspended yet?

25  A.  I was aware that Mr. Visser was not on suspension and that

1  he was cleared to fight by any boxing commission in the world.

2  Q.  All right.  Okay.  You didn't know -- but you didn't know

3  anything about --

4  A.  I -- I was not aware of an appeal.  No, I was not.

5  Q.  All right.  Now, we heard Mr. Thomas yesterday testify that

6  in less than five minutes, he learned all about Visser's steroid

7  use and the whole issue.  Now, you know, that wasn't at the time

8  you -- that was more recent.  Nevertheless, did you even do any

9  due diligence like that before you were going to set Mladen up

10 with this 6-9 monster steroid user?

11 A.  So what I did was -- I was somewhat familiar with

12 Mr. Visser.  Now, I am a boxing promoter who specializes in

13 heavyweights.  I actually had a fighter of mine who was supposed

14 to fight him at one time.  And I went on BoxRec, which we've all

15 heard, you know, over and over --

16 Q.  Uh-huh.

17 A.  -- is really a great tool to look up information about

18 opponents.  I went on Mr. Visser's profile.

19      At the top of every fighter's profile, if they're

20 suspended, it's actually an alert on BoxRec at the very top of

21 their page saying, you know, this fighter is on suspension.

22 When I go to a boxer's page, and in this case when I went to

23 Mr. Visser's page, there was no suspension.

24      So my due diligence was more about my opinion of him as a

25 fighter, of him being a credible opponent, cross-referencing the

1   opponents that Mr. Visser had fought.  And my feeling was

2   Mr. Visser, the majority -- I don't even recognize any names of

3   his opponents.  He did not beat anybody ever that was a highly

4   rated fighter or regarded fighter.  I think in his, like, 16th

5   or 17th fight, he fought somebody making their pro debut, and

6   then they never fought again.  Many of his fights were against

7   guys 0-1, 1-2.  Even I'll use, you know, had more than

8   double-digit fights.

9        So doing my due diligence on Mr. Visser, because on the

10  official recordkeeping of boxing, BoxRec, on his profile, he was

11  not under suspension, it was just my -- my due diligence was

12  relegated to --

13  Q.  Okay.

14  A.  -- seeing -- you know, determining if I thought it was a

15  fight that Mladen would win, if he would look good, and if I

16  thought it would help advance his career.

17       And Mr. Visser had a record at the time, 17-2.  He lost to

18  recently -- that year, that same year, to a fighter who -- I

19  think his name was Elvis Moyo, who was 8 wins and 5 losses.  And

20  I just thought he had a very nice cosmetic record, but, you

21  know, it was all flash and no substance.

22  Q.  So you agreed this would have been the best fighter Mladen

23  would have ever fought at that point in time, correct?

24  A.  I -- I mean, I think Dillon Carman was a better fighter that

25  Mladen fought in his, I think, seventh or eighth fight, but I

1  think this was probably the second best fighter.

2  Q.  Okay.  And he would have absolutely been the biggest,

3  largest?  This would have been his first fight with anybody even

4  taller than him and somebody weighed -- well, I don't know about

5  weight, but taller than him?

6  A.  Yeah.  I don't think Mladen's ever fought anybody that

7  height.

8  Q.  And as his promoter, you know, and you've said looking out

9  for his best interest, trying to get his career advanced, I

10 mean, you just looked at his record on BoxRec and his opponents

11 and didn't even do like a simple Google search, which would have

12 revealed all this to you, correct?

13 A.  I performed my normal due diligence.  I also -- I frequently

14 would speak with Mladen's trainer and his manager.  I spoke with

15 Eddie Mustafa Muhammed.  I know that, I believe, Eddie and

16 Steven and even Mladen looked at videos of Ruann Visser and all

17 thought -- and even, I believe, Mladen thought this was a good

18 opponent for him.

19 Q.  Right.  And nobody had done the due diligence to find out

20 about the doping that he was currently appealing, right?  None

21 of you knew?

22 A.  None of us did, no.  No.

23 Q.  Right.  Because you didn't do your due diligence; would you

24 agree?

25 A.  I do not agree that I didn't do -- I did my due diligence on

1   him as a fighter.  And, again, you know, I did my normal due

2   diligence, and, you know --

3   Q.  And I -- I can't disagree that you did your normal due

4   diligence, but as we sit here now a few years later, knowing

5   what we know about Mr. Visser, you would agree that your normal

6   due diligence at that time was insufficient at a minimum,

7   correct?

8   A.  Again, at the time I don't think so.  I mean, in hindsight,

9   you know, you might think that, but I do not think that I did

10  anything other than my normal process and probably even more

11  than my normal process because of the extensive discussions with

12  Mr. Muhammed, Mladen, Mr. Heid --

13  Q.  Right.

14  A.  -- the videos.  You know, so I believe, you know, we did --

15  we did an extensive amount of looking into Mr. Visser as a

16  viable opponent.

17  Q.  Your testimony, as I understand it -- and my question is

18  going to be if this is correct -- is that it was unreasonable

19  for Mladen to refuse to fight Ruann Visser on October 19th,

20  2019.  Correct?

21  A.  Correct.

22  Q.  As we sit here today, in hindsight, knowing everything we

23  know about Mr. Visser, who has now been suspended for, what,

24  like, four years, I believe, right?

25  A.  He -- I believe he was suspended six months after or --

1   roughly five, six months after October of '19.

2   Q.  The most recent five fights he had before he was suspended

3   were all --

4   A.  Yes.

5   Q.  -- changed to no contest, which is essentially stripped of

6   the results, right?

7   A.  Well, they're no contests.

8   Q.  Yeah.  So as we sit here today, knowing what we know, is it

9   still your opinion that it was unreasonable for Mladen to refuse

10  that fight?

11  A.  Again, back in 2019 --

12  Q.  No.

13  A.  No, no.  That's when the decision was made, and I believe

14  when Mladen made that decision, it was unreasonable, yes.

15  Q.  So you're testifying here today as Mladen's promoter,

16  supposedly looking out for his best interests, that he should

17  have fought this guy under the circumstances that we know

18  existed then that you did not discover; is that your testimony?

19  A.  Again, I'm -- my test, first of all, as of, I think, April

20  30th, 2021, the Court rendered a court order saying --

21  Q.  I'm sorry.

22  A.  -- that I was not --

23  Q.  This is not responsive.

24          MR. DEE:  I'm sorry, Your Honor.  Can I --

25  A.  No.  You asked me as I'm sitting here today as Mladen's

1   promoter.  I am not sitting here today as Mladen's promoter.

2   BY MR. DEE:

3   Q.  Okay.  You're sitting here in a lawsuit that you breached

4   the contract, and one of your defenses to the breach is that

5   Mladen's refusal to fight Visser was unreasonable.  So as we sit

6   here today, Mr. Cohen, you still contend, even knowing what we

7   know today, that it was unreasonable for Mladen to refuse that

8   fight, yes or no?

9   A.  Correct.  And Mladen did not refuse that fight based upon --

10  Q.  You didn't tell Mladen that the guy had been caught for

11  doping --

12  A.  I didn't know.

13  Q.  -- because you didn't do your due diligence to find out;

14  would you agree?

15      MR. LILLWITZ:  Objection; misstates the record and

16  argumentative.

17      MR. DEE:  I withdraw the question.

18      THE COURT:  Okay.

19  BY MR. DEE:

20  Q.  Manuel Charr, Mr. Cohen.  You claim that you had an

21  opportunity for Mladen to fight Manuel Charr in -- at least the

22  discussions took place in approximately January of 2020,

23  correct?

24  A.  The discussions and negotiations took place with myself and

25  his promotional team.

1   Q.  And you spoke to Mladen about possibly fighting Mr. Charr,

2   and he said yes, correct?

3   A.  He was excited, yes.

4   Q.  Yeah.  Okay.  And the fight didn't happen, correct?

5   A.  That's correct.

6   Q.  It never -- in fact, it never was scheduled.  There was

7   never a date that was provided, correct?

8   A.  Again, I think I said earlier Mr. Charr did not fight for a

9   number of years and eventually got stripped of his title.  So,

10  yes, that fight didn't happen, nor any other fights for

11  Mr. Charr, for a number of years.

12  Q.  Okay.

13  A.  Having nothing to do with Mladen, myself.

14  Q.  Right.  And his title got stripped, and he was suspended

15  because he too tested positive for doping, didn't he?

16  A.  His title was not stripped because of doping.

17  Q.  Okay.

18  A.  I believe at some point in his career he had tested positive

19  and it was not confirmed, and he was never -- it was never

20  stripped because -- he was not stripped because of doping.  I

21  believe he was stripped for inactivity.

22  Q.  His last fight as of January of '20 had been in November of

23  2017.  Do you recall that?

24  A.  I do.

25  Q.  So the guy hadn't fought for over two years, correct?

1    A.   Correct.

2    Q.   And let me ask you this question:  At the time you were

3    talking to Mladen about fighting Mr. Charr, did you personally

4    know about Mr. Charr's positive test results in doping?

5    A.   So Mr. Charr, he was the WBA heavyweight champion of the

6    world.

7    Q.   Can I -- I'm sorry for interrupting, Mr. Cohen, but it

8    really was a very simple yes or no question.  And if the Court

9    would allow me to instruct you to answer the question.

10   A.   I read articles about it, sure.

11   Q.   So at the time you offered this fight to Mladen, you knew --

12   so now two in a row, Visser and Charr, you were offering Mladen

13   fights with step-up opponents who were better than anybody he'd

14   ever fought who had all tested positive for banned substances

15   and had positive doping tests?

16   A.   Mladen -- the potential fight -- again, there was never an

17   offer.  The fight that was being negotiated was for a fight in

18   2020.  The allegations against Mr. Charr were in 2017.  He was

19   not on suspension.  And it was very well publicized.  You know,

20   it was common knowledge.  I believe Mladen even knew of, you

21   know, Charr's issues in the past, but he was more than happy to

22   face him if we were able to make it happen, but there was never

23   an offer, and it didn't happen.

24   Q.   I understand there was never an offer, it didn't happen, but

25   this is one of the fights that you and your counsel keep

1  bringing up, for whatever reason, and so that's why I needed to

2  ask you more of the details about this.

3  A.  Well, again, I don't know, can you -- is there a question?

4  I'm sorry.

5  Q.  I guess I would finish this with do you agree that you guys

6  keep bringing it up so it's fair game for me to ask you these

7  questions, at least, right?

8  A.  I'm just unclear of what the question is.  I'm sorry.

9  Q.  I withdraw the question.

10     Bear with me for a moment, Mr. Cohen.  I'm just -- the

11 nature of this is skipping around from subject matter to subject

12 matter.

13        MR. DEE:  Okay.  I apologize for the delay, everyone.

14 BY MR. DEE:

15 Q.  Mr. Cohen, let me ask you some questions about the WBA.  You

16 know, you testified in response to questions this morning that

17 at the time you signed Mladen in 2018, he was not ranked by the

18 WBA, and by 2020, when he terminated the contract, he was,

19 right?

20 A.  Correct.  Right.

21 Q.  Okay.  Now, you will agree that the WBA is a relatively

22 political organization that, in your own words, requires

23 lobbying to get people ranked, right?

24 A.  All four major sanctioning bodies --

25 Q.  Fair enough?

1   A.  You know, it's not like, you know, a scientific formula

2   that's -- they all have different ratings, and, you know,

3   they -- it's not a set criteria.

4   Q.  Sure.  I mean, the really good fighters are all ranked in

5   the top.  Currently, like Tyson Fury, Oleksandr Usyk, I mean,

6   all of the organizations have them in their top --

7   A.  That's not true.

8   Q.  Not even the ones who are the champions?

9   A.  No.  Tyson Fury --

10  Q.  Are you --

11  A.  No.  Just --

12  Q.  Go ahead.

13  A.  Tyson Fury is the WBC champion of the world.  He's not rated

14  by the WBA, the WBO, or the IBF.  When you're a world champion,

15  it's considered an insult if they rate you in the other -- in

16  the other federations, the other sanctioning bodies.

17  Q.  But typically, wouldn't you agree, that the top -- even if

18  it's not so, that the top three or four, if they're not

19  champions, mandatory challengers and all that, tend to be ranked

20  by everybody?  Or maybe not.  Maybe you're --

21  A.  Some of --

22  Q.  -- saying they're all like this.

23  A.  Again --

24  Q.  Right.

25  A.  -- all four major sanctioning bodies have top -- they rank

1   the top 15 contenders, and they are very different.  I mean,

2   there is some overlap for sure.  There is some overlap for sure,

3   but they're often and almost always very different.

4   Q.  You would agree, wouldn't you -- I used the comparison to,

5   for example, like the NCAA basketball tournament where everybody

6   gets a seed and they work their way through the bracket to a

7   championship -- that the rankings that these organizations use

8   is not like that?  It's a lot more subjective?

9   A.  It's a lot more subjective.

10  Q.  Okay.  And you've previously testified, and I'm going to ask

11  you if you agree with this, that you lobbied for several months

12  to get Mladen ranked.  Did you recall that?

13  A.  No.  I -- I recall saying, if not that exactly, something

14  similar.

15  Q.  Okay.  And you've said before lobbying is an important part

16  of getting, in this case, a WBA rank, right?

17  A.  Certainly advocating for your fighter, you know.  It's one

18  of the only ways they get ranked is you making people aware of

19  them.  And when I say "making people," contacting the

20  sanctioning bodies and advocating on behalf of your fighter.

21  Q.  Yeah.  Which is why -- and Mladen wasn't ranked by anybody

22  else, any of the other organizations, the WBC, WBO, IBF, et

23  cetera, correct?

24  A.  That's correct.

25  Q.  All right.  Your focus was -- your focus as his promoter was

1  the WBA, lobbying to get him ranked by the WBA, correct?

2  A.  I wouldn't say that was my focus.  I wanted him to be rated

3  by all of them, but that was the first one.

4  Q.  Okay.  And there are -- I'll use the word "companies," and

5  maybe in some cases it's actually individuals, who advocate and

6  lobby on behalf of boxers and promoters and managers, for that

7  matter, to get boxers ranked by these organizations, right?

8  A.  I don't really understand the question.

9  Q.  Yeah.  So have you heard of a company called Sports

10  Consulting Services?

11  A.  Yes, I've heard of them.

12  Q.  Okay.  And I think you would describe them as an advocate

13  and a lobbyist on behalf of boxers with these organizations; is

14  that fair?

15  A.  I would say that's one of the things they do.  I would say

16  that they're an advisor and a consultant on many things having

17  to do with boxing.

18  Q.  But for purposes of our discussion and context here today,

19  the thing that they do that's of interest is -- that's of

20  relevance, I should say, is that they advocate and lobby various

21  organizations to get boxers ranked, correct?

22  A.  Again, that's one of the things that they do, sure.

23  Q.  Yeah.  And it's very important -- it's a very important

24  component of the boxing world.  That's just -- we didn't make

25  the rules, that's just kind of how it works; would you agree?

1   A.   I would agree.

2   Q.   Okay.  And compensation is paid to companies or individuals

3   like Sports Consulting Services to do this lobbying and

4   advocating, probably just like we would pay a lobbyist in

5   Washington, D.C., right?

6   A.   Again, that's one of the services they provide, and they get

7   paid for all of the services that they provide.

8   Q.   Okay.  And they could get paid anywhere from a thousand

9   dollars to a million dollars, depending on what they're being

10  asked to do for their lobbying, correct?

11  A.   Again, I don't know what they -- if they get a thousand

12  dollars to a million dollars for lobbying, but that's one of the

13  services that they provide.

14  Q.   Right.  Right.  And you have been dealing with them since

15  about 2015 or so; would that be correct?  Maybe the year might

16  be off, but does that sound right?

17         MR. LILLWITZ:  I'm going to object.  "Them," Mike, who

18  are you referring to?

19         MR. DEE:  I'm sorry.  Sports Consulting Services.

20  Thank you.

21         MR. LILLWITZ:  Okay.  Thank you.  Go ahead.

22  A.   Again, I'm not sure the exact year, but it's probably not

23  too far off from that.

24  BY MR. DEE:

25  Q.   Fair enough.  And you have paid Sports Consulting Services

1  to get fighters ranked before, haven't you?

2  A.  Again, I've paid them for their advisory services.

3  Q.  Do you recall previously testifying that you paid them

4  $17,250 to get Jarrel Miller, who we mentioned earlier, one of

5  your fighters, ranked?

6  A.  I'm not disputing that I paid them $17,500 and, you know,

7  Jarrell Miller -- I didn't pay them to get Jarrell Miller

8  ranked.  I paid them for their consultancy and advisory

9  services.

10 Q.  But after you paid them that money, he just happened to get

11 ranked?  The timing, that's the sequence of events, right?

12 A.  Again, I do not recall the exact sequence of events, but --

13 so I just don't know the answer to that question.

14 Q.  And in the meantime, while you're doing the lobbying to try

15 to get Mladen ranked by the WBA, you agree, don't you, that his

16 ranking, at least in BoxRec, and which -- the more objective

17 rankings, was dropping from what it was when he signed with you,

18 correct?

19 A.  I do not agree with that.  I don't know that.

20 Q.  Okay.

21 A.  You know, BoxRec is done on a point system and an algorithm,

22 and you get points for victories.  So I'm not quite sure how a

23 fighter who was a 4-6 and one eight-round fighter who was 8-0,

24 was dropping when he was 12-0.  So, you know, I don't -- I'm not

25 certain that Mladen's BoxRec ranking ever went down.

1  Q.  All right.  So I think we are probably at a point where you

2  heard Mladen's testimony to the contrary.  It's the two of you

3  just don't agree on that point; fair to say?

4  A.  We have -- yeah.  I just -- again, I'm not -- I cannot say

5  that his ranking went up or down.

6  Q.  Okay.  Would it be fair to say because you weren't

7  necessarily paying attention and keeping track of what his

8  ranking was during that time while you were his promoter?

9  A.  No, no, no.  That's -- that's not fair to say.  BoxRec and

10 the BoxRec rankings is not what I go by and never have.  It's a

11 tool to see what, where -- it's one ranking system based on a

12 mathematical algorithm, but that is not what I view as

13 important -- the important ranking system in the sport.

14       There's absolutely zero commercial value to BoxRec's

15 rankings, and this is -- you know, this is a business for

16 profit.  Fighters fight for profit, promoters promote for

17 profit, and your BoxRec ranking has zero to do with your

18 commercial value.

19 Q.  Now, around this same time in late '19 and early '20, you

20 were understandably busy with the issues going on in your life

21 with this criminal matter, correct?

22 A.  I mean, it was pretty much at the end at that point.

23 Q.  So, you know, just to follow up on some of the questions

24 that you were asked before, the arrest for this was in January

25 of 2019, correct?

1  A.   That's correct.

2  Q.   Okay.  And you were charged with one count of wire fraud?

3  A.   That's correct.

4  Q.   And the amount of the fraud was $200,000?  At least that's

5  what the charge was?

6  A.   That's correct.

7  Q.   Right.  And the basis of the charge was that you

8  fraudulently induced a person to loan you money under false

9  pretenses, correct?

10 A.   That's correct.

11 Q.   And the loan was to you personally, not -- as you said

12 before, Greg Cohen Promotions had nothing to do with it?

13 A.   That's correct.

14 Q.   Okay.  And as part of the fraud, you told the victim you

15 were going to have him participate with you in an investment,

16 and then you did not use the money for that investment, correct?

17 A.   That's correct.

18 Q.   And I think you previously testified, in fact, the

19 investment you told him about was completely fictitious?

20 A.   I lied to him, yes.

21 Q.   Okay.  All right.  And then you pled guilty in November, and

22 your sentence, as you said before, started in February of 2020?

23 A.   That's correct.

24 Q.   Okay.  Now, you were asked some questions about -- you said

25 before that the actual original charges were sealed by the

1  prosecutors.  Was it probably the U.S. Attorney's Office?

2  A.  It was Southern District of New York, yeah.  Yes.

3  Q.  But the thing that I wanted to ask you about is you said

4  that -- and so because it was sealed, you weren't allowed to

5  tell people, but you said you got some of your fighters to write

6  you letters in your support, I guess without providing them the

7  underlying details of the charges.  Is that -- did I say that

8  correctly?

9  A.  So my attorneys had advised me that it would be a good idea

10 to have people who know me well in the community, people I work

11 with, family, friends, to write letters of support.  So I did

12 not tell them I was charged with a crime.  I told them, "I have

13 an ongoing issue, and would you be comfortable writing about my

14 character, writing about" -- you know, a letter of support for

15 me.

16 Q.  And what I was just going to get at is -- and from what I

17 understand, that is a fairly common thing that happens in those

18 cases, and nothing the matter with it, but Mladen was not one of

19 the people you told about this or asked to write a letter for

20 you, correct?

21 A.  That's right, yes.

22 Q.  Okay.  Last, I think -- famous last words.  Last few

23 questions, Mr. Cohen.  You looked at Exhibit 6 with

24 Mr. Lillwitz, which we'll pull up here, which is a string of

25 emails, but the most recent email was on September 15th of 2020.

1    And you'll recall this is the one with the sentence towards the

2    end, you're -- right in there, that you would enforce your

3    promotional rights and "notify every promoter or commission and

4    sanctioning organization of," you say, "our rights, which

5    include, but are not limited to," the injunctive relief and all

6    that.

7         So, I mean, my question for you is, you know, you have

8    admitted, you've testified that you did not agree that the

9    contract was terminated as of June of 2020, right?

10   A.  That's correct.  Yes.

11   Q.  Okay.  And you told Mladen that, in fact, you would enforce

12   your rights, what you believe were your rights to still have the

13   contract and the exclusive rights to him, correct?

14   A.  That's correct.

15   Q.  All right.  And you did for a while, didn't you?  You did

16   enforce your rights under this contract for a while?

17   A.  I did.

18   Q.  Okay.  And I want to show you on Exhibit 12 -- we covered

19   this with Mladen, and I believe Mr. Lillwitz asked you a couple

20   questions about this this morning.

21        This is your text string with Sal -- is it Jobe or Jobe; do

22   you know?

23   A.  Mladen pronounced it Jobe when he was on the stand.  I said

24   Jobe.  Tomato, tomato.

25   Q.  With Sal.  Let's go with that.

1     We have been through this before, so I'm not going to go

2   through the whole thing again, but, generally speaking, you are

3   informing Sal that in your mind Mladen is still under contract

4   with you and all of that, correct?

5   A.  Correct.

6   Q.  All right.  The thing I wanted to ask you about was at the

7   end of the text string.  Now, this is -- we're up to the one in

8   the middle here, the white one in the middle.  It's November

9   28th of 2020.

10     "Sal, if you're involved with funding or assisting in

11   funding his litigation, it's about to get very expensive.  I

12   hope for your sake you're not."  And then you say to him, "This

13   is going to be fun," don't you?

14   A.  That's what it says, yes.

15   Q.  And you're referring to it being fun with you trying to

16   enforce the contract that you claim was not properly terminated,

17   correct?

18   A.  I was being sarcastic.

19   Q.  Okay.  And then the lawsuit was eventually filed in this

20   case, and you eventually filed counterclaims, correct?

21   A.  Correct.

22   Q.  And one of the counterclaims you filed was a declaration

23   from the Court that, in fact, the contract had not been

24   terminated and you remained -- GPC remained Mladen's promoter,

25   yes?

1   A.   GCP, yes.

2   Q.   Okay.  And so that counterclaim remained on the books and a

3   public record, which all these filings are, until just a few

4   weeks ago, when that counterclaim was dismissed, right?

5   A.   I don't know the process, but I'll take your word for it.

6   Q.   Okay.  All right.  So during all this time, since -- at

7   least since these proceedings began, which were after you were

8   contacting these people and, what you say, enforcing your

9   rights, there then was a public document available to the world

10  where you were still claiming you were Mladen's promoter?

11  A.   Mladen sued me.

12  Q.   Yes.  And then you counterclaimed.

13  A.   Mladen sued me.

14  Q.   Uh-huh.

15  A.   He had sent me notices of breach, notices of termination

16  before he sued me.  I answered.  I disagreed with -- I believed

17  there was no breach, and I did not agree to the termination, and

18  I believed that Mladen was breaching my agreement.  I still

19  believe that to this day, but the Court has made their court

20  order on, you know, April of 2021.

21       But, yes, he sued me, and I countersued him because I

22  believed that GCP's contract was valid, and the rights under

23  that contract, I wanted them enforced on behalf of GCP, and the

24  way to do that, when you're sued, is to countersue.

25  Q.   Right.

1   A.   And I was -- you know, I would have preferred to have worked

2   it out, but that was Mladen's choice was he sued me, and that

3   was my reaction as the CEO of GCP.

4   Q.   Now, the timing on Mladen suing you is after all of these

5   communications you had with Sal Jobe and others in the fall of

6   2020 took place, correct?

7        In other words, Mladen didn't terminate the contract and

8   sue you a week later.  It was months and months later, after

9   you, as you just admitted, took steps to enforce?

10  A.   The timing, again, you're talking in -- his notice of

11  termination was in June of 2020.  At that time, it was in the

12  throes of the pandemic.  There were no boxing events, there were

13  no sporting events, and certainly in America no boxing events,

14  and most people had a lot of time on their hands.

15       Mladen then went back and forth with me several times in

16  September, October, November.  You know, and then I -- when I

17  corresponded with Sal, I 100 percent was of the position that

18  GCP was Mladen's exclusive promoter and here is another agent

19  for another promoter trying to get Mladen to sign with them.

20  And, you know, quite frankly, we had very professional

21  conversations, me and Mr. Jobe -- or Sal, but I only acted in

22  capacity as the CEO of a company.  We don't have --

23  Q.   I'm --

24  A.   We don't have --

25            MR. DEE:  I'm sorry for interrupting, but, Your Honor,

1  I think we're a little far afield of the question that was

2  asked.

3          THE COURT:  Go ahead and ask a new question.

4          MR. DEE:  Okay.  Thank you.

5  BY MR. DEE:

6  Q.  What I was getting at, Mr. Cohen, was you filed the

7  counterclaim still claiming that he's your fighter and you're

8  going to enforce your rights, but then you dropped it right

9  before the trial, so you're no longer pursuing that claim, but

10 in the last 2 1/2 years, the entire world has known that you had

11 a claim out there that Mladen was still your fighter, correct?

12 A.  Again, I filed my counterclaim on behalf of Greg Cohen

13 Promotions to enforce our rights and made a decision at a later

14 date that we didn't want to pursue that counterclaim.

15         MR. DEE:  I have nothing further, Your Honor.

16         THE COURT:  Redirect.

17         MR. LILLWITZ:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19 BY MR. LILLWITZ:

20 Q.  Just a couple, Mr. Cohen, very briefly.  Do you remember

21 with Mr. Dee this morning he was talking to you about the lack

22 of documents in the record regarding the Visser fight?  Do you

23 remember that conversation?

24 A.  I do.

25 Q.  Can you turn to Exhibit M, please, M as in Mary.

1   A.   Are you pulling it up or should I --

2   Q.   It's not in evidence yet, so you're going to have to pull it

3   up.

4   A.   Okay.  I have it up.

5   Q.   What do we see in Exhibit M, Mr. Cohen?

6   A.   An email from Ibn Cason to me.

7   Q.   Dated what?

8   A.   Dated September 27th, 2019.

9   Q.   What's the subject of the email?

10  A.   "Mladen Miljas bout agreement."

11  Q.   And if you turn to pages 2 through 5 of Exhibit M, what do

12  we see there?

13  A.   There was an attachment on the email, and it's a bout

14  agreement for Mladen Miljas versus Ruann Visser October 19th,

15  and it's a bout agreement for the Visser fight on October 19th

16  from the --

17  Q.   Okay.

18  A.   -- from the promoter of the event.

19           MR. LILLWITZ:  Defendants move to admit Exhibit M.

20                    (Defendants' Exhibit M was

21                     offered in evidence.)

22           MR. DEE:  Hearsay, Your Honor.

23           MR. LILLWITZ:  I'm not offering it for the truth of the

24  matter admitted.

25           MR. DEE:  I think you are.

1      THE COURT:  It is hearsay.  It's not admitted.

2  BY MR. LILLWITZ:

3  Q.  Mr. Cohen, is Exhibit M within the documents that have been

4  provided to opposing counsel in this case?

5  A.  Yes, they are.

6  Q.  No further -- or thank you.  I have a few other questions.

7      You spoke with Mr. Dee about a $16,000 dispute with a

8  gentleman named Mark Fratto, I believe; is that right?

9  A.  Mark Fratto, yes.

10  Q.  And I think you wanted to add something but the conversation

11  got sidetracked.  What did you want to add about that

12  conversation -- or that dispute with Mr. Fratto?

13  A.  Mr. Fratto's company was providing production services.  I

14  did an event in Sloan, Iowa -- GCP did an event in Sloan, Iowa,

15  and we were producing our own television for the CBS sports

16  network.  So when you do that, you have to pay for your own

17  production.

18      We did a number of events with Mr. Fratto like that, and we

19  had -- that $16,000 was a portion of somewhere between 150, 160

20  thousand dollar bill, and a portion of that I was in dispute

21  with Mr. Fratto.

22  Q.  Again, jumping around, and I apologize, but I just have a

23  few more questions.

24      You also talked with Mr. Dee about Mr. Heid's -- I think he

25  used the term as a "lender" or "investor" in GCP.  Do you

1    remember that conversation?

2    A.  I do.

3    Q.  Have Mr. Heid or any of his entities been a lender,

4    investor, or had any financial interest in GCP since June of

5    2018?

6    A.  No.

7    Q.  You also had a discussion with Mr. Dee about Bulldog

8    Promotions.  Is there a Bulldog Boxing Promotions that you're

9    aware of, Mr. Cohen?

10   A.  Yes.

11   Q.  What is Bulldog Boxing Promotions?

12   A.  Bulldog Boxing Promotions is a boxing promotional company

13   that I consult for.

14   Q.  Consult for?

15   A.  Yes.

16   Q.  Do you have any ownership interest in Bulldog Boxing?

17   A.  I do not.

18   Q.  Does anyone related to you have an ownership interest in

19   Bulldog Boxing Promotions?

20   A.  No.

21   Q.  You also had a discussion with Mr. Dee about -- and I think

22   it was for Jarrell Miller, who the promoter was listed on BoxRec

23   for Jarrell Miller.  Do you remember that conversation?

24   A.  I do.

25   Q.  Mr. Cohen, for the clarity for the jury's sake, who holds

1  the boxing promotion license that you operate under?  Is it

2  yourself personally or is it GCP?

3  A.  It would be under GCP.  I personally don't hold any

4  licenses.

5  Q.  Does BoxRec give out any promotional licenses?

6  A.  They do not.

7  Q.  Where do the promotional licenses come from?

8  A.  The state athletic commissions.

9          MR. LILLWITZ:  That's all the questions I have, Your

10 Honor.

11         THE COURT:  Mr. Dee, any recross?

12         MR. DEE:  Yeah.  Just quickly, Your Honor.

13                    RECROSS-EXAMINATION

14 BY MR. DEE:

15 Q.  So, Mr. Cohen, when I asked you before about Bulldog

16 Promotions, you seemed to act as if you had no clue what I was

17 talking about, but you were aware of Bulldog Boxing Promotions

18 and didn't mention that?

19 A.  You asked me a question and I answered it.

20 Q.  Okay.  Are you the registered agent for Bulldog Boxing

21 Promotions?

22 A.  I don't believe Bulldog Boxing Promotions is even in

23 business -- I mean Bulldog Promotions.

24 Q.  Wait.

25 A.  I --

1   Q.   What entity are we talking about?

2   A.   What's that?

3   Q.   Bulldog Boxing Promotions, what you were just asked about by

4   your lawyer, are you the registered agent?

5   A.   Of Bulldog Boxing Promotions, I am not.

6   Q.   You are not?

7   A.   Bulldog Boxing Promotions, I am not.

8   Q.   So your testimony is that Bulldog Boxing Productions'

9   registered agent is not you at your home address in New Jersey?

10  A.   Bulldog Boxing Promotion is not me.

11  Q.   Nor is a company called Bulldog Promotions?

12  A.   I'm not aware of Bulldog Promotions.

13  Q.   Okay.

14  A.   And I'm just -- I'm not disputing your document.  I'm saying

15  that I am not aware of Bulldog Promotions.  I am aware of

16  Bulldog Boxing Promotions.

17          MR. DEE:  This was all I had, Your Honor.

18          THE COURT:  Okay.  Any re-redirect?

19          MR. LILLWITZ:  Nothing, Your Honor.

20          THE COURT:  All right.  Thank you, Mr. Cohen.  You can

21  step down.

22                                  (Witness excused.)

23          THE COURT:  Do you have additional evidence you'd like

24  to present, Mr. Lillwitz?

25          MR. LILLWITZ:  No, Your Honor.  At this time the

1  defense rests.

2          THE COURT:  All right.  Would the plaintiff like to

3  offer any rebuttal evidence?

4          MR. DEE:  Well, at the risk of making anybody a little

5  irritated, I have less than ten minutes that I would do.

6          THE COURT:  All right.

7          MR. DEE:  I would recall Mladen Miljas.

8          THE COURT:  Okay.

9          THE DEPUTY CLERK:  Please raise your right hand.

10      MLADEN MILJAS, PLAINTIFF'S WITNESS IN REBUTTAL, SWORN

11         THE DEPUTY CLERK:  Thank you.  Please have a seat.

12                       DIRECT EXAMINATION

13  BY MR. DEE:

14  Q.  Mladen, you heard Greg Cohen testify this morning that he

15  offered to have your trainer from Vegas, Eddie Mustafa Muhammed,

16  come to Canada and train you for the Ruann Visser fight and pay

17  for it.  You heard that testimony?

18  A.  I heard that this morning, yes.

19  Q.  And that they offered this to you, that they told you --

20  that he told you that they would do this.  Do you remember --

21  heard that testimony?

22  A.  That's what he's claiming, yes.

23  Q.  Is that true?

24  A.  No.

25  Q.  Okay.  Did anybody ever tell you that Eddie would come to

1   Canada and train you for the Ruann Visser fight?

2   A.  No.

3   Q.  All right.  Now, you testified the other day that there --

4   and Mr. Cohen testified there was this conference call --

5   Mr. Cohen, Mr. Heid, Eddie, and you -- when the Visser fight was

6   offered to you.  Do you remember that?

7   A.  Yes.

8   Q.  And it was during that call that you made the decision not

9   to fight him on October 19th, right?

10  A.  Yes.

11  Q.  Okay.  So the question I'm getting to is did you ever have

12  any other conversations, other than that conference call, with

13  Mr. Cohen regarding Ruann Visser and the October fight?

14  A.  No.

15  Q.  All right.  Last question:  Did you know, in January of

16  2020, when the possible fight against this Manuel Charr came up,

17  that he had tested positive for a banned substance and for

18  doping?

19  A.  No.

20  Q.  And did Mr. Cohen tell you that at the time he spoke to you

21  about possibly fighting Mr. Charr?

22  A.  No.

23  Q.  But you had no knowledge of Mr. Charr, you hadn't -- you

24  don't know?

25  A.  No, I didn't know.

1          MR. DEE:  That was all I had, Your Honor.

2          THE COURT:  Any cross-examination?

3                    CROSS-EXAMINATION

4   BY MR. LILLWITZ:

5   Q.  Mr. Miljas, the discussion Mr. Dee just asked you about,

6   conversations about the Visser fight, I think he said October

7   2nd.  Do you recall having any conversations with your manager

8   on or about October 2nd about the Visser fight?

9   A.  I spoke to my manager about the Visser fight but never with

10  Cohen directly other than the conference phone call with him.

11  Q.  Okay.  Do you have any idea whether your manager spoke with

12  Mr. Cohen about it?

13         MR. DEE:  Objection; calls for hearsay.

14         MR. LILLWITZ:  I asked him if he had any idea.

15         MR. DEE:  Okay.  All right.

16  A.  I don't know if he did, but I'm sure he must have.  If he's

17  speaking about a fight with me, he must have spoke to my

18  promoter first.

19         MR. LILLWITZ:  No further questions.

20         THE COURT:  Any redirect?

21         MR. DEE:  No.  No, Your Honor.

22         THE COURT:  All right.  You can step back down.  Thank

23  you.

24         THE WITNESS:  Thank you.

25                              (Witness excused.)

1          THE COURT:  Any additional rebuttal evidence you'd like

2     to present?

3          MR. DEE:  No, Your Honor.

4          THE COURT:  Any surrebuttal evidence you'd like to

5     present?

6          MR. LILLWITZ:  No, Your Honor.

7          THE COURT:  So both parties rest?  Yes.

8          MR. DEE:  Yes.  Sorry.  I didn't know it was a

9     question.

10          THE COURT:  Stumped you with that one.

11          MR. LILLWITZ:  Yes.

12          THE COURT:  Then, ladies and gentlemen, you've heard

13     all the evidence you're going to hear.  We're going to take a

14     lunch break.  When we come back, I'll give you final jury

15     instructions, the parties will make their closing arguments, and

16     then you'll begin your deliberations.

17        So I believe your lunch -- we ordered it for you thinking

18     you might be deliberating by the lunch hour, so it should be

19     arriving in about 15 minutes there in the jury room.  So you're

20     welcome to relax, enjoy lunch on us, and we'll see you back here

21     at 1 o'clock.  Thank you.

22        (In open court, out of the presence of the jury.)

23          THE COURT:  All right.  You can be seated.

24        Okay.  I assume you haven't had a chance, really, to look

25     at the verdict form or the final jury instructions, given that

1    you've been busy litigating since I handed them out.  Why don't

2    you go ahead and take 15 minutes to review the verdict form and

3    to look at those two substantive changes to the final jury

4    instructions, and we'll come back here at noon just to make a

5    final record.  That will give me time to get the final version

6    copied and ready for the jury.

7         Kyle, anything else you need from the parties?

8         Okay.  I'll see everybody back here in about 15 minutes,

9    then.

10        (Recess at 11:46 a.m. until 12:00 p.m.)

11             THE COURT:  All right.  So we're outside the presence

12   of our jury and we're here for purposes of making a final record

13   on our jury instructions.

14        And I'll start with Plaintiff.  Any final objections to the

15   proposed jury instructions or the verdict form?

16             MS. ALESCH:  Sorry, Your Honor.

17        An administrative one on Final Instruction 21.  It just

18   mentions "manager" in the title.

19             THE COURT:  Oh, yep.  And it does probably in the table

20   of contents then too.  Yep.

21             MR. LILLWITZ:  Oh, it does.  Yes.

22             THE COURT:  Okay.  Thank you.

23             MS. ALESCH:  No other objections on the final

24   instructions.

25        And on the verdict form, Verdict Form Two A, No. 2, has the

1  word "Final."

2          THE COURT:  Okay.

3          MS. ALESCH:  And Verdict Form Two B also has the word

4  "Final" in paragraph 2.

5          THE COURT:  All right.

6          MS. ALESCH:  Otherwise, no objections.

7          THE COURT:  On behalf of the defendants?

8          MR. LILLWITZ:  Yes, Your Honor.  Thank you.

9      Just a point of order, a number of my objections will be

10  legal objections based on motions that are, you know, going to

11  be coming.

12      From the jury instructions standpoint, I have no --

13  sorry -- Defendants have no objection as to the contents of the

14  actual instructions.  They would object to Instructions 12

15  through 24 being included in the final jury instructions for --

16  and I don't know if Your Honor would like me to go through them

17  now, but, essentially, no basis for submitting the tortious

18  interference claim as a matter of law, no basis for submitting

19  the Muhammed Ali Boxing Reform Act as a matter of law.

20      And because those claims are, again, barred as a matter of

21  law, you wouldn't have any punitive or willful, wanton damages

22  because the only claim left would be a breach of contract which

23  you cannot collect punitive damages on.

24      On the verdict form, no -- again, similar, no objections

25  from Defendants as to the actual contents of the verdict form or

1   its various forms as a legal -- as legal grounds.

2       Defendants have an objection to including Verdict Form

3   Two A as a matter of law, given the failure to establish the

4   claim of tortious interference by wrongful activity, which will

5   be further explained in Defendants' Rule 50 motions.

6       Verdict Form Two B, not only for the same reason that the

7   tortious interference claim shouldn't be submitted, it equally

8   should not be submitted against Mr. Cohen individually because

9   there is no testimony he acted outside the scope of his duties

10  as CEO and day-to-day operations manager of Cohen Promotions.

11      Verdict Form Three A should not be submitted based on the

12  fact that there has been no evidence to establish a violation as

13  a matter of law based on the wording of the Muhammed Ali Boxing

14  Reform Act.

15      And Verdict Form Three B, again, for those legal grounds

16  that there's no violation of the Muhammed Ali Boxing Reform Act,

17  but also there's no basis to submit a claim against Mr. Cohen

18  individually under that act, A, because, again, he was always

19  acting within the scope of his employment; but, B, Mr. Cohen

20  undisputedly does not hold a license to promote.  He's not a

21  promoter, just Greg Cohen Promotions is, so there can be no

22  damages against Mr. Cohen individually under the Muhammad Ali

23  Boxing Reform Act.

24      So for those reasons, Defendants would object to the jury

25  instructions and verdict forms.

1            THE COURT:  Okay.  Any response to that on behalf of

2     Plaintiff?

3            MS. ALESCH:  No.

4            THE COURT:  All right.  Would you like to make your

5     motions at this time as well, then, Mr. Lillwitz?

6            MR. LILLWITZ:  Yes, Your Honor.  Is it okay if I remain

7     seated?

8            THE COURT:  Yes.

9            MR. LILLWITZ:  Thank you.  Appreciate it.

10         Defendants make at this time, at the close of all evidence,

11     a number of motions under Federal Rule of Civil Procedure 50 and

12     specifically 50(a)(1).

13         Judgment as a matter of law, as the Court is aware, is

14     warranted when no legally sufficient evidentiary basis exists

15     for a reasonable jury to have found in favor of a party that has

16     been fully heard.

17         Specifically, number one, on the issue of Mr. Cohen's

18     individual liability, the *HOK Sport Inc.* case from the Eighth

19     Circuit, 495 F.3d 927, it's a 2007 decision of the Eighth

20     Circuit Court of Appeals, states both that disregarding an

21     entity's corporate form, either under the alter ego doctrine or

22     the remedy of piercing the corporate veil, is an extraordinary

23     measure that should be reserved for exceptional circumstances,

24     and then the mere identity of ownership and corporate management

25     is not alone or sufficient to pierce that corporate veil.

1       Moreover, under Iowa law, Iowa Code 489, and it's actually,

2   because I've done this research, under the Uniform Limited

3   Liability Act, a limited liability company is an entity distinct

4   from its members.  A member or manager is not liable for the

5   debts, obligations, or other liabilities of a limited liability

6   company arising in contract, tort or otherwise, solely by reason

7   of acting as a member or manager.

8       Here it's uncontroverted that the promoter's license at

9   issue in this case and utilized under the promotional agreement

10   belongs solely to Greg Cohen Promotions.  Greg Cohen himself has

11   testified that at all times he was communicating with Mr. Miljas

12   or others about Mr. Miljas in his role as CEO of Greg Cohen

13   Promotions.  He's even signed emails to this extent that are in

14   the record.  The subject agreement was signed by Mr. Cohen as

15   CEO of Greg Cohen Promotions.

16       And, again, all that evidence is uncontroverted and

17   therefore those claims should not go -- the claims against

18   Mr. Cohen individually should not go to the jury as a matter of

19   law.

20       Under the second basis for the Rule 50 motion under the

21   violation of the Muhammad Ali Act, again, similarly cannot go to

22   the jury as a matter of law.  The proposed violation of the act

23   is set forth in 15 U.S.C. 6307e -- actually 6307e and then

24   subparagraph (b) and it's entitled "Disclosures" by a promoter.

25       And the text of that statute is crystal clear that for a

1   violation of that disclosure statute that the promoter must

2   first receive compensation as to the subject bout.  There is

3   testimony here that is clear and uncontroverted that Greg Cohen

4   Promotions did not receive any compensation.  I believe the word

5   used was "consideration" when questioning Mr. Cohen, but they

6   did not receive any compensation whatsoever regarding the four

7   bouts that Mladen fought under the promotional agreement.  And,

8   again, that evidence is uncontroverted, so the Muhammad Ali Act

9   claim should not go to the jury.

10       And finally, the tortious interference claim.  As a matter

11   of law, any actions of Greg Cohen Promotions in contacting third

12   parties after Mr. Miljas had allegedly terminated the

13   promotional agreement in June of 2020 were not wrongful or

14   improper as a matter of law.

15       There is a case almost directly on point, the *General*

16   *Electric Capital Corp. vs. Commercial Services Group Inc.,* 485

17   F.Supp.2d 1015.  It's a Northern District of Iowa case from 2007

18   authored by Judge Bennett.  Again, a very similar case in

19   which -- a dispute between parties as to a debt collection

20   agreement.  After one party sent a purported termination letter,

21   the other party then went to third parties and said, and I'm

22   paraphrasing here, that the party sending the termination letter

23   was wrong and that the debt collection letter was valid and its

24   rights were maintained.

25       Quoting from the Restatement (Second) and finding that

1   there was no tortious interference claim as a matter of law, the

2   case, *General Electric Capital Corp.* case, states a party does

3   not improperly interfere with another's contract by exercising

4   their own legal rights in protection of their own financial

5   interests.

6        Again, there is uncontroverted evidence in this case that

7   that is all Mr. Cohen was doing in contacting third parties, and

8   for those reasons, the tortious interference claim should also

9   not go to the jury.

10       Thank you, Your Honor.

11            THE COURT:  Okay.  I'm going to circle back to a couple

12   of those things.

13       As to your statement that it's uncontroverted that

14   Mr. Cohen made no money, I think that's for the jury to decide

15   whether they believe him when he says that.  That, to me, is a

16   credibility issue that they'll have to make a determination of,

17   so I don't think it's fair to say that it's uncontroverted.

18       I also am concerned about the claim that's now being

19   presented that Greg Cohen does not qualify as a promoter under

20   the Muhammed Ali Boxing Reform Act.  In the joint jury

21   instructions submitted to me on January 6th of 2023 at Docket

22   130, and I'm looking at page 53, quote, there is no dispute that

23   Greg Cohen and Greg Cohen Promotions, LLC are promoters under

24   the Ali Act, end quote.

25       So I saw that as a stipulation of the parties, and because

1  I viewed it that way, I assume the plaintiff did as well, and so

2  I don't think you can change that stipulation at this point in

3  the game and now claim that he is not, in fact, a promoter.

4       And you made no objection to paragraph -- or Instruction 21

5  that also says that, that there is no dispute that both he and

6  Greg Cohen Promotions are promoters under the Muhammed Ali

7  Reform Act.

8       As to the interference claim, I think it's up to the jury

9  to decide.  I'll certainly take a look at that Judge Bennett

10  case, but I think there are some components here that are

11  different.  One is the nature of this dispute in that boxers

12  really can't fight when they are having the kinds of disputes

13  that are at issue here.  Another is the sudden dismissal right

14  before trial of the counterclaims that were keeping the

15  defendant -- or the plaintiff from boxing and sort of the

16  implication, or at least I think one interpretation the jury

17  could make, that that was done for the purpose of preventing

18  Mr. Miljas from being able to fight.

19       Those are facts that are, in my view, different than that

20  Northern District of Iowa case, but, again, I'll take a look at

21  it again more closely in post-trial motions in the event there

22  is a jury verdict on that particular claim that is against

23  Mr. Cohen or Cohen LLC.

24       Any other response the plaintiffs would like to make to

25  those motions?

1          MR. DEE:  No, Your Honor.  I, of course, would echo

2    what you said.  I would also add that, I believe, it is not --

3    at a minimum, it's unclear that the Muhammad Ali Act is limited

4    necessarily by whatever promotional agreement, whatever contract

5    exists between the parties.

6          In other words, that the act itself does not necessarily

7    limit itself to identified parties to a purported promotional

8    contract, which would then, in that case, allow, as you said,

9    Mr. Cohen individually to be identified as a promoter.

10         THE COURT:  Okay.  So Defendants' motions are denied.

11   I'll, of course, take a look at the more fulsome written motions

12   of both parties in this case or responses in this case.

13         Let's talk, then, about the exhibit list that will go to

14   the jury.  I circulated that last evening as well to the

15   parties.  We have added today -- the only exhibit I have being

16   admitted today is Exhibit B, and I would propose we add to this

17   list a description that is consistent with what was circulated

18   by the parties; that is, that a description of Exhibit B would

19   be the Miljas vs. Reed promotional poster.

20         Other than that change, any objections or corrections or

21   suggested edits by the plaintiffs -- or the plaintiff in this

22   case?

23         MS. ALESCH:  No, Your Honor.

24         THE COURT:  And by Defendants?

25         MR. LILLWITZ:  None, Your Honor.

1          THE COURT:  Okay.  We'll make that change and have that

2     ready to go.

3          I'll go make the changes we discussed to the verdict form

4     and the final jury instructions, and we'll have printed, signed

5     versions available for the parties during closing arguments.

6          Anything else we need to talk about before you take some

7     lunch and get ready for your closings?

8          MR. DEE:  So 1 o'clock, and then we're going to go

9     right in -- no, you read the instructions first.

10          THE COURT:  Correct.  I read all but the final

11     instruction, and then once you're done with closings, I'll go

12     over the final instruction and the verdict form.  You're welcome

13     to use, during your closing arguments, any of the jury

14     instructions and verdict forms.

15          MR. DEE:  Thank you.

16          MR. LILLWITZ:  One question quickly, Your Honor.  On

17     the Rule 50 motions, would you like those combined or separate

18     for purposes of ruling?  Does it matter to you?

19          THE COURT:  However it makes sense to you is fine with

20     me.

21          MR. LILLWITZ:  Okay.  Thank you, Your Honor.

22          MR. DEE:  Can we stay in here during lunch and work?

23          THE COURT:  Yeah.  That's fine.  Yeah.

24          MR. DEE:  Okay.  Sorry, Kyle.

25          THE COURT:  Are both of you planning to stay in here?

1          MR. LILLWITZ:  I can do whatever.  I don't care.  It

2   doesn't matter to me either way.  If we want to work in here,

3   that's probably more convenient, but yeah.

4          THE COURT:  As long as both of you are in here, then

5   that allows Mr. Chrismer and Ms. Mulcahy to leave the courtroom.

6          MR. LILLWITZ:  Oh, that's fine.  Yes.  We can do that.

7   Thank you.

8          THE COURT:  Okay.

9          (Recess at 12:14 p.m. until 1:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        AFTERNOON SESSION (1:00 p.m.)

2           (In open court, out of the presence of the jury.)

3           THE COURT:  Which one of you is doing closing?

4           MS. ALESCH:  Mr. Dee.

5           THE COURT:  He doesn't let you do anything fun.

6           MS. ALESCH:  Maybe next year, Judge.

7           THE COURT:  Don't threaten me.

8        (In open court, in the presence of the jury.)

9           THE COURT:  Welcome back.  Everyone can be seated.

10      Ladies and gentlemen, I am going to go over some final jury

11   instructions with you shortly here.  Mr. Chrismer is going to

12   bring you a copy.  While he's doing that, you can go ahead and

13   tuck your notebooks away since you've heard all the evidence in

14   the case.  You will have your notebooks with you when you do

15   your deliberations.

16      Just as with the preliminary jury instructions, I am

17   required to read these to you, so as soon as you each have your

18   copy, I'll start that process.

19        (The jury was duly instructed.)

20           THE COURT:  I'll go over the last instruction with you,

21   along with the verdict form, after the parties have had a chance

22   to make their closing arguments in this case.

23      Mr. Dee, would you like to present closing arguments on

24   behalf of the plaintiff?

25           MR. DEE:  Thank you, Your Honor.

1          THE COURT:  Do you want any kind of warning system as

2     far as your time?

3          MR. DEE:  Yeah.  I'll do 20 minutes now and then maybe

4     we'll stick with the two-minute warning, perhaps.

5          THE COURT:  Okay.

6          MR. DEE:  Thank you.

7       Okay.  So good afternoon, everyone.  Just so you kind of

8     know this process, Mr. Lillwitz and I each get a half an hour

9     for our closing, but the plaintiff, according to the rules, gets

10    a chance to do a rebuttal, so that comes out of my 30.  So I'm

11    going to talk to you now for 20 minutes, Tim Lillwitz will talk

12    to you, and then I'll reserve 10 minutes, so, unfortunately,

13    you're going to hear from me twice.

14         So you've got three claims to decide, as you heard from

15    what the judge just read to you:  breach of contract, tortious

16    interference, and the Muhammad Ali Act.  The breach of contract

17    claim is just against Greg Cohen Promotions because that's the

18    party to the contract, and the other two are against both.

19         You've heard the case.  You've heard all the evidence.  The

20    good news is it only took a little over two days to come in, so

21    hopefully it's still relatively fresh.  And I'm not going to

22    spend a lot of time up here rehashing what everybody said for

23    the last two days because you've got that down.

24         But I think it's a fairly straightforward situation for

25    you, and the question for yourselves when you get into your

1   deliberations is who are you going to reward in this thing and

2   who do you believe.  Those are -- the second one is the

3   quintessential function of the jury, who do you believe in these

4   things, and then who are you going to reward for all of this.

5       If you look at -- I'm not going to put it up here, but

6   Instruction No. 3, take a look at that when you start thinking

7   about this.  It gives you some guidance on who the -- on dealing

8   with credibility of witnesses.

9       We've got up here on the screen a summary that we did of

10  what I would suggest are the critical dates that we've been

11  talking about for the last two days.  I'm not going to go

12  through each one of them, but you can see it starts with when

13  Mladen won the heavyweight championship of Canada on December

14  1st of 2017.

15      And then in 2018, you've got the contract being signed,

16  canceled bout, the actual one that took place with Fulton.

17      2019, you've got the three fights.  You've got some of

18  the -- you know, Mr. Cohen's issues that he was dealing with

19  listed in there.  Note the September 14th against -- the

20  supposed fight against Damion Reed, the one that didn't -- not

21  supposed, but the fight that didn't go through, didn't happen.

22  Mladen returning to Canada on roughly October 2nd.

23      And then into 2020, you know, the discussions about

24  possibly fighting this Manuel Charr in January, Mladen's return

25  to Vegas on January 2nd after his visa had gotten straightened

1  out.

2      And then the three dates, you know, when Mladen sends the

3  email, then he sends the 30-day -- well, no.  Excuse me.  May

4  21st is when he sent the 30-day notice of termination, and then

5  June 19th, Mr. Cohen responds through his lawyer, and then on

6  June 21st, the actual termination of the contract.

7      Hopefully that helps a little bit.  I know -- and I'm

8  responsible for this as the lead person on our team for the way

9  that the evidence comes in, and I know it was scattershot, and I

10  know it wasn't necessarily all chronological, and so that's on

11  me.  But we wanted to give you at least a look at this, at least

12  a very simplified version of some of the events involved here.

13      Let me talk to you first about the breach of contract

14  claim.  Let's look at Exhibit 2 really quick.

15      The breach of contract claim, obviously, is Exhibit 2, the

16  contract.  And the two bases of the breach are both in paragraph

17  3.  And the first sentence talks about the promoter using

18  reasonable efforts to promote bouts that are commensurate with

19  the boxer's level of ability, ranking, stature in the boxing

20  industry and marketability.  And then that's one basis of the

21  breach.

22      As you've heard, you know that the four fights that Cohen

23  got for Mladen were not up to Mladen's -- they weren't suitable.

24  We've been using the shorthand "suitable."

25      Then the second basis of the breach that we've alleged is

1  there weren't four bouts in the calendar year.  Obviously,

2  because of when the contract was signed and when it was

3  terminated, we're only talking about October -- excuse me --

4  we're only talking about 2019, which you'll recall in the

5  preliminary instructions the judge gave you Monday morning, it

6  talked about 2019 being the year involved.

7      So it's undisputed there were only three fights in '19.

8  And, I mean, I don't know what else I can get into on that.  I

9  mean, the contract does not say, you know, fights that might

10 have taken place, that got canceled at the last minute, none of

11 that.  They have to have actually taken place.

12     Now, we'll talk in a little bit about the issue of Ruann

13 Visser and whether or not that was a reasonable decision not

14 to -- for Mladen not to take that fight.

15     But think about this:  If you decide that any one, if not

16 all three, but if you decide that any one of those fights that

17 Mladen had in 2019 against those three guys was unsuitable, did

18 not meet that language, commensurate with Mladen's level of

19 ability, ranking, stature, et cetera, you don't even have to

20 consider the Ruann Visser situation because you're not going to

21 get to four fights.

22     The only way that that contract is complied with is if you

23 find that all three of the guys Mladen fought in 2019 were

24 suitable, you know, commensurate with -- the commensurate

25 language there, and that Mladen's decision not to fight Ruann

1  Visser on October 19th was unreasonable.  That's the only way

2  that that contract is complied with.

3      So, I mean, I don't know if you -- you know, obviously, I

4  don't know what you're all thinking about all that, but I wanted

5  to give you a little heads-up that even if you decide that one

6  of those fights was not suitable, you don't even have to spend

7  your time talking about whether or not the Ruann Visser fight

8  was reasonable.  That is breached.  The four fights have not

9  been met.  The four suitable fights have not been met.

10     I'm going to put up Instruction No. 9 that Judge Rose just

11  gave you that lays out the two bases of the breach of contract.

12  You don't have to find both.  You don't have to find that both

13  of these things were breached.  Either one of them is

14  sufficient.

15     If you find that there weren't four fights, four bouts in

16  the calendar year, breach.  If you find that even if there were

17  three and an unreasonable refusal but that they're not suitable,

18  breach.  You don't have to find both.  You don't have to find

19  both.

20     Yeah.  So on the suitability issue, I mean, you've heard

21  the story.  Three guys -- and, you know, God bless them.  They

22  are in a brutal sport trying to make a living.  And nobody is

23  here to criticize, you know, these fighters as men and athletes,

24  but they were not suitable for Mladen.  They have three of them

25  in their forties.  One of them was 38 or 39.  One of the guys in

1    his forties was 3-3 -- or 3-3-1, which makes you wonder when he

2    started boxing.

3         But anyway, more to the point is, on the suitability issue,

4    we saw -- you heard evidence that Mladen's ranking, his

5    objective ranking, done primarily by BoxRec, which you heard is

6    a computer-generated ranking -- it's not the politics and the

7    lobbying and the payoffs that go into, as Mr. Cohen said, every

8    single sanctioning body's ranking system.  It's not like that.

9         On BoxRec, you know, you heard Mladen, you heard Jim Thomas

10   and Scott Shaffer, who have been in the boxing industry for,

11   each of them, over 20 years, 25 years, and they said, yeah, it

12   tanked.  That's not right.  You go undefeated in four fights and

13   you go from 35th in the world to 105th, thereabouts.  I may be

14   off a couple digits on the number.  That goes to show you they

15   weren't suitable.  Doesn't it show you?

16        Let's see Exhibit 9 real quick.

17        Here's what -- not only do you have the people sitting here

18   like Mr. Thomas and Mr. Shaffer saying this, but this article,

19   Exhibit 9, take a look at this when you get back into the jury

20   room, if you would, please, and read this article closely.

21        This is an objective analysis, an objective opinion about

22   how in the world Mladen got to be ranked 14th by the WBA when

23   he's fighting -- they name his four fights here:  Chavers,

24   Greer, Carter, and Fulton.  They're like, "There's no way."

25        "Quite unreal" is the bottom.  Let's be clear.  These

1  fights give him now a shot at some title.  But read the whole

2  article.  I mean, read the whole article.  It is an objective

3  criticism of the people that Mladen is fighting.  It's also a

4  criticism of the WBA, frankly, let's face it.  The point of the

5  article is what in the world is Mladen doing ranked 14th in the

6  world with the opponents he's had.

7       And one other thing.  You know, we had Jim Thomas come in

8  here and testify based on his experience about the quality of

9  these four guys, the suitability of these four guys who Mladen

10  fought, and, you know, then Scott Shaffer talked about the

11  damages numbers.

12       But they both had occasion in their testimony to talk about

13  the fact that these guys were not suitable based on Mladen,

14  based on where Mladen was in his career, what he had

15  accomplished, his age, his size, his -- you know, his ability to

16  knock these guys out, all three of them -- and then, you know,

17  Mladen's father, who clearly is not objective, it's his father,

18  but who's been in the boxing business.

19       You've got all these people who came in here and testified

20  to you that these guys were not suitable for Mladen.  They were

21  not commensurate -- the commensurate language.

22       Who did Mr. Cohen bring in besides himself to counter that?

23  Where was Mr. Cohen's expert in the boxing industry to tell you

24  that they were absolutely perfectly fine?  No one.  They have

25  every right to call witnesses the same as the plaintiff does.

1  You draw your own conclusion as to why Mr. Cohen had to rely

2  only on himself to counter objective third parties who would

3  come in here and testify about the suitability of these things.

4       Okay.  Let's talk now a little bit about this tortious

5  interference.  Only lawyers can come up with a word like -- and

6  legislators can come up with a word like "tortious"

7  interference.

8       Jury instruction -- I'm using the ELMO a little bit here so

9  I'm going to get my legwork in here.

10      Can we switch over to this, Kyle.

11      So Instruction No. 12, which you have, is the -- are what's

12  called the elements for the tortious interference claim.  And

13  there are elements for each of the causes of action, the breach

14  of contract and all that, too, and so I will walk you through,

15  if you can get it down far enough.

16      Well, number Five at the bottom just says damages.

17      So number One at the top there, Mladen had an existing

18  contract or a prospective business relationship.  What we're

19  talking about here in this is not some other contract he had.

20  We are talking about the prospects of having a business

21  relationship with another promoter, prospective promoters he

22  could have worked with, like the Queensberry people in Exhibit

23  1, who wanted to sign him, who, but for Mr. Cohen's

24  interference, would have done so.

25      So Mladen -- you heard testimony Mladen talked to promoters

1   all over Canada.  He had the Queensberry offer.  He had

2   prospective promoter business relationships in issue one, in

3   element number one.

4        And he's got this Lee Baxter.  You heard all about

5   Mr. Baxter up in Canada.  Mr. Baxter is apparently ready to sign

6   on with Mladen but not until this lawsuit is done.  And we'll

7   get into that in a moment.  So I guess without a lawsuit, we'd

8   have Mr. Baxter on as a promoter, but not at this point.

9        So then the second one, Greg Cohen Promotions and Cohen

10  knew of the existing contract and the prospective relationships.

11  Yeah.  You've seen those exhibits.  We've got exhibits.  If you

12  remember the letter -- it's Exhibit 6.  We don't have to put

13  that up right now, but Exhibit 6 is the email that Mr. Cohen

14  sent Mladen in September of '20 that said -- it was about

15  three-quarters of the way down the paragraph, and it said I'm

16  going to enforce this agreement, you're still my fighter, and

17  I'm going to file injunctions, and all these other things.  He

18  knew about it.

19       And you've seen we've got emails and texts with this Sal

20  Jobe, the guy -- that's how Mladen says you pronounce the name.

21  But the guy in Great Britain who was trying to set him up with

22  the Queensberry people.  We've got direct communications with

23  Mr. Cohen.  And then you heard Mladen's testimony that Mr. Cohen

24  has been contacting Lee Baxter.

25       Now, here's the situation where I got to ask the question

1   again:  Who do you believe?  Mr. Cohen says, "No, I haven't

2   contacted him."  Mladen's sitting there saying, "Yeah, Greg's

3   been contacting him for months, which is why he won't sign on as

4   my promoter until this lawsuit is over."  Who do you believe?

5   Who gets the benefit of the doubt from you?

6        The third element, Greg Cohen Promotions intentionally and

7   Greg Cohen intentionally interfered with the relationship, the

8   prospective relationship, by, among other things, contacting the

9   individuals, threatening litigation, falsely representing that

10  the promotional agreement was still in place.

11       The other aspect of this intentional interference is what

12  you heard about the lawsuit, the counterclaims that he filed.

13  They had a counterclaim in place until a week ago.  And these

14  are all public documents that people -- you know, people who

15  know how to search court records can get at that said, "I am

16  still Mladen's promoter.  He's still subject to my contract."

17  And that was a public document that had been in place for the

18  last three years.

19       Now, all the sudden, before trial, when they get a chance

20  to come in here and prove that that's the case, they drop it the

21  week before trial?  You all decide why you think that happened.

22  I would suggest to you that the reason it happened is because

23  that counterclaim has been out there for the last three years so

24  that Mladen had to disclose to everybody who asked him that he's

25  got a lawsuit, that his promoter is suing him because his

1   promoter says he's still his boxer.

2       Because if they really believed -- if he really, really

3   believed what he filed in this lawsuit, we'd have counterclaims

4   that you would have heard about here these last two days.  But

5   no.  No, no.  That's all part of the interference that took

6   place here.

7       The fourth element, the interference caused individuals in

8   the industry not to enter into relationships, we've already

9   talked about that.  I think you've heard that evidence.

10          THE COURT:  And you're at 18 minutes.

11          MR. DEE:  Okay.  Let me get to the Muhammad Ali Act,

12  then, with my two-minute warning.  The Muhammad Ali Act

13  instructions are primarily Nos. 20 and 21.  And it's the same

14  kind of thing here.  It's got elements like the other -- like

15  the tortious interference does, but these are in a slightly

16  different format here.

17      So the Muhammad Ali Act -- I pulled part of it down too

18  far.  The issue with the Muhammad Ali Act is that, you know,

19  it's clear Mladen says he never got told what his payment would

20  be for any of the fights.  Cohen says he told him.  At the risk

21  of being redundant, who do you believe?  Who gets your benefit

22  of the doubt about what really happened, first question.

23      Second of all, then, now, here's the hard one.  You heard

24  Mr. Cohen testify this morning, "I never got paid for any of the

25  fights that I put Mladen in, none of them."  And remember my

1   question, like that's -- that's not a very good business

2   practice.  But his testimony to you is, "I never got paid.  I

3   didn't get paid anything for these fights."  I mean, obviously,

4   he's got the expenses that he has to cover that every promoter

5   covers, but he says to you, "I didn't get paid for any of these

6   fights."

7        You have to decide whether you believe him.  That's all

8   there is to it on this Muhammad Ali Act.  You have to decide

9   whether or not you believe him.  Is that realistic?  Do you

10  bring a promoter or an act to a show for free as the promoter?

11  Maybe you do.  Maybe you do.  But do you do it time after time

12  after time, four times, and -- you know, once in '18 and three

13  times in '19?  You have to decide whether or not that's the

14  case.

15       I suggest to you that it is incredibly unbelievable, has no

16  credibility, and is completely self-serving testimony by

17  Mr. Cohen.  It's ultimately your call.  You have to make that

18  decision.

19       Assuming you find that, in fact, that's not believable and

20  that there was -- that Mr. Cohen did -- that it's unbelievable

21  that he was not paid or got some kind of compensation or

22  consideration for these fights he had, then I think the rest of

23  the analysis on the Muhammad Ali Act, with, like I said,

24  Instructions 20 and 21, you know, you can work through.  It's

25  fairly easy to do.

1      All right.  I will sit down, and I will get up -- and just

2  to give you a preview, when I get up the last ten minutes, I'm

3  going to talk to you actually about some of the money, the

4  monetary damages kind of stuff that Mr. Shaffer mentioned

5  yesterday and maybe walk you through some numbers.

6      Thank you all.

7          THE COURT:  All right.  Mr. Lillwitz.

8          MR. LILLWITZ:  Thank you, Your Honor.

9          THE COURT:  Do you want any kind of warning,

10  Mr. Lillwitz?

11          MR. LILLWITZ:  Two minutes is fine.  I don't think I'll

12  get there, but two minutes is fine.

13          THE COURT:  All right.

14          MR. LILLWITZ:  If I get there, yell at me.

15      May it please the Court.

16      Counsel.

17      Ladies and gentlemen of the jury, last time I get to talk

18  to you this week.  So I know I told you this at the beginning of

19  the week, but I do really mean thank you so much for sitting

20  through.  I know it was only three days, but believe it or not,

21  lawyers watch you guys when we try cases, and I know you were

22  all paying close attention and listening to the evidence, and I

23  really appreciate that and my client appreciates that.

24      So like Mr. Dee said, we were kind of a little scattershot,

25  so I've done my best to sort of coordinate a logical analysis of

1   what the exhibits were, what the evidence was.  We're going to

2   go through that right now.

3       Remember in my opening, I brought up Occam's razor, the two

4   stories.  And you heard two very, very, very different stories

5   in the last three days.  Which one requires the fewest

6   assumptions?  How are you guys going to solve the problem?

7       And I want to add one other little theme, and I just

8   thought of it last night because I went home, and my 12-year-old

9   son was texting me because I came home very late.  And

10  12-year-olds now text in, like, some sort of code, right?  I

11  don't even know what they say.  It's always like, oh, you bet,

12  you got -- they don't even speak English half the time.

13      But it reminded me of whenever I challenge him -- whenever,

14  you know, he hits his sister or doesn't do his chores or

15  something, he challenges me, he says, "Bring the receipts, Dad."

16  Apparently there's some sort of meme out there that says "Bring

17  the receipts."  And it means, "Prove it, Dad.  Prove it."  And

18  so I want you to think, and I'll use that phrase a couple more

19  times in the next 15, 20 minutes, who brought the receipts this

20  week.  Which party brought the receipts with them to prove their

21  case?

22      And the most obvious example just occurred this morning.

23  Mr. Dee on cross-examination with my client said, "Where are all

24  the documents for the Visser fight?"  Remember that?  "Where are

25  all those documents?"

1        Okay.  I put the document in front of my client.  What is

2   this?  It's the Visser contract.  Plaintiff doesn't want to see

3   it.  Who brought the receipts?  Defendants brought the receipts

4   in this case, ladies and gentlemen of the jury.

5        Remember -- and I don't want to belabor this point because

6   I know jurors hate it.  You guys are smart people, you

7   understand what a burden of proof is, but one thing I do want to

8   point out to you is Jury Instruction No. 4.

9        And, Kyle.

10       This is Jury Instruction No. 4.  I'm not going to sit there

11  and read it to you, but as you can tell, the burden of proof is

12  on the plaintiff in this case, ladies and gentlemen.  It's not

13  50-50.  If you think we both brought the same amount of

14  evidence, if you think, you know, they're both not telling the

15  truth, we don't know what's going on, they haven't proven their

16  case.  They've got to prove their case by a preponderance of the

17  evidence, more than 50 percent.

18       So what claims are they trying to prove?  They're trying to

19  prove a breach of contract claim, a tortious interference.  As

20  Mr. Dee said, it's sort of a hard tongue twister to say, but

21  essentially an interference with the contract claim.  And then

22  the violation of the Muhammad Ali Act.

23       I'll start in reverse order.  The violation of the Muhammad

24  Ali Act is really, really simple.  I mean, really simple.

25  Plaintiff brought in Mr. Thompson, who was a super nice guy, to

1   explain the boxing world to you.  And it sounds like he's had an

2   awesome life representing Evander Holyfield.  That would be

3   really fun.

4        But it had an interesting history, right?  It's a boxing

5   act to protect fighters so they know what's going on and they

6   don't get, you know, screwed over by other people in the boxing

7   industry.

8        I want you to read very carefully, when you go back -- in

9   your jury instructions, I want you to read Instruction No. 20.

10  Instruction No. 20 is the one that says "Essentials For

11  Recovery" of the Muhammed Ali Boxing Reform Act.

12       Number One, I'll submit to you Number One is undisputed.

13  Yep, Greg Cohen, acting through Greg Cohen Promotions, was

14  serving as a promoter, right?  No one disputes.

15       Unfortunately for Plaintiff, number Two is also undisputed

16  in this case.  "Greg Cohen, acting by and through Greg Cohen

17  Promotions, received compensation directly or indirectly in

18  connection with a boxing match before providing to Mladen Miljas

19  the following," and then it goes on.

20       GCP has to receive compensation for these fights for it to

21  be a violation of the Muhammad Ali Act.  And, of course, that

22  makes sense, ladies and gentlemen.  If you heard Mr. Thomas say

23  it, if the promoter is going to take -- say there's a purse of

24  $100,000.  If the promoter is going to take $90,000 of it, the

25  boxer's got to know, right?  What's Mladen fighting for in this

1    case?  He's fighting for the $2,000 it talks about in his

2    contract.

3           THE COURT:  Ms. Beveridge, you're not taking notes, are

4    you?

5           JUROR BEVERIDGE:  We're not allowed?

6           THE COURT:  You're not allowed to take notes during --

7    no.  That's why I told you to put your notebook away.

8           JUROR JOHNSON:  I was too.

9           THE COURT:  No.  Can't take any notes.  Closing

10   arguments aren't evidence, so you can't take notes, okay?

11          JUROR JOHNSON:  Sorry.

12          THE COURT:  Go ahead, Mr. Lillwitz.

13          MR. LILLWITZ:  No, Your Honor.  I appreciate that.

14       So the Muhammed Ali, it's there for a purpose.  Mr. Miljas

15   is fighting for $2,000.  There's no bigger purse in these fights

16   that Mr. Cohen -- or Greg Cohen Promotions, I should say, is

17   taking anything from.  So there's no violation of the Muhammed

18   Ali Boxing Act.  After number Two, you're done.

19       The next claim.  And this is where I'm going to need my --

20   Kyle, can you turn it to my computer.

21       Oh, perfect.  It comes up.  And I hope this little clicker

22   thing works.

23       This is the interference -- the interference claim.  And,

24   again, I'd submit to you this is another fairly easy thing for

25   you to resolve in your deliberations.

1          This is Exhibit 26, page 2.  It's one of the examples that

2     the plaintiff talked about in what Mr. Cohen was doing -- oh,

3     that doesn't show up on the screen.  That's interesting.

4     Anyway -- my pointer doesn't work -- what he was doing in

5     September of 2020.

6          What he's doing, as he says there in that last paragraph,

7     his contract with Mr. Miljas isn't being honored.  What do you

8     do when someone's not honoring a contract with you, right?  You

9     defend yourself.  You tell others, "This person is not honoring

10    my contract."  That's exactly what he's doing.  There were other

11    examples you saw that the Sal Jobe text -- feel free.  I think

12    it's -- I want to say it's Exhibit 12.  But you can go through.

13    Go through those.  They'll be in your exhibit binder.

14         You heard Mr. Cohen's testimony this morning.  He had a

15    contract with Mr. Miljas.  He believed not Greg Cohen

16    Promotions, but Mladen Miljas violated that contract.  He

17    believed it in September of 2020.  He believed it when

18    Mr. Miljas brought suit against GCP and him, right, which is why

19    he filed a counterclaim.  He still believes it to this day.

20         Now, the suggestion that this counterclaim being on file is

21    somehow some wrongful act by a party that prevents others from

22    doing so, you -- I don't know how many lawsuits you heard about

23    in the boxing industry today.  Just in this case, there was

24    probably 20 or 30 that were mentioned.  Half the boxing industry

25    is suing each other, right?

1    How is a lawsuit preventing a promoter who thinks Mladen

2  Miljas is going to make him money from signing that promoter?

3  Mr. Miljas was not under any restriction, any restriction

4  whatsoever, from signing with another promoter.

5    In fact, Mr. Dee mentioned in his statement just now that

6  because of the counterclaim, Mr. Miljas couldn't sign with

7  anyone.  Your Preliminary Jury Instruction No. 2, when the Court

8  was explaining the nature of the case --

9    Thank you, Kyle.  Sorry.  I forgot to ask.

10    "The parties dispute whether the promotional agreement was

11  properly terminated; however, even without termination for

12  cause, the promotional agreement has long since expired, and

13  Mladen no longer owes exclusivity to Cohen Promotions."  He

14  hasn't owed exclusivity since -- again, since the contract ran

15  out, and certainly since the injunction you heard about on May

16  1st of 2021.

17    Again, what receipts, what receipts did Plaintiff bring you

18  to show you that Mr. Cohen was doing something so wrongful and

19  improper?

20    And I want to point out one more jury instruction while I'm

21  here, and it's Jury Instruction 17.  It talks about how to

22  determine whether something's proper or improper under the law

23  when it comes to an interference claim.

24    Let's see.  I'll zoom it out a little bit.

25    It's 17.  It gives you factors, right, factors to consider

1    about whether something was improper or not.  "You should

2    consider whether the conduct was fair and reasonable under the

3    circumstances," and then gives you all these.

4         I'd submit to you that what Mr. Cohen was doing on behalf

5    of GCP was more than fair and reasonable.  It was, "Hey, this

6    guy breached our contract.  He can't get away with it."

7         So I think the tortious interference claim, again, is an

8    easy decision for you once you go through the instructions and

9    once you deliberate.

10        Now I want to talk a little bit about the breach of

11   contract claim.  This one, of course, is where the timeline

12   comes in, and it gets a little bit messy because you saw the

13   promotional agreement.  It's 13 -- you know us lawyers like to

14   draft 15-page documents, right?

15        This is Exhibit CC in your book.  This was, you know, June

16   21st when he sent the official notice of termination.  Mladen's

17   words:  "After the recent months leading up until your

18   incarceration and since the beginning of our contract," since

19   the beginning of our contract, "I have had such displeasure of

20   dealing with you and your lack of care of my career.  You did

21   not respond...you are officially terminated and no longer have

22   any association with me."

23        What's the basis for Mr. Miljas' breach of contract?  It's

24   two things.  Did he have four fights, suitable fights, offered

25   to him in 2019?  Again, "suitable," I kind of combine them too,

1  but were all those fights suitable, right?  Those are the only

2  two issues we're dealing with.

3      It did work.  Perfect.

4      Paragraph 5 of the -- paragraphs 5 and 6, I should say, of

5  the promotional agreement.  It's all you need look at in terms

6  of which party was right when it comes to the four fights.

7  Again, these opponents, first, especially the first three in

8  2019, were opponents that Mladen Miljas agreed to voluntarily

9  over and over and over again, right?  And I'll come back to the

10  slide in a second.

11      What I want to start with is, again, the receipts motif

12  that I'm proffering here.  There were two exhibits in the entire

13  case, two exhibits, where Mladen Miljas expressed his

14  displeasure.  This is Exhibit 21.  It's page 3, Exhibit 21.

15  It's December of 2018.

16      And Exhibit 21 is multiple pages.  You guys can look it up.

17  Mr. Cohen, remember, he's on vacation.  He immediately responds

18  to this.  He says, "Hey, I'm sorry.  Here's what we've got

19  planned to the start of 2019, here's what we're going to do,"

20  and Mladen apologizes, "You're right, you're right.  Okay.

21  Let's do that."

22      The only other exhibit in the entire -- in the entire book

23  of exhibits that you're going to get is Exhibit 14.  March of

24  2020, Mr. Cohen's already reported for his prison sentence.

25  "Hey Greg I am reaching out to you."  I haven't been satisfied

1   with my fights during both years of our contract.  I've never

2   been satisfied with any of our fights, right, since I started

3   fighting with you.  I haven't received the contractual number,

4   I'm terminating the contract, essentially, is what it says.

5        Those are Plaintiff's two receipts saying that during the

6   entire contract, he wasn't happy.

7        What did Defendants bring to you?  Exhibit 14, March of

8   2020, right after the Matthew Greer fight.  "My man.  Sir, I

9   can't wait to" -- "I appreciate you.  I can't wait to get back

10  fighting."

11       Any suggestion that Mladen's unhappy with the Matthew Greer

12  fight?  This is the night of the fight.

13       Exhibit C, right, the next month, Mladen's moving to Vegas.

14  "How are things for you?

15       "Things are" -- you know, "Things are awesome.  This is

16  going great.  I'm so excited to be in Vegas."

17       No suggestion he's unhappy.

18       Exhibit D, a couple days later.  Greg Cohen, who doesn't

19  care, of course, according to Mladen, doesn't care about him at

20  all, checking in on him again.  "Are you okay in Vegas?  Are you

21  okay?  I've set you up with a world-renowned trainer.  I've set

22  you up with a manager who is going to look out for you.

23       "Yes.  I'm so excited.  This is great.  Everything is

24  great."

25       Another one a few days later, again, Mr. Cohen checking in

 1   with Mr. Miljas, yet Mr. Miljas is the one in this case bringing

 2   a lawsuit about how he wasn't being cared for.

 3        The photograph.  You heard Mladen's testimony.  He doesn't

 4   even remember meeting Greg Cohen.  There's a photograph of him

 5   in June of 2019 from a casino in Las Vegas with his two

 6   promoters, and he doesn't even remember it.

 7        By the way, in that last -- related to that last

 8   photograph, he spent a couple hours with Mr. Cohen.  Never

 9   mentioned to him that he was unhappy with any of the fights that

10   he'd had in his contract until then.

11        Late June, this is Exhibit 23.  We'll move through these

12   pretty quick.

13        Exhibit H, still training on his own, no complaints.

14        Exhibit R, later in 2019 -- we'll get to the Visser fight

15   in a second and all that happened, but this is the end of 2019,

16   after Mr. Cohen and him had a conversation about Mr. Cohen's

17   criminal sentencing.  Look at the very bottom from Mladen,

18   "Absolutely me too nothing has changed!!"

19        If there was ever a time for Mladen to stand up and say,

20   "I'm firing you, you lying SOB.  You're going to prison."

21   Nothing's changed.  That was the last one I showed before.

22        That's at least eight different times in 2019 that Mladen's

23   texting to Mr. Cohen.  He's undoubtedly happy.  He's pleased

24   with everything.  He never brings up how his career is

25   apparently going into ruins.  Who brought the receipts in this

1   case?

2       Let's talk about the Visser right really quick.  So, again,

3   I mentioned four fights in 2019, right?  We got the fight on

4   January 18th, the Greer fight on March 2nd, the Chavers fight on

5   August 19th.  Those are three that actually happened.  None of

6   those opponents did Mr. Miljas ever say, "I don't want to fight

7   those.  Those are unsuitable for me.  There's no way I'm

8   stepping in the ring with these guys."

9       And Mr. Miljas apparently has a very good ability to recite

10  BoxRec's statistics.  He talked about them all on the stand.  He

11  can do the research himself too.  Mr. Cohen told you exactly why

12  these people who he was fighting were good for his career.

13  These guys were experienced fighters.  Some of them had fought

14  heavyweight champions of the world in prior fights, right?  They

15  can -- Mladen can use these guys for experience in the fights

16  he's going to have to have in the future to make both his career

17  and GCP successful, right?

18      GCP is buying on the come.  That's what you do in this

19  industry.  You get young talent, you sign them up, and you get

20  them in the big fights.  So these are three fights.

21      The Visser fight, again, undisputed there was a phone call.

22  Both Mladen and Mr. Cohen testified there's a phone call

23  sometime in the last couple days of September about the Visser

24  fight.  No dispute that it was Visser who he was fighting.  No

25  dispute that it was communicated it was on October 19th.

1      And there's no dispute that Mladen wanted to fight Visser.

2  So the opponent is not unsuitable.  The opponent's very suitable

3  to Mladen, right?  What does Mladen complain about?  Can't fight

4  him in three weeks.  "I'm in Canada," right?

5      Paragraph 5, "Boxer shall box in and otherwise engage in

6  the bouts arranged by Promoter.  Such bouts shall be on such

7  dates and at such sites as determined in the sole and absolute

8  discretion of Promoter and against such opponents as mutually

9  agreed upon by Boxer and Promoter."

10      The only mutual agreement has to be about the opponent.

11  That was already mutually agreed.  Greg Cohen Promotions has the

12  sole and absolute discretion to pick that date.

13      Now, you heard some testimony, I think it was Mr. Thomas,

14  oh, well, they can just pick any date, right, the next date?

15  Well, no.  Of course, it has to be reasonable, right?  This was

16  three weeks off.  This was hey, you're in shape from your last

17  fight, let's go get this guy, right?

18      And remember, this was a contract that Mladen negotiated

19  with Mr. Cohen for months with his attorney, and they agreed to

20  the sole and absolute discretion of the promoter on the dates.

21  But Mladen rejects the Visser fight.

22      And, again, if you read through 6, like Mr. Dee read

23  through with you, if Mladen unreasonably rejects the Visser

24  fight, that's the fourth bout in 2019.  That's what the contract

25  says.  He can't unreasonably reject a bout and have it not

1  count.  So we've got the three bouts that occurred and we've got

2  the Visser fight, four bouts in 2019.

3      Another easy resolution to the breach of contract issue,

4  ladies and gentlemen of the jury, the jury instructions with the

5  elements of breach of contract -- excuse me, wrong one.

6      Thank you, Kyle.

7      This is Instruction No. 8, but it lays out one, two, three.

8  Number Two, "Mladen Miljas performed his obligations under the

9  terms of the promotional agreement."  As I just explained to

10  you, he didn't.  He didn't perform his obligations under

11  paragraph 5 because he didn't let Mr. Cohen, in his sole and

12  absolute discretion, pick the date for the Visser fight.  So

13  without proving that Mladen Miljas performed his obligations, he

14  can't recover under the breach of contract claim.

15      Now, ladies and gentlemen, this is my personal favorite,

16  because I -- can you go back to my slide show, Kyle.

17      I'll tell you I spent a lot of time on this last night, on

18  this slide.  That slide, that's the receipts that the plaintiffs

19  brought for their damages, right?

20      You heard their damages expert, Mr. Shaffer.  First of all,

21  Plaintiff is paying two guys $1100 an hour combined to sit in

22  here and tell you how much he's been damaged, over a million

23  dollars.

24      Mr. Shaffer's testimony, he's been retained as an expert in

25  this case, yet he has such an axe to grind with Mr. Cohen that

1    months later he's giving -- he's giving statements to reporters

2    about how Mr. Cohen's doing other things that he thinks are

3    illegal.  Remember that testimony?

4         Because, of course, he's completely unbiased, he's going to

5    tell you like it is, right, how the facts are?  Yet outside of

6    this courtroom, he wants to just -- he wants to -- he's got such

7    an axe to grind with Mr. Cohen, apparently.  I have no idea why,

8    but he apparently doesn't like him.

9         Do you remember his testimony as well?  I think he said it

10   while laughing, actually.  He said, "Oh, I'm not speculating."

11   He was laughing at the time he said it.  Probably because he

12   knows yes, you are.  That's exactly what you're doing.

13        He was giving -- I think he even uttered another phrase

14   like "This is my best guess."  This is their damages expert.

15   They want millions of dollars from you based on a guy that's

16   guessing and speculating.

17        He brings up nine other fighters.  He can't even list them

18   all for you.  Where are the exhibits that show you how he was

19   doing his calculation?  He's literally rattling off numbers into

20   a microphone that anyone could have done.  Where is his

21   analysis?  Where are the profiles of the fighters that he was

22   using to compare to Mladen Miljas to say, "Yes, Mladen is just

23   like this guy.  Here's what this guy is making"?  This is

24   completely reasonable.

25        He's giving you the names of people you've never heard of.

1  Joe Smith?  I mean, who knows?  I think one of them was a

2  heavyweight champion of the world at one point.  That's their

3  damages receipts.

4      I'll submit to you Defendants believe Mr. Shaffer's

5  testimony is just completely unreliable.  Think of it this way:

6  It's undisputed Mladen was making $2,000 a fight in 2019.  A

7  contract he negotiated, he was making $2,000 a fight.  He

8  voluntarily negotiated that, signed it.

9      And Scott Shaffer came in here and testified to you that,

10  nope, if he would have gotten out from Greg Cohen Promotions, he

11  would have immediately been making 334,000 to 500,000 dollars a

12  year.  In what world does that make any sense?

13      You also heard testimony about, oh, Mladen's lost his

14  Canadian heavyweight title.  Did you catch the numbers that we

15  went through?  So he started before Mr. Cohen's -- before Greg

16  Cohen Promotions' promotion of him under the agreement, he was

17  ranked No. 2 in Canada, right?  Remember that?  Today he's

18  ranked No. 3 out of five or six heavyweights in Canada, less

19  than one percent of the entire world.

20      And apparently -- oh, by the way, there's the WBA rank

21  that, of course, Plaintiff wants to just tell you is completely

22  worthless, yet it's one of only four belts, titles that they

23  actually give out in boxing.  They keep relying on BoxRec.

24  BoxRec is a website.  It's like baseballreference.com, which I

25  know I've used to check up on baseball players.  BoxRec doesn't

1   have a belt.  Whether you're ranked No. 1 or 10 on BoxRec makes

2   no difference in the world -- in the boxing world.

3        Did you also hear the testimony that apparently Mr. Cohen's

4   actions were so damaging to Mladen that upon Mladen terminating

5   the contract, less than three months later, some other promoter

6   wants to offer him fights for the first year of $169,000?

7        Again, Mladen's coming into the contract with Mr. Cohen

8   fighting for 2,000 and probably has made no more than, you know,

9   20,000 bucks his entire boxing career, he terminates the

10  contract, some other guy wants to give him $169,000 a year?  Yet

11  it's Mr. Cohen who is devaluing Mladen?  How does that make any

12  sense?  You can't have damages when your value goes up.

13       And on the mitigation issue, ladies and gentlemen, remember

14  I told you in opening that date May 1st, 2021.  That's 22 months

15  ago.  And I actually told you to look for an exhibit.  And I

16  didn't know this was going to be the testimony because I thought

17  Mladen knew who he had fought down in South America.  But you

18  heard him.  Apparently he stepped into the ring with some guy he

19  didn't know who he was.  He had no idea what his record was,

20  didn't know if that was the right person.  He didn't get paid a

21  single cent for that fight.

22       So in 22 months he's fought once.  Again, 22 months under

23  which he's had no obligation to Greg Cohen Promotions.  That's

24  what the Court's instructed.  He's had no obligation to Greg

25  Cohen Promotions, and in 22 months he's fought once for zero

1  dollars, yet he wants over a million bucks from you for all

2  these damages.  Rather than continue his career and actually get

3  out there and fight, he'd rather sit back and hope that you give

4  him a bunch of money.

5      I want to comment just briefly, real quick, on the

6  individual liability.  They've made claims against Greg Cohen

7  Promotions and Greg Cohen individually, and you'll have separate

8  verdict forms when you get back there.  Please take the time to

9  read through them.  That's the law.  It's very important to read

10  through them.

11      I would submit to you there is absolutely no evidence in

12  this case that Greg Cohen, the individual, did anything.  We all

13  know how corporations work, right?  There's the -- and,

14  actually, I'll show it to you -- Preliminary Jury Instruction

15  No. 4.

16      Let's see.  There it is.

17      "Corporate Party and Agency."  And, of course, what this

18  tells you is a corporation, like Greg Cohen Promotions, LLC,

19  only acts and is bound through its members or agents, right?

20  What did all the evidence that you heard this week show you?

21  Every email that Mr. Cohen was sending had "Greg Cohen

22  Promotions" on the bottom of it.  The license, the promoter's

23  license, was in the name of Greg Cohen Promotions.

24          THE COURT:  And this is your two-minute warning.

25          MR. LILLWITZ:  Thank you, Your Honor.

1    I'd submit to you, ladies and gentlemen, when you read

2  through the instructions, there's absolutely no individual

3  liability on Mr. Cohen's behalf, and you should find

4  accordingly.

5    Now, in closing, ladies and gentlemen of the jury, remember

6  what I told you.  Plaintiff's theory in this case, and I

7  distinctly remember these exact words, their first and main

8  theory, is Mr. Cohen is a liar and a cheat.  That's the entire

9  theory of their case, right?

10    Sure, I guess I'll admit they brought a lot of receipts

11  trying to impeach him.  In fact, the first 30 minutes of

12  cross-examination this morning had nothing to do with this case,

13  right?  They weren't cross-examining him about the evidence in

14  this case, they were cross-examining him about things that

15  happened in, you know, past years in New York, in other

16  testimony he's given in other cases.

17    Why didn't they have questions for Mr. Cohen about this

18  case?  They didn't have questions for him because they didn't

19  bring their evidence here to prove to you their client has been

20  damaged and that Mr. Cohen did anything wrong.

21    Which story makes sense?  You guys are the problem solvers.

22  Which party brought the receipts for the last three days?

23    I just want to say thank you again.  It's been a pleasure

24  trying this case in front of you, and good luck in your

25  deliberations.

1    Thanks.

2         THE COURT:  Thank you, Mr. Lillwitz.

3    Mr. Dee, you still have 11 minutes left.

4         MR. DEE:  All right.  I'll see what I can do with that.

5    Okay.  I wouldn't be doing my job if I didn't react to a

6    couple of things that my friend and colleague, Mr. Lillwitz,

7    just said to you.

8         First of all, the exhibit with the June -- excuse me.  He

9    showed you the statement that said that the contract -- the

10   court order that the contract was terminated effective -- it

11   concluded effective in June of '21, which is the three years

12   when the contract ran.  Fine and dandy.  But he ignores the fact

13   that for the last -- since then, for the last almost two years,

14   year and a half, you know, Mr. Cohen has had this lawsuit out

15   there.

16        And I was remiss when I was going through the tortious

17   interference elements with you when I was up here the first time

18   in pointing out, in reminding you what Mladen said about every

19   single promoter he's talked to in the last 2 1/2, 3 years.  What

20   are the questions that every promoter first asks a fighter who

21   comes to them or they go to the fighter?  Do you have a criminal

22   record?  Can you travel?  Are you subject to a contract with

23   another promoter?  Are you involved in a lawsuit?

24        As long as they kept that bogus counterclaim in play in

25   this court telling the whole world that Mr. Cohen was still

1    Mladen's promoter, Mladen had to disclose that to everybody.

2    The fact that the Court recently ruled that the contract was

3    terminated effective June of '21 didn't stop Mr. Cohen from

4    continuing to argue in court, requiring the disclosure to the

5    rest of the world, that he doesn't -- that he still believes

6    he's Mladen's promoter and Mladen is still subject to his

7    promotional agreement with Cohen Promotions.

8        Second, the texts, you know, that Mr. Lillwitz just showed

9    you.  Just remember Exhibits 16 and 20 and 21.  16 and 20 are

10   the texts that Mladen had with Greg in 2018, remember?  And

11   Mladen is saying, "That's fine, but how about these other?  How

12   about a different opponent?  How about a different opponent?"

13       From the very beginning in 2018, Mladen was asking for

14   better opponents, and he sends the email that you were just

15   shown, Exhibit -- I think it's 21, in December of 2018 that

16   says, "Look, I want to be done with all of this."

17       And so what's he do?  He essentially gave Cohen another

18   year.  He gave him the year of 2019 to try to make good.  Cohen

19   says, "No, here's what we're going to do.  I got these fights

20   ready.  I talked to your dad.  Got this all lined up.  We got a

21   January fight, we got a February fight, we got a May fight in

22   2019.  We're going to roll."

23       Mladen's like -- well, you heard his testimony:  Okay.

24   Good.  If that's what it's going to be, maybe this is going to

25   turn around.  Gave him another year.  Still didn't perform.  The

 1   contract gets terminated.  That's what happened.  Who do you

 2   believe?

 3       Third, regarding the Muhammad Ali Act, take a look -- I

 4   don't have time for this now to go through it, but take a look

 5   at Instruction No. 21 on the Muhammad Ali Act.  It talks about

 6   who -- what the definition of a promoter is.  It is not limited

 7   to what the contract says.  We're talking now about a statute, a

 8   federal statute.  It talks about who the promoter is.  It

 9   doesn't -- it is not limited to Greg Cohen Promotions.  It can

10   be, it can be Mladen's.

11       And so now I want to talk to you about damages a little

12   bit.  And let me start with a comment that you can't have

13   receipts if the transaction never took place and you didn't

14   get -- you didn't get paid.  There are no receipts because

15   nothing ever happened.  And that's the whole point of the

16   lawsuit:  Nothing happened.

17       So let's talk first about what Mr. Shaffer went through

18   with you.  If you recall, Mr. Shaffer had two bases of his

19   calculation.  And for the first year, his first-year calculation

20   was based on the numbers in that Exhibit 1 promotional offer

21   from Queensberry Promotions.

22       And Queensberry Promotions, you heard him say that's an

23   arm's-length offer, an arm's-length transaction from an

24   unrelated party for someone who says this is what Mladen Miljas

25   is worth, so this is what we're going to pay him.  "You come

1    fight for us, Miljas, and this is what you're going to earn."

2         That is what you determine -- some of you already know

3    this.  That's how you determine what the market value of

4    anything is, whether it's a person, a commodity, a car.  What

5    are you offering?  What are you willing to pay for it?  That

6    tends to set the market.  This is what he based it on.

7         Otherwise, so the $3400, if you recall, he said that's the

8    conversion rate from -- remember it was £2400 per scheduled

9    round.  This is in Section 5.1 of that Queensberry contract,

10   5.1.  $3400 is the conversion of £2500.

11        So he said this first fight would be eight rounds, the

12   second fight would be ten rounds.  Then he said the last two

13   fights in the first year, then you go to Section 5.2, those

14   would each be £40,000 payments gross, not per round, and the

15   conversion on £40,000 pounds is $53,900.  $169,000 for the first

16   year when Mladen was out.

17        Now, then you heard him say, look, I can't continue -- I

18   can't continue to use that methodology going forward because it

19   gets more speculative.  So what am I going to do?  He gave you

20   the whole explanation about the nine boxers that he found that

21   he said were comparative to Mladen.  And he went through the

22   whole list.

23        And now I will express a little bit of frustration.  When

24   Mr. Lillwitz just stood here and said where is the detail?

25   Where is the report?  Where are the boxers?  Here is

1   Mr. Shaffer's double-sided report that was presented in this

2   case, which you recall he had in front of him when he was

3   testifying.

4        For various reasons, these aren't admissible and you can't

5   have them.  But the idea that where is all of his information

6   and all of his background?  It's all right here.  Here's the

7   name of all -- it starts here, No. 1, Bogdan Dinu; example 2,

8   Christian Hammer.  This is 75 pages.

9        The idea that Mr. Shaffer just came in here and winged it

10  and made stuff up is really kind of -- it's really -- it's bad.

11  It's not -- it's not -- it's very disingenuous.

12       So this is what he did for the second year.  He took the

13  nine comparators.  He said over 2 1/2 years as a group, the nine

14  earned 7,516,000.  Divide it by 9, so in 2 1/2 years, they made

15  835,000 per, and then he figured that down to that comes out to

16  334,000 a year or 501 for 18 months.

17       That's how he did that calculation.  He could -- and you

18  heard him say, he's like I didn't use champions, I didn't do any

19  of this other stuff.  He thought they were proper comparators.

20       So let me show you the verdict form -- forms, plural.  This

21  is what you're going to be filling out.  And you'll see this is

22  the one for breach of contract, and you'll see on the second

23  page that there will be a signature page for all of you.

24       So this is for the breach of contract.  And the breach of

25  contract is only against GCP because they're the party to the

1  contract.  So did Mladen prove his breach of contract claim?

2  Yes.

3       Damages.  Mladen -- we're going to use these, what we

4  just -- what Mr. Shaffer did for us.  The damages we are asking

5  for for Mladen's breach of contract claim is just for that first

6  year that he was out, $169,000.  This year two-plus is not part

7  of the breach of contract claim.

8       So Mladen would ask that, based on the calculations,

9  opinions, the time spent by Mr. Shaffer, that that would be the

10 damages he's asked for for breach of contract.

11      And I would suggest to you that Mladen did everything

12 humanly possible to mitigate his damages, but that it was

13 unavailing, given Mr. Cohen's reticence to do anything to help

14 him and then Mr. Cohen's unavailability for a portion of time

15 for reasons we've talked a lot about.

16      Okay.  The tortious interference.  These are both --

17 there's two of these.  You can see we've got Verdict Form Two A

18 and Verdict Form Two B.  Verdict Form Two A is against Greg

19 Cohen Promotions.  Verdict Form Two B is against Greg Cohen

20 individually.

21      Now, let's think about this.  You are going to have to

22 decide -- if you get to the point where you believe damages are

23 appropriate -- that's obviously a threshold question, but if you

24 get to that point, you have to decide who you are going to hold

25 liable for all of this.

1       Now, if you think about some of the -- some of the

2    testimony you've heard and think about for the last couple of

3    days Mr. Cohen has been repeatedly talking about how everything

4    he did, everything he did, was as the agent, CEO, president,

5    whatever it is, of Greg Cohen Promotions.  Why?  Because this is

6    the verdict form he wants you to award any damages on, not the

7    one to him personally.

8       But think about the questions that he would not answer this

9    morning.  "Is Greg Cohen Promotions active, Mr. Cohen?

10       "Yeah, yeah, it's active.

11       "Are you registered currently with New Jersey?

12       "Well, I'm sure I am.

13       "Who is the registered agent?

14       "I think it's me.

15       "Have you filed your papers with New Jersey?  Are you

16    current?  Is Greg Cohen Promotions current in New Jersey?

17       "Yeah.  I -- I can't say.  I couldn't know.

18       "What about the Department of Labor and the revenue issues

19    with the Department of Labor in New Jersey?"

20          THE COURT:  Mr. Dee, you're down to two minutes.

21          MR. DEE:  Ask yourself, based on those answers, why in

22    the world do you think he wants you to award damages to Greg

23    Cohen Promotions and not against him personally?  Ask yourselves

24    that.  The logical conclusion is because Greg Cohen Promotions

25    is what we call in the business a turnip.  You know the old

1  saying you can't get blood from a turnip?  A verdict against

2  Greg Cohen Promotions, based on the evidence you heard and the

3  answers he gave, is going to be worthless, worthless.

4       So we would ask that Two B is the verdict form that you

5  enter.  Again, if you decide that it's appropriate to award

6  damages, that it's Two B against Greg Cohen personally for

7  tortious interference because, let's face it, he said, "I don't

8  have employees.  None of my directors work for the company."  He

9  was doing everything.  He was sending emails and the texts and

10 everything else that interfered with Mladen's efforts.

11      And so this would be the years two-plus, based on what

12 Mr. Shaffer testified to yesterday, would be the basis for the

13 tortious interference.  The 18 months up to the time of his

14 report a year ago is $501,000, and then if you recall, he said

15 for the -- and he admitted each year it gets a little harder and

16 a little harder to predict what would have happened with Mladen,

17 he says.  But for this final year, January '22 to now, he said

18 anywhere between 334 and 500.  You decide what you think Mladen

19 would have done, what he's entitled to.

20      Lastly, there's an issue on punitive damages.  The

21 instructions are clear on how you consider this, but punitive

22 damages, at the end of the day, are meant to punish.  They are

23 meant to punish.  I'm not about to sit here and write down a

24 number for you on this.  I never do that.  I'm way -- I'm way

25 too close to this situation to be objective.

1      If you believe in answer to those questions and in

2  following the instructions that Judge Rose gave you that a

3  message needs to be sent to Greg Cohen that his conduct with

4  Mladen is unacceptable and he damn well never better do it again

5  with another fighter, that's how you do it.

6      If you decide to do that, you can put any amount you want.

7  You can do a dollar.  You can do anything you want.  It is

8  absolutely positively your call.  There's no formula.  There's

9  nothing like that that applies.  We would ask you, on behalf of

10  Mladen, to send Mr. Cohen that message, to send that message.

11      The same with the Muhammad Ali Act information.  The

12  Muhammad Ali Act information we'd ask you to fill out against

13  Mr. Cohen because he was acting individually.  He's the one who

14  undertook all the conduct, the damages being that same 169,000

15  for that first year and nothing beyond.

16          THE COURT:  And you're out of time, Mr. Dee.

17          MR. DEE:  All right.  If I could, Your Honor, just --

18  the last thing, with the Court's permission, that I want to say

19  is that from the beginning of this case, this has been Casey's

20  and my case, it's been Tim Lillwitz's case, it's been Judge

21  Rose's case.  In another few minutes, when you go in to

22  deliberate, it's your case.  It's now on you.  It's now your

23  case.  It's out of our hands, and I want to thank you for taking

24  the time to do this and being so conscientious in what you're

25  about to do.

1          THE COURT:  All right.  Ladies and gentlemen, I'll go

2    over the final instruction with you and then over the verdict

3    form.

4          (The jury was further duly instructed.)

5          THE COURT:  So we only give you one copy of the verdict

6    form so that we don't accidentally get competing versions of it

7    coming back to us.  So it is -- for each one of the claims,

8    there are a number of questions, and they're sorted by verdict

9    form.

10         So Verdict Form One relates to the breach of contract

11   claim, the two forms -- Verdict Forms A and B on Verdict Form

12   Two relate to the tortious interference claim, and Verdict Forms

13   Three A and B relate to the Muhammed Ali claim.

14         On each one you're going to have a statement that starts,

15   "We, the jury, find," in relation to that claim, and you're

16   either going to find that Mladen Miljas proved his claim or he

17   didn't, and you'll answer that yes or no.  And then depending on

18   what your answer is, you'll follow the further instructions.  If

19   you answer no, it will tell you to do something different than

20   if you answered yes.

21         So you'll make your way through those questions.  When

22   you've reached a verdict on each of the three claims, your

23   foreperson will sign and date the verdict, and each one of you

24   will sign off on the claim.  And that's true on each one of the

25   verdict forms for the three different claims and the two forms

1   for the last two claims.

2        At this point in -- and I'm going to give this to

3   Mr. Chrismer to hand off to one of you.

4        At this stage in the trial, I often get questions from the

5   jurors about how long you should deliberate.  That's entirely up

6   to you.  Sometimes jurors have seen and heard the evidence very

7   similarly and they reach a verdict quickly.  Sometimes they have

8   wildly different views about what the evidence is and what the

9   verdicts should be and they spend a lot of time deliberating.

10       You'll work today until you reach a verdict or 5:00,

11   whichever happens first.  If you haven't reached a verdict by

12   5:00, you'll return tomorrow morning at 8:30, and you'll

13   continuing deliberating until, if it happens, then until 5:00

14   tomorrow, and we'll repeat that until you reach a verdict.

15       While you're deliberating, we provide meals for you, so if

16   you're deliberating over the lunch hour tomorrow, we'll again

17   bring in lunch.

18       You are allowed to take breaks if you would like to.  You

19   just can't continue your deliberations until everybody's back in

20   the room.  So if one of you needs to make a phone call or use

21   the restroom or take a smoke break or, you know, plug a meter or

22   something like that, you're welcome to do that.  Just don't

23   continue deliberating until everybody's back in the room with

24   you.

25       We will bring you all of the exhibits shortly.  We'll also

 1  bring you an exhibit list that identifies what all those

 2  different exhibits are, so if you're looking for something in

 3  particular, you can consult the list and find what you need.

 4       Your phones will now sit outside the jury room in a box

 5  with the court security officer.  If you need them on a break,

 6  again, you can come out and use them, but they're not allowed in

 7  the jury room during deliberations.

 8       In the event you have a question or a concern or reach a

 9  verdict, you can pass a note to the court security officer, who

10  will be sitting there throughout your deliberations, and he will

11  bring that note to me immediately so I can address whatever the

12  question or concern or verdict is.

13       Any questions before we send you off?

14       All right, then.  Good luck to you, and we'll be in shortly

15  with all the evidence.

16       (Jury out at 2:31 p.m.)

17       (In open court, out of the presence of the jury.)

18           THE COURT:  Okay.  You can go ahead and be seated.

19       Mr. Dee, we have a particular criminal prosecutor who we

20  deal with all the time who I have a "no more coffee for you"

21  rule because she gets talking so fast.  We might, if we have

22  future trials with you, have a "no more coffee for you,

23  Mr. Dee," kind of rule.

24           MR. DEE:  Hopefully it's just the openings and the

25  closings when I do that when I'm on the clock.

1          THE COURT:  I am going to take the Fifth on that.  But

2   I will say your rebuttal was particularly brutal for our poor

3   court reporter.

4          MR. DEE:  Sorry.

5          THE COURT:  I think you've already provided your cell

6   phone numbers to Mr. Chrismer, correct?

7          MR. LILLWITZ:  Kyle, I believe so, right?

8          THE COURT:  Okay.  So we'll reach out to you,

9   obviously, if we get a verdict or if we have any questions.  Do

10  you want to be around for the verdict?

11         MR. DEE:  We don't need to be.

12         MR. LILLWITZ:  No.  No, Your Honor.

13         THE COURT:  Okay.  Then we'll just let you know when

14  one comes in and what the result is.  If we have a question that

15  requires your input, we'll reach out to you and get that

16  information on a telephone call or something along those lines.

17      I appreciate all the work the parties put into this case

18  and especially all of the efforts you made to reach resolutions

19  where you could on exhibits and instructions and other things.

20  It really does make my job much easier, and I appreciate it.  So

21  I enjoyed working with all of you.

22      Anything else we need to do for the good of the record at

23  this point?

24         MR. DEE:  Not from the plaintiff, Your Honor.

25         MR. LILLWITZ:  Nothing from Defendants.

1          THE COURT:  All right.  We'll let you know as soon as

2     we hear anything.  Don't leave the room until Kyle is sure he

3     has all the exhibits.

4       Mr. Dee, if you could provide a copy of the notes you used

5     during your closings just so we have an appellate record of what

6     you put on the screen.  You had that --

7          MR. DEE:  Oh, just those calculations?

8          THE COURT:  Yes.  Exactly.

9          MR. DEE:  Yep, yep.

10          THE COURT:  All right.  Thank you.

11       (Recess at 2:33 p.m. until 4:52 p.m.)

12       (In chambers with counsel present via telephone.)

13          THE COURT:  Okay.  So we are here in the matter of

14     Miljas vs. Cohen.  We got a question from a juror -- from the

15     jury.  It says, "Can we find both business and individual liable

16     for tortious" -- it's supposed to say "interference," it says

17     "inference" -- "on Forms Two A and B?"  It's signed at 4:42 p.m.

18     February 8th of 2023.

19       The two jurors who appear to be listed are Ms. Beveridge

20     and, I think, if I can read this scrawl, it appears to be

21     Ms. Kauzlarich, who were the two back -- the women on either

22     side in the back row on the jury.

23       I think the answer is just yes, but I thought I'd give you

24     a chance to respond.

25       Mr. Dee, any response on behalf of the plaintiff?

1          MR. DEE:  I agree with you, Judge.

2          THE COURT:  Any response on behalf of the defendants?

3          MR. LILLWITZ:  Yeah.  I agree the answer is yes, Your

4    Honor.  Does this at all bring up the damages issue?  Do they

5    need an instruction -- I guess we'll deal with that once they

6    fill out the verdict form, I guess.

7          THE COURT:  Yes.

8          MR. LILLWITZ:  So I think you're right, the short

9    answer is yes.

10         THE COURT:  Okay.  We will respond in that way.  And I

11   assume they're going home in a few minutes, so we'll likely see

12   them returning at 8:30 tomorrow, and we'll keep you posted.

13   Thank you for calling in so quickly.

14            (Recess at 4:53 p.m. until 10:26 a.m., Thursday,

15   February 9, 2023.)

16

17

18

19

20

21

22

23

24

25

660

1                          C E R T I F I C A T E

2           I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3    State of Iowa and Federal Official Realtime Court Reporter in

4    and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 23rd day of March,

12   2023.

13

14                              _____
                                Kelli M. Mulcahy, CSR, RDR, CRR
15                              Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25